IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.:  WDQ-13-0460 |
| | * | |
| RICHARD SHUSTERMAN, *et al.* | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Richard Shusterman and Jonathan E. Rosenberg (the "Defendants") are charged with wire fraud and conspiracy to commit wire fraud.[1]  Pending is the Defendants' motion to dismiss for lack of venue, or, in the alternative, for transfer to the District of New Jersey or the Southern District of Florida.  ECF Nos. 68, 71.[2]  No hearing is necessary.  Local Rule 105.6 (D. Md. July 2014).  For the following reasons, the motion will be denied.[3]

---

[1] Shusterman and Rosenberg are charged in a ten-count indictment: count one (conspiracy to commit wire fraud); counts two through ten (wire fraud).  ECF No. 1.

[2] The government's motion for leave to file a surreply, ECF No. 76, will be denied as moot.

[3] Shusterman filed a motion to join and adopt, in part, co-defendant Rosenberg's motion to dismiss for lack of venue, and to provide additional support.  ECF No. 71.  Because Rosenberg's legal arguments apply equally to Shusterman, Shusterman's motion to join will be granted.

I.   Background

    A.   Facts[4]

        1.   Overview of the Alleged Fraudulent Scheme

Shusterman was shareholder and president of International

Portfolio, Inc. ("IPI"), a Delaware Corporation.   ECF No. 1 ¶ 1.[5]

In 2009, Robert M. Feldman[6] became part owner of IPI.   *Id.* ¶ 3.

Shusterman and Feldman "represented IPI to be a company with

expertise and experience in the field of medical accounts

receivable."   *Id.* ¶ 4.   Rosenberg and Douglas A. Kuber[7] were

members and operators of Account Receivable Services, LLC,

(ARS"), a Nevada limited liability company with its principal

place of business in New York.   *Id.* ¶ 5.[8]   ARS was involved in

"the business of investing in medical accounts receivable

purchased from IPI using funds borrowed from investors

---

[4] Facts are from the Indictment, ECF No. 1.   For the motion to
dismiss for lack of venue, the allegations in the indictment are
accepted as true.   *United States v. Engle*, 676 F.3d 405, 415
(4th Cir.) *cert. denied*, 133 S. Ct. 179 (2012).

[5] IPI used a Pennsylvania address and a Pennsylvania bank
account.   ECF No. 1 ¶¶ 1-2.

[6] Feldman pled guilty to one count of conspiracy to commit wire
fraud.   *See United States v. Feldman*, Crim No. WDQ-13-0457 (D.
Md. Oct. 4, 2013).

[7] Kuber pled guilty to one count of conspiracy to commit wire
fraud.   *See United States v. Kuber*, Crim. No. WDQ-12-0494 (D.
Md. Oct. 11, 2012).

[8] ARS included "special purpose entities" or "SPEs."   ECF No. 1 ¶
5.   ARS and the SPEs maintained bank accounts in New York.   *Id.*

interested in asset-based lending." *Id.*   Rosenberg was managing member and president of JER Receivables, LLC ("JER") and International Portfolio Access, LLC ("IPA"); both New Jersey limited liability companies were located in New Jersey.  *Id.* ¶ 6.[9]

IPI purchased medical accounts receivable from two Florida hospitals and one Washington State hospital.  *Id.* ¶ 13-15.[10]  The accounts receivable were composed of past due accounts the hospitals had been unable to collect, and included patient identifying information and their payment histories.  *Id.*

In June 2007, Shusterman, Rosenberg, Feldman, and Kuber (collectively, the "co-conspirators") began promoting an investment model involving "the sale and management of investment portfolios containing medical accounts receivable acquired and managed by IPI."  *Id.* ¶ 16.  Investors included (1) Platinum Partners ("Platinum"), a New York-based investment

---

[9] Rosenberg and Kuber also were members and operators of Portfolio Scope, LLC ("Portfolio Scope"), a "shell company with no active business purpose."  *Id.* ¶ 7.

[10] In December 2006, IPI purchased around $1.874 billion in medical accounts receivable from Public Health Trust of Miami-Dade County, Florida, which operated the Jackson Memorial Hospital in Miami, Florida ("JMH").  *Id.* ¶ 13.  In November 2007, IPI purchased about $1.92 billion in medical accounts receivable from Hospital Management Associates ("HMA") in Naples, Florida.  *Id.* ¶ 14.  In June 2008, IPI purchased about $175 million in medical accounts receivable from Multicare Health System in Tacoma, Washington.  *Id.* ¶ 15.

advisor; (2) Roundstone Healthcare Investments, LLC, and Roundstone Healthcare Partners I, LP (together, "Roundstone"), which operated out of Massachusetts; (3) Greenfish Fund, LP, Greenfish II, LP, and associated entities, Delaware limited liability partnerships located in Pennsylvania; (4) Eton Park Capital Management, LP, a New York-based hedge fund; and (5) the Institute of Tropical Agriculture ("IITA"), a Nigerian nonprofit organization. *Id.* ¶¶ 8-12.  IITA was governed by a Board of Trustees, and had its principal place of business in Ibadan, Nigeria. *Id.* ¶ 11.  However, one of the Board's members, "D.L.," resided in West River, Maryland. *Id.* ¶ 11(a).  D.L. "reviewed short term investment opportunities for IITA's operating capital" and "directed his own personal investments," which included "investments in IPI debt portfolios." *Id.*

The co-conspirators implemented the investment model by batching accounts receivable from IPI's inventory into discrete debt portfolios with specified outstanding balances, which they offered for sale to investors. *Id.* ¶ 17.[11]  Shusterman, Rosenberg, and Kuber "inflated the purchase prices for IPI debt portfolios that ARS purchased with loan proceeds" from

---

[11] Shusterman, through IPI, managed collection efforts. *Id.*  The co-conspirators assisted investors in choosing the best time to sell the debt portfolio "based upon demonstrated total collection activity and bids obtained from independent purchasers in the debt-buying industry." *Id.* ¶ 17(f).

investors.  *Id*. ¶ 22.  They negotiated and agreed upon (1) the actual purchase price IPI charged for each debt portfolio financed by investors for ARS, and (2) the inflated purchase price communicated to the investors.  *Id*. ¶ 23.  IPI "kickedback" the difference between the actual and inflated prices to Rosenberg and Kuber through one of their companies, such as Portfolio Scope.  *Id*. ¶¶ 25, 28.

When IPI debt portfolios were unable to generate sufficient collections to fund interest payments ARS owed Platinum, IITA, and other investors, IPI wired money to ARS to conceal the shortfall.  *Id*. ¶ 31.  IPI advances were also used to inflate collection history.  *Id*. ¶¶ 32, 33.  The co-conspirators generated "false and misleading collection reports" for investors and potential investors to "create the false impression that collections from IPI debt portfolios were much higher than they actually were."  *Id*. ¶ 36.

2.   Specific Acts Relevant to the Venue Inquiry

The overt acts alleged in furtherance of the conspiracy include: (1) a September 16, 2008 email from Kuber to D.L. containing false collection reports for an IPI debt portfolio, *id*. OA[12] ¶ 45; (2) that on September 23, 2008, Rosenberg caused

---

[12] OA stands for "Overt Acts."  Paragraph numbering started anew at the beginning of the alleged overt acts.  *See* ECF No. 1 at 17.

the emailing of a purchase agreement to D.L. about the purchase

of a $200,000 IPI debt portfolio through JER, *id.* OA ¶ 46; (3)

that on October 22, 2008, Rosenberg caused the emailing of a

signed purchase agreement from D.L. about the purchase of a

$600,000 IPI debt portfolio through JER, *id.* OA ¶ 51;[13] (4) a

February 27, 2009 wire transfer by Shusterman and Feldman,

wherein they transmitted an advance of over $2 million to a bank

account for an IPI debt portfolio bought by ARS with IITA

financing, *id.* OA ¶ 57; and (5) a March 10, 2009 email from

Kuber to an IITA representative stating that a new IPI debt

portfolio had been bought with "funds generated from the

collections on the existing debt portfolios"; in fact, the new

debt portfolio was bought with funds advanced by IPI, *id.* OA ¶

58.

In connection with the substantive wire fraud charges, the

government further alleges that: (1) on September 14, 2008, D.L.

emailed S.S., an IITA representative in Nigeria about "IITA's

due diligence before investing in medical accounts receivable

---

[13] The government's opposition clarifies that the purchases
referred to in paragraphs 46 and 51 were from D.L.'s private
funds, and not from IITA funds. *See* ECF No. 72 at 5 & n.2.
D.L. wired $200,000 of the $800,000 from an account he
maintained at a Merrill Lynch branch in Bethesda, Maryland. *Id.*
However, these details were not alleged in the Indictment; thus,
they cannot be considered in a motion to dismiss for lack of
venue, which tests the sufficiency of the Indictment. *See*
*Engle*, 676 F.3d 405 at 415.

via ARS," *id.* at 35;[14] (2) on September 16, 2008, D.L.[15] emailed S.S. a summary of a meeting held about "IITA's proposed $10 million asset-based investment in medical accounts receivable via ARS"; S.S. emailed D.L. about the IITA's Board of Trustee's consideration of that investment; and D.L. emailed Kuber "requesting a letter of recommendation from Platinum vouching for its experience with investments in medical accounts receivable via ARS," *id.*; (3) on September 17, 2008, Kuber emailed D.L. an "executive summary of proposed investment[s] in medical accounts receivable," *id.* at 36; (4) on September 18, 2008, D.L. emailed S.S. a summary of IITA's proposed investment, *id.*; (5) on May 14, 2009, D.L. emailed S.S. "the terms of IITA's proposed $5 million investment in an IPI debt portfolio via a loan to IPA," *id.*; (6) on May 22, 2009, D.L. emailed S.S. the closing document for the $5 million loan to IPA, *id.*; and (7) on May 27, 2009, D.L. emailed S.S. a confirmation of "IPA's receipt of a $5 million wire transfer from IITA's bank account," *id.*[16]

---

[14] Additional wire transmissions alleged as part of the wire fraud are listed in the Indictment in table, not paragraph, form.

[15] Email transmissions to and from D.L. occurred while D.L. was located in West River, Maryland. *See* ECF No. 1 at 35-36.

[16] Counts two through ten incorporated by reference the allegations contained in paragraphs 1-19 and 21-46. *Id.* at 35 ¶ 1.

B.    Procedural History

On September 4, 2013, the Defendants were indicted on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349,[17] and eight counts of wire fraud in violation of 18 U.S.C. § 1343.[18]   ECF No. 1.   On October 4, 2013, the Defendants were arraigned and pled not guilty.   ECF Nos. 16, 17.

On September 23, 2014, Rosenberg moved to dismiss the indictment for lack of venue.   ECF No. 68.[19]   On October 28, 2014, Shusterman moved to join and to adopt, in part, Rosenberg's motion, and to provide additional support.   ECF No. 71.   On October 31, 2014, the government opposed Rosenberg's

---

[17] Section 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."   18 U.S.C. § 1349 (2012).

[18] Section 1343 provides that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (2012).

[19] Alternatively, Rosenberg asks the Court to transfer the case to the District of New Jersey or the Southern District of Florida.   ECF No. 68 at 7, 9.

motion.   ECF No. 72.   On November 7, 2014, Rosenberg replied.
ECF No. 73.

II.   Analysis

A.   Motion to Dismiss for Lack of Venue

The Defendants contend that count one (conspiracy to commit
wire fraud) should be dismissed because the Indictment does not
allege overt acts in the District of Maryland.   ECF No. 68 at 4.
The Defendants also contend that counts two through ten (wire
fraud) should be dismissed because wire communications sent or
received from the District of Maryland were not foreseeable.
*Id.* at 5-7.   The government contends that the Indictment alleges
overt acts in the District, and that foreseeability is not a
requirement for venue.   ECF No. 72 at 5-9.

Under Fed. R. Crim. P. 12(b)(3)(B), "a motion alleging a
defect in the indictment" must be made before trial.   Alleged
defects include improper venue.[20]   Unless otherwise authorized by
law, "the government must prosecute an offense in a district
where the offense was committed."   Fed. R. Crim. P. 18.[21]   An
offense "begun in one district and completed in another, or

---

[20] The April 25, 2014 amendments to Rule 12, which take effect on
December 1, 2014, require that motions alleging improper venue
must be made before trial.   *See* Fed. R. Crim. P.
12(b)(3)(A)(i)(as amended).

[21] *See also United States v. Wilson*, 262 F.3d 305, 320 (4th Cir.
2001)(*citing* U.S. Const. art. III, § 2, cl. 3; Fed. R. Crim. P.
18).

committed in more than one district," may be tried "in any
district in which such offense was begun, continued, or
completed."  18 U.S.C. § 3237(a)(2012).

When Congress does not include a specific venue provision
in a criminal statute, venue must be "determined from the nature
of the crime alleged and the location of the act or acts
constituting it." *United States v. Cabrales*, 524 U.S. 1, 6-7
(1998) (*quoting United States v. Anderson*, 328 U.S. 699, 703
(1946)).  This inquiry focuses on "the 'essential conduct
elements' of the charged offense."  *United States v. Ebersole*,
411 F.3d 517, 524 (4th Cir. 2005)(*quoting United States v.
Bowens*, 224 F.3d 302, 311 (4th Cir. 2000)).  The government
bears the burden of proving by a preponderance of the evidence
that venue is proper.  *Id*.  When--as here--defendants are
charged with multiple offenses, "venue must be proper on each
count."  *Id*. (citation omitted).

1.   Count One

To establish venue for wire fraud conspiracy, the
government must show that "the defendant committed an overt act
in furtherance of the charged conspiracy inside the appropriate
judicial district." *United States v. Day*, 700 F.3d 713, 727
(4th Cir. 2012) *cert. denied*, 133 S. Ct. 2038 (2013) *reh'g
denied*, 134 S. Ct. 25 (2013)(*citing United States v. Green*, 599

F.3d 360, 374 (4th Cir.2010)).[22]  When determining venue, a co-
conspirator's acts may be attributed to all other co-
conspirators.  *United States v. Al-Talib*, 55 F.3d 923, 928-29
(4th Cir. 1995).  "[S]imple acts," such as emails sent by one
co-conspirator to persons in a particular district, suffice to
establish venue in that district for a different co-conspirator.
*See Day*, 700 F.3d at 727 (rejecting defendant's argument that
"de minimis" acts were insufficient; the defendant "confuses the
question of *how much* an overt act furthers a conspiracy with the
question of *whether* it furthers the conspiracy.  It is the
latter question that matters for venue purposes . . . .").

Here, although the Indictment alleges that Rosenberg
"caused the emailing of a purchase agreement to D.L." in
Maryland, ECF No. 1 OA ¶ 46, it is not clear who emailed D.L.,
and whether it was another co-conspirator whose acts are
attributable to Rosenberg.  Although D.L. emailed a signed
purchase agreement from Maryland, *id.* OA ¶ 51, his acts are not
attributable to the Defendants.[23]  However, on September 16,

---

[22] However, the conspiracy need not have been formed in the
district where the case is to be prosecuted, nor do any of the
co-conspirators need to have entered that district.  *United
States v. Bolden*, 305 F. App'x 83, 84 (4th Cir.
2008)(unpublished) (*citing Whitfield v. United States*, 543 U.S.
209, 218 (2005)).

[23] Other alleged overt acts that the government cites in its
opposition were not conducted in the District of Maryland.  For
example, the $2 million advance from IPI to an ARS bank account,

2008, Kuber--a co-conspirator--emailed to D.L. in Maryland false collections reports for an IPI debt portfolio. *Id.* OA ¶ 45. Because Kuber's email to D.L. in Maryland was an "overt act in furtherance of the conspiracy," and his acts are attributable to co-conspirators, venue is proper in the District of Maryland on count one. *See Day*, 700 F.3d at 727; *Al-Talib*, 55 F.3d at 928 ("To establish venue, the government need only show that *an act* occurred in the district by a preponderance of the evidence.")(citation omitted)(emphasis added).

    2.   Counts Two through Ten

The essential conduct element of wire fraud is "the act of causing a wire to be transmitted in furtherance of a fraud." *Ebersole*, 411 F.3d at 527 (*quoting United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001). Wire fraud is a "continuing offense" under 18 U.S.C. § 3237(a), and, thus, is "properly tried in any district where a payment-related wire communication was transmitted in furtherance of" the fraud. *Id.*

In *Ebersole*, the Fourth Circuit Court of Appeals expressly reserved the question of whether wire communications establishing venue must have been foreseeable to the defendant,

---

in connection with an IITA-financed IPI debt portfolio, was presumably sent from IPI's Pennsylvania bank to ARS's New York bank. *Id.* ¶ 2, 5; OA ¶ 57. Kuber's March 10, 2009 email went to an *unnamed* IITA representative, *id.* OA ¶ 58; thus, apparently not to D.L. in Maryland.

finding that any foreseeability objection had been waived. *See id.* at 527-28.  Other Circuits have split on this issue.[24]

However, in *United States v. Johnson*, 510 F.3d 521, 527 (4th Cir. 2007), the Fourth Circuit declined to "judicially engraft" a foreseeability requirement onto the venue provision governing securities offenses.  That statute provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred."  15 U.S.C. § 78aa.  The Fourth Circuit reasoned that "mens rea requirements typically do not extend to the jurisdictional elements of a crime," that "venue is similar in nature to a jurisdictional element," and that venue "typically lacks any sort of explicit knowledge or foreseeability prerequisite."  *Johnson*, 510 F.3d at 527 (citations and quotation marks omitted).

The Fourth Circuit's reasoning in *Johnson* is persuasive here.  Like 15 U.S.C. § 78aa, which provides for venue in the

_____

[24] *Compare United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)("venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur . . . or (2) it is foreseeable that such an act would occur . . .") *with United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012)("Simply put, section 3237(a) does not require foreseeability to establish venue for a continuous offense."), *and United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987)(venue was proper in the Eastern District of Pennsylvania when wire transfers from New York to Wilmington passed through the Federal Reserve Bank in Philadelphia, a fact apparently unforeseen by the defendant when he initiated the transfers).

district where any acts occurred, 18 U.S.C. § 3237(a) permits the government to prosecute an offense "in any district in which such offense was begun, continued, or completed."  Accordingly, in the absence of contrary controlling authority, and at this stage of the proceedings,[25] the Court will not require that wire communications establishing venue in the District of Maryland must have been foreseeable to the Defendants.

Perhaps anticipating that conclusion, Rosenberg's reply argues that the emails identified in Counts Two through Ten were not "'payment-related' wires that are 'essential conduct elements' of wire fraud"; accordingly, "those communications cannot have been overt acts in furtherance of the alleged fraud" and "are insufficient to give rise to venue in this District." ECF No. 73 at 6.

That venue is proper in districts where payment-related wire communications are transmitted does not mean that venue is

---

[25] *See United States v. Lenihan,* 19 F.3d 1430, 1994 WL 102149, at *3 (4th Cir. 1994)(Table decision)("[I]f the indictment contains a proper allegation of venue but the government fails to prove that allegation at trial, an objection can be made at the close of the government's case or at the close of the evidence.") (*citing United States v. Melia,* 741 F.2d 70, 71 (4th Cir. 1984)); *United States v. Jang*, No. 1:07-CR-00052-DFH-KP, 2007 WL 4616927, at *9 (S.D. Ind. Dec. 27, 2007)("To the extent that the Constitution's venue provisions require some degree of knowledge or foreseeability of, or agreement to, the connection with the forum district where venue is based on the actions of persons other than the defendant on trial, the issue in this case cannot be decided short of a trial on the merits.").

*only* proper in those districts.  *See United States v. Stewart*, 256 F.3d 231 (4th Cir. 2001), *citing with approval Kim*, 246 F.3d at 192 (holding that venue was proper for a substantive wire fraud conviction . . . when the defendant . . . "caused communications to be transmitted into and out of the district" in which the defendant was tried).[26]

Here, the Indictment alleges numerous instances of the co-conspirators "causing a wire to be transmitted in furtherance of a fraud." *See Ebersole*, 411 F.3d at 527.  Kuber emailed D.L. false collection reports and an executive summary on proposed investments, and Rosenberg caused the emailing of purchase agreements to and from D.L.  ECF No. 1 OA ¶¶ 45, 46, 51.  D.L. sent and received wire communications from Kuber and IITA in connection with IITA's $15 million investment in IPI debt portfolios.  *Id.* at 35-36.  Those communications "caused the fraud to bear fruit," at least with respect to IITA; thus, they were "essential to the continuing offense of causing fraudulent wires to be transmitted." *Ebersole*, 411 F.3d at 527 (citations and internal quotation marks omitted); *see also United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006) ("Where venue

---

[26] *See also United States v. Radley*, 558 F. Supp. 2d 865, 884 (N.D. Ill. 2008)("This Court agrees with Defendants that the cases cited by the government stand for the proposition that wire fraud charges *may* be tried in a district where a payment-related wire communication was transmitted, not that they *must* be tried in such a district.").

requirements are met, the prosecution may proceed in that district, notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere.").

Accordingly, because venue is also proper in the District of Maryland on Counts Two through Ten, the Defendants' motion to dismiss for lack of venue will be denied.

B.   Motion to Transfer

The Defendants alternatively request a transfer of venue, contending that the District of New Jersey, or the Southern District of Florida, is more appropriate.  ECF No. 68.   The government contends that the trial should proceed in the District of Maryland.  ECF No. 72 at 11.

Upon the defendant's motion, a district court may transfer a criminal case to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Fed. R. Crim. P. 21(b).  In a multi-district conspiracy, venue is proper "in any one of those districts." *United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990)(citation omitted).

In deciding a Rule 21(b) motion to transfer, the Court considers the following factors, known as the *Platt* factors: (1) location of the defendant; (2) location of witnesses; (3) location of events likely to be in issue; (4) location of documents and records; (5) disruption of the defendant's

16

business; (6) expense to the parties; (7) location of counsel;
(8) relative accessibility of place of trial; (9) docket
conditions in each district; and (10) any other specific element
which might affect the transfer. *United States v. Heaps*, 39
F.3d 479, 482 (4th Cir. 1994) (*citing Platt v. Minn. Mining &
Mfg. Co.*, 376 U.S. 240, 243-44 (1964)), *abrogated on other
grounds by United States v. Cabrales*, 524 U.S. 1 (1998).[27]

No factor is dispositive, and the defendant bears the
burden of proving that prosecuting "the case in the district
where the count was properly filed would result in a substantial
balance of inconvenience to the defendant." *United States v.
Ferguson*, 432 F.Supp.2d 559, 562 (E.D. Va. 2006) (internal
quotation marks omitted); *United States v. Farkas*, 474 F. App'x
349, 354 (4th Cir. 2012) (unpublished).[28]

    1.   Location of the Defendant

Rosenberg resides in New Jersey and Shusterman resides in
South Florida. ECF No. 68 at 9. Rosenberg contends that trial
in Maryland would significantly disrupt his ability to care for
his elderly father and twelve-year old daughter, *id.*, although

---

[27] *See also United States v. Buensalida*, 537 F. App'x 226 (4th
Cir. 2013) (unpublished) (affirming the application of the *Platt*
factors).

[28] *See also United States v. Spy Factory, Inc.*, 951 F. Supp. 450,
455 (S.D.N.Y. 1997) ("A Court should weigh the ten *Platt* factors
against one another and against the backdrop of doing what is in
the overarching interest of justice.").

the government contends that Rosenberg's mother and wife also provide care, ECF No. 72 at 11.

Criminal defendants have no Constitutional right to be tried in their home district. *Platt*, 376 U.S. at 245 ("Art. III, [§ ] 2, of the Constitution provides that 'The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed....'"). Here, trial in New Jersey or South Florida would require at least one defendant to travel, and trial in Maryland would require both to travel some distance. Because a defendant's home "has no independent significance" and should be considered in connection with "such factors as the convenience of records, officers, personnel and counsel," *id.*, this *Platt* factor is neutral.[29]

> 2. Location of Witnesses

> i. Co-Conspirators

Kuber and Feldman reside in South Florida; however, during the events at issue, Kuber resided in New Jersey, and Feldman owned a vacation home in New Jersey. ECF No. 68 at 9-10. The government argues that because Kuber and Feldman pled guilty in the District of Maryland, they have consented to venue here, and have a significant interest "in having their testimony heard by the judge who has taken their guilty pleas and who will

---

[29] *But see United States v. Oster*, 580 F. Supp. 599, 602 (S.D.W. Va. 1984)(defendant's residence in Middle District of Florida favored transfer to that district).

determine their sentences." ECF No. 72 at 12.  The Defendants

argue that Rule 21(b) considers witness convenience, not their

"intangible interests vis-à-vis plea agreements." ECF No. 73 at

9.

### ii.  Investors/Victims

D.L.--the representative of Nigerian non-profit IITA--

resides in Maryland.  ECF No. 72 at 12.  D.L. allegedly lost

$800,000 as an individual investor, and IITA allegedly lost $15

million--the third largest loss suffered by any investors.  *Id.*

The first and second largest losses were suffered by companies

whose officers are located in New York, New Jersey, and

Massachusetts.  *See id.*; ECF No. 68 at 10.  Other investors are

scattered around the country.  *See* ECF Nos. 68 at 11; 72 at 12.[30]

### iii. Other Witnesses

Several IPI attorneys--who are potential witnesses--live in

New Jersey, and one IPI attorney lives in Florida.  ECF No. 68

at 11.[31]  Former IPI contractors, also potential witnesses, are

located in Pennsylvania, Georgia, and Ohio.  ECF No. 72 at 13.

---

[30] Investors are located in 16 states: Indiana, Georgia, Oregon,
Florida, Maryland, New York, New Jersey, Louisiana,
Massachusetts, Virginia, Pennsylvania, North Carolina, South
Carolina, Connecticut, California, and Arizona.  ECF No. 72 at
12.

[31] However, the government asserts that the Florida-based IPI
attorney met with the co-conspirators in the Eastern District of
Pennsylvania.  *Id.* at 13.

"Location of witnesses is one of the more significant factors in the decision to transfer venue under Rule 21(b)." *United States v. Ferguson*, 432 F. Supp. 2d 559, 564 (E.D. Va. 2006)(internal quotation marks and citation omitted). However, to carry their burden on this factor, defendants "must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial." *United States v. Farkas*, No. 1:10CR200 LMB, 2010 WL 3835110, at *3 (E.D. Va. Sept. 24, 2010), *affirmed* 474 F. App'x 349 (4th Cir. 2012) (internal quotation marks and citation omitted). Here, the various locations of witnesses do not point decisively to any particular forum; accordingly, this *Platt* factor does not favor transfer.

### 3.   Location of Events

The Defendants argue that most of the key events in this case occurred in New Jersey and Florida, including IPI's purchase of $1.8 billion in medical accounts receivable from JMH, and its purchase of $1.9 billion in medical accounts receivable from HMA--both Florida-based entities.  ECF No. 68 at 13.[32]  Rosenberg's alleged conduct occurred in New Jersey.  *Id.*

---

[32] Most of the debt repackaged and sold to investors originated in the JMH and HMA accounts.  ECF No. 68 at 13.

at 13-14.[33]  Rosenberg's companies--through which the Indictment alleges he participated in the fraudulent scheme--were organized and located in New Jersey.  *Id.* at 14.  IPI's attorneys practiced, and corresponded with investors, in New Jersey.  *Id.*

The government contends that key events occurred in Maryland (in connection with D.L. and IITA), New York (the location of Platinum--the largest investor), and Pennsylvania (where Shusterman and Feldman lived "during significant periods in the life of the fraud").  ECF No. 72 at 14.

Consideration of the location of events "ensures that the trial is held near where the allegedly criminal activity occurred, rather than in a district where venue has a more remote connection to the crime."  *United States v. Coffee*, 113 F. Supp. 2d 751, 755-56 (E.D. Pa. 2000).  Here, many of the events at issue occurred in New Jersey; Maryland's connection to the case is limited to communications with D.L.  Accordingly, this *Platt* factor favors transfer to the District of New Jersey.

    4.    Location of Documents and Records

Because documents and records in this case are in electronic format, neither party afforded this factor any weight.  ECF Nos. 68 at 14-15; 72 at 15.  Accordingly, this *Platt* factor is neutral.

---

[33] This includes meetings and discussions with the co-conspirators.  *Id.* at 14.

21

5.   Disruption of the Defendants' Businesses

Rosenberg works as a freelance court reporter in New Jersey.  ECF No. 68 at 15.  Shusterman conducts business in South Florida.  ECF No. 71 ¶ 6.  Both argue that this *Platt* factor favors transfer to their respective home districts.  ECF Nos. 68 at 15; 71 ¶ 6.  The government contends that Rosenberg's and Shusterman's businesses will be disrupted wherever trial occurs, but that Rosenberg's business will suffer less if trial proceeded in Maryland.  ECF No. 72 at 15.

Disruption to a defendant's business because of prosecution is unavoidable.  *United States v. Bloom*, 78 F.R.D. 591, 609 (E.D. Pa. 1977).  Here, Rosenberg's and Shusterman's respective interests are at cross-purposes.  Although Rosenberg is licensed in--and, thus, eligible to practice only in--New Jersey, Shusterman has not provided details about his business or the disruption that would result should trial not proceed in South Florida.  Accordingly, this *Platt* factor slightly favors transfer to the District of New Jersey.

6.   Expense to the Parties

Rosenberg contends that transfer to the District of New Jersey would minimize expenses because the case would be reassigned to court-appointed counsel there, thereby reducing travel and costs associated with client meetings, investigation, and trial preparation.  ECF No. 68 at 15.  It would also ease

22

the significant financial burden placed on Rosenberg if he were required to incur travel and lodging expenses for a six-week trial in Maryland.  *Id.* at 16.[34]   Shusterman argues that transfer to the Southern District of Florida would minimize expenses because he, key witnesses, and potential witnesses, are located there.  ECF No. 71 ¶ 7.[35]

The government contends that transfer would inconvenience the United States, because Assistant U.S. Attorneys ("AUSAs") and agents who have spent two years on this case would have to follow the case, incurring great expense, or new agents and AUSAs would be assigned, with "a steep learning curve in a complex matter."  ECF No. 72 at 16.[36]   However, Rosenberg asserts

---

[34] To a lesser extent, trial in South Florida would also ease Rosenberg's financial burden because he could reside with family there.  ECF No. 68 at 16.

[35] The government asserts, however, that because Shusterman's counsel is in Washington, D.C., he is closer to Maryland than Florida, and closer to witnesses in the Northeast.  ECF No. 72 at 15.

[36] The government cites *United States v. Smallwood*, 293 F. Supp. 2d 631, 640 (E.D. Va. 2003) to support its argument that its investment in this case disfavors transfer.  ECF No. 72 at 16. However, in *Smallwood*, more than 12 co-conspirators had already been tried in the Eastern District of Virginia.  "In such circumstances," the Court found, "it is reasonable for the government to conserve resources by charging and trying the remaining co-conspirators in this district."  *Smallwood*, 293 F. Supp. 2d at 640.  Thus, the government's investment of resources in *Smallwood* appears higher than the government's investment--to date, at least--in this case. *See Ferguson*, 432 F. Supp. 2d at 570 (transferring case when two co-conspirators had pled guilty in the charging district).

that Rule 21(b)'s purpose in guarding against forum-shopping would be defeated "if the government could bootstrap itself into the venue of its choice by investing time and resources in a particular District before the defendant has any opportunity to be heard on the choice of venue."  ECF No. 73 at 12.

This factor focuses on the Defendants' ability to pay their expenses, not on the amount of the expenses.  *Ferguson*, 432 F. Supp. 2d at 567.  Shusterman has not shown--nor argued--that he would be unable to cover his litigation expenses unless trial proceeded in South Florida.  Although Rosenberg's litigation expenses will be paid by the United States government through the Federal Public Defender's Office, he must bear his travel, lodging, and related expenses.  ECF No. 68 at 15-16.

Even when defendants enjoy "significant financial means," the government's financial resources place it in a better position to bear additional expenses that arise from transfer. *Ferguson*, 432 F. Supp. 2d at 567-68 ("It is true that Defendants are people of significant financial means, however, when compared to that of the government's resources, they pale in comparison.").[37]  Therefore, this *Platt* factor favors transfer to the District of New Jersey.

---

[37] *See also Coffee*, 113 F. Supp. 2d at 757 ("Unlike the [Defendants], the Government can, and does, mint money.").  *But see Farkas*, No. 1:10CR200 LMB, 2010 WL 3835110, at *5 (finding that this factor does not favor transfer when the government is

7.    Location of Counsel

Rosenberg is represented by Federal Public Defenders; accordingly, were venue transferred, he would be appointed counsel in the transferee district.  ECF No. 68 at 16. Shusterman is represented by counsel in Washington, D.C., and Chagrin Falls, Ohio.  *Id*.  As mentioned above, were venue transferred, the AUSAs prosecuting the case for the government would follow the case, or new AUSAs would be appointed.  ECF No. 72 at 16.  On balance, this *Platt* factor is neutral.

8.    Relative Accessibility of Place of Trial

The federal courthouse in Baltimore, and those in the proposed transferee districts (Newark and Miami), are located near major airports.  ECF Nos. 68 at 17; 72 at 16.  Baltimore and Newark have the added benefit of Amtrak train stations.  *Id*. Accordingly, this *Platt* factor is neutral between Maryland and New Jersey, but disfavors transfer to South Florida.

9.    Docket Conditions in Each District

The Defendants do not contend that docket conditions favor or disfavor transfer.  ECF No. 68 at 17.  The government

---

covering the defendant's litigation expenses).  However, in addition to litigation expenses, the Court must consider the parties' ability to pay for travel, lodging, and meals. *Ferguson*, 432 F. Supp. 2d at 568 ("[E]xpense to Defendants will result in a 'substantial balance of inconvenience' because Defendants will be forced to absorb significant out-of-pocket costs for both travel and hotel accommodations during trial.").

contends that Maryland's lighter docket, compared to New Jersey and South Florida, disfavors transfer.  ECF No. 72 at 17.

For the year ending September 2013, the District of Maryland had 493 weighted filings per authorized judgeship; New Jersey had 546; and South Florida had 662.[38]  Although relative docket conditions are a factor, the enactment of the Speedy Trial Act, 18 USC § 3161, *et seq.*, diminishes this factor's weight.  *See Oyster*, 580 F. Supp. at 603.  Accordingly, this *Platt* factor slightly favors Maryland, and, to a lesser extent, New Jersey.

> 10.  Other Factors

Rosenberg argues that Maryland has little connection to, and thus little interest in, this case.  ECF No. 68 at 17. Further, Rosenberg has an interest in defending himself where his alleged conduct occurred, and where he "is more likely to be tried by a jury of his peers."  *Id*.  Shusterman presents the same argument--albeit, of course, with respect to South Florida. ECF No. 71 ¶ 8.  The government contends that two co-conspirators have already pled guilty in Maryland; that the Defendants' residence in different states makes it impossible to

---

[38] *See* Judicial Business of U.S. Courts, Table X-1A, *Weighted and Unweighted Filings Per Authorized Judgeship During the 12-Month Period Ending September 30, 2013*, http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2013/appendices/X01ASep13.pdf (last accessed November 12, 2014).

try the case where both Defendants live; and that Maryland is home to IITA's representative and is convenient for other victims.  ECF No. 72 at 17.

"Defendants are not entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)(citations omitted).  The Defendants have not shown that trial in Maryland, New Jersey, or South Florida would deprive them of their right to be tried by a fair cross-section of their peers.  The factors cited by the government have been addressed elsewhere.  Accordingly, this *Platt* factor is neutral.

In sum, the location of events, disruption to Rosenberg's business, and expense to the parties favor transfer to the District of New Jersey.  However, the majority of the *Platt* factors do not favor transfer.  Therefore, the Defendants have not shown that trial in Maryland "would result in a substantial balance of inconvenience to the defendant." *Ferguson*, 432 F. Supp. 2d at 562.  The Defendants' motion to transfer will be denied.

III. Conclusion

For the reasons stated above, Shusterman's motion to adopt, in part, co-defendant's motion to dismiss for lack of venue and to provide additional support, will be granted.  However, the Defendants' motion to dismiss for lack of venue, or, in the alternative, for transfer to the District of New Jersey or the Southern District of Florida, will be denied.  The government's motion for leave to file a surreply will be denied as moot.

_12/2/14_____
Date

_____
William D. Quarles, Jr.
United States District Judge