IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
    vs.                              )
                                     )  CRIMINAL NO.: JKB-13-0460
RICHARD SHUSTERMAN,                  )
                                     )
        Defendant.                   )
                                     )
_____)


Transcript of Proceedings
Before the Honorable James K. Bredar
Tuesday, April 26th, 2016
Baltimore, Maryland


For the Plaintiff:

    Martin J. Clarke, AUSA

    Leo J. Wise, AUSA

For the Defendant:

    John J. McMahon, Jr., Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

P R O C E E D I N G S

1

2        THE COURT:  Good morning.  So counsel, it's Election

3   Day and I'm on chambers duty in relation to the election.

4   Luck of the draw.  Hopefully, all will go smoothly, but we

5   don't know.  Ready for the jury?

6        MR. CLARKE:  Yes, Your Honor.

7        MR. MCMAHON:  Yes, Your Honor.

8        THE COURT:  Let's bring them in.

9        (Jury entered the courtroom.)

10       THE COURT:  Good morning, ladies and gentlemen.  I

11  see some orange in the jury box today, despite that rather

12  abysmal performance last night on the part of the local

13  baseball team.  I take it some of you are optimists that

14  things are going to turn around tonight.  I hope you're right.

15  We are ready to continue with our trial, and specifically, the

16  direct examination of Mr. Shusterman by Mr. McMahon.

17       Mr. Shusterman, you may resume the witness stand.

18       THE WITNESS:  Thank you, Your Honor.

19       THE COURT:  You remain under oath.  And Mr. McMahon,

20  once your client has seated himself, you may continue.

21

22                RICHARD SHUSTERMAN,

23  called as a witness, being previously duly sworn, was examined

24  and testified as follows:

25       MR. MCMAHON:  Thank you, Your Honor.

                          DIRECT EXAMINATION

BY MR. MCMAHON:

Q    Mr. Shusterman, again, I'm going to finish this up here
this morning, and if you don't understand any questions,
again, just remember you can ask us.  And if counsel asks you
questions, you can ask to repeat it too, if you don't
understand.  Okay?

A    Yes.

Q    All right.  One thing I just -- in reviewing my notes
last night, I just want you to explain, I don't think I was
clear, the payment to Zoldan to get the Platinum files, what
was that about, why did you have to give him money?

A    There was a contract that IPI was entered into with DSP.
And it consisted of a monthly fee.  The payment of the
$155,000 was the accelerated payments that would have been
remaining on that contract.  Mr. Zoldan had the contract, had
the accounts.  And I couldn't get the accounts released per
Platinum's request unless I made that payment.

Q    And did you make that payment for Platinum?

A    I made the payment and it benefited Platinum.

Q    How did it benefit them?

          MR. CLARKE:  Objection.

          THE COURT:  Sustained.

Q    (BY MR. MCMAHON)  What happened to the files that
Mr. Zoldan had after you paid Mr. Zoldan?

1    A    They were released.

2    Q    To who?

3    A    Platinum.

4    Q    Okay.  Now, I'm going to direct your attention to a

5    situation we heard at the end of the government's case, and

6    that is with Mr. Moni, what did you engage Mr. Moni for?

7    A    Mr. Moni was working with or attempting to engage with

8    various Wall Street type funds that he was sort of a broker,

9    and had relationships with various funds on Wall Street.  And

10   he was speaking to them to measure their level of interest in

11   purchasing files that IPI had.

12   Q    And how did you find Mr. Moni?

13   A    Mr. Moni was a friend of a Mr. Hyman, and had introduced

14   me to Mr. Moni.

15   Q    And you indicated that Mr. Moni was -- what you engaged

16   him for -- was he successful in any of what you sought from

17   him?

18   A    No.

19   Q    Did you make any deals as a result of that?

20   A    No.

21   Q    Okay.  Were there any deals that became negotiated but

22   did not come through?

23   A    He -- there -- I think he had talked to 30 to 50

24   different companies from what I was advised.  And the only

25   company that came back to him that expressed interest, just on

1  a preliminary level, was Eton Park.

2  Q     And the young lady that came in here, Ms. Beattie,

3  whenever that was, did you ever meet her before?

4  A     Never.

5  Q     Had you ever met her any time in your life to your

6  knowledge?

7  A     Never.

8  Q     Did you have any discussions with her at any time?

9  A     I think I had one or two very brief phone discussions

10  with her.

11  Q     And in an attempt after engaging Mr. Moni and having this

12  preliminary interest from Eton Park, what, if anything, did

13  you do to try to assist that potential deal?

14  A     The only thing that I did in relationship to Mr. Moni and

15  Eton Park, there was an e-mail or CD -- Mr. Moni -- I had

16  requested four, just various portfolios that Mr. Moni had

17  wanted, and had requested those from Mr. Rosenberg, just

18  random historical portfolios.  They were sent to me.  I could

19  not open them and indicated in an e-mail that, in fact, the

20  first time I could not read them or open them.

21  Q     What happened then?

22  A     They were sent again.  And at that point I just forwarded

23  the e-mail I had received to Mr. Moni.

24  Q     And how did you communicate to Mr. Rosenberg your desire

25  for four files and what did you say to him?

1    A    I had sent an e-mail just requesting four random

2    portfolios.

3    Q    Did you indicate any specific portfolios?

4    A    No.

5    Q    Okay.  And did it take some time for you to get those

6    from Mr. Rosenberg?

7    A    Yes.

8    Q    And what did you do in that -- what did you do to try to

9    effectuate that?

10   A    I just stressed to them that time was passing and had

11   requested that they please compile four random portfolios.

12   Q    Okay.  Now -- and did that deal ever materialize?

13   A    No.

14   Q    Okay.  Now, the -- if I can, you've heard in this case

15   about these reports that were -- you heard -- that were

16   monthly reports about each account that were sent to Mr. Kuber

17   and to Mr. Spielman and whatnot; correct?

18   A    Yes.

19   Q    Okay.  And they -- in this particular case, those reports

20   that were sent to Mr. Spielman regarding the portfolios that,

21   in fact, you had loaned money to, had you ever seen them

22   before -- or before they were sent out?

23   A    I don't understand the question.

24   Q    Sure.  The -- you saw in the courtroom last week there

25   was these spreadsheets, Excel, whatever, that indicated the

1   monthly collections and/or direct pays?

2   A    Yeah.

3   Q    That were sent to Spielman?

4   A    Correct.

5   Q    Okay.  And were those done by you?

6   A    No.

7   Q    Okay.  And what was -- did you ever see them before they

8   were, in fact, sent to Mr. Spielman?

9   A    No.

10  Q    And those ones that were, obviously, had direct pays on

11  the side, had you ever seen them before they were sent to

12  Mr. Spielman?

13  A    No.

14  Q    Okay.  And when's the first time you ever saw those

15  documents that indicated on the monthly collections these

16  large sums of direct pays?

17  A    I think about three weeks prior to the start of trial.

18  Q    And where did you see them for the first time?

19  A    You showed them to me.

20  Q    And before that time, three weeks prior to trial, had you

21  ever seen those at all?

22  A    Absolutely never.

23  Q    Okay.  And, now, you talked the other day about these

24  loans that you made.  And if we could see Exhibit 1118,

25  please.

1      Oh, it's not up on my screen.  I'm sorry.  I was just
2  sitting here waiting.
3      It's up, just came up.  Thank you.  I'm showing you
4  what's been marked as Government's Exhibit 1118.  And what is
5  this document?
6  A    This was a letter dated the 13th of July.  Let me just
7  read this a second, please.  And it sets forth the tone of the
8  $4.2 million and the odd amount listed here, of the loan
9  advance that Mr. Kuber was seeking.
10 Q    Could you scroll.  If we continue to scroll, I just want
11 to see the bottom.  Okay.  And that's Mr. Cube's signature;
12 correct?
13 A    Yes.
14 Q    And was this prepared by who?
15 A    Mr. Kuber.
16 Q    Okay.  And could we see Government 1120, please.  Now,
17 this is dated September 26th, two months later.  And this is a
18 Portfolio One, LLC and Portfolio Three is what it regards.  If
19 we could scroll to the bottom, please.  And this was signed by
20 Mr. Rosenberg; correct?
21 A    Yes.
22 Q    And what is this down here, to your knowledge?
23 A    That's the code stamp for the law firm that I engaged and
24 employed, Duane Morris.
25 Q    Okay.  If we could go to the top of this, please.  Okay.

1   Right there.  And this is obviously a loan letter in regards

2   to Portfolio One and Portfolio Three.  What is your

3   understanding as to what this represents?

4   A     It documents the terms of the loan, the amount that was

5   loaned, and the terms and conditions related to the loan.

6   Q     Okay.  And, in this, it indicates that you will make

7   efforts to make every effort to sell; correct?

8   A     Yes.

9   Q     And it talks about a repayment plan if, in fact, they're

10  sold; correct?

11  A     Yes.

12  Q     And this was an amount of 6 million whatever that was to

13  be loaned for purposes of paying the interest to Portfolio One

14  and Portfolio Three; correct?

15  A     Yes.

16  Q     And that interest that was being paid as you now know was

17  to who?

18  A     To Platinum.

19  Q     Okay.  And did you have any -- to your knowledge or your

20  mindset, did you have any responsibility to make that payment

21  of interest to Platinum?

22  A     No, not at all.

23  Q     Okay.  And as we see in this Government Exhibit 1120,

24  this is one of the first ones in September of '08 of these

25  loan letters.  You've indicated there were approximately how

1   many of these?

2   A    I think there were between 40 and 60 --

3   Q    Okay.

4   A    -- by the time they were all completed.

5   Q    And were they all in a similar fashion as to this

6   particular Government Exhibit 1120?

7   A    Yes, sir.

8   Q    And were they all signed by Mr. Rosenberg?

9   A    Yes, sir.

10  Q    And they were all reflective of loans; correct?

11  A    Correct.

12  Q    And all prepared by the law firm; correct?

13  A    Yes.

14  Q    Okay.  Now, if we could look at Government Exhibit 1343.

15  This was shown last week in the government's presentation.

16  And this is a chart prepared by Agent Rutledge; correct?

17  A    Yes.

18  Q    Now, I want to go over this with you.  This transaction

19  1, okay, this is a -- what is that exactly, tell us.

20  A    That's a sale from IPI to ARS, with a face value of $793

21  million.

22  Q    And is this -- this was reflected on Government's 1267 as

23  a sale of December 21st, which would be line 6 on Government

24  1267, that particular titanium deal; correct?

25  A    Yes, sir.

1    Q    Okay.  And that was done on December 21st.  And that was

2    a sale at that point in time; correct?

3    A    Yes.

4    Q    As of this date of December the 21st, okay, when you sold

5    that, who was the owner of the face value there of those

6    items?

7    A    ARS.

8    Q    Okay.  And did you have any interest in the ownership of

9    that as of that date?

10   A    Not at all.

11   Q    And we won't go over -- you did retain the collection

12   component under the assistance portion of the contract;

13   correct?

14   A    That is correct.

15   Q    But as far as any other rights or responsibilities, you

16   had none?

17   A    That's correct.

18   Q    Okay.  And, now, we look down here, down at the

19   transaction 2.  And as we see here, this transaction 2 is a

20   partial repurchase by IPI.  Some -- I don't know, six, seven

21   months later; correct?

22   A    Yes.

23   Q    And this is a face value that is less than that one,

24   obviously; correct?

25   A    Correct.

```
1    Q    And this was a sale and purchase that you purchased it
2    back from them; correct?
3    A    Yes.
4    Q    Okay.  And as of this date, 7/18/08, who is the owner of
5    it?
6    A    IPI.
7    Q    Does ARS have any interest or responsibilities to that at
8    that point in time?
9    A    No, not at all.
10   Q    Okay.  And, again, back to our -- something that we
11   indicated in the last couple of days, and that is these were
12   sales and purchases, not investments --
13            MR. CLARKE:  Objection.
14            THE COURT:  Sustained.
15   Q    (BY MR. MCMAHON)  Did you have any investors then, in
16   these deals?
17   A    Absolutely not.
18   Q    They were straight purchase and sales?
19   A    Yes, they were.
20   Q    Now, on transaction 2 then -- then we have transaction 3.
21   And this is in which you, that same day, sell the same
22   portfolio, correct, the same CD that you own, to somebody
23   else; correct?
24   A    That is correct.
25   Q    And that IIG is someone that we've heard about and talked
```

1     about, and you sold that at that time; correct?

2     A     That is correct.

3     Q     And you sold it for -- it appears to be the same price;

4     correct?

5     A     Yes.

6     Q     Okay.  And when you owned it here, was there any

7     restriction from you selling it to here?

8     A     None.

9     Q     Okay.  And when you sold it to IIG, whatever make up of

10    that company was, did you at that point in time retain any

11    interest or responsibilities to that slice of the original

12    titanium file at that point in time?

13    A     No, not in an ownership capacity.

14    Q     What was your only role to it as of 7/18/08?

15    A     Just servicing that portfolio.

16    Q     So what IIG does with it after that is beyond your

17    control; correct?

18    A     That is correct.

19    Q     Can we see 1341.  1341, similar in its analysis, this is

20    the titanium one and transaction 2.  You bought it back;

21    correct?

22    A     Yes.

23    Q     And in this case, again, the same thing.  You sold it to

24    another group called Greenfish at this particular time?

25    A     Correct.

1    Q     And Greenfish was what, to your knowledge?

2    A     Another fund, purchaser in another fund.

3    Q     Okay.  And that fund you sold it to, it looks like the

4    dates are different, but you sold it after owning it here, and

5    you owned it and you sold it to this third-party Greenfish;

6    correct?

7    A     That is correct.

8    Q     Okay.  And then when Greenfish gets it on that date, you

9    no longer have any interest in it; correct?

10   A     Correct.

11   Q     And you had all the ability to sell it to Greenfish at

12   that time too; correct?

13   A     Completely correct.

14   Q     Were there any restrictions on selling it to who or

15   what?

16   A     No, not at all.

17   Q     And would this be the situation where this recoding would

18   take place?

19   A     Yes.

20   Q     And what point would it be recoded?

21   A     Once the portfolio was sold and, in fact, funded by the

22   purchaser, at that point, it would be recoded to the new

23   owner.

24   Q     And the purpose of the recoding again?

25   A     It would be to notify the collection agency as to who

1    owned the accounts, and also to make certain that it was

2    updated and reflected properly in Mr. Zoldan's database.

3    Q     We can take that down.  Can we see Government Exhibit

4    1334.

5          Okay.  This is 1334.  And here we have -- on the left

6    side we have Roundstone.  And this transaction here is a

7    purchase; correct?

8    A     Yes.

9    Q     They purchased a portfolio from who?

10   A     It was purchased from IPI.

11   Q     Okay.  And they paid for it; correct?

12   A     Yes.

13   Q     And as of the date that they wired the money, who's the

14   owner of that?

15   A     The purchaser, that was Roundstone.

16   Q     Okay.  And who gets the money at that time?

17   A     International portfolio.

18   Q     Whose money is that at that time?

19   A     International portfolio's.

20   Q     Okay.  And as we can see then, you opted with your money,

21   at that point in time, to make the loan transfers, or the loan

22   advances that we've all heard about in this case; correct?

23   A     That is correct.

24   Q     Okay.  And you made them that very day and you loaned the

25   money out in the ways that it depicted here; correct?

1    A    Yes.

2    Q    Okay.  And, again, as of that date on June 29th, when

3    this was all done and when you wired this money out to these

4    various places.  Did you have any contractual obligation to do

5    that?

6    A    No.

7    Q    Could you have just kept that money?

8    A    Yes, clearly.

9    Q    Okay.  And the government talked about this amount here,

10   97,000 that you had in the bank account at that time.  Okay.

11   How many bank accounts did you have at that time?  On June of

12   2009?

13   A    I had a personal bank account and also the business bank

14   account.

15   Q    And in the personal -- the relationship between the

16   personal bank account and the business bank account, how did

17   they interact?

18   A    Frequently, whether it was daily or weekly, I had money

19   going back and forth.  Typically, there was not a very

20   significant balance in the business account because they

21   weren't paying any type of interest on a business account.

22   And I was still receiving some type of interest on the

23   personal account.  So I just shifted money back and forth and

24   transferred it internally.

25   Q    So do you know, as of this date here, if you can recall,

1   if you had more funds available to you than $97,000?

2   A     Absolutely.

3   Q     Do you know what number you had available to you at that

4   date?

5   A     Off the top of my head, I don't, but it had to be well in

6   seven figures, meaning in excess of a million dollars, I don't

7   know the exact amount.

8   Q     Okay.  And, now -- so I guess my question on that is, did

9   you need that Roundstone money to make those loans?

10  A     No, not at all.

11  Q     How could you make those loans without the Roundstone

12  money?

13  A     Well, I had my own money in my personal account, and I

14  also had an equity loan and line on my house that I could draw

15  down, that was, at first, 3 million.  And then the second one

16  was an additional one for a million.  So I had an additional

17  $4 million that at any time I could have used or drawn

18  against.

19  Q     When you say -- how did you obtain those equity loans?

20  A     I placed my house as collateral with the bank and secured

21  two lines of credit with the bank.

22  Q     And what bank was that?

23  A     Wilmington Trust.

24  Q     Okay.  And did you use that money at various times as

25  needed?

```
 1   A    Yes.

 2   Q    Okay.  How did that money get paid back?

 3   A    The house was sold and the proceeds of the $4 million was

 4   paid.

 5   Q    Now, you saw last week when Agent Rutledge testified

 6   about portfolios not performing and the figures that were

 7   obviously -- I won't use the word abysmal again -- woeful, at

 8   this point in time, and the value of those particular

 9   portfolios.  Was there a component of that analysis that was

10   left out?

11   A    Yes.

12   Q    And what was that?

13   A    It was the resale of those files.

14   Q    Okay.  And is that reflected in Mr. Zoldan's analysis?

15   A    It was.  It was also reflected in the Apollo letters.

16   And it was a real value.

17   Q    And that is a -- as we've heard many times, it's not an

18   actual sale number, it's a percentage number; correct?

19   A    Correct.

20   Q    Okay.  And so that analysis, that particular component

21   was missing; correct?

22   A    Yes, it was.

23   Q    Now, can we turn --

24             THE CLERK:  It's ready, Counsel.

25             MR. MCMAHON:  Thank you.
```

1    Q    (BY MR. MCMAHON)   These are previously marked as Defense

2    Exhibit 10, and I'm just going to show you a particular few of

3    these.  This is an e-mail dated December 11th of 2008.  And

4    this was from you responding to Mr. Rosenberg's questions.  It

5    says here, at 12:11, Rosenberg writes, "Hi Richard," okay.

6    And then you respond to him later.  This is 10:02.  This is

7    10:25.  See?

8    A    Yes.

9    Q    Okay.  And the portions here in the highlighted underline

10   are your responses; correct?

11   A    Correct.

12   Q    Okay.  And I want to -- on this particular one, again,

13   we're now into December of '08.  And in response to the above

14   question, what is your response to him, to his concern in the

15   first paragraph?

16   A    I respond that, "There's no guarantee.  Any files can or

17   will be sold.  That said, the accounts if in-stat can and

18   would be sued.  They would also be collected.  Legal accounts

19   with judgments are currently being sold for 9 to 13 cents on

20   the dollar.  Using your doomsday scenario, the accounts would

21   still have value as a result of their ability to be collected

22   and serviced.  Although, I cannot and will not predict the

23   future.  I have yet to not sell a portfolio.  That does not

24   mean it will not happen.  As always, we do the very best we

25   can, but make no promises."

1    Q    Okay.  And this is reflective of the -- as you indicated

2    yesterday, the 41 times that was mentioned; is that correct?

3    A    Yes.

4    Q    I'm going to show you Defense Exhibit 12.  And this is a

5    chain that we see at the bottom.  This is from Mr. Rosenberg.

6    This is January of '09.  "Since Doug is away, called and asked

7    if I would relay this information to you.  He will be giving

8    Platinum an update this evening.  And he mentioned that you

9    and he had had a conversation last week and would be speaking

10   with a group sometime today, I believe, regarding the influx

11   of a new 25 to 30 million, which would be used partially or

12   completely to purchase a chunk of Platinum files.  Before he

13   speaks with Platinum, he wanted to check with you, okay."

14        And it's cut off after "kind of."  And then up here is

15   the response.  And what do you respond?

16   A    "Jon, I will not have any type of update for 1 to 2 days.

17   I also do not want to set any false expectations as to what

18   this group may or may not do."

19   Q    And what were you indicating by that e-mail?

20   A    Just that I'm doing the best I can to assist, although I

21   had no legal obligation to sell their files.  And -- but could

22   not promise anything.

23   Q    And let me show you 14, Defense Exhibit 14, which is a --

24   this is in February of '09 now.  And this person at the top

25   here, S. Prieto, who is that?

1   A     She's an accountant at the accounting firm that I used.

2   Q     And you're cc'ed on this.  And what is being requested

3   there?

4   A     She's asking Doug for an EIN number so that she can issue

5   a 1099 for Portfolio Scope.

6   Q     Okay.  And for what year?

7   A     2008.

8   Q     Okay.  And we see a follow up from you.  And what is it

9   that you say about getting this tax document for the money

10  that went to Portfolio Scope?

11  A     "Jon, I need the information requested below ASAP."

12  Q     Okay.  Do you know whether, in fact, you got that

13  information so that your accountant could do a 1099?

14  A     I'm not sure.  I don't know.

15  Q     I'll show you one other one, Exhibit 21.  And this is

16  July of '10, which you write to Mr. Rosenberg, cc'ed to

17  Mr. Perkiss, who was your lawyer at the time; correct?

18  A     Yes.

19  Q     "Jon, as you know, IPI" -- and you put "as you know,"

20  "has no contractual responsibility to repurchase any portfolio

21  sold to any portfolio buyer"; correct?

22  A     Yes.

23  Q     And is that information because of "as you know," that

24  you had given to him many, many times in the past?

25  A     Yes.

1    Q    "IPI will, however, assist JER in repurchasing the files

2    purchased by Lauren Toppleson.  The fee paid would be 270,000

3    over three payments.  The first would take place September

4    10th.  I will have the figures tomorrow from Ron Drizzen.

5    Please let me know if you want me to move forward with the

6    contract."  Okay?

7    A    Yes.

8    Q    And, again, this is the information that you continued to

9    give to Mr. Rosenberg and others, but as to this,

10   Mr. Rosenberg, as to your responsibilities; correct?

11   A    Yes.

12   Q    Okay.  Believe it or not, I'm almost completed.  I'm

13   going to ask you just six questions to end the examination

14   here.  Okay?

15   A    Yes.

16   Q    And if we could pull up 1267.  These will be the last six

17   questions I ask you here today.

18        We're looking here at column 10, vertical column 10.

19   Okay?

20   A    Yes.

21             THE COURT:  Of Exhibit 12 --

22             MR. MCMAHON:  Of Exhibit 1267.  Yes, Your Honor.

23   Thank you.

24   Q    (BY MR. MCMAHON)  And we see all these numbers there, 27

25   times, the numbers on there.  The payments in those columns,

1   and that column, was for what?

2   A     2.6 for the unqualified accounts.

3   Q     Were they ever, as you heard Mr. Kuber say a hundred

4   times, that they were kickbacks?

5   A     Absolutely never.

6   Q     Okay.  We can take that down.

7         Second question:  By loaning the dollars that we saw in

8   this case to ARS, to pay the interest to Platinum, in doing

9   so, were you attempting to deceive Platinum?

10  A     Never.

11  Q     Why not?

12  A     I had no reason to ever deceive anyone.  Platinum clearly

13  knew that the loans --

14              MR. CLARKE:  Objection.

15              THE COURT:  Sustained.  You can't tell us what

16  Platinum knew.

17  Q     (BY MR. MCMAHON)  What did you know about Platinum's

18  information?

19  A     There was no paperwork to ever substantiate that the

20  money loaned had a reconciliation related to any direct

21  payments.  I also knew, and it became clear that the escrow

22  agent and a Mr. Glass and the other individual, Mr. Jedwab --

23              MR. CLARKE:  Objection.

24              THE COURT:  Foundation?

25              MR. CLARKE:  Leading, Your Honor.

1        THE COURT:  He didn't ask him a leading question.

2        MR. CLARKE:  Well, I mean -- I'm sorry, Your Honor.

3   Mr. Shusterman is about to answer regarding his knowledge of

4   what three other people knew or what they had --

5        THE COURT:  So that's a foundational objection.

6        MR. CLARKE:  Correct, Your Honor.

7        THE COURT:  Sustained.  You can attempt to lay it.

8   Q   (BY MR. MCMAHON)  Fine.  The knowledge that you had

9   regarding Platinum's information came from where?  What was

10  the source of the information that you had in your head about

11  Platinum's information?

12  A    From Mr. Kuber.

13  Q    Okay.  And at any time, after July of 2018 -- 2008, when

14  you gave these loans, did you have any contra information in

15  your head that Platinum was being deceived in any way?

16  A    No, not at all.

17  Q    Third question:  Did you have any benchmarks at all to

18  meet as far as collections were concerned at any time in

19  dealing with hospital receivables?

20  A    Never.

21  Q    Did you enter into any contractual agreement to ever

22  repurchase any file?

23  A    What --

24  Q    To promise to repurchase any file?

25  A    No.

1    Q     Did you ever guarantee or promise any result to anybody

2    any time?

3    A     No.

4    Q     Did you lose money on all of this?

5    A     I did.  I lost all of my money.  And, in fact, had I not

6    made those loans, I would have been a wealthy person today.

7              MR. MCMAHON:  Thank you.  I have no other

8    questions.

9              THE COURT:  Ladies and gentlemen, we'll take the

10   morning break.  During this recess, do not discuss the case

11   with anyone.  Don't discuss it among yourselves.  Do not allow

12   yourselves to be exposed to any news articles or reports that

13   touch upon this case or the issues it presents, or any

14   articles or reports that relate to any of the participants in

15   the case.

16             Avoid all contact with any of the participants in

17   the trial.  Do not make any independent investigation of the

18   law or the facts related to the case.  Do not look up anything

19   on the internet.  Do not consult an encyclopedia or a

20   dictionary.

21             Ten minutes.  Ten-minute recess.  Please take the

22   jury out.

23             (Jury left the courtroom.)

24             THE COURT:  Ten minutes.

25             (A recess was taken.)

1          THE COURT:  Ready for the jury, Mr. Clarke?

2          MR. CLARKE:  Yes.

3          THE COURT:  Mr. McMahon?

4          MR. MCMAHON:  Yes.

5          THE COURT:  Please bring the jury in.

6          (Jury entered the courtroom.)

7          THE COURT:  Be seated, please.  Cross-examination

8  Mr. Clarke?

9          MR. CLARKE:  Yes, Your Honor.

10          THE COURT:  Mr. Shusterman, you remain under oath.

11  Mr. Clarke, you may proceed.

12          MR. CLARKE:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14  BY MR. CLARKE:

15  Q    Good morning, Mr. Shusterman.

16  A    Good morning.

17  Q    Do you recall the line of questioning from your attorney

18  about the early sales of JMH paper in early 2007 to

19  Mr. Rosenberg and others?

20  A    Yes.

21  Q    And, at that time, you said that it was already apparent

22  that the paper was poor; right?

23  A    I don't know specifically at which period of time you're

24  speaking about.

25  Q    Well, I just said the beginning of 2007.  You had it

1    since December of 2006 and now we're talking about the first,

2    second quarter of 2007.  You already knew that JMH paper was

3    doing poorly; correct?

4    A    Oh, I clearly knew that there were issues pertaining

5    to -- there was money coming in to Jackson based on patients

6    making payments.  There were issues related to the funds they

7    were obtaining and still not turning over to us.  And there

8    were issues, to some extent, that I had not known specifically

9    yet, as to what extent related to the accounts that they had

10   sold us.

11   Q    So the collections weren't coming in?

12   A    Collections were coming in to Jackson.  Collections, to

13   some extent, were coming in to the agencies servicing the

14   debt.  I wasn't sure to what amount the collections received

15   by Jackson were.  They weren't being turned over to us.

16   Q    Sir, I thought that you testified for the last day and a

17   half that almost immediately it was clear that the JMH paper

18   was not collecting well.  I understand that there could be

19   numbers of reasons for that, but your overall testimony is

20   that it wasn't doing well.

21   A    If I understand your question, you asked me in the first

22   quarter, the paper was just bought in December.  So four weeks

23   later, the first quarter of January, it would have been

24   impossible for me to know --

25   Q    All right.

1    A    -- at that point, in fact, that collections were poor.

2    Q    Well, according to your IPI business model you need a

3    ramp-up period; right?

4    A    It does take time to ramp up on the collection process.

5    Q    Okay.  And according to what we've seen in this case,

6    it's about three to four months to get the paper placed, to

7    enhance it, do what you're going to do, and then you start to

8    see the collections coming in; right?

9    A    Yes.

10   Q    So how about by June of 2007?  Can we all agree that

11   seven months later you've had plenty of time and the paper at

12   that point is, as been described in this, case abysmal?

13   A    I knew by June that payments were coming in to Jackson,

14   we were well aware of that.  To what extent, I didn't know.  I

15   also was aware, through the collection agencies servicing the

16   debt, that they were having problems collecting it for a

17   multitude of reasons.

18   Q    Well, when your counsel asked you if the JMH paper was

19   collecting well and is it fair to call it abysmal, you said

20   yes.  I'm asking you the same question.  In June of 2007,

21   after seven months, were the collections on the JMH paper

22   abysmal?

23   A    There was no doubt that the agencies servicing the debt

24   made it clear to me that they were having problems collecting

25   the debt for a multitude of reasons.

1    Q    All right.  Notwithstanding the multitude of problems and

2    multitude of reasons for those problems, in June of 2007,

3    according to our charts, you sell the first IPI

4    Platinum-funded portfolio, IPI ARSH on August 6th, 2007;

5    right?

6    A    I'd have to -- I don't know what chart you're looking

7    at.

8    Q    So that would be 1255.

9    A    One second.

10   Q    August 6th, 2007.  Line one, sir.  1255.

11   A    There was an earlier sale of June 27th of 2007 that

12   had -- that there was a Sanctuary Wealth sale.

13   Q    And there was a July 3rd, 2007 sale as well; correct?

14   A    Yes.

15   Q    All right.  So I think you testified earlier that

16   Mr. Rosenberg had already, on his own, purchased some JMH

17   paper and was collecting on it; correct?

18   A    Yes.

19   Q    And so come June, July, and August of 2007, more paper is

20   sold to him and Mr. Kuber is included; correct?

21   A    The -- yes, that's correct.

22   Q    All right.  So I think you testified that you didn't know

23   Mr. Kuber very well until the IPI ARSH deal -- or I'm sorry,

24   the first Sanctuary Wealth deal, which was June of 2007;

25   correct?

1    A    I met him a very short time earlier, prior to the first

2    transaction.

3    Q    Okay.  So prior to this June date, you met him once and

4    you didn't know him very well?

5    A    Correct.

6    Q    All right.  You've made a point of saying that you were

7    not in any sort of partnership with Mr. Kuber or

8    Mr. Rosenberg.  So, clearly, in June of 2007, you all weren't

9    working together or engaged in any way to try and promote the

10   JMH paper.

11   A    I don't understand the question.

12   Q    Well, you've testified that you were not in a partnership

13   with ARS, Mr. Kuber, or Mr. Rosenberg.  And since you had just

14   met Mr. Kuber in June of 2007, or around that time, you hadn't

15   been involved in any sort of promotion of JMH paper with him;

16   right?

17   A    I was not in any legal partnership, I had no investors or

18   owners in IPI at all at that time.

19   Q    Well, my question was whether or not you were engaged,

20   prior to June of 2007, in a joint effort with Mr. Kuber and

21   Mr. Rosenberg to promote JMH paper, the sale of JMH paper to

22   investors?

23   A    I had -- when you say "investors," these were purchasers.

24   These were people buying portfolios.

25   Q    But you understood them to be investment groups; right?

1    A    These were individuals that were looking to purchase an

2    asset that was owned by IPI.  They were not interested in

3    making an investment in IPI.  And they were clearly looking to

4    buy, as a purchase and sale agreement, the asset that IPI

5    owned.

6    Q    Sir, when I say "buy IPI portfolios," I don't mean that

7    anybody's looking to buy shares in your company, okay?  So

8    when we talk from here on out, when I say "investors," I'm

9    referring to the investment groups that purchased your

10   product.  And they did, didn't they?

11   A    They did.

12   Q    All right.  So there's no need to talk from here on out,

13   so we have a clear understanding, that I'm referring to

14   anybody who's buying shares in IPI, okay?

15   A    Sure.

16   Q    All right.  So we know that one of the investment groups

17   that purchased was in June of 2007.  It was Sanctuary Wealth

18   and then it was ARS.  And then we know that Platinum loaned

19   money through ARS was in August; right?  So those are all

20   investment groups.

21   A    They were purchasers buying accounts from IPI.

22   Q    Well, yes.  So investment groups are also purchasers;

23   right?

24   A    Yes.

25   Q    All right.  So when I'm talking about investment groups

1    that are buying your paper, we can also deal with that issue.

2    I'm referring to the purchasers who are investment groups

3    buying your paper.  Okay?

4    A    Now, there were investment groups that I had nothing to

5    do with that were --

6    Q    Okay.  That's fine.

7    A    Can I finish my sentence, sir?

8    Q    Sure.  You can answer.

9         MR. MCMAHON:  Object.

10   A    There were investment groups --

11        THE COURT:  Hold on.  There's an objection.  Please

12   allow the witness to answer the question fully, Mr. Clarke.

13        Sustained.  Mr. Clarke, you may continue.

14   Q    (BY MR. CLARKE)  So you had nothing to do with the

15   investment groups?

16   A    My obligation to any purchaser was to sell them the

17   portfolio and contractually to assist in servicing of the

18   portfolio post purchase.  That was my legal obligation.

19   Q    Okay.  But I wasn't asking about your legal obligation.

20   I was asking whether you were engaged with investment groups

21   in the promotion of IPI portfolios?

22        MR. MCMAHON:  Objection, Your Honor, as to who,

23   what, when, which ones, where?

24        THE COURT:  Overruled.

25   A    If individuals were interested in purchasing debt from

1    IPI, and have requested information from IPI, I would

2    certainly supply or give any information readily available to

3    any of those perspective people that had inquired.

4    Q    (BY MR. CLARKE)  Sir, isn't it the case that this huge

5    sale -- this huge purchase by you of JMH paper represented a

6    multimillion dollar opportunity for you?  Isn't that fair to

7    say?

8    A    Was it my intent to make money buying the JMH paper?

9    Absolutely.  I'm a businessman.

10   Q    Okay.  And I'm showing you Government's 1091.  Back on

11   January 30th, which is only about a month -- can you see your

12   screen, sir?

13   A    Can I -- oh, I'm sorry.

14   Q    Just about a month after you purchased the JMH paper,

15   you're sending Mr. Kuber your bio; correct?

16   A    Just give me one second to read it, please.  Can I read

17   the rest?

18   Q    Well, I'm only interested in you responding to my

19   question.  And my question is whether you can tell just by

20   even a cursory glance that this is from you to Mr. Kuber

21   responding to his request for your bio?

22   A    He -- this is an e-mail where I supply Mr. Kuber with my

23   background information as it relates to what I've done in the

24   collection sector and the collection industry.

25   Q    Sir, isn't that the same thing as a bio?

1    A    It's not an official -- I mean, I don't see when I went

2    to high school and graduated, but it's the highlights of what

3    I've done.

4    Q    Okay.  And in those highlights, you talk about how you're

5    a 26-year veteran of collections; correct?  And you're in the

6    debt-selling sector; correct?

7    A    Yes, sir.

8    Q    And that you've established long-term relationships with

9    hospitals; correct?

10   A    Yes, sir.

11   Q    In order to obtain non-performing debt.  So the person

12   that you're providing this to was Mr. Kuber, who you've

13   testified, wouldn't be buying through his investment groups

14   until at least six months later; correct?

15   A    I just to answer your question, it says "establishing,"

16   not "established."  I was working toward establishing

17   relationships with hospitals, not established.

18   Q    Okay.  Well, to that point, in fact, you had only

19   established a relationship with JMH about 30 days or 45 days

20   earlier; correct?

21   A    The deal was finalized approximately December of 2007.

22   Q    Right.  And this is January of 2007?

23   A    Yes.

24   Q    All right.  So you didn't have a long-term

25   relationship --

1          MR. MCMAHON:  Objection.  It's 2006, Judge.  It

2     wouldn't make any sense.  December of '07 wouldn't --

3          THE COURT:  Okay.  I'm not sure that's grounds for

4     an objection.

5          MR. MCMAHON:  I know, just -- I agree.

6          THE COURT:  So overruled.  Next question.

7     Q    (BY MR. CLARKE)  Are we clear you purchased JMH paper in

8     December of 2006?

9     A    Yes, sir.

10    Q    All right.  So to get back to my point, about 30 days

11    later; right?  That's how long -- 45 days later, that's your

12    relationship with JMH at that point; correct?

13    A    My relationship with JMH is like consummated a deal that

14    was completed in December of 2006.

15    Q    And you wouldn't describe it as a long-term or

16    long-standing relationship with JMH, would you?

17    A    Well, the relationship is still in existence to some

18    extent now, but at that particular time, it was not a

19    long-term relationship, no.

20    Q    All right.  And you're providing this to Mr. Kuber so he

21    can use it for promotional purposes, that is, to help you sell

22    JMH paper; right?

23    A    He asked me for my historical information related to what

24    I've done in the collection industry.

25    Q    You think he's just curious?

1      MR. MCMAHON:  Objection, Your Honor.  Objection.

2   Let him finish his answer.  He keeps interrupting.

3      THE COURT:  Sustained.  You may finish your

4   answer.

5   A    Can you please ask the question again?

6   Q    (BY MR. CLARKE)  My question was, isn't it true that

7   you're providing this information for promotional purposes to

8   promote your JMH paper product through your business model?

9   A    The reason I sent the information contained in that

10  e-mail to Mr. Kuber was because he had requested my background

11  and experience in the credit sector world.  That's what I sent

12  him.

13  Q    You think he was just curious?

14      MR. MCMAHON:  Objection.

15      THE COURT:  Overruled.

16  A    I can't answer what Mr. Kuber was thinking when he had

17  requested the information.  He requested my background, I sent

18  it to him.  That's what I did.

19  Q    (BY MR. CLARKE)  Sir, you knew why he was asking for that

20  information, didn't you?

21      MR. MCMAHON:  Objection.

22      THE COURT:  Overruled.  Did you know?

23      THE WITNESS:  I don't know.

24      THE COURT:  Next question.

25  Q    (BY MR. CLARKE)  I'm showing you Government's Exhibit

1    1092.  This is the same day, from Mr. Kuber to you.  And the

2    subject is Richard Shusterman.  And he asks, "Are you able to

3    provide the names of the hospitals and face amounts of the

4    last 5 deals?  I think that would be very impressive."  And he

5    wants five deals before January of 2007, which doesn't include

6    JMH paper; right?

7    A    Correct.

8    Q    So that would include credit card deals?

9    A    No.  This says hospitals.

10   Q    All right.  So did you have five hospital deals prior to

11   January of 2007?

12   A    I had North Philadelphia Health Systems.  I had --

13   Q    Robert Wood Johnson?

14   A    Just -- Robert Wood Johnson.  St. Joe's Hospital, which

15   was part of -- but a separate hospital from North Philadelphia

16   Health Systems.  And I think that was it.

17   Q    Okay.  And so he's asking for that information; right?

18   And you know why he's asking for this information, don't

19   you?

20   A    He just asked for the names of hospitals and the face

21   amounts of what I purchased.

22   Q    Simply personal curiosity again, is that what you

23   deduced?

24   A    Sir, I don't know why he -- he asked me a question, "What

25   hospitals did you buy from in the past?"  He asked me for five

Cross-Examination Richard Shusterman by Mr. Clarke

1    deals.

2    Q    Well, isn't it clear that he's going to disseminate it,

3    because he's going to make it impressive?  He's going to make

4    your background and the last five deals, your bio or your

5    personal history, plus the last five deals is going to sell.

6    That's what's going on here; right?

7    A    I can't answer what Mr. Kuber did with any information

8    that he asked me for that I provided.  He asked me for the

9    names of hospitals and transactions that took place prior to

10   Jackson.  That's what I supplied.

11   Q    I'm showing you 1378, which is ten minutes later.  You

12   respond that you're limited by a nondisclosure agreement in

13   what you can tell him; correct?

14   A    Yes.

15   Q    And you did say, "But you can tell him that your firm has

16   completed transactions with these various hospitals"; right?

17   A    Correct.

18   Q    All right.  And then you go on to say, "We currently have

19   final discussions ongoing with transactions involving 35 of

20   the largest most respected hospitals in the United States."

21   You wrote that; right?

22   A    Yes.

23   Q    Sir, that was quite an exaggeration, wasn't it?

24   A    No, not at all.  To the contrary.  HMA had 51 hospitals.

25   And, in fact, the 51 hospitals were very substantial hospitals

1    and a publicly traded company, and highly respected.  In

2    addition, there were many, many hospitals at the time that I

3    was engaged in conversations with.

4    Q    And you're in final discussions with those hospitals and

5    hospital networks?

6    A    I was in serious discussions with HMA, as well as many

7    other hospitals across the country, many.  It took a long

8    time.

9    Q    And so when you say here, "35 of the largest, most

10   respected hospitals," you're including HMA as a single

11   hospital that represents a network of lots of hospitals and

12   that's how you get to 35?

13   A    No, not at all.  HMA represented, I think, 51 or 52

14   hospitals that were under the HMA umbrella but were individual

15   hospitals.  There were many other hospitals, that on a daily

16   and a weekly basis, I was engaged in conversations with.

17   Q    All right.  So we've seen three e-mails, all within a

18   matter of minutes of each other back in January of 2007, six

19   months before the Sanctuary Wealth deal.

20        But even before that, and after these e-mails, you were

21   continuing to talk with Mr. Kuber and Mr. Rosenberg about the

22   possibility of both IPI and ARS or Sanctuary Wealth jointly

23   promoting, in a legal fashion, within a document, your IPI

24   portfolios; correct?

25   A    You'd have to be specific.  I don't know what you're

1    speaking about.  Other than what you just showed me, I

2    answered those questions.

3    Q    I understand.  But I'm asking you a general question

4    without showing you anything.  I'm asking you, during those

5    six months, between January of '07 until June of '07 whether

6    or not you were engaged in negotiations with Mr. Kuber,

7    Mr. Rosenberg, and Mr. Feldman, about the possibility of IPI

8    and ARS legally being a part of the same joint venture?

9    A    A joint venture to purchase hospital receivables?

10   Never.

11   Q    To promote your business, sir?

12   A    My role was strictly to purchase the receivables and sell

13   them --

14   Q    Right.

15   A    What -- may I finish?

16   Q    Well, I think you've made that point before.

17              MR. MCMAHON:  Judge, I hate to keep objecting.  Just

18   let him finish, that's all I ask.  Let him finish the answer.

19   That's all I'm asking.

20              THE COURT:  I don't find it terribly problematic.

21   This one's overruled.  You may continue.

22   Q    (BY MR. CLARKE)  Showing you 1051, which is an ARS

23   accounts receivable prospectus that involved the possibility

24   of issuing one year secured notes for the purchase of IPI

25   portfolios.  I'm turning to page 10 of that exhibit, which

1    lists the management and key personnel of that entity.

2         And you see there that Mr. Kuber, Mr. Rosenberg are

3    listed as key personnel, part of the management.  And you also

4    are listed as part of that, aren't you, sir?

5    A    I'm not -- first of all, my name is spelled wrong here.

6    So, clearly, I had no input on that.  But, secondly, I had

7    absolutely no involvement in putting this document together.

8    And I think it was only until recently that I saw this

9    document.

10   Q    Showing you 1092.  It's right from the bio that you sent

11   Mr. Kuber; correct?

12   A    Well, I see three lines.  And from what I see, it was

13   taken out of the e-mail, clearly, that I had sent Mr. Kuber.

14   Q    All right.  So he incorporated your professional history,

15   a large part of it, in the promotional material; correct?

16   A    Without my knowledge, correct.

17   Q    For the record, that was in May of 2007, is the date of

18   that memorandum.  I'm showing you Government's Exhibit 1050,

19   dated March 15th, 2007, which is a Sanctuary Wealth prospectus

20   that's selling membership interests, not a notes structure but

21   a fund structure.  And in that same document, on page 21, it

22   lists the key personnel of that proposed entity.  And this is

23   a few months apart from the prior prospectus we just looked

24   at.

25        And, once again, you're listed as a manager and key

1   personnel of the proposed company, are you not?

2   A    He, again, spells my name wrong.  And my name and

3   information is listed.  And I do not -- I don't recall ever

4   seeing that document until preparation for trial.

5   Q    In fact, sir, you were fully engaged in those

6   negotiations, as well as the early negotiations with ARS's and

7   Sanctuary Wealth's attempt to land Platinum as an investor;

8   correct?

9   A    Excuse me.  Can you repeat that again?

10  Q    You were part of Mr. Kuber and Mr. Rosenberg's efforts to

11  land Platinum as an investor; isn't that correct?

12  A    That's completely incorrect.

13  Q    Well, sir, you testified the other day that you had no

14  knowledge of Platinum's involvement at the start; correct?

15  A    Platinum was -- contacts and relationships that Mr. Kuber

16  had through the orthodox Jewish community of which was not the

17  world I lived in, nor participated in.  And so these were

18  people I didn't know, never spoke to, when Mr. Kuber had

19  secured the loans that he did from them.

20  Q    Well, sir, but you testified that you had never heard the

21  word "Platinum" by the time of the first deal.  Do you recall

22  that?

23  A    Yeah, I think you're incorrect.  In fact, there's an

24  e-mail that I sent that said and referenced the word

25  "Platinum."  I had no other knowledge, other than referencing

1    the word "Platinum."  I had no discussions with them,

2    negotiations with them, and, in fact, didn't need them until

3    he defaulted.

4    Q    All right.  Well, do you recall the line of questioning

5    by your attorney wherein he says, "And did you know who, in

6    fact, and what means that Mr. Kuber was getting the 5

7    million?"

8         And you responded, "I had absolutely no knowledge of what

9    he was doing as far as where the funds were coming from.  I

10   had enough responsibility in running the portfolios and the

11   accounts that we had."

12        Do you recall giving that response?

13   A    I do.

14   Q    All right.  And that was your testimony that day before

15   the break; isn't that correct?

16   A    I don't recall if that was precisely before the break,

17   but if you have my testimony and that's as you read it back to

18   me, I accept that.

19   Q    All right.  And then after the break -- well, actually

20   before the break, somebody showed you an e-mail, right, where

21   the word "Platinum" appeared.  And when you took the stand,

22   you stated, tell me if this is correct, "There was a time I

23   became aware of Platinum.  I think I -- the word was

24   mentioned.  I didn't know anything about that.  I had no idea

25   what Platinum was.  And I think we saw an e-mail to that

1    effect, do you recall saying that?

2    A    Yes.

3    Q    And I think I may have said it one time, "How is

4    Platinum?"  Or "How are things with Platinum?"  You got that

5    from the e-mail that somebody showed you after the break;

6    right?

7    A    I saw an e-mail that was presented here, I believe.  And

8    that's what the question was.  But, again, regarding

9    Mr. Kuber's loan that was for the $5 million that he obtained

10   from Platinum, I had no involvement, no negotiations, no

11   discussions with Platinum, and never met these people.  I

12   didn't know them.

13   Q    Well, just after you said that maybe you heard the word

14   one time before, you were asked by counsel, tell me if I'm

15   correct, "So as we move forward with all these deals, and when

16   we see Platinum, the funding of the loaning of the money for

17   each of these deals was, in fact, from Platinum, did you

18   know?"

19        "No."

20        So you didn't know it was Platinum funding the Sanctuary

21   Wealth deals or -- I mean, the original IPI ARSH deal or the

22   subsequent deals until much, much later on; correct?  That's

23   your testimony?

24   A    My testimony was very clear when Mr. Kuber bought, in

25   fact, the portfolio on June of '07, the Sanctuary Wealth deal.

1    I had no clue where his money was coming from.  I never asked

2    him.  When he subsequently went on and made an additional

3    purchase on 3 July, I never asked him then, "Where was your

4    money from?  Who was your lender?"

5    Q    Well, I'm showing you Government's 504.  And this is the

6    e-mail that you saw during the break, which caused you to

7    modify your --

8              MR. MCMAHON:  Objection.  Your Honor, there's no

9    evidence he saw that during the break.

10             MR. CLARKE:  I can break it up.

11             MR. MCMAHON:  I object.  There's no evidence in this

12   record to reflect that.  And for him to state -- he's stating

13   facts not in the record.

14             THE COURT:  The jury's recollection of the facts

15   will control.  Overruled.  You may continue.

16   Q    (BY MR. CLARKE)  Sir, I'm showing you this e-mail where

17   you said, "Doug, I wanted to see how things were progressing

18   with Platinum."

19             MR. MCMAHON:  Objection.

20   Q    (BY MR. CLARKE)  "Please advise when I should instruct

21   Debbie Gersh to get a new purchase agreement ready."

22       This is the one that you saw during the break; correct?

23             THE COURT:  There's a problem with your screen,

24   Mr. McMahon?

25             MR. MCMAHON:  Yeah, both our screens are out.

1          THE COURT:  Ms. Smith, let's see if we can rectify

2     that.  Are any juror screens out?

3          (Negative.)

4          THE COURT:  Mr. Wise?

5          MR. WISE:  Our screen is on, Your Honor.

6          THE COURT:  It's out.

7          MR. WISE:  No, our screen is on.

8          THE CLERK:  I have to reboot the system and take it

9     down.

10         THE COURT:  We have to reboot ladies and gentlemen.

11    That's an opportunity for everybody to stand up and stretch.

12    Takes about three minutes.

13         (Pause in the proceedings.)

14         MR. MCMAHON:  It's up.

15         THE COURT:  Be seated, please.  Screens all up

16    ladies and gentlemen?

17         Mr. Clarke, you may continue.

18    Q    (BY MR. CLARKE)  So this is in July.  And is this the one

19    time that you seem to recall hearing the word "Platinum"?

20    A    In this particular e-mail that I had authored and sent,

21    it -- it clearly says in there, and it was very -- you just

22    took that off -- but it was very limited to the word

23    "Platinum."  And my reference was limited to just how things

24    were going.  I didn't know any of the details pertaining to

25    what discussions, conversations, status, nothing was taking

1  place.

2  Q    This is around the same time, and you state down below,

3  "Jon, should I move forward with the contract for

4  Doug/Platinum transaction?  What is the latest update?"

5       Sir, you're seeking out updates about how things are

6  going with Platinum, specifically, aren't you, sir?

7  A    I'm trying to determine if, in fact, there's going to be

8  a purchase and should I hold paper or look at setting aside

9  paper if Mr. Kuber is going to be purchasing them.

10  Q    Around the same time, Mr. Rosenberg responds,

11  "Absolutely.  I believe Doug is holding off from notifying you

12  as he has sent the final contracts to Platinum and is waiting

13  for their final tweaks."

14       So that was the update you were looking for; right?

15  A    That's the e-mail and the information he provided.

16  Q    Showing you 5 of 5, where you say, "Doug, rest assured, I

17  will not speak with Platinum under any conditions."

18       So you all have had this discussion about whether or not

19  IPI is going to be out front with Sanctuary Wealth or ARS or

20  behind the scenes.  That conversation has already happened --

21  it's already happened; right?

22  A    Absolutely disagree.  When you talk about out front,

23  behind the scenes, Sanctuary Wealth -- sir, there is

24  absolutely no correlation between IPI and Sanctuary Wealth.

25  IPI acquired the debt, sold the debt, and had a transaction

1    with Sanctuary Wealth.  I had no ownership interest in

2    Sanctuary Wealth.  I wasn't involved in the discussions

3    Mr. Kuber had on behalf of Sanctuary Wealth with anybody he

4    spoke to in relationship to Sanctuary Wealth.

5    Q    All right, sir.  Showing you 1393.  This is from you and

6    you say that I will make sure I include on the 75 million file

7    and the 202 million Platinum file.  This is in October of

8    2007.  So you're still discussing -- I mean, these e-mails

9    aren't the only conversations you're having with Mr. Kuber and

10   Mr. Rosenberg; correct?

11   A    My relationship with Mr. Kuber was limited to having

12   files and selling him files and finding out what his level of

13   interest was in buying them.  It wasn't like he was a neighbor

14   or a friend or a best friend or even a long-term business

15   associate.

16   Q    I'm showing you 1394.  This is November of '07.  And you

17   need information on the Platinum files.  You're asking for

18   that; right?

19   A    I didn't have time to read that.  Can you please put that

20   back up?

21   Q    Sure.

22   A    Thank you.

23   Q    You're welcome.

24   A    Oh, this relates to just asking -- should I set aside,

25   are you looking to purchase?  Is there going to be a

1    transaction that's going to take place?

2    Q    Sir, just a few minutes ago you said that you never saw

3    those prospectuses, never seen them before, and that you had

4    nothing to do.

5         I'm showing you 1410, which is Mr. Rosenberg saying that

6    he sent you the electronic prospectus that they are sending

7    out, "We are raising the monies for this fund and then using

8    those monies to buy the product from you."  And this is to you

9    in March of 2007, around the date of one of the

10   prospectuses?

11   A    Can I just read the whole thing, please?  I'm not sure --

12   I don't recall what he sent, what portion he compiled, I

13   honestly, I don't recall.  I don't recall -- I wasn't -- it

14   says I sent it only at Bob's request.  I don't recall.

15   Q    Showing the second page of that.  And you state, "The

16   only question I have is my name appears in the fund offering.

17   Please confirm there's no conflict with my name appearing and

18   the purchases being made from IPI."

19        Sir, that's a direct reference to the offering itself and

20   your participation in it, isn't it?

21   A    No, it clearly says in here that I want to make certain

22   there's no conflict.  And in reading this e-mail, they're

23   purchasing files, the purchases are being made from IPI.  I

24   have nothing to do with his fund.

25   Q    This is the page number where your information is

1    contained.  And Rosenberg said, "Got it.  I just called the

2    attorney.  He said no conflict"; right?

3    A    That's what the e-mail says, yes.

4    Q    And, in fact, page 11 of that document is where your name

5    appears; correct?

6    A    I just --

7         THE COURT:  Please leave the exhibit on the document

8    camera until the witness has finished his answer.  Thank you.

9    A    Oh, that's marked page 11 and my name does appear

10   there.

11   Q    (BY MR. CLARKE)  Which is consistent with the e-mail from

12   you about your participation or reference in the offering;

13   correct?

14   A    Again, it relates to that.  I don't recall at this

15   moment, as I sit here today, some nine years later, reading

16   that.  I just don't recall it.

17   Q    I'm showing you 1395, where Mr. Kuber is asking you for

18   information.  "I've not received reports.  I need to update

19   Platinum at my meeting with them tomorrow."

20        And you respond, "They're going to be sent to you in the

21   next 30 minutes."  And we're still in December, you haven't

22   even made the second Platinum deal yet.

23   A    Was that a statement or a question?  I don't understand.

24   Were you asking me?

25   Q    Yeah.

1    A    When was the second Platinum deal, is that the question?

2    Q    No, my question is, aren't you involved in the

3    solicitation, the pitching, and the management and servicing

4    early on of the Platinum and it's fully known and you're fully

5    involved?

6    A    My responsibility was limited to servicing his files that

7    he had purchased.  I did not meet with or talk to Platinum

8    until after a default.  I didn't know these people.  I didn't

9    know the company.  I didn't go to New York and meet with them.

10   I never solicited them for anything.

11   Q    1396.  You're asking them to please get working on the

12   numbers that you need for the Platinum file that you all spoke

13   about during a conference call the previous week; correct?

14   A    "Please work on getting me the numbers I need for the

15   Platinum file we spoke about on the conference call last

16   Friday, so I can complete a sale this week."  That's what it

17   says.

18   Q    You talk about needing to keep track of what's going on

19   with Platinum, right?  What's coming in, what's coming out,

20   how much they're buying and what partial sales you might

21   include for the Platinum portfolios; correct?

22   A    It just -- what you highlighted says, "I need to keep

23   track of that pursuant to my agreement with Platinum.  He

24   wants to know, above that, Richard, how do I know which

25   particular accounts are being sold and which are being

1    retained?"

2    Q    Doug is asking you for analysis for Platinum so that they

3    can fund; correct?

4    A    Yes.

5    Q    That was 1399.  Showing you 1400.  Now you're talking

6    with Mr. Kuber, still in December, about which should you sell

7    of the Barnert or the second portion of the Platinum file;

8    correct?

9    A    Correct.

10   Q    So, this notion that he's just a buyer and that somehow

11   you guys are like a corner store where you sell something and

12   give a receipt and the person goes off and doesn't come back,

13   isn't really accurate, is it?  You're fully engaged with them

14   in what they're promoting, and what they're promoting is your

15   product.

16   A    Absolutely not.

17   Q    January 16th of 2008, you talk about the fees owed to

18   each other.  And you come up with an idea -- who's

19   collections?

20   A    Well, it's signed Doug, so I don't know -- I assume

21   that's Doug Kuber.

22   Q    And he tells you about Platinum and the necessity of what

23   he needs, the permission to get anything out of the escrow

24   account, right, the restricted escrow account.  And that's in

25   the beginning of 2008; correct?

1    A    This is dated January 16th, 2008, correct.

2    Q    Showing you 1405.  I think I just -- did I just show

3    that?  It's the same one.

4         February, "Doug just e-mailed me that Platinum called

5    tonight and they are speaking in the morning."

6         And you respond, "Great.  Thanks.  Please keep me posted.

7    The file is ready"; correct?

8    A    Yes.

9    Q    That was 1401.  So, sir, one thing that wasn't covered

10   during your direct examination that I'd like to talk about a

11   little bit is how you attained the JMH paper.  You say that no

12   one invests with you, but you're just a seller of paper.  But

13   isn't it the case that your dealings with the Robert Wood

14   Johnson file, and the North Philadelphia Health System file

15   did not create enough proceeds for you to go out and buy $5.8

16   million worth of hospital debt from JMH; correct?

17   A    Yes.  Actually, on the purchase --

18   Q    I'm just asking you if that's correct.

19        THE COURT:  That's a fair yes or no question.  Just

20   answer that question yes or no.  Is that true or not true?

21   A    That's correct.

22        THE COURT:  Next question.

23   Q    (BY MR. CLARKE)  All right.  Thank you.  And in order to

24   raise the money, you went out and solicited investors and

25   asked them for money in return for a percentage on their

Cross-Examination Richard Shusterman by Mr. Clarke

1    investment; right?

2    A    If you'll allow me, I'll be glad to answer the question.

3    It requires more than a yes or no answer.

4    Q    Well, sir, we're going to talk about this for a bit, but

5    right now as we go through it, so we can go through it in an

6    organized fashion, I'm asking you, if in fact, you approached

7    investors about investing with IPI to purchase hospital debt

8    in return for giving them a particular rate of return?

9    A    I -- I -- I'm glad to answer the question.  I can't

10   answer it in just a simple yes or no because there are facts

11   and details related to that.

12   Q    Did you have investors that gave you money to help you

13   buy JMH paper?

14   A    There was one individual, Moe Harris, who in fact,

15   entered into a contract with IPI related to and placed the

16   funding amount as part of a contract and a purchase and sale

17   agreement in the portfolio.  And that was done with Mr. Moe

18   Harris.  He was not an investor or owned shares, so to speak,

19   in IPI.

20   Q    But, sir, to get that $5.8 million, you went out and

21   basically sold shares of that amount of money.  You pulled

22   money together from numerous individuals, and you got it;

23   right?

24   A    No, that's from one individual.

25   Q    One individual?

1    A    Correct.

2    Q    I'm showing you Government's Exhibit No. 1409, and maybe

3    you can help me understand, here's someone not named Moe --

4    unless this is Moe.  Is this Moe?  Michael Richman?

5    A    No.  The money related to the acquisition and purchase of

6    the Jackson Paper was obtained via a contract between IPI and

7    Mr. Moe or Morris Harris.

8    Q    Sir, I'm looking at this and it says November 26th, which

9    is beforehand, that's Michael Richman.  Says with

10   International Portfolio.  And on that date, whereas the

11   medical debt portfolio consists of 1.8 billion and change,

12   that's JMH; right?

13   A    Yes.

14   Q    All right.  And whereas the purchase price shall be 7.3

15   million -- that was the price; right?

16   A    No, the purchase -- I'd have to see the rest of this.

17   Q    I'm just asking you, sir, if that $7.3 million is the

18   purchase price.

19   A    That's what's listed here.

20   Q    My question is whether or not JMH purchase price was $7.3

21   million?

22   A    No, it was $5.8 million.

23   Q    Okay.  But you're raising how much?

24   A    I'd have to see the rest of the document, but the money

25   that was --

1    Q    Go on, sir.

2    A    The money that was obtained for the funds for the

3    specific JMH purchase were obtained from Morris Harris related

4    to a contract I had with him.

5    Q    I appreciate that.  But my question is that you were

6    attempting to raise 7.3 million for a 5.6 or 5.7 purchase of

7    the JMH paper; right?

8    A    This looks like, if I read the entire transaction, that

9    it relates to either the pending acquisition or the accounts

10   coming in and the funding of the sales as they were coming

11   in.

12   Q    Sir, it says here that his money will be used to purchase

13   a portion of the total, which would include clean up costs of

14   the JMH paper, and that he will furnish you $200,000,

15   participate in that purchase, and that you shall use all

16   monies invested by him solely for the purpose of purchasing

17   the medical debt portfolio.  You were a party to this

18   agreement, were you not, sir?

19   A    Yes, I just have to see my signature, just to make

20   sure.

21   Q    Okay.  You recall this; right?

22   A    I do recall vaguely, the contract, but yes.

23   Q    Well, I have a bunch of them, here, sir.  I have a

24   Mr. Bittner, Shields, and others.  We're not going to go

25   through all of them, but you got a whole stack of contracts

Cross-Examination Richard Shusterman by Mr. Clarke

1    from people who were willing to give you significant sums of

2    money for you to pull together and buy JMH paper; right?

3    A    I'd have to check the dates of those contracts to

4    determine if, in fact, they were buying pieces of the

5    portfolio after the portfolio was actually acquired.

6    Q    All right.  But you acknowledge that International

7    Portfolio should have exclusive right to sell, manage, and

8    determine when to initiate collections and when they should

9    cease, and when the portfolio should be sold; correct?

10   A    That is correct.

11   Q    And in return for the money he gives you, he gets a part

12   of the profit that comes from servicing -- owning and

13   servicing that paper through IPI, and that you're going to

14   give him a ten percent return on his investment; correct?

15   A    That's correct.

16   Q    Is he an investor, sir?

17   A    Again, in -- on this particular transaction, I don't

18   recall specifically if it relates to after the acquisition or

19   if he was part of the funds that were used to actually make

20   the purchase and acquisition of the portfolio from Jackson.

21   Q    Sir, either way, he's an investor in your business model,

22   is he not?

23   A    He would be a purchaser.

24   Q    Well, to the extent that your investor is purchasing a

25   portion, he's still an investor; right?

1   A    He would be a purchaser of the portfolio or a subsection

2   of that portfolio.

3   Q    Okay.  Now, on direct exam, you testified that you met

4   with a Jerry Gray, a Mr. Bingham, and a Mr. Handfield;

5   correct?

6   A    Correct.

7   Q    And these were all individuals that were going to assist

8   you in getting the JMH paper; right?

9   A    Yes.  Well, no.  Mr. Handfield, not.  Mr. Handfield was

10  the president or chairman of the Public Health Trust.  So

11  Mr. Handfield wasn't going to assist me in getting the JMH

12  paper, he sat as the leader of the Public Health Trust of that

13  hospital.

14  Q    Right.  So he would be a part of the decision to vote on

15  whether or not you should get the JMH paper, correct?

16  A    That is correct.  And, actually, I don't think he voted.

17  I think the board did.  I don't think he was part of that

18  vote.

19  Q    Oh, I see.  Okay.  So you said you had about three

20  meetings with Mr. Gray and Mr. Bingham is that about; right?

21  A    There were several.  I don't remember exactly.  There

22  were several meetings.

23  Q    So several is what, three or four?

24  A    Thereabout.

25  Q    All right.  So three or four meetings.  And ultimately,

1    you were successful in convincing them to sell you the paper.

2    That's your testimony; right?

3    A    I didn't have to convince them.  I made them an offer, I

4    asked them if they were interested in selling the debt.  They

5    put it to a board vote and ultimately it passed the board

6    vote.  I didn't know any of the members even sitting on this

7    board.

8    Q    So your product sort of -- or your idea, your model sort

9    of sold itself, you're offering them a good price and they

10   agreed to pay it?

11   A    I don't know what went on in discussions internally with

12   Jackson, I have no clue.  I told them I was interested in

13   buying their bad debt, and ultimately the board voted on it

14   and IPI purchased it.

15   Q    I'm showing you Government's Exhibit No. 1379, which is

16   already in evidence.  And right here it lists hospital

17   portfolio purchase for Jackson Health Systems, price of 5.7

18   million and change; correct?

19   A    Can you just move it over a little bit so I could see

20   that?

21   Q    December 15th, 2006.

22   A    Yes.

23   Q    That's the funding for the purchase; correct?

24   A    Correct.

25   Q    And your balance before that, 7.3, then it goes down to

1    1.6; correct?

2    A    Yes.

3    Q    So you raised the money -- you raised the cash to make

4    this purchase; correct?

5    A    There was one individual who had funded the proceeds of

6    the $5.7 million.

7    Q    Well --

8    A    In a --

9    Q    I know you explained that earlier.

10            THE COURT:  Let him finish.

11   Q    (BY MR. CLARKE)  Go on?

12   A    In a contract that was responsible for this purchase.

13   Q    Approaching the witness, I'm showing you Government's

14   Exhibit 1382.

15            THE COURT:  Is this in evidence or for

16   identification?

17            MR. CLARKE:  To be in evidence, Your Honor.

18            THE COURT:  1382.

19   Q    (BY MR. CLARKE) Do you recognize who that is?

20            MR. MCMAHON:  Can I see --

21            THE COURT:  Show it to counsel.

22            MR. MCMAHON:  Can I see what it is before?

23   Q    (BY MR. CLARKE)  Do you recognize --

24            THE COURT:  Hold on.  Let Mr. McMahon look at the

25   exhibit.

1          1382 is received.

2     Q    (BY MR. CLARKE)  Do you recognize it?

3     A    Yes.

4     Q    And you recognize him as not only a member of the board

5     of JMH, but he's on the board of Bethune-Cookman University or

6     Bethune-Cookman College?

7     A    Correct.

8     Q    That's historically a black college; correct?

9     A    It is a historic black college.

10    Q    Sir, I'm moving this schedule of your bank account down

11    further.  On December 21st, 2006, after you purchased the JMH,

12    how much money did you wire to Mr. Jerry Gray, the person that

13    assisted you with this transaction?

14    A    $627,000.

15    Q    And so that was the use of investor funds, right?  To pay

16    Mr. Gray?

17    A    Was it the use of investor funds --

18    Q    In other words, you didn't have these funds in your

19    account prior to you pooling the money and raising them

20    through your agreements with the investors.

21    A    I had my own proceeds, my own money that I had made

22    through the buying and selling of portfolios long before

23    2006.

24    Q    Sir, you did -- if I may --

25               THE COURT:  Let him finish.

1    A    That I had had multiple transactions starting in 2002,

2    going back to the profit that I had made in credit card sales.

3    So, again, I don't know what I had in my personal account at

4    the time.  And I always transferred money back and forth

5    between my business and personal account.

6    Q    (BY MR. CLARKE)  Sir, are you saying that the money that

7    you made from the Robert Wood Johnson deal and the North

8    Philly deal, and the credit card deals that you described in

9    your direct examination, which were $100,000 and $400,000, all

10   of that totaled up to a point where you could afford $627,000

11   fee to Mr. Gray?

12   A    Well, the North Philadelphia Health Systems deal alone

13   was purchased at $70,000.  It was sold for $700,000.  In fact,

14   even if divided, and with the multitude of other transactions

15   that I did, yes.

16   Q    Okay.  So this was a commission to Mr. Gray?

17   A    That was his fee for doing the consulting work that was

18   paid to Mr. Gray.

19   Q    And that was an upfront cost for this investment;

20   correct?

21   A    I don't know what you mean by an upfront cost.

22   Q    Well, sir, it's a cost that's required to help close the

23   deal; right?  It's a fee that's associated with closing the

24   transaction; correct?

25   A    No.  It was a separate fee, total and separate and apart

Cross-Examination Richard Shusterman by Mr. Clarke

1    from the purchase of the portfolio.

2    Q    So this -- paying Mr. Gray the fee had nothing to do with

3    you acquiring JMH.  Is that what you're saying?

4    A    No.  What I'm testifying is that it was a consulting fee

5    that was paid to Mr. Gray that was directly related to the

6    acquisition of and the work that he did in IPI purchasing

7    successfully that portfolio.

8    Q    It was part of the cost for you to acquire that

9    portfolio; correct?

10   A    The cost for the portfolio was paid to Jackson.  This was

11   a separate cost involved in acquiring the debt.

12   Q    Whether it's separate or not, it's a cost related to the

13   acquisition of JMH; correct?

14   A    That's what I said.

15   Q    So further down, a couple weeks later, you make a

16   donation to Bethune-Cookman College of $1 million; correct?

17   A    That's correct.

18   Q    And that's the same college, where Mr. Handfield is on

19   the board of trustees; right?

20   A    He is on the board and I had the honor and privilege to

21   visit and spend time, a lot of time at Bethune-Cookman

22   College, a historic black college.  Unfortunately, I didn't

23   have the privilege and opportunity to attend college, but I

24   went there, I visited there, I spent a lot of time speaking

25   with the students that attended that college, and these were

1    students that under any other normal condition, would not be

2    able to go to college.

3         And to this day, I donated funds anonymously and it was a

4    privilege and an honor.

5    Q    So you were moved by your experience at Bethune-Cookman

6    to give them a million dollars around the same time that you

7    were negotiating with the board member at JMH.

8    A    I, in fact, gave them a million dollar donation.  It had

9    absolutely nothing to do with the purchase or any relationship

10   to the acquisition of debt.  In fact, I've spent my life, my

11   entire life, donating anonymously and giving money to

12   charitable causes across the world.

13   Q    All right.  Well, this $1 million though, that is an

14   upfront cost; right?

15   A    No, it's not an upfront cost.  It's a $1 million donation

16   that was posted on my personal tax return.  And to this day,

17   it was an honor.

18   Q    All right.  So this is the check you signed it and you've

19   got "donation" here; right?

20   A    Correct.

21   Q    And that was 1381.  Showing you 1380.  This is a letter

22   to you from Bethune College dated January 8th, 2007.  And it's

23   to you at International Portfolio, acknowledging, and they're

24   showing their great appreciation for the $1 million that was

25   "designated for our football training center to the name the

1    facility in the honor of Dr. Larry Handfield."

2    A    Was there a question?  I missed it.

3    Q    Well, I think it begs the question, sir.  You said

4    earlier it had nothing to do with Mr. Handfield or the JMH

5    deal, but you donated it in his name?

6    A    What I said was it had nothing to do with the JMH

7    transaction.  Absolutely nothing.

8    Q    Mr. Handfield gets the acclaim, you get the paper, and

9    you use the investor's money for it; correct?

10   A    That's completely incorrect.  It -- to this day, giving

11   money to educate students that normally under any normal

12   circumstance wouldn't have the ability to go to college, is a

13   privilege, an honor, I've done it at Bethune, and if I ever

14   could, would do it again.

15   Q    All right.  And you state here that you -- what appears

16   that you gave this contribution anonymously; correct?

17   A    As I've given many other contributions in my life,

18   anonymously.

19   Q    Well, you give contributions when it furthers your

20   business interest, isn't that fair to say?

21   A    It's insulting.

22   Q    Well, Cleveland Clinic, we saw the e-mails and the

23   attachments that you and your attorneys sent to Eton Park

24   where you donated money to Cleveland Clinic; right?

25   A    I did donate money to Cleveland Clinic.

1    Q    All right.  And you aren't shy about having your picture

2    in the paper and taking credit for that; correct?

3    A    Cleveland Clinic --

4    Q    Sir, I'm just asking -- that's a question, sir.  You

5    weren't shy about -- let me finish my question.  You weren't

6    shy about getting the acclaim or the rightful notation that

7    you were the donor of that money to Cleveland Clinic, you

8    elected not to be anonymous in that deal; isn't that correct?

9    A    Cleveland Clinic had asked me if they could compile an

10   article related to the medical services they had provided my

11   wife in relationship to saving her life.

12   Q    All right.

13   A    And I would do anything to assist them at the Cleveland

14   Clinic based on the medical care they had provided.

15   Q    All right.  But you didn't do it anonymously.  And you

16   had paper from Cleveland Clinic; correct?

17   A    The -- I had purchased paper from Cleveland Clinic, but I

18   can tell you that the care, the choice, the selection, the

19   fact they saved my wife's life will -- it's remarkable, and I

20   can -- to the day I die, be forever thankful to them.

21   Q    So, I think it's clear from the e-mails that we've

22   reviewed up to this point, and the ones that have come out

23   through various witnesses, that you pitched yourself from the

24   very beginning as an expert in the field of medical accounts

25   receivable and their collections; correct?

1   A     I -- when you say pitched myself, I described myself as

2   somebody who has spent many years in the collections sector.

3   In fact, the North Philadelphia Health Systems portfolio was

4   the first medical portfolio that was acquired.

5   Q     But you testified that you first started in the medical

6   debt collection business in 2006.  You segued from credit card

7   debt to medical debt in 2006.  That's your testimony; right?

8   A     My testimony was that through the purchase of North

9   Philadelphia Health Systems, that was the first acquisition in

10  medical debt that was made by IPI.

11  Q     Okay.  Up until that point, you were collecting on credit

12  cards and car loans and things like that; correct?

13  A     Not car loans.

14  Q     All right.  Well, but you hadn't been involved in medical

15  debt collection prior to 2006.  I think you said mid 2006;

16  correct?

17  A     Medical debt purchase or collection?  I don't understand

18  the question.

19  Q     Well, both.  You said you didn't start buying until you

20  went to the Robert Wood Johnson and to the North Philadelphia

21  Health Center.  Those were your first two purchases according

22  to your testimony?

23  A     Correct.  Right.  That's correct.

24  Q     So you weren't collecting on medical debt prior to the

25  purchases; correct?

Cross-Examination Richard Shusterman by Mr. Clarke

1    A    I don't know if there was any medical debt or trying to

2    remember, that were just small portfolios sold in the

3    secondary market prior to that, that I may have purchased.  I

4    don't remember.  If so, they may have been very, very small.

5    But the main acquisition starting on the medical debt sector

6    side started with North Philadelphia Health Systems.

7    Q    All right.  So you heard the testimony of Mr. Feldman,

8    Mr. Kuber, Mr. Rosenberg, that things were going along

9    swimmingly with the credit card debt and then you decided that

10   you were going to enter the medical debt realm and that was in

11   2006 and that would seem to jive with what you're saying here

12   today; correct?

13   A    The first purchase of medical debt from a hospital was

14   North Philadelphia Health Systems in, I believe, 2006.

15   Q    All right, sir.  So by your response, you're agreeing

16   with me; correct?

17   A    I'm trying to answer the question.

18   Q    By your response, you agree that that was the first time

19   that you got involved in the purchase of medical debt;

20   correct?

21   A    The first acquisition from a hospital, direct from a

22   hospital, was North Philadelphia Health Systems in 2006.

23   Q    And then you started collecting on medical debt after

24   that point; correct?

25   A    I continued to purchase, service, and sell, correct.

Cross-Examination Richard Shusterman by Mr. Clarke

1    Q    All right.  Prior to that, you had no medical debt

2    collection experience; correct?

3    A    Prior to that, I had not made any direct purchase of

4    medical debt from a hospital.

5    Q    Prior to that, had you had medical debt collection

6    experience?

7    A    When I worked in the collection realm, to me, if a

8    self-pay was owed -- it wouldn't matter if a debt was owed.  I

9    would call a patient.  If it was the patient -- when working

10   in a collection agency and it was a self-pay debt that was

11   owed -- it was a self-pay debt that was owed.  It would be

12   treated no differently than if I was collecting on a credit

13   card debt.

14   Q    My question wasn't about self-pay, was it?  My question

15   was whether or not you had any prior experience collecting

16   medical debt prior to the two purchases we've just been

17   talking about.

18   A    I collected at some point self-pay balances, low balances

19   when I worked at collection -- at a collection agency.  There

20   was no doubt there was some self-pay accounts that were owed

21   from a hospital that I may have pulled patients on to collect.

22   That was before --

23   Q    IPI wasn't involved in that; correct?

24   A    No, no.  IPI was not a collection agency.

25   Q    So all that predates IPI, which was in 2002, when you

1    formed; correct?

2    A     Correct.

3    Q     All right.  So your experience at that point was Franklin

4    Mint and credit cards and some car loans?

5    A     I didn't do car loans, sir.

6    Q     What is fleet, I thought you had some fleet?

7    A     No, I never -- I never called and collected on car loans.

8    Fleet was a credit card processor.

9    Q     Okay.  Very good.  I stand corrected.  And none of those

10   collections involved all of the various issues that you

11   testified about.  The issues with HIPAA and self-pay, and the

12   various medical insurances and the co-pays and deductibles and

13   the right to sue and Medicare, Medicaid -- none of those types

14   of debt had the same issues as medical debt.  That's fair to

15   say, isn't it, sir?

16   A     No, not at all.  The right to sue, clearly, was the

17   ability in all of those accounts.  There was a provision

18   contained that there was a right to sue.  I would disagree.

19   Q     Well, would you agree that the investment groups and

20   individuals that you were selling to did not have medical debt

21   collection experience?

22   A     That's -- I completely disagree.

23   Q     Well --

24   A     For example --

25   Q     Go on.

1    A    For example, Mr. Hill was a CEO of a hospital and made it

2    crystal clear to me that he had experience as a CEO of a

3    hospital, knowing all the financial components running a

4    hospital that related to bad debt, how the bad debt was

5    serviced, and how the bad debt was handled in his hospital.

6    Q    Well, the -- Mr. Kuber was a trial attorney; correct?

7    A    Yeah, litigation trial attorney.

8    Q    Mr. Rosenberg was a court stenographer; correct?

9    A    Yes.

10   Q    Mr. Dean Lewis had no experience; correct?

11   A    I think he -- from speaking to him, his experience in the

12   business world was very savvy.

13   Q    That wasn't my question.  I'm talking about medical debt

14   collection experience.  He had none; correct?

15   A    Correct.

16   Q    All right.  And Mr. Raymond, the folks in IIG,

17   Mr. Willner, Mr. Shields, none of those individuals had any

18   medical debt collection experience; correct?

19   A    No.  Mr. Raymond's entire career was centered on the

20   realm of health care insurance, medical debt, co-pay,

21   insurance, his whole life.

22   Q    Well, but he wasn't -- there's a difference between being

23   in a hospital, right, and understanding the collections

24   business.  You spent your life in the collections business,

25   that doesn't mean that you know about credit card companies,

Cross-Examination Richard Shusterman by Mr. Clarke

1    right?  You don't know how to run a credit card company

2    because you collect on their debt; right?

3    A    Correct.  But --

4    Q    All right.  So they relied on you and your experience to

5    help them collect on the investments they had made in IPI

6    Portfolios; correct?

7    A    I would disagree.  The contract and the buyers of the

8    debt were told, as the contract stated, that the only

9    obligation that IPI had, was to assist in servicing the debt.

10   Mr. Raymond, for example, had spent -- he was a Wharton grad,

11   his entire life, in the health care sector.

12        I wish I had one tenth the brain capacity intelligence of

13   Mr. Raymond.  But these were people that clearly had a firm

14   grasp and level of sophistication and understanding of the

15   health care world, the medical world, the health care

16   sector.

17   Q    All right.  Well, you, IPI, you set the price on what

18   they paid for it; correct?

19   A    IPI asked and said, "We're selling a portfolio.  Here is

20   the price" --

21   Q    All right.  I'm not asking for you an entire --

22             MR. MCMAHON:  Judge --

23   Q    (BY MR. CLARKE)  -- background on how many prices?

24             THE COURT:  Fair enough.  It was a simple question,

25   Mr. Shusterman.  Just answer that question, please.

1    A    There was a --

2    Q    (BY MR. CLARKE)  No my question, sir, is did you say,

3    that is IPI -- did IPI set the price on what these folks paid

4    for the IPI portfolios?

5    A    They were told what the selling price was on a

6    portfolio.

7    Q    Okay.  And who serviced and collected upon the debt?

8    A    IPI.

9    Q    All right.  And who set the price for the resale?

10   A    On any resale, IPI would tell the owner what the offer

11   was that IPI would purchase that file back at.

12   Q    Okay.  So, sir, if they're not in the business, then --

13   strike that.

14        If you are the person who's held himself out as an expert

15   in the debt collection business, right, then the collections

16   themselves are what's going to measure whether or not you're

17   successful at what you're doing; correct?

18   A    No.  Also the resale.

19   Q    Well, if there's no collections, then you're not doing

20   what is the essence of what you say you can do; correct?

21   A    If there's no collections, it doesn't mean I'm not doing

22   my job.

23   Q    Well, if you were -- if I may -- if you were in the

24   business of --

25             THE COURT:  Let him answer that question.  I don't

 1    think he was finished.  Go ahead.

 2    A     To the contrary, I was working 19 hours a day to do my

 3    job, to engage with the collection agencies, to do the best we

 4    absolutely could do.  Because the portfolios at any given

 5    moment weren't producing the type of income didn't mean I

 6    wasn't doing my job.

 7    Q     (BY MR. CLARKE)  Well, if you were in the well-drilling

 8    business and you're looking for water, okay.  And someone asks

 9    you to find a well and drill the well and get them water.  If

10    you can't find a water source, you're not successful in that

11    venture up to that point; correct?  That's a fair example;

12    right?

13    A     I don't know anything about well water, but I can talk

14    about the portfolios and the debt world.

15    Q     All right.  Well, let me stick with my example.  If

16    someone holds themselves out as somebody who can drill for

17    water and they don't get the water, you wouldn't want to pay

18    him any money; right?  That's somebody who's not doing what

19    they said they would do; correct?  In my example.

20    A     In your example, the individual could still be working

21    many, many hours to try to get well water.

22    Q     I understand.  But if he goes out and drills --

23          MR. MCMAHON:  Judge, this is just nonstop

24    interrupting him.  Constantly.  He will not let him finish the

25    answer.  Constantly.

1           THE COURT:  I disagree.  Overruled.  You may

2    continue.

3    Q    (BY MR. CLARKE)   So if you're in the well-drilling

4    business and you dig a hundred wells and you never hit water,

5    you, should advise people of that, that you're not being very

6    successful at what you're being an expert in, in my example;

7    correct?

8    A    Your example has changed two times.  As you first asked

9    me, the portfolios, since they were not collecting, was I then

10   not doing the job that I was, as an expert, hired as part of

11   the contract.  And I clearly stated that I disagreed with you,

12   that I was working many, many hours a day to do the best I

13   could to have those portfolios that were placed, to fulfill my

14   contractual obligation under the agreement with each and every

15   collection agency that was managed first by ART and then later

16   by IPI.

17   Q    My question wasn't whether you tried hard, sir.  My

18   example was simply a way of trying to understand the concept

19   that someone who holds themselves out as an expert and doesn't

20   produce what they claim to be an expert in, is not much of an

21   expert.

22   A    I have a background, for years, in the collection

23   industry.  That doesn't change whether the medical debt is

24   collecting or not collecting.  I've spent years working in the

25   collections sector and the collection industry.  I tried

1    everything I could with the team of people I had, working with

2    the agencies that we engaged, to do the best we could on the

3    files that were being serviced.

4    Q    I think you testified, sir, that when you came into the

5    ownership of the JMH paper that you were the only person in

6    IPI; correct?

7    A    I was the only shareholder and owner, if that's what

8    you're asking me.

9    Q    Well, you were the only employee too; correct?

10   A    Yes.

11   Q    So when I asked you if you were the only person in IPI,

12   you certainly understood my question; right?

13   A    I didn't.  I thought you meant -- were you asking me was

14   I the only shareholder?

15   Q    Yeah.

16   A    Yes, I was the only shareholder in IPI starting from 2002

17   forward.

18   Q    All right.  And there were no employees; correct?

19   A    In what year?

20   Q    When you purchased the debt, the JMH debt.

21   A    2006, no.

22   Q    You didn't have the joint venture with Mr. Feldman

23   effectively until 2009; correct?

24   A    I don't -- I'd have to see the joint venture agreement.

25   I don't recall what the date was.

1    Q    Well, when you got this almost 2 billion in face value of

2    debt, you went to Mr. Landrum and asked him to collect on the

3    debt for you, isn't that; correct?

4    A    Correct.  On behalf --

5    Q    Okay, sir.  And if, at that time, you had no employees,

6    you were relying completely on ART to do the collections;

7    correct?

8    A    Yes.

9    Q    All right.  At that point, Lina was not your employee or

10   your 1099 contract worker; correct?

11   A    Correct.  But IPI also had other collection agencies

12   outside of the ART network of agencies that they were using.

13   Q    Okay.  But IPI itself had no collection personnel;

14   correct?

15   A    That's correct.

16   Q    And IPI itself had no corporate managers or anybody else

17   doing anything.  You were doing it all.

18   A    That's correct.  Every day.

19   Q    Okay.  And at some point, Ms. Lina Monterosso comes to

20   work for you, because the collections were so low that ART

21   wasn't making any money; correct?

22   A    As far as what Mr. Landrum told me, I don't know how much

23   money they made or didn't make.  But, in fact, IPI had

24   terminated the contract with ART.

25   Q    All right.  And you picked up Ms. Monterosso as your

1    first employee to assist you with this JMH medical debt;

2    correct?

3    A    She was first hired as a 1099 basis contractor.  And then

4    ultimately as an employee, correct.

5    Q    All right.  And she spent most of 2000 -- the latter part

6    of 2007 and good part of the first part of 2008, trying to

7    assemble a team to catch up with all the portfolios you'd been

8    selling.  Isn't that fair to say?

9    A    She -- clearly, when she came over both as a 1099 paid

10   individual and ultimately an employee, put together a team

11   effectively, to work on getting the debt serviced.

12   Q    Well, you heard her testify and others testify that there

13   was no office.  There was no IPI headquarters where anybody

14   could go and respond or where things were stored, you had a

15   virtual office; correct?

16   A    And made no bones about it, completely.

17   Q    All right.  So you had this virtual office where if

18   people call you and they see your number on your stationary,

19   they call and somebody from IPI calls, but they're not really

20   from IPI, they're from this virtual office; correct?

21   A    I don't understand the question.

22   Q    Well, you had this service, Regency Service, forward all

23   of the calls that came into IPI on the number that was on your

24   letterhead; correct?

25   A    I had an answering service on-ramp, that took all the

1    phone calls coming in that were called to IPI, and they would

2    answer the phone, "IPI."

3    Q    Okay.  But you had no staff to do that, and you had no

4    storage capacity.  In fact, you were relying on

5    Ms. Monterosso, Mr. Zoldan, and Mr. Landrum, three different

6    contractors, to handle IPI's work in this regard; right?

7    A    When you say "work," which -- what aspect of the work are

8    you talking about, the storing of data?  I don't know which

9    part you're talking about.

10   Q    The servicing of the debt.

11   A    Oh, the servicing of the debt, IPI did ultimately when

12   Ms. Monterosso came over, by engaging our own collection

13   agencies and then ultimately used Mr. Zoldan to house the data

14   on his system.

15   Q    But when she came over, as you say, as a 1099 employee,

16   you didn't tell her anything about the company's main source

17   of revenue, which was the sale of portfolios to investment

18   groups.  Your VP, when she came on board, had no clue what IPI

19   really did.

20   A    Ms. Monterosso was hired to assist with the servicing of

21   debt of collection agencies to assist IPI.  And she did a good

22   job and had many years experience in the sector.  I never

23   discussed with her, out of the context and realm of what her

24   job was, and how to service the debt and help with the

25   servicing of the debt.  That's not what my discussions were

1    with Ms. Monterosso.

2    Q    But, sir, not only did you not tell her, you lied to her.

3    You didn't just not tell her, you told her that what you did

4    on a daily basis, to make money, all these sales and

5    everything and these recodings, were just related to your

6    family; correct?

7    A    Early on, when she had asked me about the initial

8    recoding of files, as I testified here, I did tell her that

9    they were for friends and family.  And, in fact, I had also

10   employed a Mr. William Beck, who was Ms. Monterosso's

11   significant other --

12   Q    I appreciate that.  I appreciate the additional

13   information, sir.  But my question was just, you lied to her

14   about what you did on a daily basis in terms of who you were

15   selling to.

16   A    I never -- she never asked me as far as early on, who I'm

17   selling to.  What I told her --

18   Q    I'm not asking what you told her, sir.  Later on --

19            THE COURT:  Let's approach.

20            (Bench conference on the record.)

21            THE COURT:  So we have to strike a balance here.

22   And the balance is between Mr. Clarke's entitlement to control

23   his examination of the witness -- and he is entitled to do

24   that.  And, particularly, Mr. Shusterman is a bit challenging

25   because he is loquacious, to say the least.

1          On the other hand, Mr. Clarke, you have to have a

2    finely tuned ear.  And when the witness is still answering the

3    question that you posed, when you ask an open-ended question,

4    like "explain this to me" or "what's the information about,"

5    you're going to get a long answer --

6               MR. CLARKE:  I understand.

7               THE COURT:  -- and that's legitimate.  So I need

8    both counsel to adhere to the structure that I have just

9    provided.  You can step back.

10              (The following proceedings were had in open court.)

11              MR. CLARKE:  May I, Your Honor?

12              THE COURT:  You may proceed.

13              MR. CLARKE:   Thank you.

14   Q    (BY MR. CLARKE)  And you didn't tell Mr. Zoldan either

15   until much later; correct?

16   A    Tell Mr. Zoldan what?

17   Q    What you were doing to earn all this money.

18   A    Oh, Mr. Zoldan knew from early on --

19   Q    Sir, let me interrupt you there.  My question is not what

20   you thought he knew.  My question was, you didn't tell

21   Mr. Zoldan either; correct?

22   A    I was just going to finish.  Mr. Zoldan, what I engaged

23   his services going back to 2002, knew, that I was a buyer of

24   debt, a servicer of debt, and a seller of debt.  That's what

25   Mr. -- my relationship with Mr. Zoldan was, starting back to

1    2002.

2    Q    On direct examination, didn't you say that you didn't

3    tell Mr. Zoldan and that that was wrong?

4    A    Early on, when the files were recoded, I, in fact, did

5    not tell Mr. Zoldan.  I had a contract with him and did not

6    tell him in fact, nor did I have an obligation to tell him

7    that, in fact, the files that were being recoded were being

8    sold to anyone.  I had no obligation to do that.

9    Q    My question wasn't whether you had an obligation.  My

10   question was really whether you told him or not.  So by your

11   response, you did not tell him that you were selling these to

12   investors; correct?

13   A    Very early on, I did not tell him in fact I was selling

14   the portfolios to buyers of the debt, correct.

15   Q    And you didn't tell Mr. Landrum either; correct?

16   A    That's correct.

17   Q    So, back to my original question.  You didn't tell the

18   three people who were running the IPI business what the heart

19   of that business was, which was the sale of IPI portfolios to

20   investment groups.  None of those three people responsible for

21   running your company knew any of that; correct?

22   A    There was no correlation to the jobs they did.

23   Q    Well, I -- sir, my question was yes or no.

24             THE COURT:  Let him answer.

25             THE WITNESS:  May I answer?

1          THE COURT:  You may.

2   A    Their jobs were related to the management and the

3   collection of debt.  They had no knowledge, nor did they --

4   would they have cared as to if the -- if, in fact, who owned

5   the account, it doesn't change the characteristic of the

6   account.  They were working with the collection agencies to

7   try to maximize the collection dollars.

8   Q    (BY MR. CLARKE)  So you lied to them for their benefit.

9   Is that your testimony?

10  A    I lied to them for their benefit?  Is that what you just

11  asked?

12  Q    Yeah.

13  A    I lied to them for their benefit.  I don't -- there was

14  no benefit to neither them or to me.  There was no -- it

15  didn't change the characteristics of what the contract had for

16  the job work they were doing.

17  Q    On direct examination you spoke about a woman named

18  Josephina.  Do you recall that line of questioning?

19  A    I do.

20  Q    And do you recall testifying that you had thought that

21  she was possibly an auditor for Mr. Kuber; correct?

22  A    Yes.

23  Q    And that sometimes you would refer to her as the auditor;

24  correct?

25  A    Yes.

1    Q    But in truth and fact, sir, you were referring to her as

2    your auditor, right?  Not Mr. Kuber's or ARS's, you were

3    claiming that she was your auditor.

4    A    It -- if, in fact, that's the case, I take full

5    responsibility.  The e-mails --

6    Q    Why?

7    A    I'm sorry.

8              THE COURT:  Next question.

9    Q    (BY MR. CLARKE)  My question isn't whether if, do you

10   remember that you personally were claiming that this woman,

11   Josephina, who worked for ARS and had the IPI collections

12   address was your auditor, not Mr. Kuber's.  You were claiming

13   she was your auditor.

14   A    If -- I take full responsibility for that.  And I don't

15   run from anything.  If, in fact, that was said, I assume the

16   full responsibility in stating that.

17   Q    Well, sir.  You're being deceptive because you didn't

18   want your staff to know that you didn't have an auditor and

19   you didn't want your staff to know that you were using this

20   auditor scheme to pump information to one of your investment

21   groups.  It was a deceptive practice that you deliberately

22   involved yourself in; correct?

23   A    Incorrect, sir.

24   Q    All right.  Well, looking at 1033.  Highlighted in

25   yellow, it states -- and this is from you, "Lina," going down

1  to the second paragraph, "please also copy my auditor on these

2  e-mails.  He is only to receive HMA daily collection reports

3  and weekly collection reports."  Right?  You're claiming that

4  the auditor is your auditor.

5  A    I own it.  I take full responsibility.

6  Q    That was a lie; correct?

7  A    It -- it -- I take full responsibility.  I am not running

8  from anything I have a responsibility to.

9  Q    Showing you another page, 1003, "Are DPs sent to the

10 auditor?  Are contest results sent to the auditor?"

11      "No and no."  That was a deceptive e-mail; correct?

12 A    A deceptive e-mail -- she's -- you mean deceptive because

13 it's not my auditor?

14 Q    Right.

15 A    I assume full responsibility for the relationship to the

16 classification of auditor.

17 Q    I'm showing you 3/31/2008 where you say "my auditor."

18 I'm showing you another page of the same exhibit, which is

19 3/31/2008, where you refer to this e-mail address as being "my

20 auditor."  Again, on 4/2/2008, again, on 4/14/2008.

21      All those throughout that year reflect that that was a

22 charade for your own internal purposes and who got

23 information, certain information, and who didn't; isn't that

24 correct?

25 A    It was not a charade, sir.  The auditor was not my

1    auditor.  I take full responsibility.  I own that.  And I

2    don't run from anything that's my responsibility.

3    Q    You testified last Wednesday and Thursday that you

4    instructed your staff -- and you were proud of this fact, that

5    you weren't going to outsource collections to non-Americans.

6    Do you remember that?

7    A    Yes.

8    Q    And you were adamant about that; correct?

9    A    That is correct.  And, in fact, I think one agency --

10   Q    I'm not asking you to go further, sir.  You can -- I'm

11   showing you Government's 1408.  This is from a Jon Kolakowski

12   on March 3rd, 2008.  This says, "Jon," this is from you, "I

13   made 15 different calls to your center in India.  The manner

14   in which they were handled was beyond poor.  From endless

15   holds to NA" -- I guess that means not answering -- "to

16   recorded message indicating they were closed is hard for me to

17   comprehend.  I would like to get a report that details how

18   many calls came into your 866 number in the last 24 hours.

19   It's a real shame an entire day of business was lost and

20   wasted."

21       You had collectors in India collecting on your debt;

22   correct?

23   A    No, what happened here, to explain this, is one of the

24   collection agencies we employed forwarded calls on a

25   particular given time to a call center that they had had

1    outside of the United States.  It was my policy not to have

2    call centers outside of the United States.  And, in fact, I

3    made it very clear, this contract was concluded and ended.

4    Q    Well, this is with FMS; right?  Which is a collection

5    agency that was using Indian collection agencies; correct?

6    A    No, they weren't using Indian collection agencies.  They

7    were an American-based, very large operational collection

8    agency in the United States.  However, there were times when

9    you would call them on an 866 number that instead of the calls

10   getting routed into the United States, they would get routed

11   to their facility overseas.

12   Q    Showing you, from the same person.  "Richard, India is

13   back online and phones are back in service."  So that's not a

14   rerouting of a call.  This is about the fact that they're

15   actually up and working; correct?

16   A    Again, it's that they're up and working, but when you

17   call their 866 number, it's that the calls were going to and

18   being serviced by people that were in a facility overseas.

19   That's not the arrangement that I had had with them.

20   Q    All right, sir.  I'm showing you a fellow by the name of

21   Raj.  He writes you or you write to him, "Raj, I spent the

22   better part of 30 plus minutes listening to calls from India."

23        Well, you weren't listening to your own calls; right?

24   And you say, "Please note the following observations were

25   made:"  You talked about how a female collector is talking to

1    people and she sounds confusing, that the hold time for these

2    patients who are talking, all right, needs to be changed.  And

3    you need shorter talk time, less confusion, and more

4    experienced collectors.  So you're talking about the actual

5    collection service being provided by the Indian employees, are

6    you not?

7    A    I had listened to the people that were receiving calls

8    that were being routed to or going from their American

9    operational center -- they were going to their facility in

10   India.  This was contrary to and in listening to what the

11   contract stipulated, shortly thereafter, the contract with FMS

12   was canceled.

13   Q    But in this e-mail, sir, you're not -- you're actually

14   encouraging them to do a better job; right?  That's what

15   you're doing here.  You're double checking on their collection

16   activities on your behalf and suggesting ways that it can be

17   improved; correct?

18   A    No.  It was a way to audit the agency and listen to some

19   of the phone calls, which I did all the time with all the

20   agencies.

21   Q    Including the American collection agencies?

22   A    All -- every agency.

23   Q    Including the foreign collection agencies?

24   A    Sir, they were an American-based company.  They're one of

25   the largest American-based collection agencies in the United

1    States.

2    Q    All right.  Here's Raj again, "In terms of feedback from

3    the e-mail below, I will listen to them -- because you had

4    complained -- this weekend.  And I will have the team in India

5    look at them because I'm working directly with the team in

6    India."

7         And you respond, "Thanks, Raj"; correct?

8    A    That's correct.

9    Q    All right.  This is with Lina.  And you say, "Please also

10   notify FMS regarding the recorded calls we are still waiting

11   on from India.  Please let them know the master contract

12   between IPI and HMA states upon request from HMA, IPI must be

13   provided copies of any requested recorded calls within 24

14   hours.  I need the recorded calls and the process speeded up."

15        So this is your auditing that you're talking about;

16   correct?

17   A    That's correct.

18   Q    All right.  And Raj states to you, "I had said that we

19   would like to finish up March and then take a look at how this

20   will look.  Let us discuss this tonight."

21             THE COURT:  "How this will work"?

22   Q    (BY MR. CLARKE) "How this will work.  Let us discuss

23   this at tonight's call.  I will give everyone an update on

24   India operations."  And you thought the call was scheduled for

25   a different time.  Isn't that what that e-mail says?

1    A    That's what it says.

2    Q    Down below, Raj mentions that, "We can talk some more on

3    this next week.  I thought this was a key initiative for IPI."

4         And your response is, "We can have an entire city work in

5    India for $10,000 a month.  I will let the individual

6    collection firms handle it."

7    A    That's correct.  And what you could -- wait, wait, wait.

8    Just please let me go back to that.

9    Q    Sure.

10   A    If you look at this, it says on here it's a "Proposal for

11   validation notices, final."  That's leading to the -- my

12   discussion with them to terminate my relationship with them.

13   Because the contract was sold to IPI being handled

14   domestically within the United States, it became clear that

15   the overflow or some portion of their calls were going to

16   their facility in India.  It was not acceptable and the

17   relationship was terminated.

18   Q    So at some point you terminate with FMSDC; correct?

19   A    Yes.

20   Q    Because you didn't want anything more to do -- you'd been

21   collecting through them, but you didn't want anything more to

22   do with them because they were using a foreign collection

23   service or employees; correct?

24   A    Calls were being routed from their call center in the

25   United States to overseas to another facility they had.

Cross-Examination Richard Shusterman by Mr. Clarke

1    Q    Here, sir, you state, "Raj, this is the biggest problem

2    we have had and the biggest concern I have.  We are both

3    wasting time.  If the office in India cannot secure collectors

4    who can speak in a dialect that is easy to understand in the

5    States.  It frustrates and complicates the patients.  We are

6    not experiencing this with our other collection project in

7    India."

8         So sir, it's not just FMS, it's multiple collection

9    operations that you have in India; isn't that correct?

10   A    Wrong.  The other collection project referenced here was

11   to do insurance resubmission to the insurance, not to speak

12   with or contact debtors.  But this reference was to doing

13   recoding and rebilling.

14   Q    But you're using agencies and workers outside the United

15   States; correct?

16   A    The company that was doing the rebilling and recoding,

17   their workers were based there, yes.

18   Q    So the answer to my question is yes; correct?

19   A    No.  Because the company that they were associated with

20   from an ownership standpoint was a large United States

21   company.

22   Q    This is from you to Lina, talking about some sort of

23   direct placement, "Lina, can you handle this with India so

24   these accounts are not sitting idle?"

25   A    Right.  That's --

1    Q    "We're now in May of 2008"; correct?

2    A    Yeah.  Just, if you can, sir, under the subject line,

3    this goes to exactly what I said, "Update on insurance."

4    Q    Okay.  Here's another e-mail.  It says, "Chris" -- and

5    Chris is not with FMS, is he?  He's with Oxford?

6    A    Correct.

7    Q    So this is an entirely different collection agency;

8    correct?

9    A    That's correct.

10   Q    And you're saying, "Chris, I called this evening and got

11   your India office.  They sounded fine.  Load up as many FTE's

12   as possible."

13        FTE's means full-time employees, doesn't it?

14   A    Correct.

15   Q    Load them up.  Sir, you're actively using Indian

16   collection agencies to collect on your IPI portfolios for your

17   investors, contrary to your testimony last week.

18   A    I disagree with you completely.

19   Q    Last page of that.  We're all the way in August, Tony's

20   friend from India.  "Lina, can you listen to voice com calls

21   when you have time from another firm who wants our business

22   and is based out of India?  They are owned by a close friend

23   of Tony's from Burkes."

24        So even in August of 2008, you're looking for additional

25   firms who can provide out-of-country outsourcing of your

1    collection business; correct?

2    A    That's not correct at all.

3    Q    You recall Ms. Lina Monterosso's testimony that when a

4    FedEx package came -- she got a call from the -- I think it

5    was the virtual office, Regency Services, that a FedEx package

6    came for a Mr. Feldman, that you told her or you told someone

7    that he didn't work there.

8         Do you recall that?

9    A    I recalled her testimony as it relates to a FedEx package

10   for Mr. Feldman.

11   Q    I'm showing you Government's Exhibit 948.  This is in

12   March of 2008.  Mr. Zoldan had been working with you for quite

13   a long period of time, and you state, "At some point, I will

14   have you recode the other IPI accounts.  This is for internal

15   accounting purposes only.  No change on the names of the

16   letters going out."

17        You're asking for the DSP letters addressed to you, but

18   you're not telling him that you're going to take the DSP

19   letters and provide them to the various investment groups when

20   they buy the portfolios; right?

21   A    No, that's not what this says, sir.

22   Q    Well, it's for internal purposes only; right?

23   A    He's -- the e-mail states, "At some point, I will have

24   you recode the other IPI accounts."  These are unsold accounts

25   that were in the IPI inventory.  And I tell him in here, "It's

1    for internal accounting purposes only.  No change on the name

2    of the letters going out."

3    Q    Right, sir.  But you are recoding for the purposes of

4    changing the ownership; right?  In terms of who the collection

5    agencies know to collect from.

6    A    That -- who they know who to collect from?

7    Q    Who to send the collection money to.

8    A    Correct.

9    Q    All right.  I'm showing you 975.  You say, "Michael,

10   please e-mail me a list of all known medical debt buyers,

11   including NCO and the new spin off of tenant.  I would like to

12   get a sense for what the landscape looks like should I ever

13   decide to sell a medical portfolio."

14        Sir, this is in February of 2009, and Mr. Zoldan still

15   doesn't know that you're in the business of selling IPI

16   portfolios to investment groups; correct?

17   A    This e-mail relates to what medical debt buyers he has.

18   It says on here to "e-mail me a list of all known medical debt

19   buyers, including NCO," because I wanted to get a sense of who

20   his medical debt buyers were and what the landscape looked

21   like.

22        "Should I ever decide to sell," my mind in reference was

23   going to using his firm if I ever wanted to use him again to

24   sell and who the buyers were that he had in his pool.  That is

25   correct.

1    Q    And, sir, since you've been working with him for almost

2    two years at this point and you knew he was in the business of

3    online posting of medical debt in the secondary market, you

4    hadn't used him for that purpose up to this point.  And now

5    you're asking him for a list of potential medical debt buyers

6    two years after -- or so -- after you could have used him in

7    the first place; correct?

8    A    After I could have used him in the first place?

9    Q    Right.  To sell your debt portfolios.  You never used him

10   to sell your debt portfolios except for the time back in 2000

11   and whatever it was that you testified to, '5 or '6; right?

12   A    No, no.  Not at all.  In 2006, correct, he sold the North

13   Philadelphia Health Systems portfolio.

14   Q    Okay.  But since that time, after you got investment

15   groups to buy IPI portfolios, the person you had as your IT

16   person, the person who you were using for your DSP letters was

17   not used to assist you in selling your portfolios to the

18   broader market.  He didn't know about your investment groups

19   and you never asked him to sell your portfolios to the broader

20   market; correct?

21   A    In 2009, at -- I don't know what the exact date was when

22   I specifically told him in relation to February 9th, 2009,

23   that, in fact, portfolios were being sold to recode them and

24   all the bank account information.  Clearly, that was -- and I

25   provided that information to him.  I just don't know what --

1    Q    Okay.  Sir.  And so he did provide you with a bunch of

2    people who could buy and sell medical debt portfolios;

3    correct?

4    A    Can you push it down, please?  Thank you.  Yes.  And he

5    writes on here he's not sure which one of these entities buy

6    resales.

7    Q    Okay.  You didn't use any of these; right?

8    A    I need to see that, please.  Collect America, I did, I

9    sold to.  Semex and Carville -- it's actually Cargill, I

10   talked to multiple times as far as sales go.  Capio, also

11   talked to multiple times.

12   Q    If I could then, the only one -- I think you said this

13   yesterday in response to a question by your attorney, about

14   whether you had ever sold on the secondary market, and you

15   said that you -- I mean, to a collection agency -- and you

16   mentioned the name Collect America; correct?

17   A    Yes.

18   Q    Now, you've had notice of this case for a very long time;

19   right?  That you were going to be tried on the allegations

20   that the government has made against you in the indictment?

21   A    2013 is when the indictment came out.

22   Q    And you've -- your company received a grand jury subpoena

23   and you've had multiple groups of attorneys assisting you

24   prior to Mr. McMahon representing you; correct?

25   A    The grand jury subpoena that we received --

1    Q    My question, sir, is whether you've had multiple groups

2    of attorneys assisting you in preparing for this trial.

3    A    No.

4    Q    No?

5    A    No.  I'm -- if you -- I'd love to answer the question.

6    Q    Let me ask a name, how about Mr. Andy White's law firm?

7    They assisted you, did they not?

8    A    Andy White, prior to any indictment even being issued by

9    the government, was a law firm based out of Baltimore that, in

10   fact, I had retained to provide legal assistance.

11   Q    Okay.  And a Mr. Hirschhorn, and he had a partner, they

12   entered their appearance and they assisted you in preparing

13   for this case; correct?

14   A    And you conflicted him out, correct.

15   Q    All right.  And then there was another attorney.  His

16   name escapes me.  Do you recall his name, before

17   Mr. McMahon?

18   A    Mr. Benowitz.

19   Q    Mr. Benowitz.  And he assisted you as well in preparing

20   for this trial?

21   A    He didn't.  There was virtually -- because the trial date

22   was postponed or rescheduled -- because the prior judge who

23   was going to hear this case had since retired.  So the amount

24   of work that Mr. Benowitz did was virtually nothing.

25   Q    All right.  Well, if you exclude him, you've at least had

1    three groups of attorneys to assist you in compiling

2    information; right?

3         And do you have anything showing a sale to a secondary

4    market buyer?  You've testified to one, which is Collection

5    America.  And do you have that contract?

6    A    I don't know what the term "secondary buyer" and how you

7    define "secondary buyer," but the contracts that IPI sold to,

8    in fact, we have, and I have provided counsel.  I can also

9    tell you that the grand jury subpoena was received between 60,

10   at most, 90 days only before you actually rushed and released

11   the indictment against me.

12        So the amount of time to -- and at that point, as we were

13   getting them, we were doing rolling submission to the

14   government, to go through the millions of documents or

15   whatever was involved in this case, pull them out of retrieval

16   and get them -- we gave you as much as we could in the

17   shortest window we possibly could.

18   Q    All right.  Well, my question is, do you have the

19   document reflecting a sale to somebody other than the

20   investment groups you've been testifying to during this

21   trial?

22   A    The agreements with the collection --

23   Q    Sir, my -- that is a yes or no question, I think.  You

24   can say whether or not you brought any documents with you to

25   reflect a sale to somebody other than the investment groups

1    that have been talked about during this trial.

2    A    They were absolutely provided.  Absolutely 100 percent.

3    Q    Sir, do you have Collection America to show us?

4    A    As I sit on the stand this second, do I have a copy of

5    their agreement in my hand, no.

6         But whatever agreements I had, clearly, I had no reason

7    to hide them at all.

8    Q    Well, clearly, if we had it, we'd show it to you.  So if

9    we could look at 548.  Sir, for whatever reasons, I think

10   you've made it clear that, not just with JMH, but with the HMA

11   paper, over the course of 2007, '8 and '9, going into '09, the

12   collections for whatever reason were abysmal.  That's the term

13   being used.  Your attorney referred to it as "woeful" today;

14   correct?

15   A    Yes.

16   Q    Those are the terms that we've been using?

17   A    Correct.

18   Q    All right.  And you were telling one thing to your staff

19   about how collections were doing, and you were telling

20   something else completely to your investment groups;

21   correct?

22   A    No.  What I -- I'd be glad to elaborate if you'd

23   permit.

24   Q    Let me show you some e-mails and maybe that will help

25   you.

1    A    Sure.

2    Q    I'm showing you 548.  I think this was something that was

3    part of your exhibit list.  "With the exception of Oxford, it

4    seems your agencies are very soft on weekly HMA collections.

5    I have sent Lina a list of questions and information we need

6    help getting from your agencies today."

7         Right?  Because things weren't going well and you were

8    telling your staff to help things get going?

9    A    Well, just --

10   Q    I'm showing you 544.  This is from you saying, after

11   seeing the HMA dailies through 2/13/08, you respond, "I'm

12   becoming concerned that I see a pattern that 80 percent of the

13   daily collections are being made by Oxford.  Something is

14   wrong."  And this is in February 2008, correct?

15   A    Correct.

16              THE COURT:  Counsel, why don't you approach.

17              (Bench conference on the record.)

18              THE COURT:  Okay.  We've been going a long time.

19   The reporter's going to need a break.  We took a morning

20   recess very early.  So my thought is to take an earlier lunch

21   break to give her a good break.

22              MR. CLARKE:  Okay.

23              THE COURT:  But I don't want to do that if you're

24   near the end of what you're about to do, only if we've got a

25   ways to go.

1          MR. CLARKE:  I think -- if you can hold up for five

2     minutes?

3          THE COURT REPORTER:  I'm fine.

4          THE COURT:  Okay.  She never will assert her own

5     interest.  So in five minutes, you'll finish your

6     cross-examination?

7          MR. CLARKE:  No, Your Honor.

8          THE COURT:  You'll just finish this topic.

9          MR. CLARKE:  Yes.

10          THE COURT:  Okay.  So we'll go about five minutes

11     and then we'll take the lunch break.

12          MR. CLARKE:  Thank you, Your Honor.

13          (The following proceedings were had in open court.)

14          THE COURT:  Ladies and gentlemen, we're going to go

15     five or ten more minutes and then we're going to take an

16     earlier lunch break because we took an earlier morning recess

17     and you've been sitting there for a while.

18          Next question.

19     Q    (BY MR. CLARKE)  So on 554, where you talk about how

20     something is wrong, you include in there, first of all, the

21     daily reports are being provided to IPI collections.  That's

22     the auditor; right?  The person that you referred to as "my

23     auditor," that's that person's e-mail address; right?

24     A    That's correct.

25     Q    And that's really a direct line to ARS and Mr. Kuber

Cross-Examination Richard Shusterman by Mr. Clarke

1    through Josephina; correct?

2    A    That was the e-mail address related to Mr. Kuber and his

3    bookkeeper or auditor, Josephina, correct.

4    Q    All right.  My question was, if that is the e-mail

5    address that you would use to send them information -- so by

6    your response, your answer is yes; correct?

7    A    Yes.

8    Q    All right.  So up above where you talk about how

9    something is wrong, you don't include -- you don't do a reply

10   all -- you cut out ARS.  They're not in the reply all

11   category; correct?

12   A    Absolutely no reason to have them in the reply all

13   category.  I'm servicing their debt.

14   Q    All right.  So my question was whether they were in

15   there, and your answer is they are not in the reply all.  You

16   did not share your reply with the folks down below who saw the

17   report?

18   A    Correct.

19   Q    Exhibit 558.  Again, these are having to do with the HMA

20   dailies back in March of 2008.  And you describe them as

21   terrible, and that you need immediate improvement; correct?

22   That's what you say to Mr. Landrum there; correct?

23   A    Can you please move it down a little bit?  Thank you.

24   Q    Right?

25   A    Yes.

1   Q     Okay.  Showing you 562, which is from you to Mr. Landrum.

2   And you say, "Fred, I'm concerned.  The collection figures on

3   the first data dump and the collection figures on the second

4   data dump are awful.  I can't keep paper with these agencies

5   based on this performance.  I have other firms crushing the

6   files we own.  I must see immediate improvement."

7         Sir, there weren't any other collection agencies that

8   were crushing the HMA files in March of 2008, were there?

9   A     There were, actually, the legal route clearly, since we

10  were able to sue, was proving to be far more effective when

11  initial demand notices were sent by the legal route, the legal

12  law firms.  The responses typically by the people that had

13  received them.  The penetration rate was much higher than what

14  we were getting from a plain, quote, "collection agency."

15  Q     I thought you testified that the legal strategy takes a

16  long time to penetrate, that you've got to get out notices,

17  you've got to file the suit, you've got to do all that.  The

18  HMA paper, sir, in March of 2008, you had only had a short

19  while.

20  A     However, when accounts were sent and an initial demand

21  notice sent from the legal route, that doesn't mean that

22  they're suing right away.  It's asking for the money from the

23  patient.  The response rate received by the patients receiving

24  those notes, the penetration rate was much higher than a plain

25  collection agency.  People --

Cross-Examination Richard Shusterman by Mr. Clarke

1    Q    So -- go ahead.

2    A    I'm sorry.  I didn't mean to interrupt.  People were much

3    more receptive in getting a note from a law firm to pay then

4    from when a plain collection agency sent a note.

5    Q    So using a legal strategy actually expedites the

6    collections.

7    A    It helps it on the initial note.  If the patient then

8    makes a decision not to pay, it slows down the process.

9    Q    So you can play that both ways.  You can say the legal

10   strategy takes a long time to receive any kind of results, yet

11   on the other hand, when you're faced with an e-mail like this,

12   you can say sometimes it works very quickly.

13   A    Sir, I didn't spend 28 years of my life in the collection

14   industry to play.  What I'm trying to explain to you is when

15   an initial letter is sent from a law firm, there is a

16   penetration rate.  That's the volume of people that are going

17   to respond to that letter and pay.  If they don't and it goes

18   through the legal course or the legal process, it takes a

19   protracted period of time.

20   Q    Okay.

21   A    Those are the facts.

22   Q    Okay.  Well, we've -- I think we've all seen, in a

23   tortuous way, all the various collection charts in this case.

24   All of the AMH paper, sir, that you had out.

25   A    It's HMA, not AMH.

1    Q    HMA paper.  Thank you.  I stand corrected.  We've seen

2    all the HMA portfolios, sir.  And nothing comes close to

3    crushing it; right?

4    A    I'd have to look at what the penetration rate was from

5    the law firms servicing the debt.  I don't have that in front

6    of me.  But I can tell you, clearly, their success rate on an

7    initial letter sent on a legal letterhead was far greater and

8    more successful than any collection agency used.

9    Q    Showing you 567.  Again, it's an HMA daily.  We're in

10   April.  And you say to Mr. Landrum, "I really need to get the

11   closed and returned HMA files.  These collection numbers just

12   don't cut it."

13        That's what you say to him; right?

14   A    That's correct.

15   Q    All right.  And, once again, you get the bad news down

16   here, right?  Right?  The daily reports.  And any talk about

17   it or any analysis about it or any affirmation how bad it is,

18   you don't include ARS.  You cut out ARS and Mr. Kuber.  You

19   don't include them on the reply all; correct?

20   A    I was getting notification from Mr. Kuber or

21   Mr. Rosenberg, primarily Mr. Kuber, all the time that

22   collection numbers were poor.  He doesn't have to be copied

23   with a collection agency when he sees the remits coming back

24   to him with the reconciliation reports -- are terrible.

25   Q    My point is, that the e-mails that we just looked at,

1    sir, those were to your staff, Mr. Landrum, Lina Monterosso,

2    Mr. Zoldan, and you were talking about how horrible the

3    collections were based on the weekly reports; correct?

4    A    That's correct.

5         MR. CLARKE:  This is a good time to stop, Your

6    Honor.

7         THE COURT:  Ladies and gentlemen, we will take the

8    lunch break now.  Do not discuss the case with anyone during

9    the break.  Do not discuss the case even among yourselves.

10   You must wait until after you've heard all of the evidence,

11   the closing arguments, and my instructions as to the law.

12        Do not allow yourselves to be exposed to any news

13   articles or reports that touch upon the case or the issues it

14   presents or any articles or reports that relate to any of the

15   participants in the case.

16        Avoid all contact with any of the participants in

17   the trial.  Do not make any independent investigation of the

18   law or the facts of the case.  Do not look up anything on the

19   internet.  Do not consult an encyclopedia or a dictionary in

20   reference to terms that you may have heard about here in

21   court.

22        One hour and 15 minutes for lunch.

23        Please take the jury out.

24        (Jury left the courtroom.)

25        THE COURT:  Mr. Clarke, any sense of how much --

1    Mr. Shusterman, you may step down.

2          MR. CLARKE:  I'm hoping a few more hours.  My hope

3    is that I can finish him today.  That's my hope.

4          THE COURT:  Okay.

5          MR. CLARKE:  I'm going to try to do that, Your

6    Honor.  If I don't today, I'm hoping it's just a spill over

7    for a little bit tomorrow morning.

8          THE COURT:  Okay.  Very good.  Tomorrow is

9    Wednesday.  So a question in my mind is when to hold the

10   instructions conference.  I think we should shoot for the end

11   of the testimony today.

12         MR. CLARKE:  Are we concluding at 5:30 with the

13   testimony?

14         THE COURT:  Well, that will probably have to be

15   pulled back a little bit to be reasonable because I've got to

16   have a court reporter for the instructions conference, not to

17   mention the fact that it makes it a pretty long day for

18   counsel.

19         So have you had an opportunity to review the

20   instructions, Mr. Clarke and Mr. Wise?

21         MR. CLARKE:  We have.

22         THE COURT:  And Mr. McMahon?

23         MR. MCMAHON:  I have too.

24         THE COURT:  Okay.  How do they look?

25         MR. CLARKE:  I think we have just one recommendation

1    out of all the instructions, and I'll let Mr. Wise discuss

2    that.

3            You recall what it is?  I recall it.  You want me to

4    handle it?

5            MR. WISE:  Sure.

6            MR. CLARKE:  The one recommendation --

7            THE COURT:  Make sure that Mr. Dugan is listening,

8    Ms. Smith.  Would you contact Mr. Dugan and make sure that he

9    is listening or either he can come into the courtroom.

10           MR. WISE:  Your Honor, I just happen to have it.

11   It's -- does Mr. Dugan need a minute?

12           THE COURT:  One second.  It's a one-way street.

13   They can hear us, but I can't hear them.  Thank goodness.

14           MR. WISE:  It's nice that you always tell people,

15   the chambers I clerked in, we weren't told that --

16           THE COURT:  There should be a little note there --

17   that's to comply with Title III.  Otherwise, you know, you're

18   surreptitiously monitored.  What people don't realize is that

19   oftentimes after court is out of session, the jury's out of

20   the room and we've recessed and so forth, if the system is

21   still on, you're still -- you can still be heard in chambers.

22   So that's a note that means what it says.  Hopefully, there's

23   one on your table as well, Mr. McMahon.

24           MR. MCMAHON:  I would never say anything improper

25   anyhow.

1          THE COURT:  No, of course not.  Okay.  So what's the

2    government's jury instructions issue you wanted to raise?

3          This is not the conference, by the way, but it helps

4    to have some advance notice.

5          MR. CLARKE:  Sure.  It's on jury instruction 36,

6    page 51 of the Court's draft.  This is the first element,

7    conspiracy agreement.  And our only suggestion, since this has

8    been such a significant issue in the case, is that in the

9    second paragraph where it reads, "In order for the government

10   to satisfy this element, you need not find that the alleged

11   members of the conspiracy met together and entered into any

12   expressed or formal agreement," we would request that instead

13   of "expressed," "written" be used.

14         I think "expressed" is one of those terms that

15   lawyers use, but isn't -- it isn't self-defining and lay -- in

16   everyday life, we don't really use it.  We think it's more apt

17   to insert "written."

18         THE COURT:  All right.  Mr. McMahon, any concerns?

19         MR. MCMAHON:  I don't believe so.  I'd have to read

20   it again, Your Honor, in its totality, but I don't think

21   that's a major --

22         THE COURT:  All right.  Let's plan to substitute the

23   word "written" for "expressed," Mr. Dugan.

24         Nothing else from the government?

25         MR. WISE:  That was our only suggestion, Your

Cross-Examination Richard Shusterman by Mr. Clarke

1    Honor.

2                THE COURT:  All right.  Mr. McMahon?

3                MR. MCMAHON:  Nothing at this time.  Let me re --

4    doing other things -- let me just review it again.  I read it

5    once and nothing jumped out at me.

6                THE COURT:  Okay.  Very good.  Take your time over

7    lunch, what time you have --

8                MR. MCMAHON:  Yes.

9                THE COURT:  -- to review it one last time and then

10   we'll hold our on-the-record instructions conference at the

11   conclusion of today's testimony.

12               MR. MCMAHON:  At 5:00?

13               THE COURT:  Yeah.  And we will not go till 5:30.

14   We'll end around 5:00 with the testimony so that we've carved

15   out some time for the instructions conference.

16               All right.  We're in recess.  What -- is that 5

17   of -- 5 of 2:00.

18               (A recess was taken.)

19               THE COURT:  Ready for the jury, Mr. Clarke?

20               MR. CLARKE:  Yes, Your Honor.

21               THE COURT:  Mr. McMahon?

22               MR. MCMAHON:  Yes.

23               THE COURT:  Bring them in.

24               (Jury entered the courtroom.)

25               THE COURT:  Be seated, please.

1           Mr. Shusterman may take the stand.  Mr. Shusterman

2    remains under oath.  Once he's been seated, Mr. Clarke, you

3    may continue your cross-examination.

4    Q    (BY MR. CLARKE)  Mr. Shusterman, Good afternoon.

5    A    Hello, sir.

6    Q    Sir, we finished off looking at a bunch of e-mails about

7    collections where you were discussing how poorly things were

8    going with members of your staff, Mr. Landrum, Ms. Monterosso,

9    and Mr. Zoldan.  Do you recall that line of questioning?

10   A    Yes, sir.

11   Q    So while you were telling your staff one thing about the

12   collections, you were telling the investment groups something

13   different; correct?

14   A    Could you be more specific, please?

15   Q    Well, you weren't telling the investment groups that

16   collections were horrible; right?  When a new investment group

17   came, you didn't say, "You should know that on this HMA paper,

18   and JMH paper, for example, in late 2007 or through 2008,

19   it's -- we have not had much success at this point."

20        Whatever the cause, you're not telling the investment

21   groups that; right?

22   A    What I told the investment groups was that I could not

23   predict the future of the performance and the collections of

24   portfolios.  What I had was the prior sales of portfolios that

25   had taken place in the past.

1        But as I testified to on at least 41 times, I had

2    authored e-mails that said, "I cannot predict the collection

3    performance or predict how a portfolio will do."

4    Q    Okay.  Well, you told them that they should worry about

5    the economy; right?

6        I'm showing you 936.  "The impact of worsening of credit

7    on collections" is the subject matter.  And you're advising a

8    member of Roundstone that your paper is, for the most part,

9    not the model of a distressed asset.

10       You also go on to say, "We also have the ability to

11   collect from workers' comp cases, accident subrogation, and so

12   on."  You apologize for providing such a long reply and you go

13   on to say, "We have many more avenues to pursue when

14   collecting hospital debt than any other asset class can

15   claim."

16       So this is in January of 2008.  This is what you're

17   telling one of your investment groups about what they can

18   expect your collections to do, notwithstanding what's

19   happening in the economy; correct?

20   A    It's not what they can expect the collections can do,

21   it's a comparison to a charged off account.  For example, an

22   auto account where if somebody's had their car repossessed,

23   the car's gone, their ability at that point to pay or try to

24   settle that is completely diminished.

25       In this comparison, there are other bites at the apple,

1   so to speak, that would be covered under a workmen's comp

2   case, under a car accident case if there's pending litigation,

3   and also a self-pay component where people could pay out of

4   their pocket to settle it.  So it's -- what I was describing

5   is that it is a much different type of an asset class than,

6   for example, what an auto deficiency account would be.

7   Q    That's all in response to them saying that they're

8   reading stories about how collection agencies are having a

9   hard time and things are weaker than normal.  And you are very

10  upbeat and you provide all the facts to support your

11  conclusion that your asset is not a distressed asset in these

12  times and conditions.  That's what you're saying there;

13  correct?

14  A    You missed the important second line in their e-mail,

15  which relates to -- if you bring it up a drop further -- "auto

16  related paper are showing increased delinquencies."

17  Q    Right.

18  A    And as I testified to, it's consistent.  People that had

19  their car repossessed, in fact, have little or no desire to

20  pay money that's owed on a car they no longer have that's been

21  repossessed.  It's the most distressed asset class.

22  Q    Okay.  I'm showing you Government's 971, which is much

23  later in that year.  And it's October 8th, 2008.  And the

24  question put to you, "Is the current financial crisis limiting

25  the ability of our secondary buyers to obtain credit to buy

1    our portfolios?"

2          You respond, "I can't speak for how the buyers of files

3    obtain their cash.  If I had to guess, many are long-term

4    players and have employed their own money.  Banks did not lend

5    on this asset class in the past, so I think it's a non-issue."

6          Then you ask him, "When are you ready to deploy more

7    funds?"  So you're telling them that's not a concern, the

8    economy is not a concern, that the way these things are sold

9    and financed has never been through banks and that they should

10   keep buying and, in fact, you're asking them, "When are you

11   going to deploy some more investment funds"; right?

12   A    That's what the e-mail says.  Yes, sir.

13   Q    Showing you this is e-mail, which is October 3rd, 2008,

14   which is -- let's see -- that's about three months after the

15   Champps meeting; right?

16   A    Yes.

17   Q    And at this point in time, you've already provided over

18   $4.2 million in July as an advance, 6.3 million in September,

19   another 6.6 million is coming up on October the 30th, at the

20   end of this month when this e-mail takes place.  So that's a

21   lot of money; right?

22   A    I'd have to -- I'm taking you at face value on the

23   numbers you just --

24   Q    And I appreciate that.

25   A    -- referenced.  I have not verified those.

1    Q    It seems like in the ballpark though; right?

2    A    Again, if you want to -- if you want me to look at the

3    charts with the loan documents, I'm glad to do that.

4    Q    If you're willing to accept it, I'm willing to accept it.

5    All right?  Very good.

6         You say here -- again, this is from you to a member of

7    the Roundstone Investment Group, "Many thanks.  I will hold

8    paper for you and await your final number next week.  Many

9    people have called and increased their desire to purchase

10   paper since the equities market tanked.  We are busier than

11   ever."

12        Sir, in responding in that fashion, you are trying to

13   provide confidence in your product and trying to persuade them

14   that this would be a good investment; right?

15   A    I'm a salesperson selling accounts that were uncollected

16   and written off from a hospital.  This was a period of time

17   when the stock market had collapsed.  There were people, many

18   people, that were contacting me and saying, "I'm in the stock

19   market, I have interest or would like to talk to you further

20   about buying a portfolio."  That's what this is referencing.

21   Q    All right, sir.  Now, when you talked yesterday about how

22   JMH was having trouble, you also talked about how you slice

23   off pieces of the inventory and give them to people.  And you

24   also talked about how sometimes you repurchase and it goes

25   back into inventory.  Do you recall those general areas of

1    discussion yesterday?

2    A    Yes, sir.

3    Q    All right.  And when you talked about the problems --

4    first of all, when you purchased the JMH paper and all of your

5    testimony thus far, you didn't distinguish between the various

6    hospitals that were in the JMH network; right?  In other

7    words, the collections overall, as a general sampling of the

8    JMH paper, were not going well; correct?

9    A    JMH did not have a network, sir.  HMA did.

10   Q    All right.  So it was homogenous.  It was one solid

11   hospital center with all the patient accounts.  There weren't

12   independent hospitals mixed in; correct?

13   A    Correct.

14   Q    All right.

15   A    They did have Jackson South, I just wanted to add.  But

16   it was a much smaller hospital.

17   Q    Was that included in the JMH paper?

18   A    Yes, sir.

19   Q    So what percentage would you say that is?

20   A    If I had to guess, I would say maybe 20 percent.  Just --

21   it's a rough guess.

22   Q    All right.  So when you decided to pursue a civil suit

23   against JMH, you were suing because of what you considered to

24   be possible deficiencies in all the JMH paper.  I know you

25   were doing direct pays as well, but in terms of collections

1    and the age of the accounts and those kinds of things, you

2    were looking for a settlement as to all the JMH paper;

3    right?

4    A    Well, the settlement was with JMH, who represented --

5    they were the seller of the accounts.

6    Q    All right.  Let me show you 1389.  On Friday, October the

7    19th, this says, "Richard" -- this is from Mr. Kuber -- "I saw

8    the article about the Jackson litigation.  How does this

9    impact our portfolios, our sale of those portfolios, why were

10   we not advised on those issues beforehand or even now of the

11   lawsuit?"

12        So according to Mr. Kuber here, you never advised him

13   back in October of 2007 that you were suing the hospital from

14   which you obtained the paper that they were relying on for

15   their investment.

16   A    Well, the lawsuit, it was -- when filed, publicized in

17   almost every newspaper and media outlet around the world.

18   Q    So you expected him to find it on his own?

19   A    I -- it wasn't a question if I expected, it was so highly

20   publicized -- I had people that had purchased files, in fact,

21   telling me, I read about it, or called me, "I saw the

22   lawsuit."

23   Q    All right, sir.  You respond to him not in the way you

24   just testified, but you respond, "The issues at hand have

25   nothing to do with your files.  The files at hand are from one

1    hospital only.  The accounts at the other hospitals contain

2    your files and were never part of the agreement referenced.

3    There is no impact on any of your files at all.  The claim we

4    filed does not have any impact on our ability to collect money

5    on files we own or manage.  It will have no impact on resell

6    as well."

7        Now, you wrote that in response to his question.  And

8    what I don't understand is I thought you testified that the

9    JMH paper was homogeneous, just one block.  And yet you're

10   telling him here it has nothing to do with his paper.  And he

11   owns JMH paper.

12   A    Well, there was, as I just said a few minutes ago, about

13   20 percent of the portfolio was contained from Jackson South.

14   The reference to having no impact on the resale, the lawsuit

15   was mainly focused on the accounts they were trying to recall

16   because payments were coming into them, which weren't being

17   forwarded to us.

18   Q    But I might add, sir, that you just testified that

19   Jackson South was a part of this suit, that the settlement

20   regarded all of the Jackson paperwork.  There was no

21   distinction between Jackson South and I guess Jackson Main

22   Hospital?  You just testified to that.

23   A    That's correct.

24   Q    All right.  Well, then, sir, the notion that his files

25   are not part and parcel of the JMH paper that you're having an

1    issue with in your civil litigation is just not accurate, is

2    it?

3    A    Well, I had purchased, in fact, $1.9 billion.  And

4    sitting here at this second, I don't know at this particular

5    point in time of October 19th, 2007, what the face value in

6    aggregate was that was sold to him from Jackson files when

7    almost $2 billion in files from Jackson were sold.  That would

8    clearly help a lot.

9    Q    All right, sir.  But we all agree that you sold him

10   Jackson paper and your settlement involved all Jackson paper,

11   and that's what your testimony is; right?

12   A    The settlement was an all-encompassing settlement between

13   Jackson and IPI.  As of October of 2007, when that e-mail was

14   written, again, I don't know how much of the Jackson paper was

15   sold to Mr. Kuber out of $1.9 billion.

16   Q    Sir, there had only been one sale.  And that was the

17   August 6th, 2007, which was the JMH; right?

18   A    Okay.  So of almost $2 billion, there was less -- roughly

19   10 percent of that.

20   Q    Right.  But 10 percent of a problem is still 10 percent

21   of a problem.  You're telling him he doesn't have a problem

22   with his 10 percent.

23   A    I can't -- I felt comfortable knowing that I had

24   purchased $1.9 billion from a hospital that with -- if his

25   percentage was 10 percent and Jackson South was 20 percent,

1    and the overall settlement going on that was entered into was

2    with Jackson aggregate, I felt comfortable representing to him

3    that what I sold him, I was comfortable with.

4    Q    Okay.  So Government's 1250 reflects when you purchased

5    the Jackson Memorial Hospital paper.  And by the end, I think

6    you've already testified, that by the end of 2008, prior to

7    getting any replacement accounts, you had sold your inventory

8    to JMH; correct?

9    A    Prior to the end of --

10   Q    2008.

11   A    I believe so, I'd have to --

12   Q    All right.

13   A    -- confirm that.

14   Q    So notwithstanding the problems, you sold the entire

15   inventory, and that's even before you got the civil

16   settlement.

17        So when we look at the price that you paid for this

18   hospital debt, you paid .31; correct?

19   A    That's correct.

20   Q    Right?

21        MR. MCMAHON:  Judge, objection.  Can we -- I

22   withdraw the objection.  I withdraw it.

23        THE COURT:  You may continue.

24   Q    (BY MR. CLARKE)  So you bought it for a third of a

25   percent; correct?

1    A    A third -- I bought it for 31 basis points.

2    Q    Right.  Which is roughly a third of a percent.  But

3    you're right it's more accurate to say .31 percent.  And then

4    we know that right off the bat you started selling the JMH

5    paper, for example, looking at 1255, line 1, for 2.475.  And

6    then immediately you're up into the 3s, I'm looking at line 6.

7    I'm looking at combined paper, 3.1, 3.1, right?  More JMH

8    which is down here, which is still before you get the

9    replacement paper, you're charging 3.4, 3.4, 7.8.  And

10   similarly, JMH that you provided to -- I'm looking at 1257 to

11   Platinum was 2.25 --

12            THE COURT:  Platinum?

13            MR. MCMAHON:  That's --

14            MR. CLARKE:  I stand corrected.  Roundstone.

15   Q    (BY MR. CLARKE)  And then further down here -- no, that's

16   in 2009.  So, you obviously, as you testified, you're in the

17   business of making money by selling hospital debt.  So you

18   want a profit, so you buy low and you sell high; right?

19   A    That's what makes America great, sir.

20   Q    Yes, sir.  And I see you're wearing your American flag

21   pin again today.  And in doing the American thing, you charged

22   for this particular portfolio, you charged -- if you can

23   follow my writing here, you charged .3, roughly.  But if we

24   take -- and if you're to double that; right?  That would be

25   .6, and you would agree with me, wouldn't you, that if you

1    charge .6, that would be a mark-up of 100 percent; right?

2    A    If I charge .6, that would be a mark up of a hundred

3    percent --

4    Q    Right.

5    A    -- is that what you're asking me?

6    Q    Yes, sir.

7    A    Okay.

8    Q    You agree with that, don't you?

9    A    Okay.

10   Q    You agree with that?

11   A    Yes.

12   Q    Okay.  So if you were to charge this amount; right?  That

13   would be a 200 percent mark up.  And so on; correct?

14   A    I --

15            MR. MCMAHON:  I think it's 300.  I object only to

16   the math, I think it's 300 percent.

17            MR. CLARKE:  Well, you have your original price;

18   right?  And the amount above that is two one-hundredths

19   higher.  So you can either say it's 200 percent or you can say

20   it's 300 percent.

21            THE COURT:  Do you withdraw the objection or do you

22   persist?

23            MR. MCMAHON:  No, I withdraw the objection.

24            THE COURT:  All right.  So --

25   Q    (BY MR. CLARKE)  So if you did it three times and so

1    forth, it would be 1.2, and that would be 300 percent and so

2    on.  But if you were to take it and multiply that by 10, which

3    is -- I'm sorry -- right?  3.0.  That would be a 900 percent

4    mark-up; correct?

5    A    Sir, I got lost somewhere in your math calculations,

6    respectfully.

7    Q    Okay.

8    A    But if the question is, did I buy the debt at a low

9    number or a number that was negotiated as a fair number, that

10   a board of a hospital, comprised of 10 or 12 or 15 individuals

11   voted on, and then sold it at a profit, the answer is yes.

12   It's no different than the earlier portfolio I bought from

13   North Philadelphia Health Systems at $70,000 and sold for

14   $700,000.

15   Q    All right, sir.  Right.  And I have no qualms.  Nobody

16   has any qualms with anybody making a profit.  My only question

17   was, that obviously you've marked it up considerably; right?

18   I say it's 900 percent.  You say you're not sure of my math,

19   but I think we established that that's pretty close; right?

20   That's a 900 percent mark up.

21        So you're aware in terms of what you charge to sell it,

22   that if you were to charge, let's say $5 and you had expected

23   income of $1 in return for that $5, that that would be a 20

24   percent return; correct?  Is my math okay there?

25   A    Actually, I never did well in math at school.  I'm trying

1    to follow your reasoning.

2    Q    Well, you don't have to know my end game here in terms of

3    what I'm getting at, sir.  I just want to know if you spend $5

4    for an opportunity for $1, then you're hoping for a 20 percent

5    return.

6    A    Okay.

7    Q    You agree with that, don't you?

8    A    Yes.

9    Q    All right.  And if you were to spend $10 for that same

10   opportunity for that $1, you would be selling or requesting or

11   accepting a 10 percent rate of return; correct?

12   A    Okay.

13   Q    All right.  And so if you were to spend $50 for the

14   opportunity to get that $1, that would be a 2 percent rate of

15   return; correct?

16   A    Okay.

17   Q    So this number is 10 times higher than that number.  And

18   you would agree with me, sir, don't you, that when you take

19   the price of something that's going to have a certain income,

20   and you price it in such a way that the way you price it has

21   an impact, a significant inverse relationship to the

22   anticipated or expected later return, in other words, you

23   can't just charge whatever you want without considering what

24   the potential rate of return is going to be; right?

25   A    Wait.  I can't -- I can't -- I just want to make sure I

Cross-Examination Richard Shusterman by Mr. Clarke

1   understand your question.  I can't charge for an asset I own

2   at an ask price -- to sell a product I'm selling -- and ask

3   whatever number I want?  Did I understand your question

4   correct?

5   Q    Well, no.  Because my question was linked to the fact

6   that if you're in the business of getting people to invest in

7   your portfolios, that you can't just, for example, you

8   chose -- you chose 3.0 as your starting price, roughly.  You

9   didn't start at 10.0 or 11.  Eventually, you'd get up to that

10  price point, but you didn't start off there, because you had

11  to be sensitive to the fact that you needed a certain return

12  to your investors; right?

13  A    Sir, the price that any of these files were sold at, any

14  buyer could have said no.  Any buyer could have negotiated.

15  Any buyer could have walked away.  The price on an asset that

16  I own that I want to sell for, whether it's a portfolio or an

17  antique car, I'm -- an asking price, if someone doesn't want

18  to pay it, they walk away.

19  Q    All right, sir.  In May of 2008 -- I should say by May of

20  2008, if you look at the Roundstone chart.  So this is -- I'm

21  looking at line 9.  And if we also look over here to around

22  that same time in the sale column, which is line 6.  So line 9

23  and line 6, if you look at the prior history here, leading up

24  to that date in sales and repurchases, by my count, it looks

25  like you sold approximately eight portfolios to Roundstone,

1    and you've repurchased about six or so; correct?

2    A    If that's the number, it's the correct number.

3              THE COURT:  As of what date, Mr. Clarke?

4              MR. CLARKE:  By May -- end of May.  May 27th,

5    2008.

6              MR. MCMAHON:  So that would be -- I mean -- oh,

7    okay.

8    Q    (BY MR. CLARKE)  Yeah, I count eight here for that date.

9    And then over here in terms of sales, I count one, two, three,

10   four, five, six.  All right?

11   A    Okay.

12   Q    Okay.  So you've had a fair number of interactions with

13   the Roundstone principals by this time.  I'm showing you

14   what's already in evidence as Government's Exhibit 1234.  And

15   you've seen this before because this is one of their

16   PowerPoint presentations that they sent to you; correct?

17   1234.

18   A    I was just going to ask if I could read the first page,

19   please, for a second.

20   Q    Sure.

21   A    I don't -- I don't recall if I read this before, I may

22   have --

23   Q    Okay.

24   A    I don't recall as I sit here this minute.  I may have, I

25   don't recall.

1    Q    At this point in time, they've made money on all eight of

2    their portfolios -- I mean, you've sold them at a profit, six

3    of them.  And eight of them -- for all eight of them, the

4    price went up for every single one.  You agree with that,

5    don't you?

6    A    Was there a price variation -- yes, it's noted in your

7    chart.

8    Q    Okay.  And the pattern is that they all went up in terms

9    of buying a new one.  And they always got a profit in selling

10   an old one, up until this point in time.  You agree with that,

11   don't you?

12   A    The price varied, sure.

13   Q    All right.  So looking at this page in their PowerPoint,

14   they talked about how the portfolios of uncollected debt are

15   received directly from hospitals.  And that they're reselling

16   the purchased portfolios to other collection organizations in

17   the secondary market; is that correct?

18            MR. MCMAHON:  I have an objection.  Can we approach?

19            THE COURT:  Yes.

20            (Bench conference on the record.)

21            MR. MCMAHON:  I have an objection to cross-examining

22   him on something he did not prepare or has adopted or any --

23   this is the -- Roundstone put that out themselves.  How could

24   he be cross-examined on the document of someone else unless of

25   course he adopts it or some other fashion.

1           THE COURT:  Well, first of all, the exhibit's in

2    evidence.  You agree with that?

3           MR. MCMAHON:  I agree it's in evidence.

4           THE COURT:  Okay.  So then it comes down to what the

5    particular question is that's posed in relation to it.  But in

6    general, saying that it's not an appropriate topic for

7    cross-examination, that's overruled.  But we'll see on a

8    question-by-question basis.

9           MR. MCMAHON:  Okay.  Thank you.

10          (The following proceedings were had in open court.)

11   Q    (BY MR. CLARKE)  Sir, this is information that they

12   obtained from you.  Isn't that correct, sir?

13   A    Let me just read it one second, please.

14        They're not buying debt directly from a hospital.  It was

15   IPI that's buying debt directly from a hospital.

16   Q    Okay.

17   A    Let me just finish one second, please.

18          MR. MCMAHON:  Could we slide it up so we can see the

19   whole page?  Excuse me.  Can we just slide it up?

20          MR. CLARKE:  I did.

21          MR. MCMAHON:  Thanks a lot.

22   A    I mean, it says on the bottom footnote that "The

23   information referenced was from the Association of Credit and

24   Collection Professionals."  And it further states that

25   "Roundstone Health Care Partners is a member of that

1    association, which is a major industry trade organization."

2         That's what I'm reading.

3    Q    (BY MR. CLARKE)  All right.  So you just said, though,

4    earlier, that IPI, and what you sold them, was purchased

5    directly from a hospital.  That is IPI's product that it was

6    selling to Roundstone, was what you purchased directly from a

7    hospital.  That's what you just testified to; right?

8    A    I think it was the first eight transactions on that

9    chart, correct.

10   Q    All right.  And they were in a relationship with you,

11   IPI; right?  And you held yourself out as an expert in

12   collections.  That's information that you provided to them,

13   isn't it?

14   A    They had a relationship with -- can --

15             THE COURT:  Please don't turn the page until the

16   question has been answered.

17             MR. CLARKE:  I apologize.

18             THE COURT:  Thank you.

19   A    It's correct that they had a relationship with IPI and

20   it's also correct that I had 28 years at the time of

21   experience in the collections sector.

22   Q    (BY MR. CLARKE)  All right.  And they also put here in

23   their presentation about their association with you, that IPI

24   assumes complete management of the collection process using

25   your specialized network.  That's something you would say to

1    them; correct?

2    A    We had a group and they were well aware, as many times we

3    met, I told them about Mr. Landrum, about ART, and had a

4    network of collection agencies that were servicing the debt.

5    Q    So the response to my question is, yes, this is

6    information that you would be providing to them?

7    A    I provided them with the information that, in fact, I had

8    a contract with ART.  They employed many collection agencies.

9    And they were servicing the debt.

10   Q    Which constitutes the specialized network of collection

11   agencies; right?  That you're using; correct?

12   A    Yes.

13   Q    All right.  And if we go to the next one, you also talk

14   about the ramp-up period, which we talked about earlier in

15   your testimony.  And that's something else that you would tell

16   them; right?  That you would need a ramp-up period before the

17   collections really started to hit; correct?

18   A    Not four to six weeks.  It was typically longer than

19   that.

20   Q    All right.  September 9th, we have another PowerPoint,

21   1235.  And do you recall reviewing this?

22   A    I may have, but I don't recall.  It's possible, I don't

23   recall.

24   Q    It is possible because you recall that at times they

25   would give you promotional material for you to review, but

Cross-Examination Richard Shusterman by Mr. Clarke

1    you're not sure if this is one of the ones; correct?

2    A    When we got together and met, we talked about the

3    industry, we talked about collections, we talked about

4    hospitals.  I don't -- it's possible.  I don't know if I

5    specifically read or reviewed an entire legal offering that,

6    I'm sure, was many, many pages long.  I doubt I would have

7    gone through a very long and lengthy legal document.

8    Q    "Proven process," across the top here.  On the last part

9    it talks about "Package and sell into the secondary market,

10   leverage relationship with secondary buyers to multiply bids

11   for each portfolio."  That's also something you would have

12   told them; correct?

13   A    "Package and sell a portfolio into a secondary market"

14   was something that clearly IPI did --

15   Q    Okay.  Thank you.

16        MR. MCMAHON:  Can he finish?  There was a second

17   component to that.

18        THE COURT:  There is.  Allow him to answer the

19   second part of the question.

20   A    The second highlighted piece, "Leverage relationships

21   with secondary buyers to solicit multiple bids for each

22   portfolio."  I told them that I would do everything I could

23   to, in fact, assist with selling their portfolio, but I made

24   it very clear with them that, in fact, I had no obligation to

25   sell their portfolio.

1    Q    (BY MR. CLARKE)  But you did tell them that you placed

2    these portfolios out for bidding?

3    A    I told them that I would attempt to take their file and

4    assist with -- with the sale of their portfolio.

5    Q    All right, sir.  Looking at the next page.  You -- they

6    list here, "Secondary buyers as collection and law firms."

7    That's information you would have provided to them; correct?

8    A    I had told them that.  In fact, IPI had sold multiple

9    portfolios to attorneys -- that were attorneys.  And, in

10   fact --

11   Q    Go ahead.

12   A    I'm sorry.

13   Q    Go ahead.

14   A    And, in fact, sold a significant portfolio to a

15   collection agency, a collection firm.

16   Q    This doesn't say "attorneys," sir.  It talks about law

17   firms and you're referring -- they're referring here and

18   you're referring to law firms that specialize in debt

19   collections, which is not the same as an attorney buying it;

20   correct?

21   A    No, that's not correct at all.

22   Q    Showing you one of the final pages.  And he talks

23   about -- they talk about in their presentation, of their

24   relationship with you, they tout the results of their

25   relationship with you, which is that they've originated more

1    than 2 billion in face value of hospital accounts receivables

2    over the past two years, realizing a weighted average gross

3    rate of return of 54 percent on the purchase and sale of 23

4    portfolios.  So they're summarizing the success they've had

5    with you.  And you knew that they were pitching their

6    relationship to others as a way to sell more of your IPI

7    portfolios; correct?

8    A    I'm just trying to understand this.  If I could just read

9    it.  It's their offering and it says "originated," which I

10   assume was Roundstone, "originated more than $2 billion in

11   face value," which clearly is not factual, "of hospital

12   receivables over the past two years, realizing a weighted

13   average gross of 54 percent on the purchase and sale of 23

14   portfolios."

15       And on the bottom, there's a footnote here.  Let me just

16   read this.

17   Q    Let me help you.

18   A    "Calculations based on the weighted average of the dollar

19   value of each portfolio and excluding returns earned through

20   the collection of receivables during the hold period."

21       So that clearly relates to also the other component,

22   which is the sale component of the portfolio.

23   Q    Right.  But they're accurately summarizing, as of

24   September of 2009, a relationship that's gone on for a long

25   period now where, as you just pointed out, you assured them

1    through repurchases that you made from them, that they always

2    got a profit on all of the portfolios that they purchased at

3    higher, ever increasing prices.  And you provided them with

4    actual returns and annualized returns that were significant

5    for all of them.  There was never a loser.

6    A    So my response is number one, I never reassured them at

7    all.  And the 41 separate e-mails over the span of multiple

8    years, in fact, detail that.

9         What's also interesting is that there is a gap between --

10   if you look on the right-hand side of this page, in November

11   21, I believe, 2008, it looks like there's almost a

12   seven-to-eight month window between sales.  The date of when

13   that memorandum was issued was when in 2009?

14   Q    September.

15   A    Okay.  So that was issued in September of 2009.  The

16   number of files sold were limited, very limited, to one,

17   between 21 November of '08, and 28 July of '09.  And yet they

18   still put out that memorandum.

19   Q    Sir, it talks about all of these sales, sir.

20   A    I think it said 23, right?

21   Q    23, I think purchase -- I don't recall what the exact

22   language was.  So you're saying their number's off.  It's not

23   as many as 23?

24   A    Let me count them, hold on please.  I see 21.

25   Q    I think in July there's multiple ones.

Cross-Examination Richard Shusterman by Mr. Clarke

1    A    But --

2    Q    Anyway, whether it's 23 or 21, we both agree that they

3    never lost on portfolios that had ever-increasing prices that

4    always provided great returns, and they're simply summarizing

5    that experience in their relationship with IPI.

6    A    The dock -- go ahead.  I'm sorry.

7    Q    No.

8    A    Please, go ahead.

9    Q    I was going to move on to 1703.

10         MR. MCMAHON:  Can he answer the question?  If

11   there's a statement, he has to respond.

12         THE COURT:  Yes.  Do you have an answer to that

13   question, Mr. Shusterman?

14   A    There's a differential as to prices because if you look

15   at this, first you have in their transactions, multiple

16   different hospitals.  You have JMH, various HMA files, a

17   MultiCare file, and No. 7 and No. 8 are various providers,

18   which I don't know who that is.  So, yes, there are, in fact,

19   different selling prices, but there's also different

20   components to the characteristics and make up of each of these

21   transactions.

22   Q    (BY MR. CLARKE)  Well, but sir, if you look at the vast

23   majority of these are the HMA paper before you got new paper

24   at the end of 2008.  There's not variations in the HMA paper.

25   So -- and my question wasn't whether there's a variation in

1   price, my observation was that they never lost any money on

2   ever-increasing prices that they're paying for your

3   portfolios.

4        That is the pattern we have here.  I'm not interested in

5   a variation of price.  My point was -- I'm asking if you

6   agree, that they always paid more for yours and that they

7   always made a profit.

8   A    The transactions on these sales were sold and repurchased

9   at a profit to them.

10  Q    Thank you.  Showing you 1703, which is a letter from

11  Mr. Tucci.  1073.  And in there it talks about, "There

12  currently continues to be a strong pool of purchasers looking

13  to purchase uncollected medical debt."  And then you talk

14  about the current purchasers.

15       Well, this strong pool of purchasers is actually a pool

16  that you made; right?  When you talk about the pool of

17  purchasers -- when we look at the Roundstone chart, when we

18  look at the ARS chart, the IIG chart, the Greenfish chart,

19  sir.

20       Those are the investment groups that you sell to,

21  repurchase from, and then resell to again.  So this pool of

22  purchasers is of your own making.

23  A    The letter also indicates that the files are sold to

24  attorneys, that are sold to collection agencies --

25  Q    And that's on the next page --

1          MR. MCMAHON:  Flip it up, Judge.  Can we move that

2     up to the page that reflects that?

3          MR. CLARKE:  It's not up top?  I think your client's

4     referring to this page, which I've highlighted and we're going

5     to talk about.

6          But my question was not as to those individuals, but the

7     strong pool of people who were buying them consistently and

8     getting profits consistently are the investment groups that

9     you're selling to in the first place and then rebuying from;

10    correct.

11    A     There were many people that portfolios were sold to where

12    portfolios weren't repurchased that, in fact, people were

13    buying, were holding, were receiving collections on.  And were

14    collecting the files.

15    Q     You provided the content for this letter, did you not?

16    A     For Mr. Tucci's letter?

17          THE COURT:  Exhibit number?

18          MR. CLARKE:  Well, the one we were just talking

19    about was 1073, which is the letter from Mr. Tucci.

20          THE COURT:  So the question is, did he provide the

21    content for this exhibit?

22          MR. CLARKE:  Yes.

23          THE COURT:  This letter.

24          MR. CLARKE:  Yes.

25    A     I had a conversation and then a follow up e-mail with

1    Mr. Tucci that --

2    Q    (BY MR. CLARKE)  All right.  That's all I asked.  I'm

3    showing you what will be marked in just a second, this is a

4    e-mail on December 16th, and --

5                THE COURT:  Is this in evidence?

6                MR. CLARKE:  It is now.  1412.

7                THE COURT:  Well, let Mr. McMahon see it if it

8    hasn't been admitted yet.

9                MR. MCMAHON:  It's fine.

10               THE COURT:  It's received.

11               MR. MCMAHON:  I have no objection to it, Your

12   Honor.

13               THE COURT:  1412 is received.

14   Q    (BY MR. CLARKE)  All right.  And you were providing this

15   in response to the Bernie Madoff case?

16   A    Correct.

17   Q    And as we look down here, we compare it to the letter.

18   I'm not going to go line-by-line, but you agree with me that

19   he incorporated almost all of your proposed content;

20   correct?

21   A    Well, and I also spoke to him at length about the content

22   of the e-mail.

23   Q    All right.  And then if we look at the next page, you

24   state in a follow-up e-mail that you would add another

25   paragraph.  And that paragraph appears to be the one that's

1    added in the bottom of the letter.  It talks about a strong

2    pool of purchasers; right?  "There currently continues to be a

3    strong pool of purchasers"; right?  So it's essentially the

4    same wording that he's adopted from your e-mail; correct?

5    A    Correct.

6    Q    Yesterday, you testified that when you talked about the

7    current purchasers being hedge funds -- when you wrote this

8    letter, you really meant Platinum, didn't you?  That Platinum

9    was a hedge fund and they had invested and you could tout that

10   as a success.  But in court yesterday, you said it was

11   Greenfish and Roundstone that were hedge funds; right?

12   A    Yeah, let me just see the date of the letter again?  Yes,

13   it was relating to Greenfish, Roundstone, the funds that they

14   had created, and that they were purchasers.

15   Q    Well, you heard Mr. -- well, you heard, I think, two or

16   three of the Roundstone witnesses.  And they described

17   themselves as old friends who just have an investment group

18   and they put together money and try to make money for

19   themselves.  They never described themselves as hedge funds.

20   That's your labeling of them as a hedge fund; correct?

21   A    No, that's clearly in meeting them and from the

22   information learned from them, from their mouth, from the

23   experience they had, these were clearly hedge fund guys.

24   Q    All right.  We'll get to that in a second.

25              THE COURT:  Ladies and gentlemen, let's take a

1    five-minute restroom break.  During this break, don't discuss

2    the case with anyone.  Don't allow yourselves to be exposed to

3    any news articles or reports that touch upon the case.  Avoid

4    all contact with any of the participants in the trial.  Don't

5    make any independent investigation of the law or the facts.

6    Take the jury out.

7         Five minutes.

8              (Jury left the courtroom.)

9              THE COURT:  Five minutes.

10             (A recess was taken.)

11             (Jury entered the courtroom.)

12             THE COURT:  Be seated, please.  Mr. Shusterman, you

13   may retake the stand.

14             And once seated, Mr. Clarke you may continue with

15   your cross-examination.

16             Mr. Shusterman remains under oath.

17   Q    (BY MR. CLARKE)  Mr. Shusterman, looking at 1255, the IPI

18   ARSH deal which is line 1, the first one, you sold it on

19   August 6th of 2007, and then you repurchased it in, I believe,

20   it was four different tranches over this period of time;

21   correct?

22   A    Yes, sir.

23   Q    All right.  And IPI ARSH made a profit.  They paid 2.475,

24   you repurchased it for 2.933, they originally paid 4.999, they

25   got 5.9 million in a sale price for a profit of $924,000;

1    correct?

2    A    Yes, sir.

3    Q    All right.  And that's in a little less than -- let's see

4    12, so it's four months -- four to eight months; correct?

5    A    Four to eight, yeah.  From December -- correct.

6    Q    All right.  So we -- in evidence already are the PSAs for

7    those various sales, all four tranches, reflecting that sale

8    price, total aggregate sale price of all those four tranches.

9    What -- well, let me ask you, who did you sell those four

10   tranches to?  Where are the PSAs for the four sales?

11   A    Well, there's a repurchase that would have taken place

12   from the IPI to the actual prior owner of these portfolios, so

13   this was -- was it ARS, I guess?  I'd have to see if it's

14   moved over.  But there were -- every purchase and every

15   repurchase was documented with a very detailed legal agreement

16   involving counsel.

17   Q    Yes, sir.  But my question was, who did you sell it to?

18   Who purchased it from you?  We know that you repurchased it,

19   we have the PSAs for the four slices of IPI ARSH, my question

20   to you is, where did they go?

21   A    As I sit here this second, I'd have to go through notes

22   and records.  I don't know, it went back into the inventory

23   when it's repurchased, of IPI.

24   Q    Okay.  So there is no -- as we've seen on a number of

25   these transactions, there is an immediate sale, immediate

1    transfer to another investment group.  But in this case,

2    you're, saying that it went into the inventory?

3    A    I don't know -- you're asking me, as I sit up here, who

4    did you sell the files to?  You repurchased and what did you

5    do with them?  I'm sure they were resold.  To whom at this

6    moment as I talk to you?  I don't know.

7    Q    Well, you've heard the testimony from the forensic

8    accountant in this case, Mr. Rutledge.  And he tracked all of

9    the money in and all of the money out of IPI bank accounts,

10   including your personal accounts, and he tracked all of the

11   PSAs, and sir, there's no transaction for the four sales of

12   this.  You repurchased them, but there's no resale

13   transactions to anybody else.  My question is, where did they

14   go?

15            MR. MCMAHON:  Objection, Your Honor.  That was never

16   testified to that they were never -- none of those files were

17   never resold.  He didn't do that type of analysis audit on

18   each of those files to make a determination of what portion of

19   them were sold here, there -- that was not done.  Money in and

20   out, that was all he talked about.

21            THE COURT:  It's a complex issue, the jury's

22   recollection of the testimony will control.  The objection is

23   overruled.  The witness will answer if he can.  Perhaps you

24   should restate the question at this point.

25   Q    (BY MR. CLARKE)  Sir, you didn't have a buyer for these

1    portfolios when you repurchased them.  You just repurchased

2    them.  IPI was the only buyer of these portfolios.

3    A    That is --

4              THE COURT:  Is that a question?

5    Q    (BY MR. CLARKE)  Yes.  Isn't that correct?

6    A    That's not correct.

7    Q    Who were the buyers?

8    A    As I sit here, this second, you're asking me who the

9    buyers are with hundreds of thousands of papers and documents

10   related to purchase and sale and repurchase agreements, I

11   simply can't tell you who the buyers are sitting up here with

12   the magnitude of transactions that took place.  I just -- I

13   don't have that ability.

14   Q    So it's your testimony -- or you're saying -- correct me

15   if I'm wrong, that you believe that you could have sold these

16   four tranches over these four dates and Mr. Rutledge missed it

17   in your bank account and missed it in the PSAs?

18             MR. MCMAHON:  Objection, that is not what he's

19   saying.  He's saying --

20             THE COURT:  The question is a fair one and the

21   witness will answer it, yes, no, maybe, I don't know.  But

22   that's the question posed.

23             MR. MCMAHON:  Yes, Your Honor.

24   A    You're asking me if Mr. Rutledge missed something?  Was

25   that your question, sir?

1    Q    (BY MR. CLARKE) I'm asking if there's anything in the

2    record that you want to tell us that Mr. Rutledge didn't have,

3    in your bank accounts, or in all of the PSAs that we have, and

4    all the other documents and e-mails that reflect who you sold

5    these four slices to.

6    A    As I sit here this minute, I don't know who I sold these

7    four slices to, with millions of accounts that were in a

8    particular -- combined of all the portfolios and all the

9    accounts -- I don't know who I sold four portfolios out of a

10   tremendous number of sales over the course of years, from

11   2007, nine years ago.  I don't remember as I'm sitting up here

12   this second.

13   Q    This was your first Roundstone deal and you turned them a

14   profit.  You don't remember who you sold it to?

15        MR. MCMAHON:  Objection.  This is Titanium.  This is

16   Platinum he's referring to here.

17        MR. CLARKE:  I absolutely stand corrected.

18        THE COURT:  Sustained.  Rephrase the question.

19   Q    (BY MR. CLARKE)  This is the first Titanium -- I mean,

20   the first Platinum deal.  And you divide it up into four

21   pieces.  Name one of the buyers.

22        MR. MCMAHON:  Objection.  We've gone over this.  He

23   says he does not know.  I don't know how many times he can say

24   "I don't know" and answer the question nine different times.

25   I object.  It's asked and answered.

1              THE COURT:  Overruled.  Cross-examination.

2    Overruled.

3              MR. MCMAHON:  It's asked and answered.

4              THE COURT:  That tends to go on in examinations in

5    this courtroom.  Mr. Clarke, you may --

6              MR. MCMAHON:  I can't disagree there.

7              THE COURT:  You may ask the next question.

8    Q    (BY MR. CLARKE)  Can you name one of the buyers?

9    A    I don't know -- IPI repurchased the files.  Who they were

10   sold to immediately thereafter, I don't know, as I'm sitting

11   here today.

12   Q    I'm showing you Government's Exhibit 1372.  And in there

13   you refer -- and this is for the first tranche.  You say, "The

14   buyer is ready to fund upon advisement.  The documents are

15   waiting for you -- we are waiting for -- from you -- are

16   received."  Does that help you at all?

17   A    Just give me a moment, please, to read this.  So this is

18   December the 8th and this relates to a CD containing 150

19   million worth of accounts from the original 202 million of JMH

20   paper.  Hold on one second, please.  No, I mean, there's a CD

21   here, the letter speaks for itself.  The chart that you asked

22   me about related to ARS, which was also Kuber -- so I guess

23   I'm confused.

24   Q    Well, sir, it says the 50 million worth of accounts that

25   you have a buyer for, I'm showing you 356, which is 50 million

1    accounts that you sold for 2.75.  So that is one of the

2    tranches of IPI ARSH.  And you represent here that there is a

3    buyer ready to fund.  And then you're telling us -- well, we

4    know that you sold it.

5         So I'm asking if this helps refresh your recollection

6    that you sold it to a buyer and that IPI just wasn't

7    repurchasing it.  My question is, does this help?

8    A    No.  There's a repurchase and sale agreement, I'm sure,

9    that was in place.  That relates to what -- the document you

10   just showed me relates to ARS.  As -- if this could get moved

11   over just a drop a little bit to the right -- as does your

12   reference to on here, which are four tranches of repurchase

13   and sale agreements.  You asked me who did I sell them to.  I

14   don't recall.

15   Q    Okay.  Does this help you?  1375.

16        THE COURT:  Show the top.

17   Q    (BY MR. CLARKE)  From you to Mr. Rosenberg, showing you

18   what's attached, it's Government's Exhibit 362 which refers to

19   the 49 million .6 face value.  Purchase price for this file

20   was 4.5 million.  Your return was 592, 3, plus 100K, profit in

21   eight months exceeds 1.5.

22        THE COURT:  What's the question?

23   Q    (BY MR. CLARKE)  Do you remember the buyer?

24   A    No.  I'd have to sit and look at the entire universe of

25   purchase and sale agreements and what took place within the

1    realm of that time frame within a certain, you know, couple of

2    days or whatever the case was on that date.  As I sit here

3    today, I don't.

4    Q    All right.  In fact, sir, it didn't matter whether you

5    had a buyer ever, because you were the one setting the price

6    for the sale, the repurchase, and then the resale; correct?

7    In every one of these circumstances.

8    A    IPI acquired the asset of uncollected medical debt

9    accounts.  IPI sold those accounts.  There was a specific

10   asking price to sell that asset.  If you wanted to buy it, you

11   could buy it and execute a legally binding contract.  If you

12   didn't, you walked away.

13        In fact, if I went back to a person and said, "I'd like

14   to repurchase your account and, in fact, would like to then

15   later sell it once it's funded, once IPI owns that account" --

16   what I do with the accounts once it's funded and it's owned by

17   IPI and who I sell it to doesn't make a difference.

18   Q    All right, sir.  You talked about recoding files.  You

19   testified to that today and yesterday.  And you stated that

20   when you recoded files, it didn't change the asset.  The asset

21   remained unchanged.  Do you recall that testimony?

22   A    Yeah.

23   Q    All right.  I'm showing you Government's Exhibit 1344.

24   Transaction 1, you'll recall is the original sale to ARS,

25   financed by Platinum back in December of 2007.  This is the

1    original Titanium deal, which is line 3 of Government's 1255;

2    right?  On 12/20/07?

3    A    Yes.

4    Q    So that's transaction 1.  And then you've already

5    testified that after the Champps meeting and part of your

6    decision to give the $4.2 million advance loan was that you

7    would start to sell off tranches of IPI; correct -- I mean of

8    Titanium.

9    A    IPI would repurchase some of the IPI Titanium files and

10   then effectively sell them into either various tranches or

11   once they were repurchased and funded, in some cases, as they

12   were.

13   Q    All right.  So the $25 million original value was broken

14   up into eight pieces.  The original purchase price was 3.15.

15   In transaction 2 and 3, this is the repurchase you're

16   referring to which is transaction 2, and then we know it goes

17   to Roundstone.

18        You -- I'm showing you Government's Exhibit 663.  This is

19   from you, and it refers to the first tranche.  And you state

20   that "The portfolio originated by HMA, with a high number of

21   legal accounts is now available for sale."

22        And you give the value, and you give a buy rate of 4.45

23   percent or cost of $8 million, let's say.  And that's charted

24   here, transaction 3, quoted the price of 4.45 percent and, in

25   fact, you sold it to them for that; right?

1    A    Yes.

2    Q    Okay.  Showing you 664, related to the same transaction.

3    After telling them that you might have one available, you

4    write to Mr. Kuber on August 4th, "I expect to have another

5    bucket of files sold from the IPI Titanium file.  It looks

6    like the buyer will take a face value" -- you provide that

7    there -- "of 4.25 percent."  But actually, sir, you quoted a

8    price of 4.45 percent to Roundstone, didn't you?

9    A    I'd have to see the chart.

10   Q    Well, there's the 4.45 percent.  And we just reviewed

11   Government's Exhibit No. 663, where you state in your e-mail

12   that you got a portfolio originated by HMA at 4.45 percent.

13   So you're telling Roundstone that they could buy it for 4.45

14   percent.  But you're telling ARS that you've got a buyer for

15   only 4.25 percent; correct?

16   A    Now, that's correct because --

17   Q    All right.  I just asked if that was correct, sir.  Your

18   attorney can ask you why.  I'm just asking if that's correct

19   and your answer is that is correct; right?

20   A    Yeah.  The repurchase price and what the resell price are

21   clearly indicative.

22   Q    All right.  And 1345, you asked Mr. Zoldan to recode into

23   Roundstone the Titanium slice.  This part was divided up in

24   three parts to Roundstone for the price of 4.45 percent, which

25   is reflected here.  So you've got this transaction, 4.25

1    percent and the 4.45 percent.

2         So you repurchased it from them and then you resold it to

3    Roundstone for a .20 percent difference.  There's nothing in

4    those e-mails about you taking a .2 percent variance in the

5    price and pocketing it yourself, was there?

6    A    It wasn't a question of pocketing it.  It's IPI

7    repurchased the portfolio.  The repurchase price was paid to

8    the owner of the file.  The agreed upon price was 4.25

9    percent.  And the negotiated price to sell it was 4.45

10   percent.  Once I repurchased the asset, I'm not a nonprofit,

11   sir.  The asset's repurchased, it's funded, and it's sold.

12   Q    Okay.  Well, let me just, if you will accept that about

13   3.905 represents --

14             MR. MCMAHON:  Is this an exhibit?

15             MR. CLARKE:  It's a demonstrative exhibit.

16             MR. MCMAHON:  Oh, okay.

17             THE COURT:  Number?

18             MR. CLARKE:  1413.

19   Q    (BY MR. CLARKE)  So that when you purchased it --

20             THE COURT:  Demonstrative.  For ID only.

21   Q    (BY MR. CLARKE)  When you purchased it back from ARS,

22   which originally paid 3.15 percent, you gave them a profit.

23   So ARS profited that much just on this slice; correct?  1.10

24   percent; right?

25   A    Yes.

1    Q    The net difference between what you sold it for -- well,

2    first of all, when you sold that or purchased it back from

3    them -- and as part of that profit, you provided them with a

4    loan credit.  In other words, you took 935,000 of that sale

5    and you paid down their 4.2 loan; right?  $4.2 million loan?

6    A    Correct.  Anything over -- I think it was 3.73 percent

7    was used to apply to reduce the loan.

8    Q    Okay.  So now Roundstone is the owner of that Titanium

9    slice.  And Titanium, as we all know, had horrible

10   collections; correct?

11   A    The collections were bad on that portfolio, correct.

12   Q    All right.  So when we look at this first transaction

13   between you and ARS, when you buy it, it wasn't based on

14   collections at all; right?  Because they had been complaining

15   about it, and yet, you gave them a profit of .25 percent;

16   correct?

17   A    Correct.

18   Q    And when you sold it to Roundstone, that's with the

19   knowledge that this price couldn't even be supported by the

20   collections, and yet you bought it for more, and now you're

21   selling it for more, and none of that activity is based on

22   collections whatsoever; correct?

23   A    Well, it's -- there are two components as we discussed

24   numerous times.  One is collections, one are sales, and also,

25   what is the maturation period on the accounts that may have

1    been contained in there going through a legal process.  So I

2    think you need to look at all those components in the

3    aggregate to factor that in.

4    Q    But, sir, there were no collections for how many

5    months -- this thing was out for seven months, well past the

6    ramp-up period.  And you're buying it for more, then selling

7    it for more.  So it's not based on any collection event

8    whatsoever.  Based on what you just testified to, it's based

9    completely on your notion of what a resale price should be;

10   right?

11   A    It's not based on my notion of a resale price.  It's -- I

12   repurchased the portfolio.  I own that asset outright.  I then

13   sold that asset again to someone else.  To an independent

14   buyer who signed the contract that they have the level of

15   sophistication to do all the due diligence they want to buy

16   and inspect a portfolio.

17   Q    And if they're willing to buy it, you're the willing

18   seller to sell it; correct?

19   A    If I own the asset, and I'm trying to sell that asset,

20   whether it's a car or a house, you want to get as much money

21   as you can.

22   Q    So when you sold it to them, as you've just noted, you

23   made the 359, you got the loan credit paying down the 4.2

24   million.  And this was your original profit on the original

25   portion of those eight slices.  Now, you weren't finished with

1    this transaction.  You took the same slice and you then

2    repurchased it, and then resold it in two slices; correct?

3    A    The two slices -- you're talking about No. 5 and No. 6?

4    Q    Yes, sir.

5    A    They may have been sold -- if I look at the chart, if you

6    gave me a second or two, they could have been resold and

7    contained as part of a much larger purchase at the same time

8    or within a couple days or within a week's span.  So, in other

9    words, they were part of a much larger pool that were sold to

10   ARS at that -- within a couple of days or within a certain

11   specific period of time.

12   Q    Well, sir, let's look at the e-mails.  1346.  This refers

13   to slice 11 -- what ends up being slice 11 -- if I can find

14   it.  Slice 11 is on this side, and it ends up being slice 10

15   on this side.  So in reference to slice 11 in 1346, you state

16   to Roundstone that you have an opportunity to sell more files

17   and make a nice profit in a short time you have owned them.

18        The buy rate was 4.45.  But now with your permission, I

19   can sell both files for 4.63 percent.  You go on to say, I

20   suggest you sell the files.  With your permission, the buyer

21   would fund by next Friday.  Files are in demand and the timing

22   is perfect.  You're talking here about now moving this to ARS,

23   aren't you?  Recoding it to ARS.

24   A    Right.  So as I expected, I looked at the chart while you

25   were just speaking.  That's Exhibit 1267.  And from 9/5/2008

1   through 9/25/2008, you'll see multiple sales that took place

2   to various slice numbers from IPI.

3       So what -- to answer your question, 5 and 6 were part of

4   portfolios that were sold in a much -- they were much larger

5   face value, but sold and divided from 5 of September through

6   25 of September.  And No. 5 and No. 6, those two components

7   were just a fraction of what was contained in the overall

8   accounts sold to them.

9   Q    I'm showing you Government's Exhibit 1315, related to

10  10.5.  You say to Mr. Rosenberg, "We have a file of HMA legal

11  accounts with a face value of 99 million."  And then you go on

12  to say that you will agree to append the file, you'll cover

13  the court costs.  And further, for this file only, IPI will

14  also cover any court costs.  These accounts can be credit,

15  reported, and sued.  This is in response to his request for

16  what's referred to as a turbo charged liquidating file.  And

17  your response is "I've got one for you.  It's an HMA account";

18  right?

19  A    Can you give me a second to read this, please.

20  Q    Sure.

21  A    Thank you.  Okay.  So I read the bottom e-mail, dated 6

22  September from Mr. Rosenberg and now I'm just going to the

23  top.  He's requesting a file that can do well.  And I respond

24  on 7 September that there's a file of HMA accounts, meaning we

25  could sue these accounts, and here's the face value.  That

1    I'll agree to append the file for bankruptcy and deceased.

2    I'll cover the costs.

3    Q    All right.

4    A    Let me just finish this one second, please.  And I also

5    agree that for this file only, I would agree to pay the court

6    costs, which was estimated at about a $100,000.

7    Q    All right.  You then say to Roundstone, 1349, that "I

8    have a buyer who has bought many portfolios from us in the

9    past, interested and ready to buy two portfolios you own,"

10   which we know is 10.5 and 11.  And there they are.  Okay.

11   These are the ones that you're going to sell.  They bought

12   them for 4.45, both of those, we already talked about that.

13   And then combined, it was that single transaction, which is

14   here.  And now you're buying it here.  Reselling --

15   repurchasing it.

16        You can say, "I can sell both files for this price, the

17   profit realized will be $120,000 in just one month.  One

18   month.  And I suggest you sell.  I have more portfolios ready

19   for you for sale."  So how did you calculate the $120,000

20   profit, what went into the price increase, in one month?  When

21   you knew that Titanium wasn't collecting?

22   A    You're asking me how I offered -- well, what he purchased

23   the file for -- and you're asking how I came up with the price

24   to repurchase?

25   Q    How did you come up with giving him a profit of $120,000

1    in roughly one month on a portfolio that he only owned for a

2    month that you never even placed out for collections?

3    A    Because I knew that I was going to be adding those as an

4    aggregate to a much larger pool of accounts to sell.

5    Q    Okay.  But when you add them to this aggregate to sell,

6    it's still you who's doing the adding and doing the pricing;

7    correct?  And it's still the same parties.

8    A    I have always priced the portfolio in the purchase and

9    the sale side.  If somebody wants to pay the price that I've

10   sold the file for, as I mentioned, they're welcome to.  If

11   not, they can walk away.

12   Q    So when you sold it to them, slice 11 was a 3.9 percent

13   net difference.  Slice 10.5 was a .2 difference.  Combined for

14   both of those, 5 and 6 -- Roundstone -- you received $535,000

15   because once again, sir, you charged 4.6.  So you only gave

16   Roundstone 4.6, but you sold it for 4.99 percent.  So you

17   collected the difference between the two; correct?

18   A    When IPI --

19   Q    My only question is, did you -- did IPI keep the

20   difference between the two prices?  Yes or no?

21   A    On a portfolio it owned, yes.

22   Q    Okay.  So that's $535,000 that IPI made.  If we add up,

23   not including the original profit of the original sale, just

24   what you made in 30 days in this interaction between your two

25   investment groups, we have $1,831,070.  If you include the

1    original profit, it's 5,736,480; correct?  Does that look

2    about right to you?

3    A    I didn't do the math, but --

4    Q    Sir, when you arranged for these sales -- and let's be

5    clear -- I'll let you say it for the record, you were not

6    legally obligated under any contract to do these sales; right?

7    You -- you did this for the parties.  You helped out the

8    parties according to your earlier testimony right?  You

9    weren't contractually obligate to do it?

10   A    I was not contractually obligated anywhere in the

11   contract to repurchase these portfolios or any portfolios that

12   IPI sold.

13   Q    Well, we've just seen the e-mails that preceded these

14   transactions; right?  And we see how you talk about these

15   files and how you present them to the potential sellers and

16   the buyers.

17        Sir, we didn't see in those e-mails -- and correct me if

18   I'm wrong, whether you did tell them in some other fashion,

19   but you didn't tell Roundstone, when you sold it to him, that

20   this particular file was not purchased from a hospital and had

21   been previously collected upon.  You didn't tell him that;

22   right?

23   A    No, but they knew that well in advance --

24   Q    My question, sir --

25   A    -- as to the model.

Cross-Examination Richard Shusterman by Mr. Clarke

1   Q    It's a yes or no question.  For this transaction, did you

2   tell them that this specific file that they're paying this

3   price for, for which you pocketed the difference, was

4   something that had already been collected upon for seven

5   months.  Did you tell them that?

6   A    No.

7   Q    Did you tell them that this particular file that they

8   were buying, not only had been collected upon for seven

9   months, but that the collections were abysmal, terrible,

10  wouldn't even return someone's principal.  Did you tell them

11  that the performance that your company had with this file

12  before you sold it to them?

13  A    No.

14  Q    Don't you think that would be significant information for

15  a buyer to know about a product that you've advertised as

16  something that you're selling in these e-mails that you're not

17  including that wasn't something they would want to know about,

18  is that what you're saying?

19  A    Well, if you're going to let me respond, I'll be glad

20  to.

21  Q    Well --

22        THE COURT:  Just answer the question.

23  Q    (BY MR. CLARKE)  Yes or no?  Was it significant?  Do you

24  think it was significant --

25        THE COURT:  Stop.  Stop.  He knows the question.

1    Now answer it.

2    A    Was it significant that I didn't tell them that the file

3    had been sold to someone else and it wasn't collecting well?

4    Q    (BY MR. CLARKE)  No.  Don't you think it would be

5    significant information for the buyer to know that this was

6    not from a hospital, that it had been collected upon, it had

7    been collected upon for eight months, the collections were

8    lousy, and that you were the company that was collecting upon

9    it and now you're the one who's going to be collecting upon it

10   after they become the owners.  Don't you think that was

11   significant information that they should have been told

12   about?

13   A    Possibly, to some extent.  But yeah, I mean to some

14   extent, yes.

15   Q    Don't you think it would have been significant

16   information for this investor to understand that part of the

17   proceeds and one of the purposes in selling this file to them

18   was to get a pay down on a $4.2 million loan that you had

19   given to the previous owner because your collection service

20   strategy had failed over seven months.  Don't you think that

21   would have been important for that investor, Roundstone, to

22   know before they purchased this file?

23   A    No.

24   Q    Would it have been important for them to know that you're

25   the one who loaned the previous investor the money to cover

1    their investor benchmarks and that your collections weren't

2    sufficient?  You don't think that was significant for them to

3    know?

4    A    Well, that's not what you asked me.  You asked me was it

5    important for them to know that the proceeds or some of the

6    proceeds from the sale of that portfolio were going to be used

7    to pay down a loan that, in fact, IPI had made.

8    Q    You think it would have been important for ARS to know in

9    transaction 4 and 6, 4 to 5 and 4 to 6?

10   A    I don't --

11   Q    Let me finish my question.  That the previous owner had

12   only owned it for a month and that this was not directly from

13   a hospital.  Do you think it was important information for ARS

14   to know?

15   A    ARS knew that not all the files -- they had been

16   originated, in fact, from hospitals, but ARS and Mr. Kuber and

17   any other investor had received the letter that was authored

18   by Mr. Tucci and was fully aware of what the model was by IPI.

19   There was -- it was very transparent.

20   Q    It was.  So we didn't see that in any of these e-mails.

21   You weren't transparent in this transaction.  You didn't tell

22   them that this had been previously collected upon; right?  You

23   assigned a higher value -- this is the third higher value --

24   and you had no collections and you didn't tell them about

25   that.  In this transaction, yes or no, did you tell them in

1    this transaction?

2    A    Did I tell them in this transaction that --

3    Q    That the paper's not from a hospital and it had been

4    previously collected upon.

5    A    No.  No, but --

6    Q    Let me finish.

7            MR. MCMAHON:  Can he answer the question?  I mean, I

8    just don't understand this.  He has a right to answer a

9    question.

10           THE COURT:  You well understand, Mr. McMahon.  Next

11   question.

12   Q    (BY MR. CLARKE)  Sir, did you tell ARS, regarding

13   transaction 5 and 6, did you tell them that the SPE, slice 11

14   and slice 10, were now the proud owners of a portfolio that

15   they previously owned nine months earlier, did you tell them

16   that they were buying back their own file that they were

17   selling because the collections were abysmal?

18   A    As part of a much larger portfolio of accounts that had

19   matured over time, no, because, in fact, these two portfolios

20   were part of purchases made over a two-week period

21   approximately, and there were hundreds of millions of dollars

22   of additional accounts that were part of these transactions.

23   Q    Sir, we saw the e-mails.  You said, "I've got some great

24   HMA originated paper, you ought to buy it, it's looking good,

25   here's the price."  And it's the very paper that they sold to

1    you 30 days earlier because they were behind, defaulting with

2    Platinum.  And you are rushing in with the advance loan and

3    you're giving them the exact same file back again.

4         You don't think that that's material information, that

5    ARS, Platinum, Kuber, Rosenberg, should know about?  And of

6    course, this isn't the only example of you doing this.  When

7    you do this kind of recoding, that's important information,

8    don't you think?

9    A    I think that the buyer of any portfolio had the full

10   option to do their due diligence, to look at the portfolios,

11   analyze the portfolios, and do whatever due diligence they

12   wanted to do as part of their purchase.

13   Q    Well, sir, you issued them new DSP letters.  September

14   9th, 2008, in reference to 10.5.  1315 is a new DSP letter for

15   slice 11.  This is what you represented, that they could

16   expect.  10.8 percent liquidation rate.  As to 10.5, 11.5

17   percent liquidation rate.  This is on the file that they

18   previously owned that we've all seen the collection history

19   on, and you're presenting these as what these things are

20   capable of doing.

21   A    Let me just be clear.  When you referenced -- this is

22   what I represented.  The evaluations were independently done

23   by DSP.  I forwarded the evaluation letters that were done by

24   DSP.

25   Q    Did you tell Mr. Zoldan that he was preparing DSPs for an

1    investment group that had purchased this as part of an

2    aggregate $25 million investment and they were selling it in

3    panic because the collections weren't even sufficient to

4    return their principal?  Did you tell him anything about

5    that?

6    A    That wasn't Mr. Zoldan's task or job.

7    Q    Let me ask you, as a debt collection expert, do you think

8    a better measure of future performance is how a file actually

9    performs or how you think it's going to perform in the

10   future?

11   A    Well, there's one component that says here's the

12   historics of how a bunch of transactions in the past that

13   encompass collections and sales have taken place, through the

14   historic data.  This is his own evaluation on portfolios that

15   he did, not at all influenced by me.

16   Q    But you handed these to ARS, sir.  And these are

17   projections on something that you know that your business

18   model failed to collect on, described as abysmal, and that you

19   by your own testimony had testified could not factor into the

20   pricing whatsoever.  And you're charging them more for the

21   same file, a month after they sold it, you're charging them

22   more; correct?

23   A    The contract clearly was for a higher amount than what

24   they paid.  And just because the portfolios hadn't performed

25   at a specific time moving forward doesn't indicate that

1   through the maturation process those legal accounts would not

2   have settled and future sales taken place on those files.

3   Q    All right.  The maturation of the legal strategy; right?

4   Well, looking at 1312, maybe it could hit it, maybe it could

5   hit it.  Sir, here is slice 10's collection history after you

6   sold it back to ARS.

7        Sir, you didn't give a darn about collections.  You

8   abandoned collections a long time ago.  This was about getting

9   your money just through sales and resales, Ponzi style.

10  Wasn't it?

11  A    Absolutely not.  And if I had aban --

12            MR. MCMAHON:  Can he finish?

13            THE COURT:  Let him answer.

14            MR. CLARKE:  Go ahead.

15  A    If I had abandoned collections, then I wouldn't have had

16  a staff working for me, I wouldn't have had an auditor, I

17  wouldn't have been working with the collection agencies 18

18  hours a day to try to achieve the best possible collection

19  results that we could.

20  Q    (BY MR. CLARKE)  Showing you 1314, which is slice 11,

21  which is no better than what it did before, if not worse;

22  correct?

23  A    Excuse me?

24  Q    There's no serious shock here that the portfolio that you

25  resold to them, that you sold back to them, I mean, didn't

1    perform even though you had those DSP letters, it doesn't

2    surprise you that over the next 18 months there was virtually

3    no collections and certainly no collections in the first few

4    months.  That wasn't a big shock to you; right?

5    A    Well, that's contrary to the e-mail and information we

6    were getting later when Platinum took over the portfolios from

7    Mr. Ezra Zucker, who had indicated clearly that the files

8    through whatever collection efforts they were rendering were

9    doing, quote, "well."

10   Q    So we just looked at a series of recodings between

11   investment groups that you have been dealing with for almost

12   two years.  These inter-investment group dealings didn't stop

13   in September of 2009.  They kept going into 2010; isn't that

14   correct?

15   A    There were transactions clearly that continued through

16   the sale of portfolios between IPI.

17   Q    So around the time of that transaction that we just

18   looked at, all that recoding between the investment groups?

19   A    Uh-huh.

20   Q    Around that same time, you're selling to Mr. Morris

21   Willner -- you recall him, don't you?  The individual investor

22   who invested his mother's trust fund and his kid's trust fund

23   money.  Do you recall his testimony?

24   A    The CPA, the gentleman that was here, yes.

25   Q    All right.  And you sold him directly, right?  You didn't

1    use an investment group this time between you and the

2    investor.  You dealt with him directly; correct?

3    A    Correct.

4    Q    And based upon your pitch to him, you sold him $1.5

5    million worth of IPI debt portfolios in September of 2009;

6    right?

7    A    Yes.

8    Q    Now, to convince Mr. Willner, who was skeptical in the

9    first place, you really pitched him on the entire investment

10   model, didn't you?  The buy, the enhance, the scrub, the sale,

11   and resale; right?

12   A    No.

13   Q    So --

14   A    No.

15   Q    You told him that collections were doing poorly and he

16   shouldn't buy?

17   A    No, he contacted me through a friend of his, multiple

18   times.  He was the one that was trying to run after me to even

19   set a meeting up to meet with him.  And I did meet with him,

20   ultimately.  Our meeting lasted at Starbucks maybe a half

21   hour, with Mr. Willner and his son.

22   Q    You told both he and his son -- you persuaded he and his

23   son that the economics of your model at this late stage were

24   still sound and they should invest their money in your

25   business model; correct?

1    A    That's incorrect.  It wasn't investing money in my

2    business model, it was purchasing assets and accounts

3    receivable uncollected.  He knew what was being sold.  He had

4    told me that he was a CPA who was very successful and had a

5    long track record of conducting business transactions that

6    were very successful.  I told him that at any time he can look

7    at the accounts, analyze the accounts, and make whatever

8    choice he wants to do.  That took --

9    Q    So --

10   A    Can I -- do you want me to finish, or no?

11        THE COURT:  Let him finish.  Go ahead.

12   A    That took place over a meeting for about 30 minutes.

13        THE COURT:  Next question.

14   Q    (BY MR. CLARKE)  But whatever you told him, you convinced

15   him to separate from $1.5 million; correct?

16   A    I didn't have to convince him.  He was running after me,

17   chasing after me to buy the files based on the conversations

18   he had had with another friend of his.  He was contacting me.

19   I didn't have to convince him at all, to the contrary --

20   Q    Because -- if I may -- because your sale repurchase and

21   resale, without collections as a factor, had established a

22   track record for people to hear about and people like

23   Mr. Willner came to you to find out how their friends and

24   associates are getting those kinds of returns.

25   A    No.

Cross-Examination Richard Shusterman by Mr. Clarke

1    Q    You were successful in that respect, weren't you?

2    A    Successful in the respect of selling portfolios?

3    Q    Of achieving this pattern without collections over a

4    two-year period.  No collections.  But you've got a pattern of

5    investors who are bringing in other investors because of the

6    rates of return that they're achieving.

7    A    We had plenty of people contacting me that had the

8    ability to analyze and look at a portfolio and make an

9    independent decision as to their desire to make a purchase.

10        If they wanted to buy the portfolio, they could.  If they

11   didn't want to buy the portfolio on its own merits, they

12   didn't have to.

13   Q    Sir, at the same time that you're telling Mr. Willner

14   that his money is being well spent --

15        MR. MCMAHON:  Objection.

16   A    I never said that.

17        MR. MCMAHON:  He never said that.

18   Q    (BY MR. CLARKE)  Well, did you tell him that he --

19        THE COURT:  Sustained.  Rephrase that question.

20   Q    (BY MR. CLARKE)  Did you tell Mr. Willner that his money

21   would not be well spent buying your portfolios?

22   A    He never asked me if it was going to be spent well or not

23   spent well.  I simply -- in the first meeting we had, told

24   him -- this -- "I have a portfolio of distressed uncollected

25   debt.  These are patients that in the best of times didn't

1    pay.  Are you interested in buying this portfolio?  I will --

2    you can look at it, you can evaluate it."

3          He told me the level of sophistication he had as a CPA.

4    I was more than transparent to say to him, "Do whatever your

5    analysis is on your own" --

6    Q    Go ahead.

7    A    -- "to look at and review the particular asset before you

8    put in one dollar."

9    Q    But you affirmatively did not disclose all the various

10   aspects of the multitude of problems that you were having with

11   your business model.  You did not disclose that information

12   because it sounds like caveat emptor.  If I don't tell them

13   and they don't learn on their own, then shame on them, I get

14   their money.

15   A    It's not shame on them.  He knew these were accounts that

16   were not performing or the hospital would have collected on

17   it.  He knew these were accounts that were not collected.

18   That's why it's a charged off debt.  I'm not selling an

19   accounts receivable.  You're laughing, and it's not anything

20   to laugh at, sir.

21   Q    Well, to say that they knew that there weren't good

22   collections because they're buying debt is circular.  That's

23   circular reasoning, sir.  You are offering a product that

24   says, I can perform on bad debt.  I'm offering a product that

25   can turn around bad debt.  Follow me, the expert, and I will

1    show you how it's done.

2         That's your business model it's not we all got bad debt

3    and everybody knows it's bad debt and nobody should expect

4    anything.  That's not what you're pitching, sir.

5    A    I never told anybody buying a distressed charge off debt

6    that this is an accounts receivable.  It's a different world.

7    These are uncollected debts that a hospital couldn't collect

8    on.  It's not a performing accounts receivable.

9    Q    Well, let's look at what you're telling others at the

10   same time that Mr. Willner was convinced to part with $1.5

11   million.

12        I'm showing you Government's Exhibit 1031, page 2.  This

13   is from you to Ms. Monterosso which is about a month later.

14   You say, "Lina, I received the release of a levy notice from

15   the IRS this past week.  Please deduct the remaining fees I

16   have paid DLA from your salary this week when you bill me.  As

17   a result of collections being so low recently, I can't

18   continue to carry the outstanding debt on my books."

19        You said this to her; right, sir?

20   A    I issued and authored the e-mail, correct.

21   Q    All right.  And you knew that based upon her tax

22   situation and the use of your law firm, at your suggestion,

23   that she was in the hole, I think it was something like

24   $22,000, the amount of the levy and the amount of the tax

25   fees.  Like 22 grand; right?

A     No, she hadn't paid her taxes, she told me, for many,

many, years -- or filed a tax return.  So I had received a

levy and told her I would do everything I could to help her,

in fact, because she was panicked, and put her in touch with

one of the tax attorneys from one of the law firms that I used

in an attempt to help her.

       I told her that she can speak to them and deal direct

with them and try to seek whatever assistance she could.

Q     Well, you meant what you said there about there being

poor collections; right?

A     I'm sorry.  Say again.

Q     You meant what you said here that there were really bad

collections going on.

A     There was clearly an issue.  The economy was bad.  And

there was an issue that I listed here.  I had continued to pay

or carry her bill and had asked her, effectively, because

collections were low, and her salary was also based on a bonus

of direct payments that were coming in, I told her that it was

difficult and I couldn't continue to carry the outstanding

debt on my books.

Q     In short, you refused to give her $22,000, or even lend

her $22,000, because, in your words, collections were so low.

You couldn't even afford that.

A     I had helped her tremendously.

Q     I didn't ask you if you helped her in the past.  On this

1    occasion, collections are so low, according to you, that you

2    can't even part with $22,000.  That's what you're saying here;

3    right?  Yes or no?

4    A    I told her -- the e-mail speaks for itself, sir.

5    Q    All right.  I'm showing you 1031, page 1.  If you look at

6    the bottom, she says, "Here's one that we can hopefully help,

7    since I must pay my Sprint bill" -- I'm not going to go into

8    that, but she talks about how, when doing your work over in

9    Italy when her mother was ill, that she ran up a bill of

10   $8,800.

11        This is also about a month after Mr. Willner -- and you

12   state, "In a normal situation, your request would not be a

13   problem.  Unfortunately, I am unable to honor your request

14   because of the current economic condition, the poor

15   collections and the end of the quarter.  I hope you understand

16   I would not think twice."

17        So even as to the $8,800, because of collections, you

18   couldn't even afford that much money; correct?

19   A    Whether I could afford it or not, I wasn't the bank.  I

20   had an employee relationship based on a contract that set

21   forth the terms.  I had helped her immensely over the years

22   that she had worked for me, including co-signing for a lease

23   on her house that I had no responsibility for, so that she

24   effectively could move.

25   Q    I appreciate you offering all that information.  I didn't

1    ask for all that information.  But my point here, sir, okay,

2    is that the VP of your operations, the person who I would

3    think you would want to keep happy to run your collections to

4    turn it around, you're refusing to give her $8,800 because the

5    very thing that she's in charge of trying to improve isn't

6    apparently enough to provide you with money to do it.

7    A    I think the e-mail speaks for itself.  There was a lot of

8    additional assistance I had provided her prior to and

9    subsequently after this e-mail for tens of thousands of

10   dollars.

11   Q    I'm showing you Government's Exhibit 1283.  Around the

12   same time, just a month or two before -- you didn't buy this

13   jewelry for her, did you, sir?

14   A    No.

15   Q    You had money to cover the jewelry from the IPI business,

16   didn't you?  But not enough to give your own vice president.

17   A    Sir, she was an employee.  We had a contract.  I had

18   helped her over the period of time she worked for the company

19   by giving her assistance to the tune of tens of thousands of

20   dollars to help her.

21   Q    All right, sir.  Thank you.  And showing you Government's

22   Exhibit 1281, also around that same time, sir, these are your

23   purchases.  And subsequent to the time that you spoke with

24   her, those are your purchases.

25   A    Well, at the same time, there was a Mini Cooper.  There

1   are multiple cars on here --

2   Q    I'm sorry.  And you're highlighting the Mini Cooper,

3   what?

4   A    Well, that's around the time frame of the e-mail.  The

5   others were after the e-mail.

6   Q    Exactly.  Right.  So the Mini Cooper wasn't that much of

7   a purchase you're saying?

8   A    No, what I'm saying is you highlighted the date.  There

9   was a date of June 10th, 2009.  I'm stating that is the

10  closest date to, in fact, the e-mail she sent me.

11  Q    Well, the e-mail was beginning of November of '09.  And

12  three months later, four months later, you make a purchase of

13  $284,000.  Granted, these dates are further out, but that's

14  not much further out.

15       Let's look at Government's Exhibit 1269.

16            THE COURT:  Is there a question there, Mr. Clarke?

17            MR. CLARKE:  Not really.

18            THE COURT:  Well --

19            MR. CLARKE:  I'll withdraw.

20            THE COURT:  Let's remember, it's the witness who's

21  testifying, not the attorney.

22            MR. CLARKE:  Yes, Your Honor.

23  Q    (BY MR. CLARKE)  I'm showing you what's Government's

24  Exhibit 1269 on page 6.  This is about 25 days before the

25  e-mails that she sent you, sir.  And on that date, you made 22

1    different payments totaling $2.3 million to ARS, Kuber, and

2    Rosenberg; correct?

3    A    Loans.

4    Q    Well, you wired IPI money to ARS; right?

5    A    They were in the form of loans, documented loans.

6    Q    I understand.  Two days after, you told her collections

7    were so bad you couldn't pay it.  You sent 16 different wires

8    for 823,000.  Two days later, two more for 176.  A month

9    later, 20 more for $1.4 million.  Now, you were no fan of

10   Mr. Kuber and Mr. Rosenberg; correct?

11   A    Was I fan of them?  Of theirs?  No.  They were --

12   Q    You didn't like them at all, did you?

13   A    To me, they were -- they were -- I spoke to Mr. Kuber,

14   not very frequently.  And I wasn't very fond of him.

15   Q    So your VP of operations, you don't give $8,000 to, but

16   two gentleman that you've got no feelings for at all, no

17   contractual obligation to pay, you give $56 million to over a

18   two-year period, including around this time when you're

19   refusing to give money to Ms. Monterosso?

20   A    Well, let's --

21   Q    That's my question.

22   A    I'm going to respond to it.

23   Q    Well, yes or no.  Did you give the $56 million to two

24   people who you just testified to you weren't very fond of?

25   A    I loaned $56 million, which was fully documented by legal

1   loan documents.  I had an employment contract, relationship

2   with an employee that, over the course of her employment, I

3   went over and above trying to help.  And -- and did everything

4   I could to help her, prior to and after.

5   Q    Well, you talk about loan docs and using attorneys.  Why

6   didn't you just use a loan doc with your employee?  $8,800.

7   Get an attorney to draw up a loan doc and give her the 8800

8   bucks?

9   A    I'm an employer, sir.  If you need -- you get a phone

10  bill for $8,800, would you go to the government and ask them

11  for $8,800 to pay the bill?

12       I'm doing everything I could to help her.  I co-signed

13  properties, her credit was poor.  I did everything I possibly

14  could before and after to assist an employee who was in a

15  contractual relationship with IPI.

16  Q    Fact of the matter is --

17            THE COURT:  Ladies and gentlemen, it's time for the

18  afternoon recess.  During this recess, don't discuss the case

19  with anybody, don't talk about the case among yourselves,

20  don't allow yourselves to be exposed to any news articles or

21  reports that touch upon the case or the issues it presents.

22            Avoid all contact with any of the participants in

23  the trial.  Do not make any independent investigation of the

24  law or the facts of this case.  Do not look up anything on the

25  internet, do not consult an encyclopedia or a dictionary.

1          Ladies and gentlemen, we'll be stopping pretty much

2    right at 5:00 tonight, so we're just going to take a

3    ten-minute recess now.  Ten minutes.

4          Please take the jury out.

5          (Jury left the courtroom.)

6          THE COURT:  Ten minutes.

7          (A recess was taken.)

8          THE COURT:  Ready for the jury, Mr. Clarke.

9          MR. CLARKE:  Yes, Your Honor.

10         THE COURT:  Mr. McMahon.

11         MR. MCMAHON:  Yes, Your Honor.

12         THE COURT:  Mr. Shusterman, take the stand.

13         (Jury entered the courtroom.)

14         THE COURT:  Be seated please.  We are ready to

15   continue the cross-examination of Mr. Shusterman.  He remains

16   under oath.

17         Mr. Clarke, you may continue.

18         MR. CLARKE:  Thank you, Your Honor.

19   Q    (BY MR. CLARKE)  Mr. Shusterman, in late summer of 2009,

20   you recall that you assisted Mr. Kuber and Rosenberg in a --

21   in the creation of a sham letter to be presented to Platinum.

22   Do you recall that?

23   A    A sham letter?

24   Q    Yeah.

25   A    Can you show me the letter you're referring to that

1    you're calling a sham letter?

2    Q    Was there more than one?

3    A    I don't think there were any, but I would like to see

4    what you're referencing.

5    Q    Well, do you recall a letter that Mr. Kuber and

6    Mr. Rosenberg asked you to help draft and sign that would be a

7    letter from you, representing IPI, to them, at ARS, where you

8    would tout the advantages and benefits of owning the

9    portfolios that they own?

10   A    I'd have to see the letter to read it closely.

11   Q    So you don't recall any such letter sitting here today?

12   A    I didn't say that.  I said I recall a letter.  I recall

13   testimony about a letter, but to answer questions about the

14   letter, I'd like to just reference it or look at it.

15   Q    Okay.  Well, my first question is, do you remember

16   signing such a letter that your attorney sent to you for the

17   purposes of presenting to Platinum?

18   A    Again, it would be helpful if I could just see the letter

19   you're referencing.

20           THE COURT:  That's not the question.  Do you

21   remember a sham letter?  The answer is either yes or no or I

22   don't remember, maybe.  But there needs to be an answer to the

23   question posed.  Then we'll have the next question.

24   A    Okay.  I don't recall a sham letter.

25           THE COURT:  Next question.

1    Q    (BY MR. CLARKE)  Do you recall writing a letter or

2    signing off on a letter, approving a letter, between IPI, you,

3    and ARS, where you talk about how valuable all the Platinum

4    files are?  Do you recall that?

5    A    I recall the letter related to the files, in fact, that

6    Mr. Kuber had owned in and around that time.

7    Q    All right.  So you do remember such a letter?

8    A    I recall a letter specifically around that time frame

9    that relates to the various portfolios that Mr. Kuber owns.

10   Q    Well, they were Platinum portfolios; right?

11   A    Mr. Kuber bought them.

12   Q    I understand.  But those were Platinum loan structured

13   files, and you were aware of that; right?

14   A    Yeah, that Mr. Kuber had purchased.

15   Q    We can go back and forth like this, but the letter was

16   only about portfolios where Platinum was the lender, no other

17   investment group.

18   A    Okay.

19   Q    I'm sorry.  I didn't hear you.

20   A    I said "okay."

21   Q    Does that mean yes?

22   A    Yes.

23   Q    Okay.  So why did you authorize a letter from you to ARS

24   to talk about a subject that both you and ARS knew everything

25   about?  You're the one who sold them the Platinum files,

1    right, the Platinum finance files.  And you're the one who's

2    servicing all those portfolios, so why did you write or

3    authorize a letter to be written to them where you talk about

4    what great portfolios they are?

5    A    I think it would be helpful if I could look at the letter

6    and I would be glad to answer any question about the letter

7    once I look at it.

8    Q    My question is, why did you write it?

9    A    I -- I don't know what the contents exactly are in the

10   letter that you're asking me about.  I don't know what the

11   purpose was.  There was a letter that was supplied that

12   related to a negotiating point that I was going to attempt to

13   try to sell portfolios, that was in one particular letter.  I

14   don't know if this is the letter you're speaking about.

15   Q    Well, tell me about the letter you're referring to.

16   A    There's a letter I recall that there were various

17   portfolios referenced, it was to me, from my recollection, a

18   starting point as to the numbers I was going to try to sell

19   these specific portfolios that were purchased by Mr. Kuber.

20   Q    Were they the Platinum portfolios?

21   A    I think it was, in fact, files that were later -- they

22   were funded by Platinum.

23   Q    So wasn't it the case that you were explaining in this

24   letter that you wanted to buy them all yourself?

25   A    I'd have to see the letter, sir.

1          THE COURT:  It's a fair answer to the question that

2     "I don't remember without seeing the letter."  Is that your

3     answer, sir?

4     A    Yes, sir.

5          THE COURT:  That's his answer.

6     Q    (BY MR. CLARKE)  I'm showing Government's Exhibit

7     No. 794.  This is on your letterhead.  It's dated August 3rd,

8     2009.  And do you see who it's addressed to?

9     A    Yes, sir.

10    Q    Who is it addressed to?

11    A    Mr. Kuber.

12    Q    Where?

13    A    Accounts Receivable Services.

14    Q    And you're writing to him in your capacity as the owner

15    of IPI; correct?

16    A    Yes.

17    Q    And you say "Dear, Doug" here.  And then it has the

18    content of the letter.  Did you authorize this letter?

19    A    Can I just read it for one second, please?

20    Q    I'm going to go to the last page --

21         THE COURT:  Let him read the whole letter.

22    A    Could you move it up just a drop, please.  Okay.  Just

23    could I see the bottom of that, please.  Okay.

24    Q    (BY MR. CLARKE)  Do you recall it?

25    A    Yes.

1    Q    You authorized it?

2    A    I did.

3    Q    You authorized your name to be signed to it and for it to

4    be sent; correct?

5    A    Yes, correct.

6    Q    So this letter, this whole letter is one big deceptive

7    act, isn't it, sir?

8    A    No, not at all.  I think this was a letter that was used

9    as part of an attempt and a starting of a floor -- to a floor

10   limit to establish or try to work on selling the portfolios

11   that were referenced in the back page.

12   Q    Well, at this time, you had spent tens of millions of

13   dollars keeping ARS afloat and meeting Platinum's interest

14   payments; correct?

15   A    IPI clearly made documented loans to ARS.

16   Q    All right.  And the company that you're making loans to

17   that owns these portfolios, you're writing them a letter about

18   the very portfolios?

19   A    Yes.

20   Q    And you're discussing the attributes of these portfolios

21   to the company that owns them?

22   A    To the company that owns them.  I sent -- the letter was

23   sent to Mr. Kuber.  Is that what you're asking me?

24   Q    Yes.

25   A    Yes.

1    Q    So why is it that you sign your name to a letter that's

2    partially drafted and written by the intended recipient?  In

3    other words, your company has agreed for another company to

4    give you the content of a letter that you put on your

5    letterhead to give back to the very company that asked you to

6    sign the letter?

7    A    Oh, there was a negotiation as to what the context of

8    what they were looking for in the letter was, which ultimately

9    was to try to document the fact that IPI would do everything

10   we possibly could to sell these various portfolios that were

11   owned by Mr. Kuber's entities.  And, in fact, he wanted a

12   letter that stated that.  And I had no problem putting in

13   written form that we would use some type of a floor limit,

14   which was listed in this letter on the next page, to start a

15   reference point of negotiations to try to sell his portfolios.

16   And in fact, I did that.  I tried everything I possibly could

17   do to sell the files that are listed on the next page of this

18   letter.

19   Q    Well, sir, this, by its construction, is for the purposes

20   of presenting to others.  This wasn't a true letter from you

21   to ARS.  This was a device to be used by both you and ARS in

22   the context of providing some sort of comfort to some other

23   third party about the matters this is related to; right?

24   A    No.  This was a documented letter stating -- had some

25   type of a floor limit as a reference of negotiation to sell

1    the portfolios that Mr. Kuber had.  And that's what's

2    contained in here and on the next page, if you flip the next

3    page over.

4    Q    But you saw the e-mails before and after this letter

5    between the parties, including you, and your attorneys; right?

6    And you understood that this was to be used at the meeting

7    with Platinum, that Kuber had a meeting, and that this was to

8    be taken to the meeting to show Platinum.

9    A    You'd have to show me the e-mails you're referencing.  I

10   can only speak about this letter.  This letter was for the

11   purpose, in my mind, to set some type of a floor limit to use

12   as a source of negotiation on all the different people I was

13   talking to in and around that time frame to sell his

14   portfolios.

15   Q    Sir, you understood what you were doing with your

16   advances, and you understood that it was getting harder to

17   keep all this up and Platinum was asking questions, and you

18   had to satisfy Platinum, and this was one of the ways to do

19   it.  This was a lulling letter to convince Platinum that there

20   was another party out there, a third party, an arm's length

21   away, and you pretended to be that third party?

22   A    I --

23   Q    This is a pretense to represent that you are a

24   disinterested, unassociated party, that has an interest in

25   their portfolios, isn't that what this is?

1    A    No.

2    Q    Well, let's go through it.  You say here in the first

3    paragraph --

4              THE COURT:  What exhibit number is this?

5              MR. CLARKE:  This is 794, Your Honor.

6              THE COURT:  Thank you.

7    Q    (BY MR. CLARKE)  "You approached us earlier this month to

8    consider purchasing from you one or more portfolios of

9    hospital receivables."  So just that one phrase suggests a

10   formal relationship between you and Mr. Kuber -- between your

11   two companies -- the two of you just stumbled upon each other

12   in the last month and he just happened to stop by or you just

13   happened to meet him and you guys entered into this

14   conversation.

15       That's not true at all is it?  That doesn't reflect your

16   relationship, does it?

17   A    I don't read -- what you're reading is, "You approached

18   us earlier this month to consider purchasing from you one or

19   more portfolios of hospital receivables, with an aggregate

20   face value of 3.5 billion, more than, he asked and approached

21   me to try to assist to sell his files."  That's how I read

22   that.

23   Q    All right.  The next sentence, "As we advised you at that

24   time, IPI does not generally purchase portfolios from the

25   secondary market, instead, focusing solely on purchases

1    directly from the hospital providers themselves"; right?

2    A    Yes, sir.

3    Q    But, in fact, you buy accounts receivables from

4    investment groups; right?

5    A    I repurchase.

6    Q    Yeah.  So you say you buy them solely from hospitals and

7    directly from hospitals is not accurate; right?

8    A    No, it's not -- what it says, "As we advised you at the

9    time, IPI does not generally purchase portfolios on the

10   secondary market, instead, focusing solely on purchases

11   directly from the hospital providers themselves."  Meaning,

12   IPI purchases debt originated from hospitals and we attempt to

13   buy direct from the hospitals.  That's the business.  We focus

14   solely on purchases direct from hospital providers.

15   Q    Sir, we've been looking at charts about transactions for

16   the last two years, dozens and dozens of them where you're

17   purchasing from investment groups.  You're providing profits

18   and you're rebuying them.  You're not buying them from

19   hospitals.  You have the master agreement way back in 2006

20   but, at this point, three years later, you've been buying from

21   investment groups; correct?

22   A    Well, I bought from hospitals and as noted in Mr. Tucci's

23   letter in 2008, I also repurchased from people that had

24   purchased the portfolios.

25   Q    All right.  So you say here, "Because of your stature

Cross-Examination Richard Shusterman by Mr. Clarke

1    within the receivables industry," you're referring to

2    Mr. Kuber and Mr. Rosenberg's stature in the debt collection

3    industry; right?

4    A    Well, the letter is addressed to Mr. Kuber, not

5    Mr. Rosenberg.  And so -- and the stature reference is to the

6    fact that there are files with a $3.5 billion face value.

7    Q    So he doesn't have any stature in the debt collection

8    business.  He represents portfolio products.  He's a trial

9    attorney who formed a partnership with you to sell your

10   product --

11   A    Well, he --

12   Q    -- up until two years before this, he was a trial

13   attorney.

14   A    He was -- he was and is still or was an attorney at this

15   particular time who had stopped practicing and was doing this

16   full-time.

17   Q    But sir, the only people he bought from was your company.

18   When you say, "stature within the receivables industry," you

19   were ARS's industry.  They only bought and sold from you, so

20   that is totally misleading to say that ARS and Mr. Kuber has

21   any stature at all.  That's extremely misleading, isn't it?

22   A    $3.5 billion, in my opinion, as a buyer of medical

23   accounts is stature.

24   Q    All right.  And stature also suggests that he's doing

25   pretty well.

1        MR. MCMAHON:  Objection.

2   Q    (BY MR. CLARKE)  He wasn't doing pretty well, was he?

3        MR. MCMAHON:  I withdraw.

4        THE COURT:  Withdrawn.  You may inquire.

5   A    The word "stature" in my mind was on the acquisition

6   side.  It wasn't a question of how well he was doing or not

7   doing.

8   Q    (BY MR. CLARKE)  All right.  Let's go to the next part of

9   that sentence.  "Based upon your hope to foster a

10  long-standing relationship with you," well, that couldn't be

11  further from the truth, could it?

12  A    I'm sorry.  I lost where you were.  Can you just

13  underline it?

14  Q    It's the last sentence of the first paragraph, "because

15  of your stature."

16  A    Oh, okay.  "Because of your stature within the

17  receivables industry and our hope to foster a long-standing

18  relationship with you, we agree to review the portfolios you

19  were seeking to sell."

20  Q    You had no intention of trying to foster a long-standing

21  relationship.  You were trying to break this relationship, and

22  this was one of the ways that you hoped to do it.

23  A    Well, the relationship was a business relationship.  And,

24  in fact, I was looking at and trying to do everything I could

25  possibly do to sell the files that were contained on the next

1    page of this letter.

2    Q    All right, sir.  Then you say, "We agree to review the

3    portfolios you were seeking to sell."  Sir, you didn't conduct

4    any review.  You were the collector and servicer.  You were

5    the only man in the world who understood how the collections

6    were doing relative to what people paid for these portfolios;

7    correct?

8    A    I'm trying to read this and the words are different than

9    what you're stating to me.  Do you want me to refer to this or

10   answer your question?

11   Q    Well, I want you to answer correctly.  I thought it said,

12   "We agreed to review the portfolios you were seeking to sell."

13   And you are claiming -- are you not asserting that you

14   reviewed the portfolios?

15   A    Correct.  "We agreed to look at and review the portfolios

16   you were seeking to sell," these various portfolios.

17   Q    Aren't you suggesting that you conducted your own

18   independent review of their product and have come to a

19   decision about it?

20   A    I've looked at his portfolios.  I've looked at what the

21   face value is.  I looked at what the characteristics are of

22   these files, who the originator was, and I'm trying to assist

23   and trying to sell these portfolios.

24   Q    These weren't your words, were they?

25   A    Oh, this letter was a negotiated letter that went through

1    my counsel, some parts of this letter, I don't know what

2    portion of it, was originated, in fact, by Mr. Kuber.  There

3    were negotiations as to what portion or part of this letter

4    was to be acceptable and/or changed.

5    Q    Sir, you don't want me to show you all those different

6    versions.  The only negotiation was essentially verb tense and

7    changing a word here or there.  98, 95 percent of this letter

8    wasn't changed at all.  You're on all of the versions.  And

9    there's three versions.  And they're all red-lined.

10        There's no negotiation.  You adopted this from Mr. Kuber.

11   In essence, almost word-for-word.  Instead of saying "can" you

12   said "may" or something to that effect.

13   A    Whatever is in this letter that I signed my name to, I

14   was very comfortable with the contents of the letter.

15   Q    Next sentence.  "We have just completed our extensive

16   review and analysis of the portfolios you offered and have

17   determined that, as you advised," in other words, it's

18   Mr. Kuber's opinion, it's ARS's opinion, "that what they own

19   is of very high quality."  And you agreed with that?

20   A    There was no question there was an issue with

21   collections.  But, clearly, it was still an asset that had

22   money from a value standpoint and hopefully could have been

23   sold.

24   Q    Sir, the fact that there is some residual value -- isn't

25   there always residual value in any batch of accounts

1   receivables?  Maybe you can get a penny from a patient a year

2   from now.  There's always some value.  But you're asserting

3   here, in writing, in a letter to be presented to others, and

4   you've adopted this language, "very high quality portfolios."

5   A     Well, contained in the portfolios, there were judgments,

6   there were -- I mean, a whole demographic of accounts that

7   were contained in there.  So there were accounts in there that

8   were on the older side, but there were also accounts that were

9   contained that were bought and put in, that were almost brand

10  new.  So it ran the whole gamut.

11  Q     Sir, the ARS portfolio, sir, we're talking about here,

12  were all in '07 and '08.  It's all of the JMH old paper.  It's

13  all of the HMA old paper, so the explanation that you just

14  gave, this sales pitch that "you can never know what paper is

15  because there's all kinds of ways of interpreting it" doesn't

16  work here, because you've seen the collection results.  This

17  is in August of 2009, and a lot of these have been collecting

18  for almost a full cycle, 18 months.  And we've all seen the

19  collection results; correct?

20  A     The collection results clearly speak for themselves.

21  Q     So getting back to my original example today, if you were

22  in the business of finding water and you were in the

23  well-drilling business, and you had found metaphorically,

24  these wells producing this kind of water, it wouldn't be a

25  very good business, would it?

1    A    Well, the fact that the files at a particular time were

2    not collecting does not mean that the files won't collect in

3    the future, don't have value in the future, and can't be sold

4    in the future.  I disagree with you.

5    Q    Which gets back to my earlier point that any portfolio

6    always has some value in the future.  But that's quite apart

7    and different than what you're claiming in this letter where

8    you describe the nightmare you all have had for almost two

9    years as being very high quality.  That's a misrepresentation

10   of fact, isn't it, sir?

11   A    Yes.

12   Q    Thank you.  You go on to say, "There is no question in

13   our view that absent the current, cataclysmic economic

14   conditions, the portfolios would be performing at a higher

15   level of liquidation than you are presently experiencing."

16        That's actually contrary to the e-mails we saw today

17   where you talk about the economy being a non-issue, that it's

18   not a distressed asset.  It's very different than others, and

19   they should keep buying, and "are you ready to deploy more

20   money?"  That's completely different than what you're saying

21   here, isn't it, sir?

22   A    Well, what I'm saying here is that if there's an absolute

23   meltdown in the economic conditions that were either happening

24   or going to happen, hopefully the portfolios would perform --

25   if the meltdown didn't take place, the portfolios would be

1    performing at a higher level of liquidation.

2         So in an improved economy, if things were better, in an

3    ideal world, you would hope that the portfolios would be

4    collecting at a higher rate.

5    Q    Okay, sir.  Let's go to the next sentence.  "While that

6    fact certainly allows us to appreciate the underlying values

7    of the portfolios, it does not, however, allow us to pay the

8    same level of premium you no doubt have experienced on prior

9    sales in the secondary market."

10        Now, sir, because you're sort of the alpha and the omega

11   of ARS's market, you're the only person who has bought and

12   sold their portfolios.  So this has to be a reference to you.

13   A    It says, "it does not, however, allow us to pay the same

14   level of premium you no doubt have experienced on prior sales

15   in the secondary market," meaning, I can't -- I can't promise

16   how these files are going to sell.  I was going to take the

17   files that were attached on this list and do everything I

18   could to sell them or market them for sale.

19   Q    But you're saying here, sir -- you're talking as if you

20   don't know ARS.  You're talking as if you're not intimately

21   familiar with the collections in these portfolios, and you're

22   representing that no doubt they've had success in prior sales

23   in the secondary market, and there have been no sales.  You

24   know that.

25   A    I -- what the letter says and what I referenced in the

1    letter and signed my name to is that I would take the files

2    contained that are referenced in this letter and do everything

3    I could to market them and sell them on behalf of Mr. Kuber.

4    Q    Sir, you only sold two of the portfolios.  All of this is

5    blank.  And everything we're talking about in this letter is

6    all of the blank spaces where there haven't been sales.  So,

7    sir, when you say here, you represent that they no doubt have

8    experienced premium value on prior sales, other portfolios,

9    all of which you were the originator and servicer, is a

10   misrepresentation; correct?

11   A    No.  It's telling me that I'm going to take his files,

12   that I can't promise any success or guarantee based on prior

13   sales, that I was going to take the files he currently owns

14   and do -- and make every effort I could to sell them.

15   Q    All right.  Next sentence, "Regardless, the portfolios

16   certainly have substantial value and we anticipate purchasing

17   most, if not, all of them."

18        So, sir, you don't say here anywhere to the third parties

19   that are going to be the audience for this communication of

20   yours, you don't say anything in the communication to these

21   unnamed third parties, of which Platinum is one of them, that

22   you've lent this very company $56 million.

23   A    There's no reference to loans.  This is a letter based on

24   what I intend to hope to do to sell files.

25   Q    But it's not a full disclosure.  It's not even a partial

1    disclosure of the true relationship between the company

2    sending the letter and the company to whom it is sent.

3    A    Well, it was sent to Mr. Kuber, the letter.  Platinum was

4    fully aware, fully aware that the loans that were made, in

5    fact, were not direct payments and, in fact, were loans.

6    Q    Sir, and in -- in your answers here this afternoon, you

7    keep talking about how you're going to sell them.  But when we

8    look at this letter, you state outright we anticipate

9    purchasing most, if not, all of them.

10   A    Correct.

11   Q    So you're not selling, sir.  You're buying.

12   A    That's correct.  Buying with the intent to sell.

13   Q    You didn't have $135 million, did you?  Because that's

14   what all this adds up to.

15   A    No, I didn't.  But I was speaking with very large and

16   significant funds that had $135 million plus that could have,

17   if they wanted to move forward with an acquisition, funded

18   that.

19   Q    You go on to say, "If we were to purchase your

20   portfolios, we would fund those purchases over the course of

21   the next 14 months."  So to follow up on your response just

22   now, you weren't intending to purchase them.  You were

23   intending to sell them to a third party; correct?

24   A    No.  I would -- we -- just like in some of the other

25   transactions we discussed today, IPI would, in fact,

1   repurchase them and simultaneously sell them or flip them to

2   whoever the purchaser was that, in fact, I had either talked

3   to or would have consented to buy it.

4   Q    You point out that you're going to start buying them in

5   October of 2009; right?

6   A    Based on our expected liquidity, we would anticipate

7   being able to commence funding in October 2009, within the

8   range set forth in the schedule below.

9   Q    All right.  You can stop there.  In fact, sir, you did

10  sort of a lulling purchase; right?  You put together a PSA to

11  purchase a part of Portfolio One, and the PSA was originally 3

12  million or so.  And that was part of this scheme, to show that

13  you really intended to buy -- you put together a PSA for just

14  a part of Portfolio One.  Do you recall that testimony?

15  A    Do I recall the testimony of a funded purchase and sale

16  agreement.

17  Q    Regarding an October closing of an ARS portfolio.

18  A    On a deal that was funded on a repurchase?  Is that what

19  you're asking me?

20  Q    In accordance with this letter that you're going to start

21  buying in October of 2009.

22  A    Well, let me look at the chart.

23  Q    Sir, on the next page, Portfolio One --

24         THE COURT:  He's still answering the question.

25         MR. MCMAHON:  Still answering the question.

Cross-Examination Richard Shusterman by Mr. Clarke

1    A    One second, please.  I'm not really sure of your

2    reference to the $3 million -- if there was a funded

3    repurchase on a purchase and sale agreement, the funded

4    purchase and sale agreement speaks for itself.  I'm not really

5    sure how that ties into this letter.

6    Q    (BY MR. CLARKE)  Well, sir, Portfolio One is listed as

7    one of the portfolios.  You say you're going to start buying

8    in October of 2009 and, in fact, you signed a PSA, purchasing

9    part of Portfolio One and you recall losing a million dollars

10   in liquidated damages because you didn't follow through on the

11   ruse?

12   A    It -- well, I take exception to the word "the ruse."  I

13   do remember losing a million dollars as part of a contract on

14   the liquidated damages.

15   Q    On Portfolio One, a portion of Portfolio One.

16   A    On that purchase and sale agreement, yes.

17   Q    On Portfolio One?

18   A    I don't have --

19   Q    Do you need me to show you the portfolio?

20   A    No.  I'm taking you for what you're telling me as being

21   factual.

22   Q    Okay.  And you signed that in October; right?

23   A    Okay.  But that clearly was not a ruse.  I lost a million

24   dollars on that deal.

25   Q    So it's just happenstance that you decided to buy -- it's

1    just happenstance that you decided to buy a portion of

2    Portfolio One in October of 2009 and it's unconnected to this

3    letter.

4    A    I was constantly trying to repurchase and sell his files.

5    Constantly.  And if you look at the history of transactions

6    both on the sale side and the repurchase side.  I lost a

7    million dollars out of my pocket on that.

8    Q    You're not answering my question, sir.  If you look at

9    the chart --

10            THE COURT:  Exhibit number?

11            MR. CLARKE:  1255.

12   Q    (BY MR. CLARKE)  You made no purchases up until the time

13   now when you have this letter and you say that you're this

14   entity that hopes to buy all of it and, in fact, you, at this

15   point, come up with a million dollars towards the purchase of

16   Portfolio One.  So it's linked to this letter, you made that

17   purchase or attempted that purchase to try and establish your

18   credibility within this letter to whoever was seeing it,

19   including Platinum.

20   A    The letter speaks for itself with my efforts to take the

21   files that Mr. Kuber owned and try to take those files and

22   sell them.  The purchase and sale agreement, with the

23   liquidating damage of a million dollars, I lost a million

24   dollars.  This letter, I signed and stand behind the letter.

25   It totally relates to my efforts to try to take all the files

1    that were listed here and sell those files on behalf of

2    Mr. Kuber.

3    Q    You go on to say, "As we discussed, we have set forth

4    below the purchase prices we would expect to be the starting

5    point for our negotiations."

6         Sir, you colluded with Mr. Kuber and Mr. Rosenberg to

7    come up with these prices.  These prices had no bearing

8    whatsoever in collections or any independent third-party

9    offer; isn't that correct?

10   A    Again, if you -- in reading the letter, the goal was to

11   take the numbers that were here and use them as an expected --

12   it's listed right here -- expected negotiation starting price.

13   This gave me some form of parameter as to the numbers that I

14   had to work with in trying to sell these portfolios.  They

15   weren't set in stone.  This was a starting point because it

16   says here, "an expected negotiation start price."

17   Q    So these weren't set in stone, you were willing to pay

18   even more for this?  Is that what you're saying?

19   A    No, that's not what I said, sir.  What I said is

20   hopefully I could sell them.  These were in reference to what

21   was hopefully going to be evaluation on a sale.  If it was

22   less, it was less.  If it was more, it was more --

23   Q    But, sir, you're representing here in this last

24   paragraph --

25             MR. MCMAHON:  Judge, again.  He was in the middle of

Cross-Examination Richard Shusterman by Mr. Clarke

1    talking and he just interrupts again.

2              THE COURT:  It was a little quick.  Were you

3    finished, Mr. Shusterman?

4              THE WITNESS:  No, Your Honor.

5              THE COURT:  Please finish.

6    A    Thank you.  The whole intent of the letter was to show

7    and reference an amount that I was trying to take a portfolio

8    that was owned by Mr. Kuber and attempt to sell.  It could

9    have been higher, it could have been lower.  I tried

10   everything I could fast forward in trying to take all the

11   files that he owned and sell them.

12   Q    (BY MR. CLARKE)  You said it was set in stone, but in the

13   letter, you state, "Obviously, our willingness to purchase" --

14   now you say here, as such, "We would expect the prices to

15   which we may ultimately agree to be in excess of those

16   starting prices."  So obviously it depends on the economy.

17        "However, our current expectation is to be able to

18   purchase all of your portfolios within a time frame mentioned

19   below, which is, I think, a year and a half, and likely,

20   substantially sooner, and at least at the starting prices set

21   forth below."

22        That's what it says; correct?

23   A    Yeah.  You had said and maybe I heard you --

24   Q    I just asked you if that was correct.  What I just read

25   was correct; right?

Cross-Examination Richard Shusterman by Mr. Clarke

1    A    Yes.

2    Q    I didn't misread it, did I?

3    A    You misstated something or maybe I heard you

4    incorrectly.

5    Q    All right.  Well --

6    A    I was trying to ask to state what I heard you perhaps

7    said.

8    Q    What did you perhaps hear me say, sir?

9    A    You referenced or stated that it was set in stone.  What

10   I stated was the figures, in fact, were not set in stone.

11   These were an attempt for me to take the files, to market the

12   files, and to sell the files.  It was not, in fact, set in

13   stone.

14   Q    Sir, every one of these, as I scroll up here, every one

15   of them, there's been testimony, is priced at significantly

16   more than what ARS paid for them, sir.  And we have seen and

17   what's in evidence, are the collection results for every one

18   of these over the prior 18 months.  Yet, you are providing a

19   price to the reader of this letter that shows a profit in all

20   these portfolios.

21   A    Well, if you go back to the top of the page, it clearly

22   says "Expected negotiation."  I think that's the key part

23   you're missing.  "Expected negotiation start price."

24   Q    But the purpose is to entice and persuade and to convince

25   for your own ends.  And that's why you're providing such high

1    prices.

2    A    The high prices were a guideline to try to take these

3    files and work with.  I could not promise that these were the

4    numbers anything would ever sell at, higher or lower.  It was

5    a letter to say I'm trying my best to take a file and it was a

6    sense of a -- some negotiation to try to work within a

7    parameter of selling pools of accounts.

8         MR. CLARKE:  No other questions for today, Your

9    Honor.  It's 5:00 o'clock.

10        THE COURT:  Ladies and gentlemen, it is time for us

11   to recess for the evening.  During this recess and overnight,

12   please follow these instructions.  Do not discuss the case

13   with anyone.  Do not discuss it with your fellow jurors.  Do

14   not discuss it with any of your friends or family.  Do not

15   allow yourselves to be exposed to any news articles or reports

16   that touch upon the case or the issues it presents or the

17   participants in the trial.

18        Avoid all contact of any kind with the participants

19   in the trial.  Do not make any independent investigation of

20   the law or the facts relevant to the case.  Do not make

21   internet searches.  Do not conduct internet searches with

22   respect to the issues presented or the persons participating

23   in the trial.

24        Do not consult external sources, such as

25   encyclopedias or dictionaries in reference to the issues and

1          the terms that have been presented to you here.

2                    You are excused until 9:30 tomorrow morning.

3                    Please take the jury out.

4                    (Jury left the courtroom.)

5                    THE COURT:  We'll begin the instructions conference

6     in chambers in five minutes.  Counsel only.  Otherwise, in

7     recess until 9:30 tomorrow morning on the trial.

8                    (The proceedings were concluded.)

9              I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
10    record of proceedings in the above-entitled matter.

11

12

13                    _____
                          Christine T. Asif
14                        Official Court Reporter

15

16

17                              INDEX

18    Witness Name                                        Page

19    Richard Shusterman

20       Direct Examination By Mr. McMahon.................. 3

21       Cross-examination By Mr. Clarke .................... 26

22

23

24

25

< Dates >
"may" 190:12.
12/20/07 148:2.
2/13/08 100:11.
21 november
   134:17.
28 july 134:17.
3 july 45:3.
3/31/2008 85:17,
   85:19.
4/14/2008. 85:20.
4/2/2008 85:20.
6 september
   154:21.
7 september
   154:24.
7/18/08 12:4,
   13:14.
9/25/2008 154:1.
9/5/2008 153:25.
April 26th, 2016
   1:19.
August 3rd, 2009
   181:7.
August 4th 149:4.
August 6th
   140:19.
August 6th, 2007
   29:4, 29:10,
   119:17.
December 15th, 2006
   59:21.
December 16th
   138:4.
December 21st
   10:23, 11:1.
December 21st, 2006
   61:11.
February 2008
   100:14.
February 9th, 2009
   95:22.
January 16th
   52:17.
January 16th, 2008
   53:1.
January 8th, 2007
   64:22.
July 3rd, 2007
   29:13.

June 27th 29:11.
June 29th 16:2.
June, july 29:19.
March 15th, 2007
   41:19.
March 3rd, 2008
   86:12.
May 27th, 2008
   126:4.
November 21
   134:10.
November 26th
   55:8.
October 19th, 2007
   119:5.
October 2009
   196:7.
October 3rd, 2008
   114:13.
October 8th, 2008
   113:23.
September 26th, two
   8:17.
September 9th
   130:20.
September 9th, 2008
   162:13.
"35 39:9.
$1 63:16, 64:13,
   64:15, 64:24,
   123:23, 124:4,
   124:10, 124:14.
$1,831,070.
   156:25.
$1.4 175:9.
$1.5 166:4, 167:15,
   170:10.
$1.9 119:3, 119:15,
   119:24.
$10 124:9.
$10,000 90:5.
$100,000 62:9,
   155:6.
$120,000 155:17,
   155:19, 155:25.
$135 195:13,
   195:16.
$155,000 3:15.
$2 119:7, 119:18,
   133:10.

$2.3 175:1.
$200,000 56:14.
$22,000 170:24,
   171:21, 171:22.
$22,000. 172:2.
$25 148:13,
   163:2.
$284,000. 174:13.
$3 197:2.
$3.5 187:6,
   187:22.
$4 17:17, 18:3.
$4.2 8:8, 114:18,
   148:6, 151:5,
   159:18.
$400,000 62:9.
$5 44:9, 123:22,
   123:23, 124:3.
$5.7 60:6.
$5.8 53:15, 54:20,
   55:22.
$50 124:13.
$535,000 156:14,
   156:22.
$56 175:17, 175:23,
   175:25, 194:22.
$627,000 61:14,
   62:10.
$7.3 55:17,
   55:20.
$70,000 123:13.
$70,000. 62:13.
$700,000 123:14.
$700,000. 62:13.
$793 10:20.
$8 148:23.
$8,000 175:15.
$8,800 172:17,
   173:4, 176:10,
   176:11.
$8,800. 172:10,
   176:6.
$924,000 140:25.
$97,000 17:1.
'07 35:2, 40:5,
   44:25, 191:12.
'07. 48:16.
'08 9:24, 134:17.
'08. 19:13,
   191:12.

'09 20:24, 99:11.
'09. 20:6, 134:17,
   174:11.
'10 21:16.
'5 95:11.
'6 95:11.
'8 99:11.
'9 99:11.
.2 150:4, 156:13.
.20 150:3.
.25 151:15.
.3 121:23.
.31 120:18,
   121:3.
.6 121:25, 122:1,
   122:2, 146:19.
.
.
< 1 >.
1 10:19, 20:16,
   121:5, 140:18,
   147:24.
1. 148:4, 172:5.
1.10 150:23.
1.2 123:1.
1.5. 146:21.
1.6 60:1.
1.8 55:11.
10 19:2, 22:18,
   40:25, 119:19,
   119:20, 119:22,
   119:25, 123:2,
   123:10, 124:11,
   124:17, 153:14,
   161:14, 164:5.
10. 22:18.
10.0 125:9.
10.5 155:10,
   156:13, 162:16.
10.5. 154:10,
   162:14.
10.8 162:16.
100 99:2, 122:1.
1003 85:9.
100K 146:20.
101 1:46.
1031 170:12,
   172:5.
1033. 84:24.
1050 41:18.

1051 40:22.
1073 137:19.
1073. 136:11.
1091. 33:10.
1092. 37:1,
   41:10.
1099 21:5, 21:13,
   77:10, 78:3,
   78:9, 79:15.
10:02. 19:6.
10:25. 19:7.
10th 22:4, 174:9.
11 50:4, 50:9,
   153:13, 153:14,
   153:15, 156:12,
   161:13, 164:20.
11. 125:9, 155:10,
   162:15.
11.5 162:16.
1118 7:24.
1118. 8:4.
1120 8:16, 9:23,
   10:6.
11th 19:3.
12 22:21, 123:10,
   141:4.
12. 20:4.
1234. 126:14,
   126:17.
1235. 130:21.
1250 120:4.
1255 121:5, 140:17,
   148:1.
1255. 29:8, 29:10,
   198:11.
1257 121:10.
1267 10:22,
   10:24.
1267. 22:16, 22:22,
   153:25.
1269 174:24.
1269. 174:15.
1281 173:22.
1283. 173:11.
12:11 19:5.
13 19:19.
1312 164:4.
1314 164:20.
1315 154:9,
   162:14.

1334. 15:4, 15:5.
1341 13:19.
1341. 13:19.
1343. 10:14.
1344. 147:23.
1345 149:22.
1346 153:15.
1346. 153:12.
1349 155:7.
1372. 145:12.
1375. 146:15.
1378 38:11.
1379 59:15.
1380. 64:21.
1381. 64:21.
1382 60:18, 61:1.
1382. 60:14.
1389. 117:6.
1393. 48:5.
1394. 48:16.
1395 50:17.
1396. 51:11.
1399. 52:5.
13th 8:6.
14 20:23, 195:21.
1400. 52:5.
1401. 53:9.
1405. 53:2.
1408. 86:11.
1409 55:2.
1410 49:5.
1412 138:6,
   138:13.
1413 150:18.
15 86:13, 106:22,
   123:10.
150 145:18.
16 175:7.
1703 136:10.
1703. 135:9.
176. 175:8.
18 164:17, 165:2,
   191:18, 201:18.
19 74:2.
19th 117:7.
.
.
< 2 >.
2 11:19, 12:20,
   20:16, 77:1,

124:14, 133:1,
  148:15, 148:16.
2. 11:19, 13:20,
  170:12.
2.25 121:11.
2.475 140:23.
2.475. 121:5.
2.6 23:2.
2.75. 146:1.
2.933 140:24.
20 116:20, 118:13,
  119:25, 123:23,
  124:4, 175:9.
200 122:13,
  122:19.
2000 78:5, 95:10.
2002 62:1, 69:25,
  76:16, 81:23,
  82:1.
2006 27:1, 35:1,
  35:8, 35:14,
  61:23, 67:15,
  68:11, 68:14,
  68:22, 76:21,
  95:12, 186:19.
2006. 67:6, 67:7,
  67:15.
2007 26:18, 28:10,
  28:20, 29:2,
  29:11, 29:19,
  29:24, 30:8,
  30:14, 30:20,
  34:21, 34:22,
  37:5, 37:11,
  39:18, 41:17,
  49:9, 78:6,
  99:11, 111:18,
  117:13, 119:13,
  140:19, 144:11.
2007. 26:25, 27:2,
  31:17, 48:8,
  147:25.
2008 21:7, 24:13,
  52:17, 52:25,
  78:6, 92:24,
  103:8, 103:18,
  111:18, 120:6,
  125:19, 125:20,
  134:11, 186:23.
2008" 92:1.

2008. 19:3, 93:12,
  102:20, 112:16,
  120:10, 135:24.
2009 16:12, 76:23,
  94:14, 95:21,
  133:24, 134:13,
  166:5, 177:19,
  191:17, 196:5,
  197:8, 198:2.
2009. 121:16,
  134:15, 165:13,
  174:9, 196:21.
2010 165:13.
2013 96:21.
2018 24:13.
202 48:7, 145:19.
21 41:21, 134:24,
  135:2.
21. 21:15.
21201 1:47.
21st 11:4.
22 170:25,
  174:25.
23 133:3, 133:13,
  134:20, 134:21,
  134:23, 135:2.
24 86:18, 89:13.
25 20:11, 154:6,
  174:24.
26-year 34:5.
27 22:24.
270,000 22:2.
28 104:13,
  129:20.
2:00. 110:17.
.
.
< 3 >.
3 17:15, 146:20,
  148:1, 148:15,
  148:24, 196:11.
3. 12:20.
3.0 125:8.
3.0. 123:3.
3.1 121:7.
3.15 150:22.
3.15. 148:14.
3.4 121:9.
3.5 185:20.
3.73 151:6.

3.9 156:12.
3.905 150:13.
30 4:23, 20:11,
  34:19, 35:10,
  50:21, 87:22,
  156:24, 162:1,
  167:12.
300 122:16, 122:20,
  123:1.
300. 122:15.
30th 33:11,
  114:19.
31 121:1.
35 38:19, 39:12.
356 145:25.
359 152:23.
36 109:5.
362 146:18.
3s 121:6.
.
.
< 4 >.
4 160:9.
4.2 151:5,
  152:23.
4.25 149:7, 149:15,
  149:25, 150:8.
4.45 148:22,
  148:24, 149:8,
  149:10, 149:12,
  149:13, 149:24,
  150:1, 150:9,
  155:12.
4.45. 153:18.
4.5 146:20.
4.6 156:16.
4.6. 156:15.
4.63 153:19.
4.99 156:16.
4.999 140:24.
40 10:2.
41 20:2, 112:1,
  134:7.
45 34:19, 35:11.
49 146:19.
4th 1:46.
.
.
< 5 >.
5 37:4, 43:6,

47:16, 110:16,
110:17, 153:3,
154:3, 154:5,
154:6, 156:14,
160:9, 161:13.
5,736,480 157:1.
5.6 56:6.
5.7 56:6, 59:17.
5.9 140:25.
50 4:23, 145:24,
145:25.
504. 45:5.
51 38:24, 38:25,
39:13, 109:6.
52 39:13.
54 133:3, 133:13.
544. 100:10.
548. 99:9, 100:2.
554 101:19.
558. 102:19.
562 103:1.
567. 105:9.
592 146:20.
5:00 110:12,
110:14, 177:2,
202:9.
5:30 107:12.
5:30. 110:13.
.
.
< 6 >.
6 9:12, 10:23,
125:23, 153:3,
154:3, 154:6,
156:14, 160:9,
161:13.
6. 121:6, 125:22,
174:24.
6.3 114:18.
6.6 114:19.
60 10:2, 98:9.
663 149:11.
663. 148:18.
664 149:2.
.
.
< 7 >.
7 135:17.
7.3 55:14, 56:6,
59:25.

7.8. 121:9.
75 48:6.
794 185:5.
794. 181:7.
.
.
< 8 >.
8 135:17.
80 100:12.
823,000. 175:8.
866 86:18, 87:9,
87:17.
8800 176:7.
8th 145:18.
.
.
< 9 >.
9 19:19, 125:22.
9. 125:21.
90 98:10.
900 123:3, 123:18,
123:20.
935,000 151:4.
936. 112:6.
948. 93:11.
95 190:7.
97,000 16:10.
971 113:22.
975. 94:9.
98 190:7.
99 154:11.
9:30 203:2,
203:7.
.
.
< A >.
aban 164:11.
abandoned 164:8,
164:15.
ability 14:11,
19:21, 65:12,
70:17, 112:10,
112:23, 113:25,
118:4, 143:13,
168:8.
able 37:2, 64:2,
103:10, 196:7,
200:17.
above 19:13, 51:24,
102:8, 122:18,

176:3.
above-entitled
203:11.
absent 192:13.
absolute 192:22.
Absolutely 7:22,
12:17, 17:2,
23:5, 33:9, 41:7,
43:8, 47:11,
47:22, 47:24,
52:16, 64:9,
65:7, 74:4, 99:2,
102:12, 144:17,
164:11.
abysmal 2:12, 18:7,
28:12, 28:19,
28:22, 99:12,
158:9, 161:17,
163:18.
accelerated 3:15.
accept 43:18,
115:4, 150:12.
acceptable 90:16,
190:4.
accepting 124:11.
accident 112:11,
113:2.
acclaim 65:8,
66:6.
accordance
196:20.
according 28:2,
28:5, 29:3,
67:21, 117:12,
157:8, 172:1.
account 6:16,
16:10, 16:13,
16:14, 16:16,
16:20, 16:21,
16:23, 17:13,
52:24, 61:10,
61:19, 62:3,
62:5, 83:5, 83:6,
95:24, 112:21,
112:22, 113:6,
143:17, 147:14,
147:15, 154:17.
accountant 21:1,
21:13, 142:8.
accounting 21:1,

93:15, 94:1.
accounts. 93:24.
accurate 52:13,
  119:1, 121:3,
  186:7.
accurately
  133:23.
achieve 164:18.
achieving 168:3,
  168:6.
acknowledge 57:6.
acknowledging
  64:23.
acquire 63:8.
acquired 47:25,
  57:5, 67:4,
  147:8.
acquiring 63:3,
  63:11.
acquisition 55:5,
  56:9, 57:18,
  57:20, 63:6,
  63:13, 64:10,
  67:9, 68:5,
  68:21, 188:5,
  195:17.
across 39:7, 64:12,
  131:8.
act 182:7.
actively 92:15.
activities 88:16.
activity 151:21.
actual 18:18, 88:4,
  134:4, 141:12.
Actually 43:19,
  53:17, 57:5,
  57:19, 58:16,
  87:15, 88:13,
  96:9, 98:10,
  103:9, 104:5,
  123:25, 136:15,
  149:7, 163:8,
  192:16.
adamant 86:8.
add 116:15, 118:18,
  138:24, 156:5,
  156:22.
added 139:1.
adding 156:3,
  156:6.

addition 39:2.
additional 17:16,
  45:2, 80:12,
  92:24, 161:22,
  173:8.
address 84:12,
  85:19, 101:23,
  102:2, 102:5.
addressed 93:17,
  181:8, 181:10,
  187:4.
adds 195:14.
adhere 81:8.
admitted 138:8.
adopted 127:22,
  139:4, 190:10,
  191:4.
adopts 127:25.
advance 8:9, 109:4,
  114:18, 148:6,
  157:23, 162:2.
advances 15:22,
  184:16.
advantages 178:8.
advertised
  158:15.
advise 45:20,
  75:5.
advised 4:24,
  117:10, 117:12,
  185:23, 186:8,
  190:17.
advisement
  145:14.
advising 112:7.
affirmation
  105:17.
affirmatively
  169:9.
afford 62:10,
  171:23, 172:18,
  172:19.
afloat 182:13.
afternoon 111:4,
  176:18, 195:6.
age 117:1.
agencies 27:13,
  28:15, 28:23,
  74:3, 76:2,
  77:11, 77:12,

79:13, 79:21,
  83:6, 86:24,
  87:5, 87:6,
  88:20, 88:21,
  88:23, 88:25,
  91:14, 92:16,
  94:5, 100:4,
  100:6, 103:4,
  103:7, 113:8,
  130:4, 130:8,
  130:11, 136:24,
  164:17.
agency 14:25,
  69:10, 69:19,
  69:24, 75:15,
  86:9, 87:5, 87:8,
  88:18, 88:22,
  92:7, 96:15,
  103:25, 104:4,
  105:8, 105:23,
  132:15.
agency. 103:14.
Agent 10:16, 18:5,
  23:22.
aggregate 119:6,
  120:2, 141:8,
  152:3, 156:4,
  156:5, 163:2,
  185:19.
ago 49:2, 118:12,
  144:11, 164:8.
agree 28:10, 35:5,
  68:18, 70:19,
  119:9, 121:25,
  122:8, 122:10,
  124:7, 124:18,
  127:4, 127:10,
  128:2, 128:3,
  135:2, 136:6,
  138:18, 154:12,
  155:1, 155:5,
  188:18, 189:2,
  200:15.
agreed 59:10,
  150:8, 183:3,
  189:12, 189:15,
  190:19.
agreeing 68:15.
agreement 24:21,
  31:4, 38:12,

45:21, 51:23,
54:17, 56:18,
75:14, 76:24,
99:5, 109:7,
109:12, 118:2,
141:15, 146:8,
186:19, 196:16,
197:3, 197:4,
197:16, 198:22.
agreements 61:20,
98:22, 99:6,
143:10, 146:13,
146:25.
ahead 74:1, 104:1,
132:11, 132:13,
135:6, 135:8,
164:14, 167:11,
169:6.
all-encompassing
119:12.
allegations
96:19.
alleged 109:10.
Allow 25:11, 32:12,
54:2, 106:12,
131:18, 140:2,
176:20, 193:7,
193:13, 202:15.
allows 193:6.
almost 22:12,
27:17, 77:1,
95:1, 117:17,
119:7, 119:18,
134:11, 138:19,
165:11, 190:11,
191:9, 191:18,
192:8.
alone 62:12.
alpha 193:10.
already 26:21,
27:2, 29:16,
47:20, 47:21,
59:16, 114:17,
120:6, 126:14,
141:6, 148:4,
155:12, 158:4.
Although 19:22,
20:20.
America 1:5, 96:8,
96:16, 98:5,

99:3, 121:19.
American 88:8,
88:21, 121:20,
121:21.
American-based
87:7, 88:24,
88:25.
AMH 104:24,
104:25.
among 25:11, 106:9,
176:19.
amount 8:8, 9:4,
9:12, 16:9, 17:7,
27:14, 54:16,
54:21, 97:23,
98:12, 122:12,
122:18, 163:23,
170:24, 200:7.
amounts 37:3,
37:21.
analysis 13:19,
18:9, 18:14,
18:20, 52:2,
105:17, 142:17,
169:5, 190:16.
analyze 162:11,
167:7, 168:8.
and/or 7:1,
190:4.
Andy 97:6, 97:8.
annualized 134:4.
anonymous 66:8.
anonymously 64:3,
64:11, 65:16,
65:18, 66:15.
answered 40:2,
129:16, 144:25,
145:3.
answering 78:25,
81:2, 86:15,
196:24, 196:25,
198:8.
answers 195:6.
anticipate 194:16,
195:8, 196:6.
anticipated
124:22.
antique 125:17.
anybody 25:1, 31:7,
31:14, 48:3,

77:16, 78:13,
123:16, 142:13,
170:5, 176:19.
anyhow 108:25.
Anyway 135:2.
apart 41:23, 62:25,
192:6.
Apollo 18:15.
apologize 112:12,
129:17.
apparent 26:21.
apparently 173:6.
appear 50:9.
appearance 97:12.
appeared 43:21.
appearing 49:17.
appears 13:3,
49:16, 50:5,
65:15, 138:25.
append 154:12,
155:1.
apple 112:25.
apply 151:7.
appreciate 56:5,
80:12, 114:24,
172:25, 193:6.
appreciation
64:24.
approach 80:19,
100:16, 127:18.
approached 54:6,
185:7, 185:17,
185:20.
Approaching
60:13.
appropriate
128:6.
approving 179:2.
approximately 9:25,
34:21, 125:25,
161:21.
April 105:10.
apt 109:16.
areas 115:25.
arguments 106:11.
arm 184:20.
Around 2:14, 30:14,
47:2, 47:10,
49:9, 64:6,
110:14, 117:17,

125:21, 165:17,
165:20, 169:25,
173:4, 173:11,
173:22, 174:4,
175:18, 179:6,
179:8, 184:13.
arranged 157:4.
arrangement
87:19.
ARSH 29:4, 29:23,
44:21, 140:18,
140:23, 141:19,
146:2.
ART 75:15, 77:6,
77:12, 77:20,
77:24, 130:3,
130:8.
article 66:10,
117:8.
articles 25:12,
25:14, 106:13,
106:14, 140:3,
176:20, 202:15.
ASAP. 21:11.
aside 47:8,
48:24.
Asif 1:44, 203:9,
203:17.
asks 3:5, 37:2,
74:8.
aspect 79:7.
aspects 169:10.
assemble 78:7.
assert 101:4.
asserting 189:13,
191:2.
asset 31:2, 31:4,
112:9, 112:14,
113:5, 113:11,
113:21, 114:5,
125:1, 125:15,
147:8, 147:10,
147:20, 150:10,
150:11, 152:12,
152:13, 152:19,
169:7, 190:21,
192:18.
assets 167:2.
assigned 160:23.
assist 5:13, 20:20,

22:1, 32:17,
58:7, 58:11,
66:13, 72:9,
78:1, 79:20,
79:21, 95:17,
98:1, 131:23,
132:4, 176:14,
185:21, 189:22.
assistance 11:12,
97:10, 171:8,
173:8, 173:19.
assisted 61:13,
97:7, 97:12,
97:19, 177:20.
assisting 96:23,
97:2.
associate 48:15.
associated 62:23,
91:19.
associates
167:24.
Association 128:23,
129:1, 129:23.
assume 52:20,
84:15, 85:15,
133:10.
assumes 129:24.
assured 47:16,
133:25.
attached 146:18,
193:17.
attachments
65:23.
attained 53:11.
attempt 5:11, 24:7,
42:7, 132:3,
171:6, 180:12,
182:9, 186:12,
200:8, 201:11.
attempted 198:17.
attempting 4:7,
23:9, 56:6.
attend 63:23.
attended 63:25.
attention 4:4.
attorney 26:17,
43:5, 50:2, 71:6,
71:7, 96:13,
97:15, 99:13,
132:19, 149:18,

174:21, 176:7,
178:16, 187:9,
187:13, 187:14.
attorneys 65:23,
96:23, 97:2,
98:1, 132:9,
132:16, 136:24,
171:5, 176:5,
184:5.
attributes
182:20.
audience 194:19.
audit 88:18,
142:17.
auditing 89:15.
auditor 83:21,
83:23, 84:2,
84:3, 84:12,
84:13, 84:18,
84:20, 85:1,
85:4, 85:10,
85:13, 85:16,
85:25, 86:1,
101:22, 101:23,
102:3, 164:16.
auditor. 85:17,
85:20.
August 29:19,
31:19, 92:19,
92:24, 191:17.
AUSA 1:25, 1:27.
authored 46:20,
112:2, 160:17,
170:20.
authorize 179:23,
180:3, 181:18.
authorized 182:1,
182:3.
auto 112:22, 113:6,
113:15.
available 17:1,
17:3, 33:2,
148:21, 149:3.
avenues 112:13.
average 133:2,
133:13, 133:18.
Avoid 25:16,
106:16, 140:3,
176:22, 202:18.
await 115:8.

aware 28:14, 28:15,
    43:23, 123:21,
    130:2, 160:18,
    179:13, 195:4.
away 20:6, 103:22,
    125:15, 125:18,
    147:12, 156:11,
    184:21.
awful 103:4.
.
.
< B >.
background 33:23,
    36:10, 36:17,
    38:4, 72:23,
    75:22.
bad 59:13, 71:4,
    71:5, 105:15,
    105:17, 151:11,
    169:24, 169:25,
    170:2, 170:3,
    171:12, 171:14,
    175:7.
balance 16:20,
    59:25, 80:21,
    80:22.
balances 69:18.
ballpark 115:1.
Baltimore 1:20,
    1:47, 97:9.
bank 16:10, 16:11,
    16:13, 16:16,
    17:20, 17:21,
    17:22, 61:10,
    95:24, 142:9,
    143:17, 144:3,
    172:19.
bankruptcy 155:1.
Banks 114:4,
    114:9.
Barnert 52:7.
baseball 2:13.
Based 27:5, 66:14,
    91:17, 92:22,
    97:9, 103:5,
    106:3, 133:18,
    151:13, 151:21,
    152:7, 152:8,
    152:11, 166:4,
    167:17, 170:21,

171:17, 172:20,
    188:9, 194:12,
    194:23, 196:6.
basically 54:21.
basis 39:16, 78:3,
    80:4, 80:14,
    121:1, 128:8.
bat 121:4.
batch 190:25.
bearing 199:7.
Beattie 5:2.
became 4:21, 23:21,
    43:23, 90:14.
Beck 80:10.
become 159:10.
becoming 100:12.
beforehand 55:9,
    117:10.
begin 203:5.
beginning 26:25,
    52:25, 66:24,
    174:11.
begs 65:3.
behalf 48:3, 77:4,
    88:16, 194:3,
    199:1.
behind 47:20,
    47:23, 162:1,
    198:24.
Believe 20:10,
    22:12, 44:7,
    47:11, 68:14,
    109:19, 120:11,
    134:11, 140:19,
    143:15.
below 21:11, 47:2,
    89:3, 90:2,
    102:16, 196:8,
    199:4, 200:19.
below. 200:21.
Bench 80:20,
    100:17, 127:20.
benchmarks 24:17,
    160:1.
benefit 3:21, 83:8,
    83:10, 83:13,
    83:14.
benefited 3:20.
benefits 178:8.
Benowitz 97:18,

97:19, 97:24.
Bernie 138:15.
best 19:24, 20:20,
    48:14, 74:3,
    75:12, 76:2,
    164:18, 168:25,
    202:5.
Bethune 64:22,
    65:13.
Bethune-cookman
    61:5, 61:6,
    63:16, 63:21,
    64:5.
better 87:22,
    88:14, 163:8,
    164:21, 193:2.
beyond 13:16,
    86:14.
bidding 132:2.
bids 131:10,
    131:21.
big 165:4, 182:6.
biggest 91:1,
    91:2.
bill 170:16,
    171:16, 172:7,
    172:9, 176:10,
    176:11.
billion 55:11,
    77:1, 119:3,
    119:7, 119:15,
    119:18, 119:24,
    133:1, 133:10,
    185:20, 187:6,
    187:22.
binding 147:11.
Bingham 58:4,
    58:20.
bio 33:15, 33:21,
    33:25, 38:4,
    41:10.
bit 53:11, 54:4,
    59:19, 80:24,
    102:23, 107:7,
    107:15, 146:11.
bites 112:25.
Bittner 56:24.
black 61:8, 61:9,
    63:22.
blank 194:5,

194:6.
block 118:9.
board 58:17, 59:5,
   59:7, 59:13,
   61:4, 61:5,
   63:19, 63:20,
   64:7, 79:18,
   123:10.
Bob 49:14.
bones 78:16.
bonus 171:17.
bookkeeper 102:3.
books 171:20.
books. 170:18.
bottom 8:11, 8:19,
   20:5, 128:22,
   133:15, 139:1,
   154:21, 172:6,
   181:23.
bought 13:20,
   27:22, 44:24,
   120:24, 121:1,
   123:12, 151:20,
   155:8, 155:11,
   179:11, 186:22,
   187:17, 187:19,
   191:9, 193:11.
box 2:11.
brain 72:12.
brand 191:9.
break 25:10, 43:15,
   43:16, 43:19,
   43:20, 44:5,
   45:6, 45:9,
   45:10, 45:22,
   100:19, 100:21,
   101:11, 101:16,
   106:8, 106:9,
   140:1, 188:21.
Bredar 1:18.
brief 5:9.
Bring 2:8, 26:5,
   110:23, 113:15.
bringing 168:5.
broader 95:18,
   95:19.
broken 148:13.
broker 4:8.
brought 98:24.
bucket 149:5.

bucks 176:8.
bunch 56:23, 96:1,
   111:6, 163:12.
Burkes. 92:23.
busier 115:10.
businessman 33:9.
buyer 21:21, 52:10,
   81:23, 98:4,
   98:6, 98:7,
   125:14, 125:15,
   142:25, 143:2,
   145:14, 145:25,
   146:3, 146:6,
   146:23, 147:5,
   149:6, 149:14,
   152:14, 153:20,
   155:8, 158:15,
   159:5, 162:9,
   187:22.
buyers 72:7, 82:14,
   94:10, 94:17,
   94:19, 94:20,
   94:24, 95:5,
   113:25, 114:2,
   131:10, 131:21,
   132:6, 143:7,
   143:9, 143:11,
   144:21, 145:8,
   157:16.
.
.
< C >.
calculate 155:19.
Calculations 123:5,
   133:18.
call 28:19, 51:13,
   51:15, 69:9,
   78:18, 78:19,
   86:25, 87:2,
   87:9, 87:14,
   87:17, 89:23,
   89:24, 90:24,
   93:4.
called 2:23, 13:24,
   20:6, 50:1, 53:4,
   70:7, 79:1,
   92:10, 115:9,
   117:21.
calling 178:1.
Calls 78:19, 78:23,

79:1, 86:13,
   86:18, 86:24,
   87:9, 87:17,
   87:22, 87:23,
   88:7, 88:19,
   89:10, 89:13,
   89:14, 90:15,
   90:24, 92:20.
camera 50:8.
canceled 88:12.
capable 162:20.
capacity 13:13,
   72:12, 79:4,
   181:14.
Capio 96:10.
car 67:12, 67:13,
   70:4, 70:5, 70:7,
   112:22, 112:23,
   113:2, 113:19,
   113:20, 125:17,
   152:20.
card 37:8, 62:2,
   62:8, 67:6, 68:9,
   69:13, 70:8,
   71:25, 72:1.
cards 67:12,
   70:4.
Care 66:14, 66:18,
   71:20, 72:11,
   72:15, 128:25.
cared 83:4.
career 71:19.
Cargill 96:9.
carry 170:18,
   171:16, 171:19.
cars 174:1.
carved 110:14.
Carville 96:9.
cases 112:11,
   148:11.
cash 60:3, 114:3.
cataclysmic
   192:13.
catch 78:7.
category 102:11,
   102:13.
cause 111:20.
caused 45:6.
causes 64:12.
caveat 169:12.

cc'ed 21:2,
    21:16.
CD 5:15, 12:22,
    145:18, 145:20.
cease 57:9.
Center 64:25,
    67:21, 86:13,
    86:25, 88:9,
    90:24, 116:11.
centered 71:19.
centers 87:2.
cents 19:19.
CEO 71:1, 71:2.
certain 15:1,
    49:21, 85:23,
    124:19, 125:11,
    147:1, 153:10.
certainly 33:2,
    76:12, 165:3,
    193:6, 194:16.
certify 203:9.
chain 20:5.
chairman 58:10.
challenging
    80:24.
chambers 2:3,
    108:15, 108:21,
    203:6.
Champps 114:15,
    148:5.
change 55:11,
    59:18, 75:23,
    83:5, 83:15,
    93:15, 94:1,
    147:20.
changed 75:8, 88:2,
    190:4, 190:8.
changing 94:4,
    190:7.
characteristic
    83:5.
characteristics
    83:15, 135:20,
    189:21.
charade 85:22,
    85:25.
charge 122:1,
    122:2, 122:12,
    123:21, 123:22,
    124:23, 125:1,

170:5, 173:5.
charged 112:21,
    121:21, 121:22,
    121:23, 154:16,
    156:15, 169:18.
charging 121:9,
    163:20, 163:21.
charitable 64:12.
chart 10:16, 29:6,
    125:20, 127:7,
    129:9, 136:17,
    136:18, 145:21,
    149:9, 153:5,
    153:24, 196:22,
    198:9.
charted 148:23.
charts 29:3,
    104:23, 115:3,
    186:15.
chasing 167:17.
check 20:13, 57:3,
    64:18.
checking 88:15.
choice 66:18,
    167:8.
chose 125:8.
Chris 92:4, 92:5,
    92:10.
Christine 1:44,
    203:9, 203:17.
chunk 20:12.
circular 169:22,
    169:23.
circumstance
    65:12.
circumstances
    147:7.
city 90:4.
civil 116:22,
    119:1, 120:15.
claim 75:20,
    118:3.
claim. 112:15.
claiming 84:3,
    84:10, 84:12,
    85:3, 189:13,
    192:7.
Clarke26 203:33.
class 112:14,
    113:5, 113:21,

114:5.
classification
    85:16.
clean 56:13.
clear 3:11, 23:21,
    27:17, 28:24,
    31:13, 35:7,
    38:2, 44:24,
    66:21, 71:2,
    87:3, 90:14,
    99:10, 131:24,
    157:5, 162:21.
CLERK 18:24,
    46:8.
clerked 108:15.
Cleveland 65:22,
    65:24, 65:25,
    66:3, 66:7, 66:9,
    66:13, 66:16,
    66:17.
client 2:20,
    137:3.
Clinic 65:22,
    65:24, 65:25,
    66:3, 66:7, 66:9,
    66:14, 66:16,
    66:17.
close 62:22, 92:22,
    105:2, 123:19.
closed 86:16,
    105:11.
closely 178:10.
closest 174:10.
closing 62:23,
    106:11, 196:17.
clue 45:1, 59:12,
    79:18.
co-pay 71:20.
co-pays 70:12.
co-signed 176:12.
co-signing
    172:22.
code 8:23.
collapsed 115:17.
collateral 17:20.
Collect 69:21,
    72:2, 72:5, 77:2,
    92:16, 94:5,
    94:6, 96:8,
    96:16, 112:11,

118:4, 163:18,
170:7, 192:2.
collected 19:18,
19:21, 69:18,
70:7, 73:7,
156:17, 157:21,
158:4, 158:8,
159:6, 159:7,
160:22, 161:4,
169:16, 169:17.
collecting 27:18,
28:16, 28:19,
28:24, 29:17,
67:11, 67:24,
68:23, 69:12,
69:15, 75:9,
75:24, 86:21,
90:21, 112:14,
137:14, 155:21,
159:3, 159:8,
159:9, 191:17,
192:2, 193:4.
collector 87:25,
189:4.
collectors 86:21,
88:4, 91:3.
College 61:6, 61:8,
61:9, 63:16,
63:18, 63:22,
63:23, 63:25,
64:2, 64:22,
65:12.
colluded 199:6.
column 22:18, 23:1,
125:22.
columns 22:25.
com 92:20.
Combined 121:7,
144:8, 155:13,
156:13.
comes 57:12, 77:19,
105:2, 128:4.
comfort 183:22.
comfortable 119:23,
120:2, 120:3,
190:14.
coming 27:5, 27:11,
27:12, 27:13,
28:8, 28:13,
43:9, 45:1,

51:19, 56:10,
79:1, 105:23,
114:19, 118:16,
171:18.
commence 196:7.
commission 62:16.
communicate 5:24.
communication
194:19, 194:20.
community 42:16.
comp 112:11,
113:1.
companies 4:24,
71:25, 185:11.
company 4:25,
13:10, 31:7,
39:1, 42:1, 51:9,
72:1, 79:16,
82:21, 88:24,
91:16, 91:19,
91:21, 96:22,
158:11, 159:8,
173:18, 182:16,
182:21, 182:22,
183:3, 183:5,
187:17, 194:22,
195:1, 195:2.
compare 138:17.
comparison 112:21,
112:25.
compile 6:11,
66:9.
compiled 49:12.
compiling 98:1.
complained 89:4.
complaining
151:14.
complete 51:16,
129:24.
completed 10:4,
22:12, 35:14,
38:16, 190:15.
Completely 14:13,
20:12, 42:12,
65:10, 70:22,
77:6, 78:16,
92:18, 99:20,
112:24, 152:9,
192:20.
complex 142:21.

complicates 91:5.
comply 108:17.
component 11:12,
18:9, 18:20,
113:3, 131:17,
133:21, 133:22,
163:11.
components 71:3,
135:20, 151:23,
152:2, 154:6.
comprehend 86:17.
comprised 123:10.
concept 75:18.
concern 19:14,
91:2, 114:7,
114:8.
concerned 24:18,
100:12, 103:2.
concerns 109:18.
concluded 87:3.
concluded. 203:8.
concluding
107:12.
conclusion 110:11,
113:11.
condition 64:1,
172:14.
conditions 9:5,
113:12, 192:14,
192:23.
conditions.
47:17.
conduct 189:3,
202:21.
conducted 189:17.
conducting 167:5.
conference 51:13,
51:15, 80:20,
100:17, 107:10,
107:16, 109:3,
110:10, 110:15,
127:20, 203:5.
confidence
115:13.
confirm 49:17,
120:13.
conflict 49:17,
49:22, 50:2.
conflicted 97:14.
confused 145:23.

confusing 88:1.
confusion 88:3.
consented 196:3.
consider 185:8,
  185:18.
considerably
  123:17.
considered
  116:23.
considering
  124:23.
consisted 3:14.
consistent 50:11,
  113:18.
consistently 137:7,
  137:8.
consists 55:11.
conspiracy 109:7,
  109:11.
Constantly 74:24,
  74:25, 198:4,
  198:5.
constitutes
  130:10.
construction
  183:19.
consult 25:19,
  106:19, 176:25,
  202:24.
consulting 62:17,
  63:4.
consummated
  35:13.
contact 25:16,
  91:12, 106:16,
  108:8, 140:4,
  176:22, 202:18.
contacted 166:17.
contacting 115:18,
  167:18, 168:7.
contacts 42:15.
contain 118:1.
contained 36:9,
  50:1, 70:18,
  118:13, 152:1,
  153:7, 154:7,
  184:2, 188:25,
  191:5, 191:7,
  191:9, 194:2.
containing

  145:18.
content 137:15,
  137:21, 138:19,
  138:21, 181:18,
  183:4.
contents 180:9,
  190:14.
contest 85:10.
context 79:23,
  183:7, 183:22.
continue 2:15,
  2:20, 8:10,
  32:13, 40:21,
  45:15, 46:17,
  75:2, 111:3,
  120:23, 140:14,
  170:18, 171:19,
  177:15, 177:17.
continued 22:8,
  68:25, 165:15,
  171:15.
continues 136:12,
  139:2.
continuing 39:21.
contra 24:14.
contract. 22:6.
contractor 78:3.
contractors 79:6.
contracts 47:12,
  56:25, 57:3,
  98:7.
contractual 16:4,
  21:20, 24:21,
  75:14, 175:17,
  176:15.
contractually
  32:17, 157:9,
  157:10.
contrary 38:24,
  74:2, 88:10,
  92:17, 165:5,
  167:19, 192:16.
contribution
  65:16.
contributions
  65:17, 65:19.
control 13:17,
  45:15, 80:22,
  142:22.
conversation 20:9,

  47:20, 137:25,
  185:14.
conversations 39:3,
  39:16, 46:25,
  48:9, 167:17.
convince 59:3,
  166:8, 167:16,
  167:19, 184:19,
  201:24.
convinced 167:14,
  170:10.
convincing 59:1.
Cooper 173:25,
  174:2, 174:6.
copied 105:22.
copies 89:13.
copy 85:1, 99:4.
corner 52:11.
corporate 77:16.
corrected 70:9,
  105:1, 121:14,
  144:17.
correctly 189:11.
correlation 47:24,
  82:22.
cost 62:19, 62:21,
  62:22, 63:8,
  63:10, 63:11,
  63:12, 64:14,
  64:15, 148:23.
costs 56:13,
  154:13, 154:14,
  155:2, 155:6.
Counsel 2:2, 3:5,
  18:24, 28:18,
  44:14, 60:21,
  81:8, 98:8,
  100:16, 107:18,
  141:16, 190:1,
  203:6.
count 125:24,
  126:8, 126:9,
  134:24.
country 39:7.
couple 12:11,
  63:15, 147:1,
  153:8, 153:10.
course 99:11,
  104:18, 109:1,
  127:25, 144:10,

162:6, 176:2,
195:20.
court. 81:10,
101:13, 128:10.
courtroom 6:24,
108:9, 145:5.
courtroom. 2:9,
25:23, 26:6,
106:24, 110:24,
140:8, 140:11,
177:5, 177:13,
203:4.
cover 154:12,
154:14, 155:2,
159:25, 173:15.
covered 53:9,
113:1.
CPA 165:24, 167:4,
169:3.
create 53:15.
created 139:14.
creation 177:21.
credibility
198:18.
Credit 17:21,
36:11, 37:8,
62:2, 62:8, 66:2,
67:6, 67:11,
68:9, 69:12,
70:4, 70:8,
71:25, 72:1,
112:6, 113:25,
128:23, 151:4,
152:23, 154:14,
176:13.
CRIMINAL 1:9.
crisis 113:24.
Cross-examination
26:7, 26:13,
101:6, 111:3,
128:7, 140:15,
145:1, 177:15,
203:33.
cross-examined
127:24.
cross-examining
127:21.
crushing 103:5,
103:8, 105:3.
crystal 71:2.

Cube 8:11.
curiosity 37:22.
curious 35:25,
36:13.
current 113:24,
136:14, 139:7,
172:14, 192:13,
200:17.
currently 19:19,
38:18, 136:12,
139:2, 194:13.
cursory 33:20.
cut 20:14, 102:10,
105:12, 105:18.
cycle 191:18.
.
.
< D >.
dailies 100:11,
102:20.
daily 16:18, 39:15,
80:4, 80:14,
85:2, 100:13,
101:21, 105:9,
105:16.
damage 198:23.
damages 197:10,
197:14.
darn 164:7.
data 79:8, 79:13,
103:3, 103:4,
163:14.
database 15:2.
date 11:4, 11:9,
12:4, 14:8,
15:13, 16:2,
16:25, 17:4,
30:3, 41:17,
49:9, 55:10,
76:25, 95:21,
97:21, 125:24,
126:3, 126:8,
134:12, 139:12,
147:2, 174:8,
174:9, 174:10,
174:25.
dated 8:6, 8:17,
19:3, 41:19,
53:1, 64:22,
154:21, 181:7.

dates 14:4, 57:3,
143:16, 174:13.
Day 2:3, 7:23,
12:21, 15:24,
27:16, 37:1,
42:13, 43:14,
64:3, 64:16,
65:10, 66:20,
74:2, 75:12,
77:18, 86:19,
107:17, 164:18.
days 12:11, 20:16,
34:19, 35:10,
35:11, 98:10,
147:2, 153:8,
153:10, 156:24,
162:1, 174:24,
175:6, 175:8.
deal 5:13, 6:12,
10:24, 29:23,
29:24, 32:1,
34:21, 35:13,
39:19, 42:21,
44:21, 44:25,
50:22, 51:1,
62:7, 62:8,
62:12, 62:23,
65:5, 66:8,
140:18, 144:13,
144:20, 148:1,
171:7, 196:18,
197:24.
dealing 24:19,
165:11.
dealings 53:13,
165:12.
deals 4:19, 4:21,
12:16, 37:4,
37:5, 37:8,
37:10, 38:1,
38:4, 38:5,
44:15, 44:17,
44:21, 44:22,
62:8.
dealt 166:2.
Dean 71:10.
Dear 181:17.
Debbie 45:21.
debt-selling
34:6.

debt. 136:13.
debtors 91:12.
debts 170:7.
deceased 155:1.
deceive 23:9,
   23:12.
deceived 24:15.
December 11:4,
   19:3, 19:13,
   27:1, 27:22,
   34:21, 35:2,
   35:8, 35:14,
   50:21, 52:6,
   141:5, 145:18,
   147:25.
deceptive 84:17,
   84:21, 85:11,
   85:12, 182:6.
decide 94:13,
   94:22.
decided 68:9,
   116:22, 197:25,
   198:1.
decision 58:14,
   104:8, 148:6,
   168:9, 189:19.
deduced 37:23.
deduct 170:15.
deductibles
   70:12.
default 51:8.
defaulted 43:3.
defaulting 162:1.
Defendant 1:12,
   1:29.
Defense 19:1, 20:4,
   20:23.
deficiencies
   116:24.
deficiency 113:6.
define 98:7.
deliberately
   84:21.
delinquencies.
   133:16.
demand 103:11,
   103:20, 153:21.
demographic
   191:6.
Demonstrative

   150:15, 150:20.
depends 200:16.
depicted 15:25.
deploy 114:6,
   114:11, 192:19.
describe 35:15,
   102:20, 192:8.
described 28:12,
   62:8, 67:1,
   139:16, 139:19,
   163:18.
describing 113:4.
designated 64:25.
desire 5:24,
   113:19, 115:9,
   168:9.
despite 2:11.
detail 134:8.
detailed 141:15.
details 46:24,
   54:11, 86:17.
determination
   142:18.
determine 47:7,
   57:4, 57:8.
determined
   190:17.
device 183:21.
dialect 91:4.
dictionaries
   202:25.
dictionary 25:20,
   106:19, 176:25.
die 66:20.
difference 71:22,
   147:17, 150:3,
   151:1, 156:13,
   156:17, 156:20,
   158:3.
different 4:24,
   14:4, 79:5,
   86:13, 89:25,
   92:7, 111:13,
   113:5, 123:12,
   135:16, 135:19,
   140:20, 144:24,
   170:6, 175:1,
   175:7, 184:12,
   189:8, 190:5,
   192:7, 192:18,

   192:20.
differential
   135:14.
differently
   69:12.
difficult 171:19.
dig 75:4.
diligence 152:15,
   162:10, 162:11.
diminished
   112:24.
Direct 2:16, 3:1,
   4:4, 7:1, 7:10,
   7:16, 23:20,
   49:19, 53:10,
   58:3, 62:9,
   68:21, 69:3,
   82:2, 83:17,
   91:23, 101:25,
   116:25, 171:7,
   171:18, 186:13,
   186:14, 195:5,
   203:31.
directly 63:5,
   89:5, 127:15,
   128:14, 128:15,
   129:5, 129:6,
   160:12, 165:25,
   166:2, 186:1,
   186:7, 186:11.
disagree 47:22,
   70:18, 70:22,
   72:7, 75:1,
   92:18, 145:6,
   192:4.
disagreed 75:11.
disclose 169:9,
   169:11.
disclosure 194:25,
   195:1.
discuss 25:10,
   25:11, 89:20,
   89:22, 106:8,
   106:9, 108:1,
   140:1, 176:18,
   202:12, 202:13,
   202:14.
discussed 79:23,
   151:23, 195:25,
   199:3.

discussing 48:8,
  111:7, 182:20.
discussion 47:18,
  90:12, 116:1.
discussions 5:8,
  5:9, 38:19, 39:4,
  39:6, 43:1,
  44:11, 46:25,
  48:2, 59:11,
  79:25.
disinterested
  184:24.
disseminate 38:2.
distinction
  118:21.
distinguish
  116:5.
distressed 112:9,
  113:11, 113:21,
  168:24, 170:5,
  192:18.
DISTRICT 1:1,
  1:2.
divide 144:20.
divided 62:14,
  149:23, 154:5.
DLA 170:16.
do. 20:18, 112:3.
doc 176:6, 176:7.
dock 135:6.
docs 176:5.
document 8:5, 21:9,
  39:23, 41:7,
  41:9, 41:21,
  42:4, 50:4, 50:7,
  55:24, 98:19,
  127:24, 131:7,
  146:9, 183:9.
documented 141:15,
  175:5, 175:25,
  182:15, 183:24.
documents 7:15,
  9:4, 98:14,
  98:24, 115:3,
  143:9, 144:4,
  145:14, 176:1.
dollar 33:6, 64:8,
  133:18.
dollar. 19:20,
  169:8.

dollars 17:6, 23:7,
  64:6, 83:7,
  161:21, 173:10,
  173:20, 182:13,
  197:9, 197:13,
  197:24, 198:7,
  198:15, 198:23,
  198:24.
domestically
  90:14.
donate 65:25.
donated 64:3, 65:5,
  65:24.
donating 64:11.
donation 63:16,
  64:8, 64:15,
  64:19.
done 7:5, 11:1,
  16:3, 33:23,
  34:3, 35:24,
  54:17, 65:13,
  142:19, 162:22,
  162:23, 170:1.
donor 66:7.
doomsday 19:20.
double 88:15,
  121:24.
doubt 28:23, 69:20,
  131:6, 193:8,
  193:14, 193:22,
  194:7.
Doug 20:6, 21:4,
  45:17, 47:11,
  47:16, 52:2,
  52:20, 52:21,
  53:4, 181:17.
Doug/platinum
  47:4.
Down 8:22, 11:18,
  15:3, 17:15,
  23:6, 46:9, 47:2,
  59:25, 61:10,
  63:15, 84:25,
  90:2, 96:4,
  102:16, 102:23,
  104:8, 105:15,
  107:1, 121:8,
  121:15, 128:4,
  138:17, 151:5,
  152:23, 159:18,

  160:7.
dozens 186:16.
Dps 85:9.
draft 109:6,
  178:6.
drafted 183:2.
draw 2:4, 17:14,
  176:7.
drawn 17:17.
drill 74:9,
  74:16.
drills 74:22.
Drizzen 22:4.
drop 113:15,
  146:11, 181:22.
DSP 3:13, 93:17,
  93:18, 95:16,
  162:13, 162:14,
  162:23, 162:24,
  165:1.
Dsps 162:25.
Duane 8:24.
due 152:15, 162:10,
  162:11.
Dugan 108:7, 108:8,
  108:11, 109:23.
duly 2:23.
dump 103:3,
  103:4.
During 25:10, 40:4,
  45:6, 45:9,
  45:22, 51:13,
  53:10, 98:20,
  99:1, 106:8,
  133:20, 140:1,
  176:18, 202:11.
duty 2:3.
.
.
< E >.
e-mailed 53:4.
e-mails 39:17,
  39:20, 48:8,
  65:22, 66:21,
  84:5, 85:2,
  99:24, 105:25,
  111:6, 112:2,
  134:7, 144:4,
  150:4, 153:12,
  157:13, 157:17,

158:16, 160:20,
161:23, 174:25,
184:4, 184:9,
192:16.
ear 81:2.
earlier 29:11,
29:15, 30:1,
34:20, 60:9,
65:4, 100:20,
101:16, 123:12,
129:4, 130:14,
157:8, 161:15,
162:1, 185:7,
185:18, 192:5.
Early 26:18, 42:6,
51:4, 80:7,
80:16, 81:18,
82:4, 82:13,
100:20.
earn 81:17.
earned 133:19.
easy 91:4.
economic 172:14,
192:13, 192:23.
economics 166:23.
economy 112:5,
112:19, 114:8,
171:14, 192:17,
193:2, 200:16.
educate 65:11.
effect 44:1,
190:12.
effective 103:10.
effectively 76:23,
78:11, 148:10,
171:16, 172:24.
effectuate 6:9.
effort 9:7, 30:20,
194:14.
efforts 9:7, 42:10,
165:8, 198:20,
198:25.
eight 125:25,
126:8, 127:1,
127:3, 129:8,
141:4, 141:5,
146:21, 148:14,
152:25, 159:7.
EIN 21:4.
either 56:9, 57:21,

81:14, 81:21,
82:15, 108:9,
122:19, 148:10,
178:21, 192:23,
196:2.
elaborate 99:22.
elected 66:8.
Election 2:2,
2:3.
electronic 49:6.
element 109:6,
109:10.
employed 8:24,
80:10, 86:24,
114:4, 130:8.
employee 76:9,
77:9, 78:1, 78:4,
78:10, 79:15,
172:20, 173:17,
176:2, 176:6,
176:14.
employees 76:18,
77:5, 88:5,
90:23, 92:13.
employer 176:9.
employment 176:1,
176:2.
emptor 169:12.
encompass 163:13.
encouraging
88:14.
encyclopedia 25:19,
106:19, 176:25.
encyclopedias
202:25.
end 4:5, 22:13,
100:24, 107:10,
110:14, 114:20,
120:5, 120:6,
120:9, 124:2,
126:4, 135:24,
172:15.
ended 87:3.
endless 86:14.
ends 153:13,
153:14, 201:25.
engage 4:6, 4:7,
74:3.
engaged 4:15, 8:23,
30:9, 30:19,

32:20, 39:3,
39:16, 40:6,
42:5, 52:13,
76:2, 81:22.
engaging 5:11,
79:12.
enhance 28:7,
166:10.
enough 43:10,
53:15, 72:24,
173:6, 173:16.
enter 24:21,
68:10.
entered 2:9, 3:13,
26:6, 54:15,
97:12, 109:11,
110:24, 120:1,
140:11, 177:13,
185:13.
entice 201:24.
entire 56:8, 64:11,
71:19, 72:11,
72:21, 86:19,
90:4, 120:14,
131:5, 146:24,
166:9.
entirely 92:7.
entities 96:5,
183:11.
entitled 80:23.
entitlement
80:22.
entity 41:1, 41:22,
198:14.
equities 115:10.
equity 17:14,
17:19.
escapes 97:16.
escrow 23:21,
52:23, 52:24.
Esquire 1:31.
essence 73:20,
190:11.
essentially 139:3,
190:6.
establish 182:10,
198:17.
established 34:8,
34:17, 34:19,
123:19, 167:21.

established.
  34:16.
establishing 34:15,
  34:16.
estimated 155:6.
Eton 5:1, 5:12,
  5:15, 65:23.
evaluate 169:2.
evaluation 162:23,
  163:14, 199:21.
evaluations
  162:22.
evening 20:8,
  92:10, 202:11.
event 152:7.
Eventually 125:9.
ever-increasing
  135:3, 136:2.
ever. 115:11.
everybody 46:11,
  170:3.
everyday 109:16.
everyone 89:23.
everything 76:1,
  80:5, 131:22,
  171:3, 176:3,
  176:12, 176:13,
  179:24, 183:9,
  183:16, 188:24,
  193:17, 194:2,
  194:5, 200:10.
evidence 45:9,
  45:11, 59:16,
  60:15, 60:17,
  106:10, 126:14,
  128:2, 128:3,
  138:5, 141:6,
  201:17.
exact 17:7, 95:21,
  134:21, 162:3.
Exactly 10:19,
  58:21, 92:3,
  174:6, 180:9.
exaggeration
  38:23.
exam 58:3.
Examination 2:16,
  3:1, 22:13,
  53:10, 62:9,
  80:23, 82:2,

83:17, 203:31.
examinations
  145:4.
examined 2:23.
example 70:24,
  71:1, 72:10,
  74:11, 74:15,
  74:19, 74:20,
  75:6, 75:8,
  75:18, 111:18,
  112:21, 113:6,
  121:5, 125:7,
  162:6, 191:21.
exceeds 146:21.
Excel 6:25.
except 95:10.
exception 100:3,
  197:12.
excess 17:6,
  200:15.
exclude 97:25.
excluding 133:19.
exclusive 57:7.
Excuse 42:9,
  128:19, 164:23.
excused 203:2.
execute 147:11.
existence 35:17.
expect 112:18,
  112:20, 149:4,
  162:16, 170:3,
  199:4, 200:14.
expectation
  200:17.
expectations
  20:17.
Expected 117:18,
  117:19, 123:22,
  124:22, 153:24,
  196:6, 199:11,
  199:12, 199:16,
  201:22, 201:23.
expedites 104:5.
experience 36:11,
  64:5, 69:2, 69:6,
  69:15, 70:3,
  70:21, 71:2,
  71:10, 71:11,
  71:14, 71:18,
  72:4, 79:22,

129:21, 135:5,
  139:23.
experienced 88:4,
  193:8, 193:14,
  194:8.
experiencing
  91:6.
experiencing.
  192:15.
expert 66:24,
  73:14, 75:6,
  75:10, 75:19,
  75:20, 75:21,
  129:11, 163:7,
  169:25.
explain 3:10, 81:4,
  86:23, 104:14.
explained 60:9.
explaining
  180:23.
explanation
  191:13.
exposed 25:12,
  106:12, 140:2,
  176:20, 202:15.
expressed 4:25,
  109:12, 109:13,
  109:14, 109:23.
extensive 190:15.
extent 27:8, 27:9,
  27:13, 28:14,
  35:18, 57:24,
  159:13, 159:14.
external 202:24.
extremely 187:21.
Ezra 165:7.
.
.
< F >.
face 10:20, 11:5,
  11:23, 37:3,
  37:20, 77:1,
  114:22, 119:5,
  133:1, 133:11,
  146:19, 149:6,
  154:5, 154:11,
  154:25, 185:20,
  187:6, 189:21.
faced 104:11.
facility 65:1,

87:11, 87:18,
88:9, 90:16,
90:25.
factor 152:3,
163:19, 167:21.
facts 25:18, 45:13,
45:14, 54:10,
104:21, 106:18,
113:10, 140:5,
176:24, 202:20.
factual 133:11,
197:21.
failed 159:20,
163:18.
Fair 28:19, 33:6,
53:19, 65:20,
70:14, 72:24,
74:11, 78:8,
123:9, 126:12,
143:20, 181:1.
false 20:17.
familiar 193:21.
family 80:6, 80:9,
202:14.
fan 175:9,
175:11.
far 11:15, 24:18,
43:9, 77:22,
80:16, 96:10,
103:10, 105:7,
116:5.
fashion 10:5,
39:23, 54:6,
115:12, 127:25,
157:18.
fast 200:10.
FCRR 1:44, 203:9.
February 20:24,
53:4, 94:14.
Federal 1:45.
Fedex 93:4, 93:5,
93:9.
fee 3:14, 22:2,
62:11, 62:17,
62:23, 62:25,
63:2, 63:4.
feedback 89:2.
feelings 175:16.
fees 52:17, 170:15,
170:25.

Feldman 40:7, 68:7,
76:22, 93:6,
93:10.
fellow 87:20,
202:13.
felt 119:23,
120:2.
female 87:25.
few 19:2, 41:23,
49:2, 107:2,
118:12, 165:3.
field 66:24.
figures 17:6, 18:6,
22:4, 103:2,
103:3, 201:10.
filed 117:16,
118:4, 171:2.
files 185:21.
final 38:19, 39:4,
47:12, 47:13,
115:8, 132:22.
final. 90:11.
finalized 34:21.
finance 180:1.
financed 114:9,
147:25.
financial 71:3,
113:24.
find 4:12, 40:20,
74:9, 74:10,
109:10, 117:18,
153:13, 167:23.
finding 48:12,
191:22.
Fine 24:8, 32:6,
92:11, 101:3,
138:9.
finely 81:2.
finish 3:3, 32:7,
36:2, 36:3,
40:15, 40:18,
60:10, 61:25,
66:5, 74:24,
81:22, 89:19,
101:5, 101:8,
107:3, 128:17,
131:16, 155:4,
160:11, 161:6,
164:12, 167:10,
167:11, 200:5.

finished 50:8,
74:1, 111:6,
152:25, 200:3.
firm 8:23, 10:12,
21:1, 38:15,
72:13, 92:21,
94:23, 97:6,
97:9, 104:3,
104:15, 132:15,
170:22.
firms 90:6, 92:25,
103:5, 103:12,
105:5, 132:17,
132:18, 171:5.
firms. 132:6.
Five 37:5, 37:10,
37:25, 38:4,
38:5, 101:1,
101:5, 101:10,
101:15, 126:10,
140:7, 140:9,
203:6.
five-minute
140:1.
flag 121:20.
Fleet 70:6, 70:8.
Flip 137:1, 184:2,
196:1.
Floor 1:46, 182:9,
183:13, 183:25,
184:11.
FMS 87:4, 88:11,
89:10, 91:8,
92:5.
FMSDC 90:18.
focus 186:13.
focused 118:15.
focusing 185:25,
186:10.
folks 71:16, 73:3,
102:16.
Follow 21:8,
121:23, 124:1,
137:25, 169:25,
195:21, 197:10,
202:12.
follow-up 138:24.
following 81:10,
87:24, 101:13,
128:10.

follows 2:24.
fond 175:14,
  175:24.
football 64:25.
footnote 128:22,
  133:15.
foregoing 203:10.
foreign 88:23,
  90:22.
forensic 142:7.
forever 66:20.
form 175:5, 183:13,
  199:13.
formal 109:12,
  185:10.
formed 70:1,
  187:9.
forth 8:7, 16:19,
  16:23, 62:4,
  108:20, 123:1,
  172:21, 179:15,
  196:8, 199:3,
  200:21.
forward 22:5,
  44:15, 47:3,
  76:17, 78:22,
  163:25, 195:17,
  200:10.
forwarded 5:22,
  86:24, 118:17,
  162:23.
foster 188:9,
  188:17, 188:20.
found 191:23.
Foundation 23:24.
foundational
  24:5.
Four 5:16, 5:25,
  6:1, 6:11, 27:22,
  28:6, 58:23,
  58:25, 126:10,
  130:18, 140:20,
  141:4, 141:5,
  141:7, 141:8,
  141:9, 141:10,
  141:19, 142:11,
  143:16, 144:5,
  144:7, 144:9,
  144:20, 146:12,
  174:12.

fraction 154:7.
frame 147:1, 174:4,
  179:8, 184:13,
  200:18.
Franklin 70:3.
Fred 103:2.
Frequently 16:18,
  175:14.
Friday 51:16,
  117:6, 153:21.
friend 4:13, 48:14,
  92:20, 92:22,
  166:17, 167:18.
friends 80:9,
  139:17, 167:23,
  202:14.
front 47:19, 47:22,
  105:5.
frustrates 91:5.
FTE 92:11, 92:13.
fulfill 75:13.
full 84:4, 84:14,
  84:16, 85:5,
  85:7, 85:15,
  86:1, 162:9,
  191:18, 194:25.
full-time 92:13,
  187:16.
fully 32:12, 42:5,
  51:4, 52:13,
  160:18, 175:25,
  195:4.
fund 14:2, 14:3,
  41:21, 49:7,
  49:16, 49:24,
  52:3, 139:9,
  139:20, 139:23,
  145:14, 146:3,
  153:21, 165:22,
  195:20.
funded 14:21, 60:5,
  147:15, 147:16,
  148:11, 150:11,
  180:22, 195:17,
  196:15, 196:18,
  197:2, 197:3.
funding 44:16,
  44:20, 54:16,
  56:10, 59:23,
  196:7.

funds 4:8, 4:9,
  17:1, 27:6, 43:9,
  56:2, 57:19,
  61:15, 61:17,
  61:18, 64:3,
  114:7, 114:11,
  139:7, 139:11,
  139:13, 139:19,
  195:16.
furnish 56:14.
furthers 65:19.
future 19:23,
  111:23, 163:8,
  163:10, 164:2,
  192:3, 192:4,
  192:6.
.
.
< G >.
game 124:2.
gamut 191:10.
gap 134:9.
gave 24:14, 54:12,
  64:8, 65:16,
  98:16, 150:22,
  151:15, 153:6,
  156:15, 191:14,
  199:13.
general 40:3,
  115:25, 116:7,
  128:6.
generally 185:24,
  186:9.
gentleman 165:24,
  175:16.
gentlemen 2:10,
  25:9, 46:10,
  46:16, 101:14,
  106:7, 139:25,
  176:17, 177:1,
  202:10.
Gersh 45:21.
gets 14:8, 15:16,
  57:11, 65:8,
  192:5.
getting 21:9, 43:6,
  51:14, 58:8,
  58:11, 66:6,
  78:11, 87:10,
  98:13, 100:6,

103:14, 104:3,
105:20, 120:7,
124:3, 125:6,
137:8, 164:8,
165:6, 167:24,
184:16, 191:21.
give 3:12, 22:9,
33:2, 33:16,
52:12, 57:1,
57:14, 64:6,
65:19, 89:23,
100:21, 115:23,
130:25, 145:17,
148:6, 148:22,
154:19, 164:7,
171:21, 173:4,
173:16, 175:15,
175:17, 175:19,
175:23, 176:7,
183:4, 183:5.
given 21:24, 65:17,
74:4, 86:25,
159:19.
gives 57:11.
giving 20:7, 43:12,
54:8, 64:11,
65:10, 155:25,
162:3, 173:19.
glad 54:2, 54:9,
99:22, 115:3,
158:19, 180:6.
glance 33:20.
Glass 23:22.
goal 199:10.
goodness 108:13.
grad 72:10.
graduated 34:2.
grand 96:22, 96:25,
98:9, 170:25.
Granted 174:13.
grasp 72:14.
Gray 58:4, 58:20,
61:12, 61:16,
62:11, 62:16,
62:18, 63:2,
63:5.
Great 53:6, 64:24,
121:19, 135:4,
161:23, 180:4.
greater 105:7.

Greenfish 13:24,
14:1, 14:5, 14:8,
14:11, 136:18,
139:11, 139:13.
gross 133:2,
133:13.
grounds 35:3.
Group 13:24, 20:10,
20:18, 111:16,
115:7, 130:2,
139:17, 142:1,
163:1, 165:12,
166:1, 179:17.
guarantee 19:16,
25:1, 194:12.
guess 17:8, 86:15,
114:3, 116:20,
116:21, 118:21,
141:13, 145:22.
guideline 202:2.
guys 52:11, 139:23,
185:13.
.
.
.
< H >.
had. 43:11.
half 27:17, 166:20,
200:19.
hand 81:1, 99:5,
104:11, 117:24,
117:25.
handed 163:16.
Handfield 58:4,
58:9, 58:11,
63:18, 65:4,
65:8.
Handfield. 65:1.
handle 79:6, 90:6,
91:23, 108:4.
handled 71:5,
86:14, 90:13.
happen 19:24,
108:10, 192:24.
happened 3:24,
5:21, 47:20,
47:21, 86:23,
185:12, 185:13.
happening 112:19,
192:23.
happenstance

197:25, 198:1.
happy 173:3.
hard 75:17, 86:16,
113:9.
harder 184:16.
Harris 54:14,
54:18, 55:7,
56:3.
hate 40:17.
head 17:5, 24:10,
24:15.
headquarters
78:13.
Health 37:12,
37:16, 53:14,
58:10, 58:12,
59:17, 62:12,
67:3, 67:9,
67:21, 68:6,
68:14, 68:22,
71:20, 72:11,
72:15, 95:13,
123:13, 128:25.
hear 97:23, 108:13,
167:22, 179:19,
201:8.
heard 4:5, 6:14,
6:15, 12:25,
15:22, 18:17,
23:3, 42:20,
44:13, 68:7,
78:12, 106:10,
106:20, 108:21,
139:15, 142:7,
200:23, 201:3,
201:6.
hearing 46:19.
heart 82:18.
hedge 139:7, 139:9,
139:11, 139:19,
139:20, 139:23.
held 73:14,
129:11.
Hello 111:5.
help 35:21, 54:12,
55:3, 62:22,
72:5, 79:24,
99:24, 100:6,
100:8, 119:8,
133:17, 145:16,

146:7, 146:15,
171:3, 171:6,
172:6, 173:20,
176:3, 176:4,
176:12, 178:6.
helped 157:7,
171:24, 171:25,
172:21, 173:18.
helpful 178:18,
180:5.
helps 104:7, 109:3,
146:5.
hereby 203:9.
hide 99:7.
high 34:2, 121:18,
148:20, 190:19,
191:4, 192:9,
201:25, 202:2.
higher 103:13,
103:24, 122:19,
124:17, 134:3,
160:23, 163:23,
192:14, 193:1,
193:4, 200:9,
202:4.
Highlighted 19:9,
51:22, 84:24,
131:20, 137:4,
174:8.
highlighting
174:2.
highlights 34:2,
34:4.
highly 39:1,
117:19.
Hill 71:1.
HIPAA 70:11.
hired 75:10, 78:3,
79:20.
Hirschhorn 97:11.
historic 61:9,
63:22, 163:14.
historical 5:18,
35:23.
historically
61:8.
historics 163:12.
history 38:5,
41:14, 125:23,
162:18, 164:5,

198:5.
hit 75:4, 130:17,
164:4, 164:5.
HMA 38:24, 39:6,
39:10, 39:13,
39:14, 85:2,
89:12, 99:10,
100:4, 100:11,
102:19, 103:8,
103:18, 104:25,
105:1, 105:2,
105:9, 105:11,
111:17, 116:9,
135:16, 135:23,
135:24, 148:20,
149:12, 154:10,
154:17, 154:24,
161:24, 191:13.
Hold 32:11, 47:8,
60:24, 88:1,
101:1, 107:9,
110:10, 115:7,
133:20, 134:24,
145:20.
holding 47:11,
137:13.
holds 74:16, 75:19,
86:15.
hole 170:23.
homogeneous
118:9.
homogenous
116:10.
honestly 49:13.
Honorable 1:18.
hope 2:14, 107:2,
107:3, 172:15,
188:9, 188:17,
193:3, 194:24.
hoped 188:22.
Hopefully 2:4,
108:22, 172:6,
190:22, 192:24,
199:20, 199:21.
hopes 198:14.
hoping 107:2,
107:6, 124:4.
horrible 106:2,
111:16, 151:9.
hour 106:22,

166:21.
hours 74:2, 74:21,
75:12, 86:18,
89:14, 107:2,
164:18.
house 17:14, 17:20,
18:3, 79:13,
152:20, 172:23.
huge 33:4, 33:5.
hundred 23:3, 75:4,
122:2.
hundreds 143:9,
161:21.
Hyman 4:13.
.
.
< I >.
ID 150:20.
idea 43:24, 52:18,
59:8.
ideal 193:3.
identification
60:16.
idle 91:24.
IIG 12:25, 13:9,
13:16, 71:16,
136:18.
III 108:17.
ill 172:9.
immediate 102:21,
103:6, 141:25.
immediately 27:17,
121:6, 145:10.
immensely 172:21.
impact 112:6,
117:9, 118:3,
118:4, 118:5,
118:14, 124:21.
important 113:14,
159:21, 159:24,
160:5, 160:8,
160:13, 162:7.
impossible 27:24.
impressive 38:3.
impressive. 37:4.
improper 108:24.
improve 173:5.
improved 88:17,
193:2.
improvement

102:21.
improvement.
  103:6.
in-stat 19:17.
in. 42:17.
include 37:5, 37:8,
  48:6, 51:21,
  56:13, 101:20,
  102:9, 105:18,
  105:19, 156:25.
included 29:20,
  116:17.
Including 39:10,
  88:21, 88:23,
  94:11, 94:19,
  142:10, 156:23,
  158:17, 172:22,
  175:18, 184:5,
  198:19.
income 74:5,
  123:23, 124:19.
incorporated 41:14,
  138:19.
Incorrect 42:12,
  42:23, 65:10,
  84:23, 167:1.
incorrectly
  201:4.
increase 155:20.
increased 113:16,
  115:9.
increasing 134:3.
independent 25:17,
  106:17, 116:12,
  140:5, 152:13,
  168:9, 176:23,
  189:18, 199:8,
  202:19.
independently
  162:22.
INDEX 203:25.
India 86:13, 86:21,
  87:12, 88:10,
  89:4, 89:11,
  89:24, 90:5,
  90:16, 91:3,
  91:9, 91:23,
  92:11, 92:20,
  92:22.
India. 87:22, 89:6,

91:7.
Indian 87:5, 87:6,
  88:5, 92:15.
indicate 6:3,
  163:25.
indicated 4:15,
  5:19, 6:25, 7:15,
  9:25, 12:11,
  20:1, 165:7.
indicates 9:6,
  136:23.
indicating 20:19,
  86:16.
indicative
  149:21.
indictment 96:20,
  96:21, 97:8,
  98:11.
individual 23:22,
  39:14, 54:14,
  54:24, 54:25,
  60:5, 74:20,
  78:10, 90:5,
  165:21.
individuals 31:1,
  32:25, 54:22,
  58:7, 70:20,
  71:17, 123:10,
  137:6.
industry 33:24,
  35:24, 75:23,
  75:25, 104:14,
  129:1, 131:3,
  187:1, 187:3,
  187:18, 187:19,
  188:17.
influenced
  163:15.
influx 20:10.
initial 80:7,
  103:11, 103:20,
  104:7, 104:15,
  105:7.
initiate 57:8.
initiative 90:3.
input 41:6.
inquire 188:4.
inquired 33:3.
insert 109:17.
inspect 152:16.

Instead 87:9,
  109:12, 185:25,
  186:10, 190:11.
instruct 45:20.
instructed 86:4.
instruction
  109:5.
instructions
  106:11, 107:10,
  107:16, 107:20,
  108:1, 109:2,
  110:10, 110:15,
  202:12, 203:5.
insulting 65:21.
insurance 71:20,
  71:21, 91:11.
insurance. 92:3.
insurances 70:12.
intelligence
  72:12.
intend 194:24.
intended 183:2,
  196:13.
intending 195:22,
  195:23.
intent 33:8,
  195:12, 200:6.
intention 188:20.
inter-investment
  165:12.
interact 16:17.
interaction
  156:24.
interactions
  126:12.
interest 4:10,
  4:25, 5:12, 9:13,
  9:16, 9:21, 11:8,
  12:7, 13:11,
  14:9, 16:21,
  16:22, 23:8,
  48:1, 48:13,
  65:20, 101:5,
  115:19, 182:13,
  184:24.
interested 31:2,
  32:25, 33:18,
  59:4, 59:12,
  136:4, 155:9,
  169:1.

interesting
   134:9.
interests 41:20.
internal 85:22,
   93:14, 93:22,
   94:1.
internally 16:24,
   59:11.
International
   15:17, 15:19,
   55:10, 57:6,
   64:23.
internet 25:19,
   106:19, 176:25,
   202:21.
interpreting
   191:15.
interrupt 81:19,
   104:2.
interrupting 36:2,
   74:24.
interrupts 200:1.
intimately
   193:20.
introduced 4:13.
inventory 93:25,
   115:23, 115:25,
   120:7, 120:15,
   141:22, 142:2.
inverse 124:21.
invest 125:6,
   166:24.
invested 56:16,
   139:9, 165:22.
investigation
   25:17, 106:17,
   140:5, 176:23,
   202:19.
investing 54:7,
   167:1.
investments 12:12,
   72:5.
investor 42:7,
   42:11, 54:18,
   57:16, 57:21,
   57:24, 57:25,
   61:15, 61:17,
   65:9, 159:16,
   159:21, 159:25,
   160:1, 160:17,

165:21, 166:2.
investors 12:15,
   30:17, 30:22,
   30:23, 31:8,
   53:24, 54:7,
   54:12, 61:20,
   82:12, 92:17,
   125:12, 168:5.
invests 53:12.
involved 30:15,
   40:23, 48:2,
   51:2, 51:5,
   63:11, 67:14,
   68:19, 69:23,
   70:10, 84:22,
   98:15, 119:10.
involvement 41:7,
   42:14, 44:10.
involving 38:19,
   141:16.
IPI. 49:18, 79:2,
   90:3.
IRS 170:15.
issue 21:4, 32:1,
   109:2, 109:8,
   119:1, 142:21,
   171:14, 171:15,
   190:20.
issued 97:8,
   134:13, 134:15,
   162:13, 170:20.
issues 25:13, 27:4,
   27:6, 27:8,
   70:10, 70:11,
   70:14, 106:13,
   117:10, 117:24,
   176:21, 202:16,
   202:22, 202:25.
issuing 40:24.
it. 90:6, 105:12,
   169:2.
Italy 172:9.
items 11:6.
itself 49:19, 59:9,
   77:13, 77:16,
   145:21, 172:4,
   173:7, 197:4,
   198:20.
.

.

< J >.
J. 1:25, 1:27,
   1:31.
Jackson 27:5,
   27:12, 27:15,
   28:13, 38:10,
   55:6, 57:20,
   59:12, 59:17,
   63:10, 116:15,
   117:8, 118:13,
   118:19, 118:20,
   118:21, 119:6,
   119:7, 119:10,
   119:13, 119:14,
   119:25, 120:2,
   120:5.
James 1:18.
January 20:6,
   27:23, 33:11,
   34:22, 37:5,
   37:11, 39:18,
   40:5, 112:16.
Jedwab 23:22.
JER 22:1.
Jerry 58:4,
   61:12.
jewelry 173:13,
   173:15.
Jewish 42:16.
jive 68:11.
JKB-13-0460 1:9.
job 73:22, 74:3,
   74:6, 75:10,
   79:22, 79:24,
   83:16, 88:14,
   163:6.
jobs 82:22, 83:2.
Joe 37:14.
John 1:31.
Johnson 37:13,
   37:14, 53:14,
   62:7, 67:20.
joint 30:20, 40:8,
   40:9, 76:22,
   76:24.
jointly 39:22.
Jon 20:16, 21:11,
   21:19, 47:3,
   86:11, 86:12.
Josephina 83:18,

84:11, 102:1,
102:3.
Jr 1:31.
Judge 35:1, 40:17,
72:22, 74:23,
97:22, 120:21,
137:1, 199:25.
judgments 19:19,
191:5.
July 8:6, 21:16,
24:13, 46:18,
114:18, 134:25.
jumped 110:5.
June 16:11, 28:10,
28:13, 28:20,
29:2, 29:24,
30:3, 30:8,
30:14, 30:20,
31:17, 40:5,
44:25, 174:9.
juror 46:2.
jurors 202:13.
Jury 2:5, 2:9,
2:11, 25:22,
25:23, 26:1,
26:5, 26:6,
45:14, 96:22,
96:25, 98:9,
106:23, 106:24,
108:19, 109:2,
109:5, 110:19,
110:24, 140:6,
140:8, 140:11,
142:21, 177:4,
177:5, 177:8,
177:13, 203:3,
203:4.
.
.
< K >.
K. 1:18.
keep 40:17, 51:18,
51:22, 53:6,
103:4, 114:10,
156:19, 173:3,
184:17, 192:19,
195:7.
keeping 182:13.
keeps 36:2.
kept 16:7,

165:13.
key 41:1, 41:3,
41:22, 41:25,
90:3, 201:22.
kickbacks 23:4.
kid 165:22.
kind 20:14, 104:10,
162:7, 191:24,
202:18.
kinds 117:1,
167:24, 191:15.
knowing 71:3,
119:23.
knowledge 5:6,
8:22, 9:19, 14:1,
24:3, 24:8,
41:16, 42:14,
42:25, 43:8,
83:3, 151:19.
known 27:8, 51:4,
94:10, 94:18.
knows 158:25,
170:3.
Kolakowski 86:11.
.
.
< L >.
labeling 139:20.
Ladies 2:10, 25:9,
46:10, 46:16,
101:14, 106:7,
139:25, 176:17,
177:1, 202:10.
lady 5:2.
land 42:7, 42:11.
Landrum 77:2,
77:22, 79:5,
82:15, 102:22,
103:1, 105:10,
106:1, 111:8,
130:3.
landscape 94:12,
94:20.
language 134:22,
191:4.
large 7:16, 41:15,
87:7, 91:20,
195:15.
larger 153:7,
153:9, 154:4,

156:4, 161:18.
largest 38:20,
39:9, 88:25.
Larry 65:1.
Last 2:12, 3:10,
6:24, 10:15,
12:11, 18:5,
20:9, 22:16,
27:16, 37:4,
38:4, 38:5,
51:15, 86:3,
86:18, 92:17,
92:19, 110:9,
131:8, 181:20,
185:12, 186:16,
188:14, 199:23.
lasted 166:20.
late 111:18,
166:23, 177:19.
Later 8:17, 11:21,
19:6, 27:23,
28:11, 34:14,
35:11, 38:11,
44:22, 50:15,
63:15, 75:15,
80:18, 81:15,
113:23, 124:22,
147:15, 165:6,
170:13, 174:12,
175:8, 175:9,
180:21, 186:20.
latest 47:4.
latter 78:5.
laugh 169:20.
laughing 169:19.
Lauren 22:2.
law 8:23, 10:12,
25:18, 97:6,
97:9, 103:12,
104:3, 104:15,
105:5, 106:11,
106:18, 132:6,
132:16, 132:18,
140:5, 170:22,
171:5, 176:24,
202:20.
lawsuit 117:11,
117:16, 118:14.
lawsuit. 117:22.
lawyer 21:17.

lawyers 109:15.
lay 24:7, 109:15.
leader 58:12.
Leading 23:25,
 24:1, 90:11,
 125:23.
learn 169:13.
learned 139:22.
lease 172:22.
least 34:14, 80:25,
 97:25, 112:1,
 200:20.
leave 50:7.
left 15:5, 18:10,
 25:23, 106:24,
 140:8, 177:5,
 203:4.
Legal 19:18, 20:21,
 30:17, 32:18,
 32:19, 39:23,
 97:10, 103:9,
 103:11, 103:15,
 103:21, 104:5,
 104:9, 104:18,
 105:7, 131:5,
 131:7, 141:15,
 148:21, 152:1,
 154:10, 164:1,
 164:3, 175:25.
legally 40:8,
 147:11, 157:6.
legitimate 81:7.
lend 114:4,
 171:21.
lender 45:4,
 179:16.
length 138:21,
 184:20.
lengthy 131:7.
lent 194:22.
Leo 1:27.
less 11:23, 88:3,
 119:18, 141:3,
 199:22.
letter. 181:2.
letterhead 78:24,
 105:7, 181:7,
 183:5.
letters 9:25,
 18:15, 93:16,

93:17, 93:19,
 94:2, 95:16,
 162:13, 162:23,
 165:1.
level 4:10, 5:1,
 48:12, 72:14,
 152:14, 169:3,
 192:15, 193:1,
 193:8, 193:14.
Leverage 131:10,
 131:20.
levy 170:14,
 170:24, 171:3.
Lewis 71:10.
lie 85:6.
lied 80:2, 80:13,
 83:8, 83:10,
 83:13.
life 5:5, 64:10,
 64:11, 65:17,
 66:11, 66:19,
 71:21, 71:24,
 72:11, 104:13,
 109:16.
likely 200:19.
limit 182:10,
 183:13, 183:25,
 184:11.
limited 38:12,
 46:22, 46:23,
 48:11, 51:6,
 134:16.
limiting 113:24.
Lina 77:9, 77:19,
 84:25, 89:9,
 91:22, 91:23,
 92:20, 93:3,
 100:5, 106:1,
 170:14.
Line 10:23, 17:14,
 26:17, 29:10,
 43:4, 83:18,
 92:2, 101:25,
 111:9, 113:14,
 121:5, 121:6,
 125:21, 125:22,
 125:23, 140:18,
 148:1.
line-by-line
 138:18.

lines 17:21,
 41:12.
linked 125:5,
 198:16.
liquidated 197:10,
 197:14.
liquidating 154:16,
 198:23.
liquidation 162:16,
 162:17, 192:15,
 193:1.
liquidity 196:6.
list 94:10, 94:18,
 95:5, 100:3,
 100:5, 132:6,
 193:17.
listed 8:8, 41:3,
 41:4, 41:25,
 42:3, 55:19,
 171:15, 183:14,
 183:17, 197:6,
 199:1, 199:12.
listen 88:18, 89:3,
 92:20.
listened 88:7.
listening 87:22,
 87:23, 88:10,
 108:7, 108:9.
lists 41:1, 41:22,
 59:16.
litigation 71:7,
 113:2, 117:8,
 119:1.
little 53:11,
 59:19, 102:23,
 107:7, 107:15,
 108:16, 113:19,
 141:3, 146:11,
 200:2.
lived 42:17.
LLC 8:18.
Load 92:11,
 92:15.
loan 8:8, 9:1, 9:4,
 9:5, 9:25, 15:21,
 17:14, 44:9,
 115:3, 148:6,
 151:4, 151:5,
 151:7, 152:23,
 159:18, 160:7,

162:2, 176:1,
176:5, 176:6,
176:7, 179:12.
loaned 6:21, 9:5,
9:13, 15:24,
23:20, 31:18,
159:25, 175:25.
loaning 23:7,
44:16.
Loans 7:24, 10:10,
17:9, 17:11,
17:19, 23:13,
24:14, 25:6,
42:19, 67:12,
67:13, 70:4,
70:5, 70:7,
175:3, 175:5,
182:15, 182:16,
194:23, 195:4,
195:5.
local 2:12.
Lombard 1:46.
long 35:11, 39:7,
61:22, 81:5,
93:13, 96:18,
100:18, 103:16,
104:10, 107:17,
112:12, 131:6,
131:7, 133:24,
164:8, 167:5.
long-standing
35:16, 188:10,
188:17, 188:20.
long-term 34:8,
34:24, 35:15,
35:19, 48:14,
114:3.
longer 14:9,
113:20, 130:18.
looked 41:23,
94:20, 105:25,
153:24, 165:10,
165:18, 189:20,
189:21.
Looking 22:18,
29:6, 31:1, 31:3,
31:7, 47:14,
48:25, 55:8,
74:8, 84:24,
92:24, 111:6,

117:2, 121:5,
121:6, 121:7,
121:10, 125:21,
127:13, 132:5,
136:12, 140:17,
161:24, 164:4,
183:8, 186:15,
188:24.
looks 14:3, 56:8,
94:12, 125:24,
134:11, 149:5.
loquacious 80:25.
lose 25:4.
loser 134:5.
losing 197:9,
197:13.
lost 25:5, 86:19,
123:5, 135:3,
136:1, 188:12,
197:23, 198:6,
198:23.
lot 63:21, 63:24,
114:21, 119:8,
128:21, 173:7,
191:17.
lots 39:11.
lousy 159:8.
love 97:5.
low 69:14, 77:20,
121:18, 123:8,
170:17, 171:17,
171:22, 172:1.
lower 200:9,
202:4.
Luck 2:4.
lulling 184:19,
196:10.
lunch 100:20,
101:11, 101:16,
106:8, 106:22,
110:7.
.
.
< M >.
Madoff 138:15.
magnitude 143:12.
Main 68:5, 79:16,
118:21.
mainly 118:15.
major 109:21,

129:1.
majority 135:23.
man 189:5.
manage 57:7,
118:5.
managed 75:15.
management 41:1,
41:3, 51:3, 83:2,
129:24.
manager 41:25.
managers 77:16.
manner 86:13.
March 49:9, 89:19,
93:12, 102:20,
103:8, 103:18.
mark 122:2, 122:13,
123:20.
mark-up 122:1,
123:4.
marked 8:4, 19:1,
50:9, 123:17,
138:3.
market 68:3, 95:3,
95:18, 95:20,
96:14, 98:4,
115:10, 115:17,
115:19, 127:17,
131:9, 131:13,
185:25, 186:10,
193:11, 193:15,
193:18, 193:23,
194:3, 201:11.
market. 193:9.
Martin 1:25.
Maryland 1:2, 1:20,
1:47.
master 89:11,
186:19.
material 41:15,
130:25, 162:4.
materialize 6:12.
math 122:16, 123:5,
123:18, 123:24,
123:25, 157:3.
matter 39:18, 69:8,
112:7, 147:4,
176:16, 203:11.
matters 183:23.
maturation 151:25,
164:1, 164:3.

matured 161:19.
maximize 83:7.
Mcmahon3 203:31.
mean 19:24, 24:2,
    31:6, 34:1,
    44:21, 48:8,
    62:21, 71:25,
    73:21, 74:5,
    85:12, 96:15,
    103:21, 104:2,
    126:6, 127:2,
    128:22, 144:19,
    145:20, 148:7,
    159:13, 161:7,
    164:25, 179:21,
    191:6, 192:2.
Meaning 17:6,
    154:24, 186:11,
    193:15.
means 43:6, 86:15,
    92:13, 108:22.
meant 76:13, 139:8,
    171:9, 171:12.
measure 4:10,
    73:16, 163:8.
media 117:17.
Medicaid 70:13.
Medicare 70:13.
meet 5:3, 24:18,
    51:7, 51:9,
    166:19, 185:13.
meeting 50:19,
    114:15, 139:21,
    148:5, 166:19,
    166:20, 167:12,
    168:23, 182:13,
    184:6, 184:7,
    184:8.
meetings 58:20,
    58:22, 58:25.
meltdown 192:23,
    192:25.
member 61:4, 64:7,
    112:8, 115:6,
    128:25.
members 59:6,
    109:11, 111:8.
membership 41:20.
memorandum 41:18,
    134:13, 134:18.

Memorial 120:5.
mention 107:17.
mentioned 20:2,
    20:8, 43:24,
    96:16, 156:10,
    200:18.
mentions 90:2.
merits 168:11.
message 86:16.
met 5:5, 30:1,
    30:3, 30:14,
    44:11, 58:3,
    109:11, 130:3,
    131:2.
metaphorically
    191:23.
Michael 55:4, 55:9,
    94:9.
mid 67:15.
middle 199:25.
million. 17:16,
    154:11.
millions 98:14,
    144:7, 161:21,
    182:12.
mind 94:22, 107:9,
    184:11, 188:5.
mindset 9:20.
Mini 173:25, 174:2,
    174:6.
Mint 70:4.
minute 108:11,
    126:24, 144:6.
minutes 25:21,
    25:24, 38:11,
    39:18, 46:12,
    49:2, 87:22,
    101:2, 101:5,
    101:10, 101:15,
    106:22, 118:12,
    140:7, 140:9,
    167:12, 177:3,
    177:6, 203:6.
minutes. 50:21.
misleading 187:20,
    187:21.
misread 201:2.
misrepresentation
    192:9, 194:10.
missed 65:2,

113:14, 143:16,
    143:17, 143:24.
missing 18:21,
    201:23.
misstated 201:3.
mixed 116:12.
model 28:2, 36:8,
    57:21, 59:8,
    112:9, 157:25,
    160:18, 163:18,
    166:10, 166:23,
    166:25, 167:2,
    169:11, 170:2.
modify 45:7.
Moe 54:14, 54:17,
    55:3, 55:4,
    55:7.
moment 50:15, 74:5,
    142:6, 145:17.
Moni 4:6, 4:7,
    4:12, 4:13, 4:14,
    4:15, 5:11, 5:14,
    5:15, 5:16,
    5:23.
monies 49:7, 49:8,
    56:16.
monitored 108:18.
Monterosso 77:19,
    77:25, 79:5,
    79:12, 79:20,
    80:1, 80:10,
    93:3, 106:1,
    111:8, 170:13,
    175:19.
month 33:11, 33:14,
    90:5, 114:20,
    134:12, 155:17,
    155:18, 155:20,
    156:1, 156:2,
    160:12, 163:21,
    170:13, 172:11,
    173:12, 175:8,
    185:7, 185:12,
    185:18.
monthly 3:14, 6:16,
    7:1, 7:15.
months 8:17, 11:21,
    28:6, 28:11,
    28:21, 34:14,
    39:19, 40:5,

41:23, 114:14,
141:4, 146:21,
152:5, 158:5,
158:9, 159:7,
159:20, 161:15,
165:2, 165:4,
174:12, 191:18,
201:18.
months. 195:21.
morning 2:2, 2:10,
3:4, 25:10,
26:15, 26:16,
100:19, 101:16,
107:7, 203:2,
203:7.
morning. 53:5.
Morris 8:24, 55:7,
56:3, 165:20.
mother 165:22,
172:9.
mouth 139:22.
move 22:5, 44:15,
47:3, 59:19,
102:23, 135:9,
137:1, 172:24,
181:22, 195:17.
moved 64:5, 141:14,
146:10.
moving 61:10,
153:22, 163:25.
Ms. 5:2, 46:1,
77:19, 77:25,
79:5, 79:12,
79:20, 80:1,
80:10, 93:3,
108:8, 111:8,
170:13, 175:19.
Multicare 135:17.
multimillion
33:6.
multiple 62:1,
91:8, 96:10,
96:11, 96:23,
97:1, 131:21,
132:8, 134:7,
134:25, 135:15,
154:1, 166:17,
174:1.
multiply 123:2,
131:10.

multitude 28:17,
28:25, 29:1,
29:2, 62:14,
169:10.
myself 67:1.
.
.
.
< N >.
NA 86:15.
Name 41:5, 42:2,
49:16, 49:17,
50:4, 50:9,
64:25, 65:5,
87:20, 94:1,
96:16, 97:6,
97:16, 144:21,
145:8, 182:3,
183:1, 190:13,
194:1, 203:27.
named 55:3,
83:17.
names 37:3, 37:20,
38:9, 93:15.
NCO 94:11, 94:19.
near 100:24.
necessity 52:22.
need 17:9, 21:11,
28:2, 31:12,
43:2, 48:17,
50:18, 51:12,
51:14, 51:22,
81:7, 88:3,
89:14, 96:8,
100:5, 100:19,
102:21, 105:10,
108:11, 109:10,
130:16, 152:2,
176:9, 197:19.
needed 17:25,
125:11.
needing 51:18.
needs 52:23, 88:2,
178:22.
Negative. 46:3.
negotiated 4:21,
123:9, 125:14,
150:9, 189:25.
negotiating 64:7,
180:12.
negotiation 183:7,

183:25, 184:12,
190:6, 190:10,
199:12, 199:16,
201:23, 202:6.
negotiation.
201:22.
negotiations 40:6,
42:6, 43:2,
44:10, 183:15,
190:3.
negotiations.
199:5.
neighbor 48:13.
neither 83:14.
net 151:1,
156:13.
network 39:11,
77:12, 116:6,
116:9, 129:25,
130:4, 130:10.
networks 39:5.
New 14:22, 20:11,
45:21, 51:9,
94:11, 111:16,
127:9, 135:23,
162:13, 162:14,
191:10.
news 25:12, 105:15,
106:12, 140:3,
176:20, 202:15.
newspaper 117:17.
Next 35:6, 36:24,
50:21, 53:22,
84:8, 90:3,
101:18, 115:8,
130:13, 132:5,
136:25, 138:23,
145:7, 153:21,
161:10, 165:2,
167:13, 178:23,
178:25, 183:14,
183:17, 184:2,
185:23, 188:8,
188:25, 190:15,
193:5, 194:15,
195:21, 196:23.
nice 108:14,
153:17.
night 2:12, 3:10.
nightmare 192:8.

nine 50:15, 144:11,
    144:24, 161:15.
Nobody 123:15,
    170:3.
non-americans
    86:5.
non-issue 192:17.
non-issue. 114:5.
non-performing
    34:11.
nondisclosure
    38:12.
None 11:16, 13:8,
    70:9, 70:13,
    71:14, 71:17,
    82:20, 142:16,
    151:21.
nonprofit 150:10.
nonstop 74:23.
nor 42:17, 82:6,
    83:3.
normal 64:1, 65:11,
    113:9, 172:12.
normally 65:11.
North 37:12, 37:15,
    53:14, 62:7,
    62:12, 67:3,
    67:8, 67:20,
    68:6, 68:14,
    68:22, 95:12,
    123:13.
NORTHERN 1:2.
notation 66:6.
note 87:24, 104:3,
    104:4, 104:7,
    108:16, 108:22.
noted 127:6,
    152:22, 186:22.
notes 3:9, 40:24,
    41:20, 103:24,
    141:21.
Nothing 32:4,
    32:14, 46:25,
    49:4, 49:24,
    63:2, 64:9, 65:4,
    65:6, 65:7,
    97:24, 105:2,
    109:24, 110:3,
    110:5, 117:25,
    118:10, 150:3.

notice 96:18,
    103:21, 109:4,
    170:14.
notices 90:11,
    103:11, 103:16.
notification
    105:20.
notify 14:25,
    89:10.
notifying 47:11.
notion 52:10,
    118:24, 152:9,
    152:11.
Notwithstanding
    29:1, 112:18,
    120:14.
November 48:16,
    174:11.
Number 17:3, 18:18,
    21:4, 49:25,
    78:18, 78:23,
    86:18, 87:9,
    87:17, 115:8,
    123:9, 124:17,
    125:3, 126:2,
    126:12, 134:6,
    134:16, 134:22,
    137:17, 141:24,
    144:10, 148:20,
    150:17, 185:4,
    198:10.
numbers 22:24,
    22:25, 27:19,
    51:12, 51:14,
    105:11, 105:22,
    114:23, 154:2,
    180:18, 199:11,
    199:13, 202:4.
numerous 54:22,
    151:24.
.
.
< O >.
o'clock 202:9.
oath 2:19, 26:10,
    111:2, 140:16,
    177:16.
Object 32:9, 45:11,
    122:15, 144:25.
objecting 40:17.

Objection 3:22,
    12:13, 23:14,
    23:23, 24:5,
    32:11, 32:22,
    35:1, 35:4, 36:1,
    36:14, 36:21,
    45:8, 45:19,
    120:21, 120:22,
    122:21, 122:23,
    127:18, 127:21,
    138:11, 142:15,
    142:22, 143:18,
    144:15, 144:22,
    168:15, 188:1.
obligate 157:9.
obligated 157:6,
    157:10.
obligation 16:4,
    20:21, 32:16,
    32:18, 32:19,
    72:9, 75:14,
    82:6, 82:8, 82:9,
    131:24, 175:17.
observation
    136:1.
observations
    87:24.
obtain 17:19,
    34:11, 113:25,
    114:3.
obtained 44:9,
    55:6, 56:2, 56:3,
    117:14, 128:12.
obtaining 27:7.
Obviously 7:10,
    9:1, 11:24, 18:7,
    121:16, 123:17,
    200:13, 200:16.
occasion 172:1.
October 48:7,
    114:19, 117:6,
    117:13, 119:13,
    196:5, 196:17,
    196:21, 197:8,
    197:22, 198:2.
odd 8:8.
of. 20:14.
offer 59:3, 73:10,
    199:9.
offered 155:22,

190:16.
offering 49:16,
  49:19, 50:12,
  59:9, 131:5,
  133:9, 169:23,
  169:24, 172:25.
office 78:13,
  78:15, 78:17,
  78:20, 91:3,
  92:11, 93:5.
Official 1:45,
  34:1, 203:18.
oftentimes
  108:19.
okay. 20:13,
  179:20.
old 127:10, 139:17,
  191:12, 191:13.
older 191:8.
omega 193:10.
on-ramp 78:25.
on-the-record
  110:10.
on. 112:12.
Once 2:20, 14:21,
  30:3, 41:25,
  105:15, 110:5,
  111:2, 140:14,
  147:15, 147:16,
  148:11, 150:10,
  156:15, 180:7.
one-hundredths
  122:18.
one-way 108:12.
One. 53:3, 127:4,
  127:9, 196:14,
  197:15, 198:16.
ones 7:10, 9:24,
  32:23, 66:22,
  131:1, 134:25,
  155:11.
ongoing 38:19.
online 87:13,
  95:3.
open 5:19, 5:20,
  81:10, 101:13,
  128:10.
open-ended 81:3.
operational 87:7,
  88:9.

operations 91:9,
  173:2, 175:15.
operations.
  89:24.
opinion 187:22,
  190:18.
opportunity 33:6,
  46:11, 63:23,
  107:19, 124:4,
  124:10, 124:14,
  153:16.
opted 15:20.
optimists 2:13.
option 162:10.
orange 2:11.
order 34:11, 53:23,
  109:9.
organization.
  129:1.
organizations
  127:16.
organized 54:6.
original 13:11,
  44:21, 82:17,
  122:17, 145:19,
  147:24, 148:1,
  148:13, 148:14,
  152:24, 156:23,
  157:1, 191:21.
originally 140:24,
  150:22, 196:11.
originated 132:25,
  133:9, 133:10,
  148:20, 149:12,
  160:16, 161:24,
  186:12, 190:2.
originator 189:22,
  194:9.
orthodox 42:16.
others 22:9, 26:19,
  56:24, 78:12,
  133:6, 170:9,
  174:5, 183:20,
  191:3, 192:18.
Otherwise 108:17,
  203:6.
ought 161:24.
out-of-country
  92:25.
out. 93:16, 94:2.

outlet 117:17.
outright 152:12,
  195:8.
outside 77:12,
  87:1, 87:2,
  91:14.
outsource 86:5.
outsourcing
  92:25.
outstanding 170:18,
  171:19.
overall 27:19,
  116:7, 120:1,
  154:7.
overflow 90:15.
overnight 202:11.
Overruled 32:24,
  35:6, 36:15,
  36:22, 40:21,
  45:15, 75:1,
  128:7, 142:23,
  145:1, 145:2.
overseas 87:11,
  87:18, 90:25.
owed 52:17, 69:8,
  69:11, 69:20,
  113:20.
owned 13:6, 14:5,
  15:1, 31:2, 31:5,
  54:18, 83:4,
  92:22, 147:16,
  153:17, 156:1,
  156:21, 160:12,
  161:15, 162:18,
  179:6, 183:11,
  198:21, 200:8,
  200:11.
owner 11:5, 12:4,
  14:23, 15:14,
  73:10, 76:7,
  141:12, 150:8,
  151:8, 159:19,
  160:11, 181:14.
owners 30:18,
  159:10, 161:14.
ownership 11:8,
  13:13, 48:1,
  76:5, 91:20,
  94:4.
owning 14:4, 57:12,

178:8.
owns 118:11,
  147:15, 179:9,
  182:17, 182:21,
  182:22, 194:13.
Oxford 92:5, 100:3,
  100:13.
.
.
< P >.
Package 93:4, 93:5,
  93:9, 131:9,
  131:13.
pages 131:6,
  132:22.
paid 3:25, 9:16,
  15:11, 18:2,
  18:4, 22:2,
  62:18, 63:5,
  63:10, 72:18,
  73:3, 78:9,
  120:17, 120:18,
  136:6, 140:23,
  140:24, 150:7,
  150:22, 151:5,
  163:24, 170:16,
  171:1, 189:6,
  201:16.
panic 163:3.
panicked 171:4.
papers 143:9.
paperwork 23:19,
  118:20.
paragraph 19:15,
  85:1, 109:9,
  138:25, 185:3,
  188:14, 199:24.
parameter 199:13,
  202:7.
parcel 118:25.
Park 5:1, 5:12,
  5:15, 65:23.
partial 11:20,
  51:20, 194:25.
partially 20:11,
  183:2.
participants 25:14,
  25:16, 106:15,
  106:16, 140:4,
  176:22, 202:17,

202:18.
participate
  56:15.
participated
  42:17.
participating
  202:22.
participation
  49:20, 50:12.
particular 6:19,
  10:6, 10:24,
  13:24, 18:8,
  18:20, 19:2,
  19:12, 35:18,
  46:20, 51:25,
  54:8, 57:17,
  86:25, 119:4,
  121:22, 128:5,
  144:8, 157:20,
  158:7, 169:7,
  180:13, 187:15,
  192:1.
particularly
  80:24.
parties 156:7,
  157:7, 157:8,
  184:5, 194:18,
  194:21.
partner 97:11.
Partners 128:25.
partnership 30:7,
  30:12, 30:17,
  187:9.
parts 149:24,
  190:1.
party 56:17,
  183:23, 184:20,
  184:21, 184:24,
  195:23.
passed 59:5.
passing 6:10.
past 21:24, 37:25,
  111:25, 114:5,
  133:2, 133:12,
  152:5, 155:9,
  163:12, 170:15,
  171:25.
patient 69:9,
  103:23, 104:7,
  116:11, 191:1.

patients 27:5,
  69:21, 88:2,
  91:5, 103:23,
  168:25.
pattern 100:12,
  127:8, 136:4,
  168:3, 168:4.
Pause 46:13.
pay 23:8, 59:10,
  61:15, 74:17,
  104:3, 104:8,
  104:17, 112:23,
  113:3, 113:20,
  125:18, 155:5,
  156:9, 159:18,
  160:7, 169:1,
  171:15, 172:7,
  175:7, 175:17,
  176:11, 193:7,
  193:13, 199:17.
paying 9:13, 16:21,
  63:2, 136:2,
  152:23, 158:2.
payment 3:11, 3:14,
  3:18, 3:19, 3:20,
  9:20.
payments 3:15,
  22:3, 22:25,
  23:21, 27:6,
  28:13, 118:16,
  171:18, 175:1,
  182:14, 195:5.
pays 7:1, 7:10,
  7:16, 116:25.
pending 56:9,
  113:2.
penetrate 103:16.
penetration 103:13,
  103:24, 104:16,
  105:4.
penny 191:1.
per 3:17.
percent. 149:7.
percentage 18:18,
  53:25, 116:19,
  119:25.
perfect 153:22.
perform 163:9,
  165:1, 169:24,
  192:24.

performance 2:12,
103:5, 111:23,
112:3, 158:11,
163:8.
performed 163:24.
performing 18:6,
169:16, 170:8,
192:14, 193:1.
performs 163:9.
Perhaps 142:23,
201:6, 201:8.
period 26:23, 28:3,
93:13, 104:19,
115:16, 130:14,
130:16, 133:25,
140:20, 151:25,
152:6, 153:11,
161:20, 168:4,
173:18, 175:18.
period. 133:20.
Perkiss 21:17.
permission 52:23,
153:18, 153:20.
permit 99:23.
persist 122:22.
person 20:24, 25:6,
34:11, 52:12,
61:12, 73:14,
76:5, 76:11,
87:12, 95:15,
95:16, 101:22,
101:23, 147:13,
173:2, 193:11.
personal 16:13,
16:15, 16:16,
16:23, 17:13,
37:22, 38:5,
62:3, 62:5,
64:16, 142:10.
personally 84:10.
personnel 41:1,
41:3, 41:22,
42:1, 77:13.
persons 202:22.
perspective 33:3.
persuade 115:13,
201:24.
persuaded 166:22.
pertaining 27:4,
46:24.

Philadelphia 37:12,
37:15, 53:14,
62:12, 67:3,
67:9, 67:20,
68:6, 68:14,
68:22, 95:13,
123:13.
Philly 62:8.
phone 5:9, 79:1,
79:2, 88:19,
176:9.
phones 87:13.
phrase 185:9.
picked 77:25.
picture 66:1.
piece 131:20.
pieces 57:4,
115:23, 144:21,
148:14.
pin 121:21.
pitch 166:4,
191:14.
pitched 66:23,
67:1, 166:9.
pitching 51:3,
133:5, 170:4.
place 14:18, 22:3,
38:9, 47:1, 49:1,
95:7, 95:8,
111:25, 114:20,
137:9, 141:11,
143:12, 146:9,
146:25, 154:1,
163:13, 164:2,
166:9, 167:12,
192:25.
placed 17:20, 28:6,
54:15, 75:13,
132:1, 156:2.
placement 91:23.
places 16:4.
plain 103:14,
103:24, 104:4.
Plaintiff 1:7,
1:23.
plan 9:9, 109:22.
Platinum-funded
29:4.
Platinum. 42:25,
43:1, 45:18,

46:23.
play 104:9,
104:14.
players 114:4.
plenty 28:11,
168:7.
plus 38:5, 87:22,
146:20, 195:16.
pocket 113:4,
198:7.
pocketed 158:3.
pocketing 150:5,
150:6.
point. 95:4,
111:19.
pointed 133:25.
points 121:1.
policy 87:1.
Ponzi 164:9.
pool 94:24, 136:12,
136:15, 136:16,
136:21, 137:7,
139:2, 139:3,
153:9, 156:4.
pooling 61:19.
pools 202:7.
poor 26:22, 28:1,
86:14, 105:22,
171:10, 172:14,
176:13.
poorly 27:3, 111:7,
166:15.
portfolio. 94:13,
115:20, 131:11,
131:22.
portfolios. 133:14,
191:4.
portion 11:12,
49:12, 52:7,
56:13, 57:25,
90:15, 142:18,
152:25, 190:2,
190:3, 197:15,
198:1.
portions 19:9.
posed 81:3, 128:5,
143:22, 178:23.
possibility 39:22,
40:7, 40:23.
possible 116:24,

130:22, 130:24,
131:4, 164:18.
possible. 92:12.
Possibly 83:21,
98:17, 159:13,
176:13, 183:10,
183:16, 188:25.
post 32:18.
posted 53:6,
64:16.
posting 95:3.
postponed 97:22.
potential 5:13,
95:5, 124:24,
157:15.
Powerpoint 126:16,
127:13, 130:20.
practice 84:21.
practicing
187:15.
preceded 157:13.
precisely 43:16.
predates 69:25.
predict 19:22,
111:23, 112:2,
112:3.
preliminary 5:1,
5:12.
premium 193:8,
193:14, 194:8.
preparation 42:4.
prepare 127:22.
prepared 8:14,
10:12, 10:16.
preparing 97:2,
97:12, 97:19,
162:25.
present 157:15.
presentation 10:15,
129:23, 132:23.
presentations
126:16.
presented 44:7,
177:21, 191:3,
202:22, 203:1.
presenting 162:19,
178:17, 183:20.
presently 192:15.
presents 25:13,
106:14, 176:21,

202:16.
president 58:10,
173:16.
pretended 184:21.
pretense 184:23.
pretty 107:17,
123:19, 177:1,
187:25, 188:2.
previous 51:13,
159:19, 159:25,
160:11.
previously 2:23,
19:1, 157:21,
160:22, 161:4,
161:15, 162:18.
price. 161:25,
199:16, 201:23.
priced 156:8,
201:15.
prices 72:23,
134:3, 135:3,
135:14, 135:19,
136:2, 156:20,
199:4, 199:7,
200:14, 200:20,
202:1, 202:2.
prices. 200:16.
pricing 156:6,
163:20.
Prieto 20:25.
primarily 105:21.
principal 158:10,
163:4.
principals
126:13.
privilege 63:20,
63:23, 64:4,
65:13.
probably 107:14.
problem 45:23,
91:1, 119:20,
119:21, 172:13,
183:12.
problematic
40:20.
problems 28:16,
28:24, 29:1,
29:2, 116:3,
120:14, 169:10.
proceed 26:11,

81:12.
Proceedings 1:17,
81:10, 101:13,
128:10, 203:8,
203:11.
proceedings.
46:13.
proceeds 18:3,
53:15, 60:5,
61:21, 159:17,
160:5, 160:6.
process 28:4,
89:14, 104:8,
104:18, 129:24,
131:8, 152:1,
164:1.
processor 70:8.
produce 75:20.
producing 74:5,
191:24.
product 31:10,
36:8, 49:8,
52:15, 59:8,
115:13, 125:2,
129:5, 158:15,
169:23, 169:24,
187:10, 189:18.
products 187:8.
professional
41:14.
Professionals.
128:24.
profit 57:12, 62:2,
121:18, 123:11,
123:16, 127:2,
127:9, 134:2,
136:7, 136:9,
140:23, 140:25,
144:14, 146:20,
150:22, 151:3,
151:15, 152:24,
153:17, 155:17,
155:20, 155:25,
156:23, 157:1,
201:19.
profited 150:23.
profits 137:8,
186:17.
progressing
45:17.

project 91:6,
91:10.
projections
163:17.
promise 20:22,
24:24, 25:1,
193:15, 194:12,
202:3.
promises. 19:25.
promote 30:9,
30:21, 36:8,
40:11.
promoting 39:23,
52:14.
promotion 30:15,
32:21.
promotional 35:21,
36:7, 41:15,
130:25.
properly 15:2.
properties
176:13.
Proposal 90:10.
proposed 41:22,
42:1, 138:19.
prospectus 40:23,
41:19, 41:23,
49:6.
prospectuses 49:3,
49:10.
protracted
104:19.
proud 86:4,
161:14.
Proven 131:8.
provide 37:3,
92:25, 93:19,
96:1, 97:10,
113:10, 115:13,
137:20, 149:6,
173:6.
provided 38:8,
47:15, 66:10,
66:14, 81:9,
88:5, 89:13,
95:25, 98:8,
99:2, 101:21,
114:17, 121:10,
129:12, 130:7,
132:7, 134:3,

135:4, 137:15,
151:3, 173:8.
providers 135:17,
186:1, 186:11,
186:14.
providing 34:12,
35:20, 36:7,
112:12, 130:6,
138:14, 183:22,
186:17, 201:18,
201:25.
proving 103:10.
provision 70:17.
PSA 196:10, 196:11,
196:13, 197:8.
Psas 141:6, 141:10,
141:19, 142:11,
143:17, 144:3.
Public 58:10,
58:12.
publicized 117:16,
117:20.
publicly 39:1.
pull 22:16, 57:2,
98:15.
pulled 54:21,
69:21, 107:15.
pump 84:20.
purchaser 14:2,
14:22, 15:15,
32:16, 57:23,
58:1, 196:2.
purchasers 30:23,
31:21, 31:22,
32:2, 136:12,
136:14, 136:15,
136:17, 136:22,
139:2, 139:3,
139:7, 139:14.
purchases 12:12,
49:18, 49:23,
67:21, 67:25,
69:16, 161:20,
173:23, 173:24,
185:25, 186:10,
186:12, 186:14,
195:20, 198:12.
purchasing 4:11,
32:25, 47:9,
49:23, 56:16,

57:24, 63:6,
167:2, 185:8,
185:18, 186:17,
194:16, 195:9,
197:8.
purpose 14:24,
56:16, 95:4,
180:11, 184:11,
201:24.
purposes 9:13,
35:21, 36:7,
85:22, 93:15,
93:22, 94:1,
94:3, 159:17,
178:17, 183:19.
pursuant 51:23.
pursue 112:13,
116:22.
push 96:4.
put 21:19, 48:19,
59:5, 78:10,
113:24, 127:23,
129:22, 134:18,
139:18, 169:8,
171:4, 183:4,
191:9, 196:10,
196:13.
putting 41:7,
183:12.
.
.
< Q >.
quality 191:4,
192:9.
quality. 190:19.
qualms 123:15,
123:16.
quarter 27:2,
27:22, 27:23,
172:15.
question-by-questio
n 128:8.
questioning 26:17,
43:4, 83:18,
111:9.
questions 3:4, 3:6,
19:4, 22:13,
22:17, 25:8,
40:2, 100:5,
178:13, 184:17,

202:8.
quick 200:2.
quickly 104:12.
quite 38:23, 93:12,
  192:6.
quote 103:14,
  165:9.
quoted 148:24,
  149:7.
.
.
< R >.
raise 53:24, 56:6,
  109:2.
raised 60:3.
raising 49:7,
  55:23, 61:19.
Raj 87:21, 89:2,
  89:7, 89:18,
  90:2, 91:1.
ramp 28:4.
ramp-up 28:3,
  130:14, 130:16,
  152:6.
ran 172:9,
  191:10.
random 5:18, 6:1,
  6:11.
range 196:8.
rate 54:8, 103:13,
  103:23, 103:24,
  104:16, 105:4,
  105:6, 124:11,
  124:14, 124:24,
  133:3, 148:22,
  153:18, 162:16,
  162:17, 193:4.
rates 168:6.
rather 2:11.
Raymond 71:16,
  71:19, 72:10,
  72:13.
re 110:3.
read 5:20, 8:7,
  33:16, 43:17,
  48:19, 49:11,
  56:8, 109:19,
  110:4, 117:21,
  126:18, 126:21,
  128:13, 131:5,

133:8, 133:16,
  145:17, 154:19,
  154:21, 178:10,
  181:19, 181:21,
  185:17, 185:21,
  189:8, 200:24.
reader 201:19.
readily 33:2.
reading 49:22,
  50:15, 113:8,
  129:2, 185:17,
  199:10.
reads 109:9.
Ready 2:5, 2:15,
  18:24, 26:1,
  53:7, 110:19,
  114:6, 145:14,
  146:3, 155:9,
  155:18, 177:8,
  177:14, 192:19.
ready. 45:21.
real 18:16,
  86:19.
realize 108:18.
realized 155:17.
realizing 133:2,
  133:12.
really 52:13,
  78:19, 79:19,
  82:10, 101:25,
  105:10, 109:16,
  130:17, 139:8,
  166:9, 171:12,
  174:17, 196:13,
  197:1, 197:4.
realm 68:10, 69:7,
  71:20, 79:23,
  147:1.
reason 23:12, 36:9,
  99:6, 99:12,
  102:12.
reasonable
  107:15.
reasoning 124:1,
  169:23.
reasons 27:19,
  28:17, 28:25,
  29:2, 99:9.
reassured 134:6.
rebilling 91:13,

91:16.
reboot 46:8,
  46:10.
rebuying 137:9,
  186:18.
recalled 93:9.
receipt 52:12.
Receivable 40:23,
  167:3, 169:19,
  170:6, 170:8,
  181:13.
receivables 24:19,
  40:9, 40:12,
  66:25, 133:1,
  133:12, 133:20,
  185:19, 186:3,
  187:1, 187:18,
  188:17, 191:1.
receivables.
  185:9.
receive 85:2,
  104:10.
received 5:23,
  27:14, 50:18,
  61:1, 96:22,
  96:25, 98:9,
  103:13, 103:23,
  127:15, 138:10,
  138:13, 156:14,
  160:17, 170:14,
  171:2.
received. 145:16.
receiving 16:22,
  88:7, 103:23,
  137:13.
recently 41:8,
  170:17.
receptive 104:3.
recess 25:10,
  25:21, 25:25,
  100:20, 101:16,
  110:16, 110:18,
  140:10, 176:18,
  177:3, 177:7,
  202:11, 203:7.
recessed 108:20.
recipient 183:2.
recode 93:14,
  93:24, 95:23,
  149:22.

recoded 14:20,
14:22, 82:4,
82:7, 147:20.
Recoding 14:17,
14:24, 80:8,
91:13, 91:16,
94:3, 147:18,
153:23, 162:7,
165:18.
recodings 80:5,
165:10.
recognize 60:19,
60:23, 61:2,
61:4.
recollection 45:14,
142:22, 146:5,
180:17.
recommendation
107:25, 108:6.
reconciliation
23:20, 105:24.
record 41:17,
45:12, 45:13,
144:2, 157:5,
167:5, 167:22,
203:11.
record. 80:20,
100:17, 127:20.
recorded 86:16,
89:10, 89:13,
89:14.
records 141:22.
rectify 46:1.
red-lined 190:9.
reduce 151:7.
refer 83:23, 85:19,
145:13, 189:9.
reference 46:23,
49:19, 50:12,
91:12, 94:22,
106:20, 118:14,
146:12, 153:15,
162:14, 178:14,
183:15, 183:25,
187:5, 193:12,
194:23, 197:2,
199:20, 200:7,
202:25.
referenced 42:24,
91:10, 114:25,

118:2, 128:23,
162:21, 180:17,
182:11, 193:25,
194:2, 201:9.
referencing 42:25,
115:20, 178:4,
178:19, 184:9.
referred 99:13,
101:22, 154:16.
referring 31:9,
31:13, 32:2,
84:1, 132:17,
132:18, 137:4,
144:16, 148:16,
177:25, 180:15,
187:1.
refers 146:18,
148:19, 153:12.
reflect 45:12,
85:21, 98:25,
144:4, 185:15.
reflected 10:22,
15:2, 18:14,
18:15, 149:25.
reflecting 98:19,
141:7.
reflective 10:10,
20:1.
reflects 120:4,
137:2.
refresh 146:5.
refused 171:21.
refusing 173:4,
175:19.
regard 79:6.
regarded 118:20.
Regarding 6:20,
20:10, 24:3,
24:9, 44:8,
89:10, 161:12,
196:17.
Regardless
194:15.
regards 8:18,
9:1.
Regency 78:22,
93:5.
relate 25:14,
106:14.
related 9:5, 23:20,

25:18, 27:6,
27:9, 35:23,
54:11, 54:15,
55:5, 56:3, 63:5,
63:12, 66:10,
71:4, 80:5, 83:2,
102:2, 113:16,
143:10, 145:22,
149:2, 154:9,
179:5, 180:12,
183:23.
relates 33:23,
48:24, 50:14,
56:9, 57:18,
93:9, 94:17,
113:15, 133:21,
145:18, 146:9,
146:10, 179:9,
198:25.
relating 139:13.
relation 2:3,
95:22, 128:5.
relationships 4:9,
34:8, 34:17,
42:15, 131:20.
relative 189:6.
relay 20:7.
release 170:14.
released 3:17, 4:1,
98:10.
relevant 202:20.
relied 72:4.
relying 77:6, 79:4,
117:14.
remain 2:19,
26:10.
remained 147:21.
remaining 3:16,
170:15.
remains 111:2,
140:16, 177:15.
remarkable 66:19.
remember 3:5,
58:21, 68:2,
68:4, 84:10,
86:6, 144:11,
144:14, 146:23,
174:20, 178:15,
178:21, 178:22,
179:7, 181:2,

197:13.
remits 105:23.
rendering 165:8.
repayment 9:9.
repeat 3:6, 42:9.
Rephrase 144:18,
   168:19.
replacement 120:7,
   121:9.
reply 102:9,
   102:10, 102:12,
   102:15, 102:16,
   105:19, 112:12.
report 86:17,
   102:17.
reported 154:15.
Reporter 1:45,
   100:19, 101:3,
   107:16, 203:18.
reports 6:15, 6:16,
   6:19, 25:12,
   25:14, 50:18,
   85:2, 101:21,
   105:16, 105:24,
   106:3, 106:13,
   106:14, 140:3,
   176:21, 202:15.
reports. 85:3.
repossessed 112:22,
   113:19, 113:21.
represent 146:2,
   184:23, 194:7.
represented 33:5,
   39:13, 117:4,
   162:15, 162:22.
representing 96:24,
   120:2, 178:7,
   193:22, 199:23.
represents 9:3,
   39:11, 150:13,
   187:8.
repurchase 11:20,
   21:20, 24:22,
   24:24, 115:24,
   136:21, 141:11,
   141:15, 143:10,
   146:8, 146:12,
   147:6, 147:14,
   148:9, 148:15,
   149:20, 150:7,

155:24, 157:11,
   167:20, 186:5,
   196:1, 196:18,
   197:3, 198:4,
   198:6.
repurchased 126:1,
   136:8, 137:12,
   140:19, 140:24,
   141:18, 141:23,
   142:4, 142:12,
   143:1, 145:9,
   148:11, 150:2,
   150:7, 150:10,
   150:11, 152:12,
   153:2, 186:23.
repurchases 125:24,
   134:1.
repurchasing 22:1,
   146:7, 155:15.
request 3:18,
   33:21, 49:14,
   89:12, 109:12,
   154:15, 172:12,
   172:13.
requested 5:16,
   5:17, 6:11, 21:2,
   21:11, 33:1,
   36:10, 36:17,
   89:13.
requesting 6:1,
   124:10, 154:23.
required 62:22.
requires 54:3.
rerouting 87:14.
resale 18:13, 73:9,
   73:10, 73:18,
   118:14, 142:12,
   147:6, 152:9,
   152:11, 166:11,
   167:21.
resales 96:6,
   164:9.
rescheduled
   97:22.
resell 118:5,
   136:21, 149:20.
Reselling 127:15,
   155:14.
residual 190:24,
   190:25.

resold 142:5,
   142:17, 150:2,
   153:2, 153:6,
   164:25.
respect 168:1,
   168:2, 202:22.
respected 38:20,
   39:1, 39:10.
respectfully
   123:6.
respond 19:6,
   19:16, 20:15,
   38:12, 50:20,
   53:6, 78:14,
   89:7, 100:11,
   104:17, 114:2,
   117:23, 117:24,
   135:11, 154:23,
   158:19, 175:22.
responded 43:8.
responding 19:4,
   33:18, 33:21,
   115:12.
responds 47:10.
response 19:13,
   19:14, 20:15,
   43:12, 68:15,
   68:18, 82:11,
   90:4, 96:13,
   102:6, 103:23,
   113:7, 118:7,
   130:5, 134:6,
   138:15, 154:15,
   154:17, 195:21.
responses 19:10,
   103:12.
responsibilities
   11:15, 12:7,
   13:11, 22:10.
responsibility
   9:20, 21:20,
   43:10, 51:6,
   84:5, 84:14,
   84:16, 85:5,
   85:7, 85:8,
   85:15, 86:1,
   86:2, 172:23.
responsible 60:12,
   82:20.
rest 33:17, 47:16,

55:16, 55:24.
restate 142:24.
restricted 52:24.
restriction 13:7.
restrictions
   14:14.
restroom 140:1.
resubmission
   91:11.
result 4:19, 19:21,
   25:1, 170:17.
results 85:10,
   104:10, 132:24,
   164:19, 191:16,
   191:19, 191:20,
   201:17.
resume 2:17.
retain 11:11,
   13:10.
retained 52:1,
   97:10.
retake 140:13.
retired 97:23.
retrieval 98:15.
return 53:25, 54:8,
   57:11, 57:14,
   64:16, 123:23,
   123:24, 124:5,
   124:11, 124:15,
   124:22, 124:24,
   125:11, 133:3,
   146:20, 158:10,
   163:4, 168:6,
   171:2.
returned 105:11.
returns 133:19,
   134:4, 135:4,
   167:24.
revenue 79:17.
review 107:19,
   110:4, 110:9,
   130:25, 169:7,
   188:18, 189:2,
   189:4, 189:12,
   189:15, 189:18,
   190:16.
reviewed 66:22,
   131:5, 149:10,
   189:14.
reviewing 3:9,

130:21.
Richard 1:10, 2:22,
   19:5, 37:2,
   51:24, 87:12,
   117:7, 203:29.
Richman 55:4,
   55:9.
right-hand
   134:10.
rightful 66:6.
rights 11:15.
Robert 37:13,
   37:14, 53:13,
   62:7, 67:20.
role 13:14,
   40:12.
rolling 98:13.
Ron 22:4.
room 108:20.
rough 116:21.
roughly 119:18,
   121:2, 121:23,
   125:8, 156:1.
route 103:9,
   103:11, 103:21.
routed 87:10, 88:8,
   90:24.
RPR 1:44, 203:9.
run 72:1, 84:15,
   86:2, 166:18,
   173:3.
running 43:10,
   71:3, 82:18,
   82:21, 85:7,
   167:16.
ruse 197:11,
   197:23.
ruse. 197:12.
rushed 98:10.
rushing 162:2.
Rutledge 10:16,
   18:5, 142:8,
   143:16, 143:24,
   144:2.
.
.
< S >.
S. 20:25.
salary 170:16,
   171:17.

sale. 148:21,
   155:19.
salesperson
   115:15.
sampling 116:7.
Sanctuary 29:12,
   29:24, 31:17,
   39:19, 39:22,
   41:19, 42:7,
   44:20, 44:25,
   47:19, 47:23,
   47:24, 48:1,
   48:2, 48:3,
   48:4.
sat 58:12.
satisfy 109:10,
   184:18.
saved 66:19.
saving 66:11.
savvy 71:12.
saw 6:24, 7:14,
   18:5, 23:7, 41:8,
   43:25, 44:7,
   45:6, 45:9,
   45:22, 49:2,
   65:22, 102:16,
   117:7, 117:21,
   161:23, 184:4,
   192:16.
saying 30:6, 44:1,
   49:5, 62:6, 63:3,
   68:11, 92:10,
   100:10, 113:7,
   113:12, 115:18,
   128:6, 134:22,
   142:2, 143:14,
   143:19, 158:18,
   172:2, 174:7,
   174:8, 190:11,
   192:20, 192:22,
   193:19, 199:18.
scenario 19:20.
scenes 47:20,
   47:23.
schedule 61:10,
   196:8.
scheduled 89:24.
scheme 84:20,
   196:12.
school 34:2,

123:25.
Scope 21:5,
  21:10.
screen 8:1, 33:12,
  45:23, 46:5,
  46:7.
Screens 45:25,
  46:2, 46:15.
scroll 8:10, 8:19,
  201:14.
scrub 166:10.
searches 202:21.
seated 2:20, 26:7,
  46:15, 110:25,
  111:2, 140:12,
  140:14, 177:14.
Secondary 68:3,
  95:3, 96:14,
  98:3, 98:6, 98:7,
  113:25, 127:17,
  131:9, 131:10,
  131:13, 131:21,
  132:6, 185:25,
  186:10, 193:9,
  193:15, 193:23.
secondly 41:6.
sector 33:24, 34:6,
  36:11, 67:2,
  68:5, 72:11,
  72:16, 75:25,
  79:22, 129:21.
secure 91:3.
secured 17:20,
  40:24, 42:19.
seeing 42:4,
  100:11, 181:2,
  198:18.
seek 171:8.
seeking 8:9, 47:5,
  188:19, 189:3,
  189:12, 189:16.
seem 46:19,
  68:11.
seems 100:4,
  115:1.
seen 6:21, 7:11,
  7:21, 28:5,
  39:17, 49:3,
  104:22, 105:1,
  126:15, 141:24,

157:13, 162:18,
  191:16, 191:18,
  201:16.
sees 105:23.
segued 67:6.
selection 66:18.
self-defining
  109:15.
self-pay 69:8,
  69:10, 69:11,
  69:14, 69:18,
  69:20, 70:11,
  113:3.
sell. 188:19,
  189:3, 189:12.
seller 53:12,
  81:24, 117:5,
  152:18.
sellers 157:15.
Semex 96:9.
send 94:7, 102:5.
sending 33:15,
  49:6, 195:2.
sense 35:2, 94:12,
  94:19, 106:25,
  202:6.
sensitive 125:11.
sentence 32:7,
  185:23, 188:9,
  188:14, 190:15,
  193:5, 194:15.
separate 37:15,
  62:25, 63:11,
  63:12, 134:7,
  167:15.
September 9:24,
  22:3, 114:18,
  133:24, 134:14,
  134:15, 154:5,
  154:6, 165:13,
  166:5.
series 165:10.
serious 39:6,
  164:24.
Service 68:25,
  78:22, 78:25,
  79:24, 88:5,
  90:23, 159:19.
service. 87:13.
serviced 19:22,

71:5, 73:7, 76:3,
  78:11, 87:18.
servicer 81:24,
  189:4, 194:9.
Services 66:10,
  81:23, 93:5,
  181:13.
servicing 13:15,
  27:13, 28:15,
  28:23, 32:17,
  51:3, 51:6,
  57:12, 57:13,
  72:9, 79:10,
  79:11, 79:20,
  79:25, 102:13,
  105:5, 130:4,
  130:9, 180:2.
session 108:19.
set 20:17, 48:24,
  72:17, 73:3,
  73:9, 166:19,
  172:20, 184:11,
  196:8, 199:3,
  199:15, 199:17,
  200:12, 200:20,
  201:9, 201:10,
  201:12.
sets 8:7.
setting 47:8,
  147:5.
settle 112:24,
  113:4.
settled 164:2.
settlement 117:2,
  117:4, 118:19,
  119:10, 119:12,
  120:1, 120:16.
seven 11:20, 17:6,
  28:11, 28:21,
  152:5, 158:4,
  158:8, 159:20.
seven-to-eight
  134:12.
several 58:21,
  58:22, 58:23.
shall 55:14,
  56:15.
sham 177:21,
  177:23, 178:1,
  178:21, 178:24.

shame 86:19,
  169:13, 169:15.
share 102:16.
shareholder 76:7,
  76:14, 76:16.
shares 31:7, 31:14,
  54:18, 54:21.
Shields 56:24,
  71:17.
shifted 16:23.
shock 164:24,
  165:4.
shoot 107:10.
short 30:1, 103:18,
  153:17, 171:21.
shorter 88:3.
shortest 98:17.
shortly 88:11.
shouldn't 166:16.
Show 19:2, 20:4,
  20:23, 21:15,
  53:2, 60:21,
  99:3, 99:8,
  99:24, 117:6,
  146:16, 170:1,
  177:25, 184:8,
  184:9, 190:5,
  196:12, 197:19,
  200:6.
showed 7:19, 40:1,
  43:20, 44:5,
  146:10.
shown 10:15.
shows 201:19.
Shusterman 1:10,
  2:16, 2:17, 2:22,
  3:3, 24:3, 26:10,
  26:15, 37:2,
  72:25, 80:24,
  107:1, 111:1,
  111:4, 135:13,
  140:12, 140:16,
  140:17, 177:12,
  177:15, 177:19,
  200:3, 203:29.
shy 66:1, 66:5,
  66:6.
side 7:11, 15:6,
  68:6, 134:10,
  153:14, 153:15,

  156:9, 188:6,
  191:8, 198:6.
sign 178:6, 183:1,
  183:6.
signature 8:11,
  56:19.
signed 8:19, 10:8,
  52:20, 64:18,
  152:14, 182:3,
  190:13, 194:1,
  197:8, 197:22,
  198:24.
significant 16:20,
  57:1, 80:11,
  109:8, 124:21,
  132:14, 134:4,
  158:14, 158:23,
  158:24, 159:2,
  159:5, 159:11,
  159:15, 160:2,
  195:16.
significantly
  201:15.
signing 178:16,
  179:2.
similar 10:5,
  13:19.
similarly 121:10.
simple 54:10,
  72:24.
Simply 37:22,
  75:18, 135:4,
  143:11, 168:23.
simultaneously
  196:1.
single 39:10,
  127:4, 155:13.
sit 50:15, 99:4,
  126:24, 141:21,
  142:3, 143:8,
  144:6, 146:24,
  147:2.
sitting 8:2, 59:6,
  91:24, 101:17,
  119:4, 143:11,
  144:11, 145:10,
  178:11.
situation 4:5,
  14:17, 170:22,
  172:12.

six 11:20, 22:13,
  22:16, 34:14,
  39:18, 40:5,
  126:1, 127:2,
  130:18.
six. 126:10.
skeptical 166:8.
Slice 13:11,
  115:22, 149:23,
  150:23, 151:9,
  153:1, 153:13,
  153:14, 153:15,
  154:2, 156:12,
  156:13, 161:13,
  161:14, 162:15,
  164:5, 164:20.
slices 141:19,
  144:5, 144:7,
  152:25, 153:2,
  153:3.
slide 128:18,
  128:19.
slows 104:8.
small 68:2, 68:4.
smaller 116:16.
Smith 46:1,
  108:8.
smoothly 2:4.
soft 100:4.
solely 56:16,
  185:25, 186:6,
  186:10, 186:14.
solicit 131:21.
solicitation
  51:3.
solicited 51:10,
  53:24.
solid 116:10.
somebody 12:22,
  43:20, 44:5,
  67:2, 74:16,
  74:18, 78:19,
  98:19, 98:25,
  112:22, 156:9.
somehow 52:10.
someone 12:25,
  55:3, 74:8,
  74:16, 75:19,
  93:6, 125:17,
  127:24, 152:13,

158:10, 159:3.
sometime 20:10.
sometimes 83:23,
  104:12, 115:24.
somewhere 123:5.
son 166:21, 166:22,
  166:23.
sooner 200:20.
sophistication
  72:14, 152:15,
  169:3.
sorry 8:1, 24:2,
  29:23, 33:13,
  84:7, 104:2,
  123:3, 132:12,
  135:6, 171:11,
  174:2, 179:19,
  188:12.
sort 4:8, 30:7,
  30:15, 59:8,
  91:22, 183:22,
  193:10, 196:10.
sought 4:16.
sound 166:24.
sounded 92:11.
sounds 88:1,
  169:12.
source 24:10,
  74:10, 79:16,
  184:12.
sources 202:24.
South 116:15,
  118:13, 118:19,
  118:21, 119:25.
spaces 194:6.
span 134:7,
  153:8.
SPE 161:13.
speaking 4:10,
  20:9, 26:24,
  40:1, 53:5,
  63:24, 71:11,
  153:25, 180:14,
  195:15.
speaks 20:13,
  145:21, 172:4,
  173:7, 197:4,
  198:20.
specialize
  132:18.

specialized 129:25,
  130:10.
specific 6:3,
  39:25, 56:3,
  111:14, 147:9,
  153:11, 158:2,
  163:25, 180:19.
specifically 2:15,
  26:23, 27:8,
  47:6, 57:18,
  95:22, 131:5,
  179:8.
speeded 89:14.
spelled 41:5.
spells 42:2.
spend 63:21,
  104:13, 124:3,
  124:9, 124:13.
spent 63:24, 64:10,
  67:2, 71:24,
  72:10, 75:24,
  78:5, 87:21,
  168:14, 168:21,
  168:22, 168:23,
  182:12.
Spielman 6:17,
  6:20, 7:3, 7:8,
  7:12.
spill 107:6.
spin 94:11.
spoke 42:18, 48:4,
  51:12, 51:15,
  83:17, 138:21,
  173:23, 175:13.
spreadsheets
  6:25.
Sprint 172:7.
St. 37:14.
stack 56:25.
staff 79:3, 84:18,
  84:19, 86:4,
  99:18, 100:8,
  106:1, 111:8,
  111:11, 164:16.
stage 166:23.
stamp 8:23.
stand 2:17, 43:21,
  46:11, 70:9,
  99:4, 105:1,
  111:1, 121:14,

140:13, 144:17,
  177:12, 198:24.
standpoint 91:20,
  190:22.
Starbucks 166:20.
start 7:17, 28:7,
  42:14, 67:19,
  125:9, 125:10,
  148:7, 183:14,
  196:4, 196:20,
  197:7, 199:16,
  201:23.
started 67:5, 68:6,
  68:23, 121:4,
  130:17.
starting 62:1,
  68:5, 76:16,
  81:25, 125:8,
  180:18, 182:9,
  199:4, 199:12,
  199:15, 200:16,
  200:20.
state 45:12, 47:2,
  49:15, 65:15,
  91:1, 93:13,
  138:24, 148:19,
  149:11, 153:15,
  172:12, 195:8,
  200:13, 201:6.
stated 43:22, 72:8,
  75:11, 147:19,
  183:12, 201:9,
  201:10.
statement 50:23,
  135:11.
States 1:1, 1:5,
  84:25, 87:1,
  87:2, 87:8,
  87:10, 89:1,
  89:12, 89:18,
  90:14, 90:25,
  91:5, 91:15,
  91:20, 93:23,
  128:24.
States. 38:20.
stating 45:12,
  84:16, 174:9,
  183:24, 189:9.
stationary 78:18.
stature 186:25,

187:2, 187:5,
187:7, 187:18,
187:21, 187:23,
187:24, 188:5,
188:16.
stature. 188:15.
status 46:25.
stenographer
71:8.
stenographic
203:10.
step 81:9, 107:1.
stick 74:15.
stipulated 88:11.
stock 115:17,
115:18.
stone 199:15,
199:17, 200:12,
201:9, 201:10,
201:13.
Stop 106:5, 158:25,
165:12, 185:12,
196:9.
stopped 187:15.
stopping 177:1.
storage 79:4.
store 52:11.
stored 78:14.
stories 113:8.
storing 79:8.
straight 12:18.
strategy 103:15,
104:5, 104:10,
159:20, 164:3.
Street 1:46, 4:8,
4:9, 108:12.
stressed 6:10.
stretch 46:11.
strictly 40:12.
strike 73:13,
80:21.
strong 136:12,
136:15, 137:7,
139:1, 139:3.
structure 41:20,
41:21, 81:8.
structured
179:12.
students 63:25,
64:1, 65:11.

stumbled 185:11.
style 164:9.
subject 37:2, 92:2,
112:7, 179:24.
submission 98:13.
subpoena 96:22,
96:25, 98:9.
subrogation
112:11.
subsection 58:1.
subsequent 44:22,
173:23.
subsequently 45:2,
173:9.
substantial 38:25,
194:16.
substantially
200:20.
substantiate
23:19.
substitute
109:22.
success 105:6,
111:19, 133:4,
139:10, 193:22,
194:12.
Successful 4:16,
59:1, 73:17,
74:10, 75:6,
105:8, 167:4,
167:6, 168:1,
168:2.
successfully
63:7.
sue 70:13, 70:16,
70:18, 103:10,
154:25.
sued 19:18,
154:15.
sufficient 160:2,
163:3.
suggest 153:20,
155:18.
suggesting 88:16,
189:17.
suggestion 109:7,
109:25, 170:22.
suggests 185:9,
187:24.
suing 103:22,

116:23, 117:13.
suit 103:17,
116:22, 118:19.
summarizing 133:4,
133:23, 135:4.
summer 177:19.
sums 7:16, 57:1.
supplied 38:10,
180:11.
supply 33:2,
33:22.
support 113:10.
supported 151:19.
surprise 165:2.
surreptitiously
108:18.
Sustained 3:23,
12:14, 23:15,
24:7, 32:13,
36:3, 144:18,
168:19.
swimmingly 68:9.
sworn 2:23.
System 46:8, 53:14,
79:14, 108:20.
Systems 37:12,
37:16, 59:17,
62:12, 67:3,
67:9, 68:6,
68:14, 68:22,
95:13, 123:13.
.
.
< T >.
T. 1:44, 203:17.
table 108:23.
taken. 25:25,
110:18, 140:10,
177:7.
talked 4:23, 7:23,
12:25, 16:9,
87:25, 96:10,
96:11, 99:1,
115:21, 115:22,
115:24, 116:3,
127:14, 130:14,
131:2, 131:3,
139:6, 142:20,
147:18, 155:12,
196:2.

talks 9:9, 131:9,
   132:16, 132:22,
   134:19, 136:11,
   139:1, 172:8.
tanked 115:10.
task 163:6.
tax 21:9, 64:16,
   170:21, 170:24,
   171:2, 171:5.
taxes 171:1.
team 2:13, 76:1,
   78:7, 78:10,
   89:4, 89:5.
tells 52:22.
Ten 25:21, 25:24,
   38:11, 57:14,
   101:15, 177:3,
   177:6.
Ten-minute 25:21,
   177:3.
tenant 94:11.
tends 145:4.
tens 173:9, 173:19,
   182:12.
tense 190:6.
tenth 72:12.
term 98:6, 99:12.
terminate 90:12,
   90:18.
terminated 77:24,
   90:17.
terms 9:4, 9:5,
   80:14, 89:2,
   94:4, 99:16,
   106:20, 109:14,
   116:25, 123:21,
   124:2, 126:9,
   127:8, 172:21,
   203:1.
terrible 102:21,
   105:24, 158:9.
terribly 40:20.
testify 78:12.
testifying 63:4,
   83:20, 98:20,
   174:21.
thankful 66:20.
Thanks 53:6, 89:7,
   115:7, 128:21.
theirs 175:11.

them. 194:17.
themselves 73:16,
   74:16, 75:19,
   127:23, 139:17,
   139:19, 186:1,
   191:20.
themselves.
   186:11.
Thereabout 58:24.
thereafter 88:11,
   145:10.
they've 127:1,
   132:25, 133:4,
   193:22.
thinking 36:16.
Third 24:17,
   120:24, 121:1,
   121:2, 160:23,
   183:23, 184:20,
   184:21, 194:18,
   194:21, 195:23.
third-party 14:5,
   199:8.
though 64:13,
   115:1, 129:3,
   165:1.
thousands 143:9,
   173:9, 173:19.
Three 7:17, 7:20,
   8:18, 9:14, 22:3,
   24:4, 28:6,
   39:17, 41:12,
   46:12, 58:19,
   58:23, 58:25,
   79:5, 82:18,
   82:20, 98:1,
   114:14, 122:25,
   126:9, 139:16,
   149:24, 174:12,
   186:20, 190:9.
Three. 9:2.
throughout 85:21.
Thursday 86:3.
ties 197:5.
till 110:13.
timing 153:21.
Titanium 10:24,
   13:12, 13:20,
   144:15, 144:19,
   148:1, 148:8,

   148:9, 149:5,
   149:23, 151:8,
   151:9, 155:21.
Title 108:17.
today 2:11, 20:10,
   22:17, 25:6,
   50:15, 68:12,
   99:13, 107:3,
   107:6, 107:11,
   110:11, 121:21,
   145:11, 147:3,
   147:19, 178:11,
   191:21, 192:16,
   195:25, 202:8.
today. 100:6.
together 30:9,
   41:7, 54:22,
   57:2, 78:10,
   109:11, 131:2,
   139:18, 196:10,
   196:13.
Tomorrow 22:4,
   107:7, 107:8,
   203:2, 203:7.
tomorrow. 50:19.
tone 8:7.
tonight 2:14, 53:5,
   89:23, 177:2.
tonight. 89:20.
Tony 92:19,
   92:23.
took 38:9, 39:7,
   43:21, 46:22,
   78:25, 100:19,
   101:16, 143:12,
   146:25, 151:4,
   153:1, 154:1,
   165:6, 167:8,
   167:12.
top 8:25, 17:5,
   20:24, 131:8,
   137:3, 146:16,
   154:23, 201:21.
topic 101:8,
   128:6.
Toppleson 22:2.
tortuous 104:23.
total 56:13, 62:25,
   141:8.
totaled 62:10.

totaling 175:1.
totality 109:20.
totally 187:20,
    198:25.
touch 25:13,
    106:13, 140:3,
    171:4, 176:21,
    202:16.
tout 132:24, 139:9,
    178:8.
toward 34:16.
towards 198:15.
track 51:18, 51:23,
    167:5, 167:22.
tracked 142:8,
    142:10.
trade 129:1.
traded 39:1.
training 64:25.
tranche 145:13,
    148:19.
tranches 140:20,
    141:7, 141:8,
    141:10, 143:16,
    146:2, 146:12,
    148:7, 148:10.
transactions 38:9,
    38:16, 38:19,
    62:1, 62:14,
    129:8, 135:15,
    135:21, 136:8,
    141:25, 142:13,
    143:12, 157:14,
    161:22, 163:12,
    165:15, 167:5,
    186:15, 195:25,
    198:5.
Transcript 1:17,
    203:10.
transfer 142:1.
transferred 16:24,
    62:4.
transfers 15:21.
transparent 160:19,
    160:21, 169:4.
treated 69:12.
tremendous
    144:10.
tremendously
    171:24.

trial 2:15, 7:17,
    7:20, 25:17,
    42:4, 71:6, 71:7,
    97:2, 97:20,
    97:21, 98:21,
    99:1, 106:17,
    140:4, 176:23,
    187:8, 187:12,
    202:17, 202:19,
    202:23, 203:7.
tried 75:17, 75:25,
    96:19, 183:16,
    200:9.
trouble 115:22.
true 36:6, 53:20,
    183:20, 185:15,
    195:1.
Trust 17:23, 58:10,
    58:12, 165:22.
trustees 63:19.
truth 84:1,
    188:11.
try 5:13, 6:8,
    30:9, 74:21,
    83:7, 107:5,
    112:23, 139:18,
    164:18, 171:8,
    180:13, 180:18,
    182:10, 183:9,
    183:15, 185:21,
    198:17, 198:21,
    198:25, 202:2,
    202:6.
trying 47:7, 68:1,
    68:17, 75:18,
    78:6, 104:14,
    115:12, 115:13,
    118:15, 123:25,
    133:8, 152:19,
    166:18, 173:5,
    176:3, 188:20,
    188:21, 188:24,
    189:8, 189:22,
    189:23, 198:4,
    199:14, 200:7,
    200:10, 201:6,
    202:5.
Tucci 136:11,
    137:16, 137:19,
    138:1, 160:18,

    186:22.
Tuesday 1:19.
tune 173:19.
tuned 81:2.
turbo 154:16.
turn 2:14, 18:23,
    129:15, 169:25,
    173:4.
turned 27:15,
    144:13.
turning 27:7,
    40:25.
tweaks. 47:13.
twice. 172:16.
two-week 161:20.
two-year 168:4,
    175:18.
type 4:8, 16:21,
    16:22, 20:16,
    74:5, 113:5,
    142:17, 183:13,
    183:25, 184:11.
types 70:13.
Typically 16:19,
    103:12, 130:18.
.
.
< U >.
ultimately 58:25,
    59:5, 59:13,
    78:4, 78:10,
    79:11, 79:13,
    166:20, 183:8,
    200:15.
umbrella 39:14.
unable 172:13.
unassociated
    184:24.
unchanged 147:21.
uncollected 115:15,
    127:14, 136:13,
    147:8, 167:3,
    168:24, 170:7.
unconnected
    198:2.
underline 19:9,
    188:13.
underlying 193:6.
understand 3:4,
    3:7, 6:23, 27:18,

27:21, 30:11,
40:3, 50:23,
55:3, 67:17,
74:22, 75:18,
78:21, 81:6,
91:4, 118:8,
125:1, 125:3,
133:8, 159:16,
161:8, 161:10,
172:15, 175:6,
179:12.
understanding 9:3,
31:13, 71:23,
72:14.
understood 30:25,
76:12, 184:6,
184:15, 184:16,
189:5.
Unfortunately
63:22, 172:13.
United 1:1, 1:5,
38:20, 87:1,
87:2, 87:8,
87:10, 88:25,
90:14, 90:25,
91:14, 91:20.
universe 146:24.
University 61:5.
unless 3:18, 55:4,
127:24.
unnamed 194:21.
unqualified 23:2.
unsold 93:24.
until 29:23, 34:14,
40:5, 41:8, 42:4,
43:2, 44:22,
50:8, 51:8,
67:11, 67:19,
76:23, 81:15,
106:10, 127:10,
129:15, 187:12,
198:12, 203:2,
203:7.
up. 89:14.
upbeat 113:10.
Update 20:8, 20:16,
47:4, 47:14,
50:18, 89:23,
92:3.
updated 15:2.

updates 47:5.
upfront 62:19,
62:21, 64:14,
64:15.
Using 19:20, 49:7,
77:12, 84:19,
87:5, 87:6,
90:22, 91:14,
92:15, 94:23,
95:16, 99:16,
104:5, 129:24,
130:11, 176:5.
.
.
< V >.
vaguely 56:22.
validation 90:11.
valuable 179:3.
values 193:6.
variance 150:4.
variation 127:6,
135:25, 136:5.
variations
135:24.
varied 127:12.
various 4:8, 4:9,
5:16, 16:4,
17:24, 38:16,
66:23, 70:10,
70:12, 93:19,
104:23, 116:5,
135:16, 135:17,
141:7, 148:10,
154:2, 169:9,
179:9, 180:16,
183:10, 189:16.
vast 135:22.
venture 40:8, 40:9,
74:11, 76:22,
76:24.
verb 190:6.
verified 114:25.
versions 190:6,
190:8, 190:9.
vertical 22:18.
veteran 34:5.
via 55:6.
vice 173:16.
view 192:13.
virtual 78:15,

78:17, 78:20,
93:5.
virtually 97:21,
97:24, 165:2.
visit 63:21.
visited 63:24.
voice 92:20.
volume 104:16.
vote 58:14, 58:18,
59:5, 59:6.
voted 58:16, 59:13,
123:11.
VP 79:18, 173:2,
175:15.
vs 1:8.
.
.
< W >.
W. 1:46.
Wait 90:7, 106:10,
124:25.
waiting 8:2, 47:12,
89:10, 145:15.
walk 125:18,
156:11.
walked 125:15,
147:12.
Wall 4:8, 4:9.
wanted 5:17, 20:13,
45:17, 94:19,
94:23, 109:2,
116:15, 147:10,
162:12, 168:10,
180:24, 183:11,
195:17.
wants 37:5, 51:24,
92:21, 156:9,
167:8.
wasted. 86:20.
wasting 91:3.
water 74:8, 74:9,
74:10, 74:13,
74:17, 74:21,
75:4, 191:22,
191:24.
ways 15:25, 88:16,
100:25, 104:9,
184:18, 188:22,
191:15.
weaker 113:9.

Wealth 29:12,
    29:24, 31:17,
    39:19, 39:22,
    41:19, 42:7,
    44:21, 44:25,
    47:19, 47:23,
    47:24, 48:1,
    48:2, 48:3,
    48:4.
wealthy 25:6.
wearing 121:20.
Wednesday 86:3,
    107:9.
week 6:24, 10:15,
    18:5, 20:9,
    51:13, 90:3,
    92:17, 115:8,
    153:8, 170:15,
    170:16.
week. 51:16.
weekend 89:4.
weekly 16:18,
    39:16, 85:3,
    100:4, 106:3.
weeks 7:17, 7:20,
    27:22, 63:15,
    130:18.
weighted 133:2,
    133:12, 133:18.
welcome 48:23,
    156:10.
well-drilling 74:7,
    75:3, 191:23.
well. 118:6,
    165:9.
wells 75:4,
    191:24.
Wharton 72:10.
Whatever 6:25,
    9:12, 13:9,
    95:11, 98:15,
    99:6, 99:9,
    99:12, 111:20,
    124:23, 125:3,
    147:2, 162:11,
    165:8, 167:7,
    167:14, 169:4,
    171:8, 190:13.
whatnot 6:17.
whatsoever 151:22,

152:8, 163:20,
    199:8.
whenever 5:3.
whereas 55:10,
    55:14.
wherein 43:5.
Whether 16:18,
    21:12, 30:19,
    32:20, 33:19,
    40:5, 47:18,
    55:20, 58:15,
    63:12, 69:15,
    73:16, 75:17,
    75:23, 82:9,
    82:10, 84:9,
    96:14, 97:1,
    98:24, 102:14,
    125:16, 135:2,
    135:25, 147:4,
    152:20, 157:18,
    172:19.
White 97:6, 97:8.
whoever 196:2,
    198:18.
whole 49:11, 56:25,
    71:21, 128:19,
    181:21, 182:6,
    191:6, 191:10,
    200:6.
whom 142:5,
    195:2.
wife 66:11,
    66:19.
William 80:10.
willing 57:1,
    115:4, 152:17,
    199:17.
willingness
    200:13.
Willner 71:17,
    165:21, 166:8,
    166:21, 167:23,
    168:13, 168:20,
    170:10, 172:11.
Wilmington 17:23.
window 98:17,
    134:12.
wire 61:12.
wired 15:13, 16:3,
    175:4.

wires 175:7.
WISE 1:27, 46:4,
    46:5, 46:7,
    107:20, 108:1,
    108:5, 108:10,
    108:14, 109:25.
wish 72:12.
withdraw 120:22,
    122:21, 122:23,
    174:19, 188:3.
Withdrawn 188:4.
within 39:17,
    39:23, 89:13,
    90:14, 146:25,
    147:1, 153:8,
    153:10, 187:1,
    187:18, 188:16,
    196:7, 198:18,
    200:18, 202:6.
Without 17:11,
    40:4, 41:16,
    124:23, 167:21,
    168:3, 181:2.
Witness 2:17, 2:18,
    2:23, 32:12,
    36:23, 50:8,
    60:13, 80:23,
    81:2, 82:25,
    142:23, 143:21,
    174:20, 200:4,
    203:27.
witnesses 66:23,
    139:16.
woeful 18:7,
    99:13.
woman 83:17,
    84:10.
Wood 37:13, 37:14,
    53:13, 62:7,
    67:20.
word 18:7, 42:21,
    42:24, 43:1,
    43:21, 43:23,
    44:13, 46:19,
    46:22, 109:23,
    188:5, 190:7,
    197:12.
word-for-word
    190:11.
wording 139:4.

words 61:18, 116:7,
   124:22, 151:4,
   153:9, 171:22,
   183:3, 189:8,
   189:24, 190:17.
work 51:14, 62:17,
   63:6, 77:20,
   78:11, 79:6,
   79:7, 83:16,
   89:21, 89:22,
   90:4, 93:7,
   97:24, 172:8,
   182:10, 191:16,
   199:14, 202:3,
   202:6.
worked 69:7, 69:19,
   84:11, 172:22,
   173:18.
worker 77:10.
workers 91:14,
   91:17, 112:11.
working 4:7, 30:9,
   34:16, 51:11,
   69:9, 74:2,
   74:20, 75:12,
   75:24, 76:1,
   83:6, 87:15,
   87:16, 89:5,
   93:12, 95:1,
   164:16, 164:17.
workmen 113:1.
works 104:12.
world 36:11, 42:17,
   64:12, 71:12,
   72:15, 74:14,
   117:17, 170:6,
   189:5, 193:3.
worry 112:4.
worse 164:21.
worsening 112:6.
worth 53:16,
   145:19, 145:24,
   166:5.
write 21:16, 87:21,
   149:4, 180:2,
   180:8.
writes 19:5, 87:21,
   96:5.
writing 121:23,
   179:1, 181:14,

   182:17, 191:3.
written 109:13,
   109:23, 115:16,
   119:14, 180:3,
   183:2, 183:13.
written. 109:17.
wrong. 100:14.
wrote 38:21, 118:7,
   139:7.
.
.
< Y >.
year 21:6, 40:24,
   76:19, 85:21,
   113:23, 191:1,
   200:19.
years 50:15, 67:2,
   75:22, 75:24,
   79:22, 95:2,
   95:6, 104:13,
   129:20, 133:2,
   133:12, 134:8,
   144:10, 144:11,
   165:12, 171:2,
   172:21, 186:16,
   186:20, 187:12,
   192:9.
yellow 84:25.
Yesterday 20:2,
   96:13, 115:21,
   116:1, 139:6,
   139:10, 147:19.
York 51:9.
you. 49:8.
young 5:2.
yourself 66:23,
   84:22, 129:11,
   150:5, 180:24.
yourselves 25:11,
   25:12, 106:9,
   106:12, 140:2,
   176:19, 176:20,
   202:15.
.
.
< Z >.
Zoldan 3:11, 3:16,
   3:25, 15:2,
   18:14, 79:5,
   79:13, 81:14,

   81:16, 81:18,
   81:21, 81:22,
   81:25, 82:3,
   82:5, 93:12,
   94:14, 106:2,
   111:9, 149:22,
   162:25, 163:6.
Zucker 165:7.